1  *Omar Qazi*

2  N.S.D.C.

3  2190 E. Mesquite Ave.

4  Pahrump, Nevada

FILED
ENTERED
SERVED
COUNSEL/PARTIES OF RECORD

FEB 2 3 2018

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:

10  **UNITED STATES DISTRICT COURT**

11  **DISTRICT OF NEVADA**

12  **\*\*\***

13  UNITED STATES OF AMERICA

14            Persecutor,

15

16           vs.

17  *Omar Qazi*

18           Accused.

19

Case No. 2:15-cr-00014-APG-VCF

**JUDICIAL NOTICE OF BAD BEHAVIOUR**

(Federal Rules of Evidence Rule 201)

20  <u>Certification</u>: This Judicial Notice is being filed timely.

21

22  COMES NOW, *Omar Qazi*, Sui Juris, by Special Appearance, hereby filing this Judicial Notice of Bad

23  Behaviour. For the reasons outlined below, I request this court to take Judicial Notice of all these facts

24  Pursuant to Federal Rules of Evidence Rule 201.

25

26

27

28

**JUDICIAL NOTICE**

1
2          This court held an evidentiary hearing on August 03, 2016 (Transcript of Proceedings – Dkt.#

3     215) (hereinafter "TOP") (**See Exhibit #1**, containing relevant portions, pgs. 70-81.) This hearing was in

4     regards to several *Miranda* Issues, and it is important to note that the government stated that they will be

5     addressing three issues at this hearing (1) the *Miranda* warnings in terms of sufficiency; (2) whether the

6     defendant needed to be re-Mirandized; and (3) general voluntariness. *See TOP, at 70-71.*

7          However, this Judicial Notice will be specifically pertaining to the issue of voluntariness, and the

8     court's intentional hinderance of a defense, without a fair opportunity to develop a full record of facts, all

9     in a clear violation of the fundamental right to Due Process, and rulings of the U.S. Supreme Court. The

10    United States Supreme Court has stated: "[W]here specific allegations before the court show reason to

11    believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . .

12    entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an

13    adequate inquiry." Bracy v. Gramley, 520 U.S. 899, 909 (1997), citing Harris v. Nelson, 394 U.S. 286,

14    300 (1969).

15          In Dkt. # 204, I had informed the court:

16          "At the recent Evidentiary Hearing regarding the *Miranda* issue, I told Ms. Waldo that I

17          wanted to testify at the Hearing and I was never asked by the Court if I wanted to testify,

18          because I would have if I was given the opportunity to do so. My testimony would have

19          proved several material facts..." Id. at 6.

20          Then in Dkt.# 228, I filed a Motion to Continue the Hearing, so that I can testify, and call

21    detective Kitchen to the stand for several reasons:

22          "I want the opportunity to testify, as it should be my right. My testimony also would have

23          provided several crucial facts..." "the evidentiary hearing should also be continued so that

24          Detective Kitchen's testimony can be heard and examined..." "Detective Kitchen's

25          testimony would also play a big role in determining my demeanor during the interrogation,

26          if I was actually in a custodial interrogation (which is explained in a separate Motion -

27          Motion to Review Stricken Docket # 174), which officers were present and if he had shown

28          me a card which had details about a firearm on it. " Id. at 2.

1    However, the Court denied these necessary facilities and procedures for an adequate inquiry. If I

2 was granted an extended evidentiary hearing in the interest of justice, the court would have considered

3 my state of mind, and Detective Kitchen's coercive tactics under the totality of circumstances, which

4 ultimately forced an involuntary admission

5    Nonetheless, I had provided an Affidavit to the court, which was attached to Dkt.# 343, at 10-11,

6 where I mentioned, *inter alia*:

7    [I]f the 9th Circuit was to somehow rule in favor of the government (which is impossible), the

8    Court must then remand to the District Court for another evidentiary hearing on whether the

9    statement was voluntary or involuntary. A waiver of Miranda rights must be voluntary,

10   knowing, and intelligent. See Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed.

11   2D 410 (1986).

12   The accused clearly briefed some of the voluntariness issues (Dkt.# 191, at 2) and attempted to

13   argue this issue at the evidentiary hearing regrding *Miranda* rights (Dkt.# 198). Nonetheless,

14   the District Court mainly specified the hearing on the sufficiency of the *Miranda* warning

15   briefed in Dkt.# 192. However, this Court must be advised that this evidentiary hearing was

16   originally held due to Dkt. #129, Dkt.# 153, and related papers.The Magistrate Judge also

17   voiced his concern at the hearing regarding the voluntariness of the statement, and the accused

18   also expected to testify on this matter, but was not given an opportunity to do so.

19   The accused also maintains that when Officer Glover originaly read the Miranda Warnings, he

20   did not reply that he understood those rights. Also, ex-detective Michael Kitchen's demeanor

21   was not only threatening but his actions were also deceptive and coercive given the totality of

22   the circumstances. First, ex-Detective Kitchen was wearing a ski mask when he interrogated

23   the accused. He was not in uniform nor did he have a badge that indicated he was an officer

24   and/or Detective. Next, the accused was taken quite a distance away from where he was

25   detained by officers; and the accused did not know who Mr. Kitchen was or what his intentions

26   were given his state of dress and the fact that the accused was pulled away from the scene near

27   an unmarked SUV at nighttime. Also, during the interrogation, Mr. Kitchen advised that the

28   decision as to whether the accused needed to go to jail rested on the "conversation" with Mr.

Kitchen. Throughout the interrogation, the accused repeatedly expressed that he did not want to go to jail. Mr. Kitchen allowed the accused to falsely believe that if he cooperated and provided a statement, he could avoid going to jail. That was never going to be the case, a fact Mr. Kitchen was fully aware of prior to the interrogation. Mr. Kitchen capitalized on the accused's fear of going to jail in order to coerce him into making incriminating statements. Furthermore, he implied a promise that if you cooperate now, it will work out for you. Mr. Kitchen then retrieved an index card from his left pocket with the details of the firearm on it and proceeded to show the accused those details and took the approach that: I know it's yours, if it's not yours it's your mother's gun.

These types of tactics were made to secure a confession through deception and coercion by also implying that if you don't confess to possessing this gun, then your mother may be charged. Therefore, even if Mr. Kitchen did not show the accused the details of the firearm, the accused still would have felt compelled to confess in those circumstances, because his will would have been overborne at that point. Law enforcement officials cannot extract a confession "by any sort of threats or violence, or ... by any direct or implied promises, however slight, or by the exertion of any improper influence." quoting Hutto v. Ross, 429 U.S. 28, 30, 97 S. Ct. 202, 50 L. Ed. 2d 194 (1976). False promises or threats may also render a confession invalid. See, e.g., Rogers v. Richmond, 365 U.S. 534, 541-45, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961) (accused's confession was coerced when it was obtained in response to a police threat to take defendant's wife into custody); Lynumn v. Illinois, 372 U.S. 528, 534, 83 S. Ct. 917, 9 L. Ed. 2d 922 (1963) (confession was found to be coerced when police officers told the accused that state financial aid for her infant children would be cut off, and her children taken from her, if she did not cooperate); Spano v. New York, 360 U.S. 315, 323, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959) (confession was found to be coerced when police officers instructed the accused's childhood friend to falsely state the accused's telephone call had gotten him into trouble, that his job was in jeopardy, and that loss of his job would be disastrous to his three children, his wife, and his unborn child).

To ensure due process, the test for determining the voluntariness of a suspect's confession is

1    whether, considering all the circumstances, the government obtained the statement by physical

2    or psychological coercion or by inducement so that the suspect's will was overcome. See

3    United States v. Coutchavlis, 260 F.3d 1149, 1158 (9th Cir. 2001) (citing Haynes v.

4    Washington, 373 U.S. 503, 513-14, 83 S. Ct. 1336, 10 L. Ed. 2D 513 (1963)). In determining

5    the voluntariness of a confession, a court "examines whether a defendant's will was overborne

6    by the circumstances surrounding the giving of a confession." Dickerson v. United States, 530

7    U.S. 428, 434, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). "The line of distinction is that at

8    which governing self-direction is lost and compulsion, of whatever nature or however infused,

9    propels or helps to propel the confession." Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.

10   Ct. 1860, 6 L. Ed. 2D 1037 (1961). "In short the true test of admissibility is that the confession

11   is made freely, voluntarily, and without compulsion or inducement of any sort." Haynes, 373

12   U.S. at 513-14.

13   A waiver of *Miranda* rights "is knowing and intelligent if, under the totality of the

14   circumstances, it is made with a full awareness of both the nature of the right being abandoned

15   and the consequences of the decision to abandon it." United States v. Rodriguez-Preciado, 399

16   F.3d 1118, 1127 (9th Cir. 2005) (citations and quotations omitted). There is a presumption

17   against waiver, and the Government bears the burden of proving a valid waiver by a

18   preponderance of the evidence. See Colorado v. Connelly, 479 U.S. 157, 168, 107 S. Ct. 515,

19   93 L. Ed. 2d 473 (1986); United States v. Bernard S., 795 F.2d 749, 751 (9th Cir. 1986). "There

20   is a presumption against waiver . . . which the Government bears the burden of overcoming by

21   a preponderance of the evidence." United States v. Crews, 502 F.3d 1130, 1139-40 (9th Cir.

22   2007). The government can satisfy this burden by "prov[ing] that, under the totality of the

23   circumstances, the defendant was aware of the nature of the right being abandoned and the

24   consequences of such abandonment." Id. at 1140. "The government's burden to make such a

25   showing is great, and the court will indulge every reasonable presumption against waiver of

26   fundamental constitutional rights." Garibay, 143 F.3d at 537 (internal quotation marks

27   omitted).

28   The reviewing court looks at "the totality of all the surrounding circumstances - both the

1   characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte,

2   412 U.S. 218, 226, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Indeed, the court should take into

3   account a multitude of factors as part of its evaluation. See, e.g., Withrow v. Williams, 507

4   U.S. 680, 693, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993) (potential circumstances to consider

5   include police coercion; the length, location, and continuity of the interrogation; the

6   defendant's maturity, education, physical condition, and mental health; and "the failure of

7   police to advise the defendant of his rights to remain silent and to have counsel present **during**

8   custodial interrogation") (emphasis added); Schneckloth, 412 U.S. at 226 (the court must

9   examine "the factual circumstances surrounding the confession, assess[] the psychological

10  impact on the accused, and evaluate[] the legal significance of how the accused reacted"). The

11  Supreme Court has observed that "[t]he application of these principles involves close scrutiny

12  of the facts of individual cases." Gallegos v. Colorado, 370 U.S. 49, 52, 82 S. Ct. 1209, 8 L.

13  Ed. 2D 325 (1962)

14  Overall, the *Miranda* warnings given were clearly insufficient under *Miranda*. Under the

15  totality of these circumstances, there is also no way that the statement was voluntary, and a full

16  evidentiary hearing would have to be conducted to decide this matter properly.

17  However, those facts provided in the Affidavit were never addressed or opposed. Additionally, at

18  the unfairly limited evidentiary hearing, the government brought up the voluntariness argument, and

19  initially, the Magistrate acted concerned about the mask covering detective Kitchen's face, when he

20  mentioned:

21  THE COURT: You know, the mask is a little disconcerting, I

22  would think; right? *TOP. at 74.*

23  Thereafter, the following argument ensues:

24  MS. MICHAEL: Correct, Your Honor. But in terms of the

25  defendant being scared or threatened --

26  THE COURT: Oh.

27  MS. MICHAEL: -- the defendant -- **we don't know the**

28  **defendant's state of mind.**

1    THE COURT: State of mind. All right. True.

2    MS. MICHAEL: So -- so what the Government is arguing is that

3    what we do have and what is required under the case law is to

4    look at the totality of the circumstances. Obviously the

5    Government's required to show that the waiver was voluntary.

6    However, if the defense is trying to say that -- I'm sorry, a

7    statement was obtained involuntarily, they have to show

8    coercion on behalf of law enforcement, and just making

9    arguments that, you know, someone felt threatened or

10   uncomfortable or didn't know if he was law enforcement or

11   not, I don't believe that's what the totality of the

12   circumstances or the evidence provided to the Court supports.

13   It is quite a high -- a high standard, Your Honor,and I do

14   have a few cases that I -- that I can note in terms, Your

15   Honor, where confession is involuntarily coerced, either by

16   physical intimidation or **psychological pressure**, which is

17   *United States vs. Haswood*, 350 F.3d 1024, 1027, Ninth

18   Circuit. "In determining whether defendant's confession was

19   voluntary, **the question is whether the defendant's will was**

20   **overborne at the time he confessed**." That's *Clark vs. Murphy*,

21   331 F.3d 1062, at 1072, Ninth Circuit. There's additional

22   quotations for that. And the -- "In the end result, **we must**

23   **consider the totality of the circumstances involved and their**

24   **effect upon the will of the defendant**," and that's *U.S. vs.*

25   *Crawford*, which is also a Ninth Circuit case that was citing

26   -- I'm sorry, *Schneckloth vs. Bustamonte* but, I guess my

27   point, Your Honor, is that just based -- based what's on --

28   what's on the record, and that's why I specifically wanted to

1    play the defendant's statement –   *TOP, at 75-76.*

2          Thereby, the government admitted that they had a high burden to show that a confession was

3    voluntary, and they clearly haven't met that burden. My testimony would have provided my "state of

4    mind," and it was required that the court "must consider the totality of the circumstances involved and

5    their effect upon the will of the defendant." See United States v. Crawford, 372 F.3d 1048, 1060 (9th Cir.

6    2004). However, the court did not consider how my will was overborne, and how the questioning

7    affected my will.

8          Nonetheless, it is quite interesting that the magistrate acknowledged *sua sponte* that there was a

9    serious issue with the questioning by Kitchen which influenced the admission, when he stated:

10          **THE COURT: I mean, it was certainly an admission that was**

11          **motivated by the questioning, but there must be a line there**

12          **in the -- in the continuum of getting someone to talk.** And,

13          you know, there's no question . . . "Your kids are in the

14          next room and I'm not going to let them out until you tell

15          me." All right. But, you know, that wasn't -- clearly not

16          that. **But it is on the continuum here. I have to give it some**

17          **serious thought.**   *TOP, at 78.*

18    Furthermore, the most disturbing part of this hearing is the following discussion:

19          MS. MICHAEL: -- and experience in the past as to whether,

20          you know, this is a law enforcement officer taking advantage

21          of let's say a juvenile, or taking advantage of someone who

22          has never had any contact with law enforcement before, or --

23          you know, or doing it down at a station house, in a more

24          custodial setting. Those are scenarios where I believe

25          courts have found that that is what pressures someone to

26          confess. Because **the whole point is, no one wants a**

27          **confession that is not -- that is not credible.**

28          THE COURT: Let me -- **let me just maybe redirect things a**

1    **little bit.**

2    MS. MICHAEL: Yes, Your Honor.

3    THE COURT: If -- of course, if I were to find that the

4    standard Miranda card that was used back then, you know,

5    doesn't comport with Ninth Circuit case law and so it wasn't

6    a good enough warning, the content of the warning was

7    defective, **then the voluntariness is no longer an issue;**

8    right? I mean, that's the end of the inquiry. **So why don't**

9    **you focus on that.**   *TOP, at 80-81.*

10    By this discussion, it is evident that the Magistrate did not want this hearing to get fully involved

11   in the voluntariness issue, and directs the attorneys to focus on the sufficiency of the Miranda warning

12   instead. Even the government was insinuating that the confession may not have been credible, and was

13   suggesting the court to inquire further on this specific matter, as required by law. Instead the magistrate

14   went beyond his judicial authority, and became a second prosecutor in violation of the law.

15    This was judicial misconduct by both of the judges in this case, by not allowing me to testify on

16   my own behalf, not knowing my state of mind, knowing well that I wanted to testify, and for not

17   continuing the hearing to have detective Kitchen testify; all of this being unfairly executed in a clear

18   violation of Due Process, and Constitutionally protected rights.

19    "The fundamental requirement of due process is the opportunity to be heard at a meaningful time

20   and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18

21   (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2D 62 (1965)).

22   Government actions which "offend the canons of decency and fairness" violate the due process

23   protection of the Constitution." Rochin v. California, 342 U.S. 165, 169, 72 S. Ct. 205, 96 L. Ed. 183

24   (1952)

25    This issue can not be ignored simply because the *Miranda* warning was deficient. The

26   government's current appeal in the Ninth Circuit based on the defective *Miranda* warning would

27   not have been pursued if the court also held my statements to be involuntary. Due to the court's

28   intentional hinderance, in violation of the Sixth Amendment to the Constitution, I was not able to

1   present these facts. I have been awaiting the government's appeal since January 04, 2017, without

2   a projected trial date; due in part, to the court's actions.

3       Additionally, the U.S. Supreme Court in United States v. Loud Hawk, 474 U.S. 302, 88 L. Ed. 2d

4   640, 106 S. Ct. 648 (1986), held that "a delay resulting from an appeal would weigh heavily against the

5   Government if the issue were clearly tangential or frivolous." Id. at 315-16. Additionally, a crucial factor

6   in *Loud Hawk* was whether the record showed "bad faith or dilatory purpose on the Government's part."

7   Id. at 316. In this case, the record clearly reflects bad faith, and a dilatory purpose on the government's

8   part.

9       These actions by the judges, demonstrates a sample of the Bad Behaviour, among the many

10  instances of this behaviour occuring in the case at hand, which are unlawful violations of the

11  Constitution for the United States of America.[1]

12                              **CONCLUSION**

13      For the reasons mentioned above, I request this court to take Judicial Notice of all these facts

14  Pursuant to Federal Rules of Evidence Rule 201, and request the Chief District Judge for the District of

15  Nevada to reassign different judges to this case, further directing a new district judge to hold an

16  evidentiary hearing on the specific voluntariness issue refrenced above.

17      I declare under penalty of perjury under the law of the State of Nevada that the foregoing is true

18  and correct, and that this document is executed without the benefit of a notary pursuant to NRS 208.165,

19  as I am a prisoner confined in a private prison within this state of Nevada.

20  Executed on February 20, 2018.

21                          Respectfully submitted,

22                          All Rights Reserved and Without Prejudice,

23                          *Omar Qazi*

24                  Signed:

25

26

27

---

[1]  "The Judges, both of the supreme and inferior Courts, *shall hold their Offices **during good Behaviour**.*" Article III,
    § 1 (emphasis added)

# EXHIBIT #1

TRANSCRIBED FROM DIGITAL RECORDING

70

1          (Proceedings resumed at 11:53:17 a.m.)

2          COURTROOM ADMINISTRATOR:  Please rise.

3          THE COURT:  Thank you.  Please be seated.

4          COURTROOM ADMINISTRATOR:  This is the conclusion of

5   USA vs. Omar Qazi, 2:15-cr-14-APG-VCF.

6          THE COURT:  Hope -- hopefully it's the conclusion.  I

7   realize that we need to talk, I guess, briefly about

8   Detective Kitchen.  Do you still think you need to call him for

9   any reason, Ms. Waldo?

10         MS. WALDO:  Not at this time, Your Honor.

11         THE COURT:  Okay.  So it is the conclusion.

12         So, as I said, the Government has the burden.  So,

13  I'll hear from the Government first on the issue of the timing

14  of the warning and also its content.

15         MS. MICHAEL:  Yes, Your Honor.

16         Your Honor, I had sort of prepared to address all

17  three.  So, as I understand it, we had the three issues in

18  front of us; the Miranda warnings in terms of sufficiency.

19  However, we've established what those warnings are.  We've

20  briefed them.  And that's really a question of law at this

21  point.  There was also --

22         THE COURT:  Sufficiency.  Okay.  Sufficiency is one.

23         MS. MICHAEL:  There was also the issue of whether the

24  defendant needed to be re-Mirandized, which, again, the

25  Government's position is that's a legal issue and I do believe

HEATHER K. NEWMAN - (702) 471-0002

TRANSCRIBED FROM DIGITAL RECORDING

71

 1 both parties argued it.  However, the Government still stands

 2 by the fact that the defense or defendant has not provided any

 3 case law to support that that was required, whereas the

 4 Government did provide case law saying --

 5          THE COURT:  Hold on.  What's the third issue then?

 6          MS. MICHAEL:  The third issue is -- is sort of the

 7 general voluntariness --

 8          THE COURT:  Voluntariness.  Oh, okay.

 9          MS. MICHAEL:  -- the Government believes.  So I guess

10 I just parsed them out to try and keep it -- the argument --

11          THE COURT:  No.  That's fine.  Let's do all three.

12 Perfect.  Yes.

13          MS. MICHAEL:  But obviously the voluntariness sort of

14 plays in to the others as well.

15          THE COURT:  Um-hmm.

16          MS. MICHAEL:  But, um . . . but, again -- yeah.

17 Again, in terms of the re-Mirandizing being required, I don't

18 believe defense has provided any case law that supports that

19 that had to have been done in this case.  But I guess,

20 Your Honor, that plays in to this -- the facts and

21 circumstances.

22          As it stands, I do believe both parties are in

23 agreement on the facts and circumstances in the sense of the

24 time frame between when the defendant received Miranda rights

25 from Officer Glover and then the time that he was interviewed

HEATHER K. NEWMAN - (702) 471-0002

TRANSCRIBED FROM DIGITAL RECORDING

72

1  by Detective Kitchen.  There is that difference in time frame.

2  The difference in location, which now has been a little more

3  explained on the record by use of the body camera footage and

4  by the witnesses, which I believe feeds into the Government's

5  argument that it wasn't a significant change in location.  It

6  wasn't a significant change in terms of who was present.

7          And just generally, in terms of there being some sort

8  of break in the time frame or the encounter the defendant was

9  having with law enforcement, again, I don't believe that there

10  have been any facts on this record to show that there was any

11  substantial break in time, location, and again, as the

12  Government had provided in the case law, even if there's a

13  change in who the defendant's speaking with, that doesn't

14  create a problem in terms of him having to be re-Mirandized by

15  the new individual.  So, Your Honor, I do believe the facts

16  that have been put forth on the record from witnesses and from

17  the evidence do support that he did not to be -- did not need

18  to be re-Mirandized.

19          Now, Your Honor --

20          THE COURT:  Hold on.  Hold on.  Hold on a minute.

21          MS. MICHAEL:  Oh, yes.  Of course.

22          THE COURT:  So, while we're on that part, I -- I was

23  trying to listen and pay attention.  You know, we certainly

24  know what time he was Mirandized.  It seems very clear that it

25  was at 1609.  That's on Exhibit 1, I think; right?

TRANSCRIBED FROM DIGITAL RECORDING

73

1             Let me see . . . 1553 was the stop and . . .

2             MS. MICHAEL:  Five lines down I do believe it says

3    1609.  That's what Officer Glover testified -- or

4    Detective Glover testified to.

5             THE COURT:  Oh, yeah.  Read Miranda 1609.

6             Now, what time did -- you know, can we pick out a

7    time when the interview started?  The transcript, you know, a

8    lot -- it says 1913 hours.

9             MS. MICHAEL:  And I did -- I did actually confer with

10   defense counsel to make sure that we were understanding.  We

11   both utilized that time frame.

12            THE COURT:  Okay.

13            MS. MICHAEL:  However, since then we've also

14   discovered that the date on there unfortunately appears to be

15   incorrect, but we were both utilizing that time frame for our

16   argument, so that's what we had both relied upon.

17            THE COURT:  You know what?  We can sort of

18   double-check to the extent this -- these Exhibits 1 and 2 are

19   in here.

20            MS. MICHAEL:  Yes.

21            THE COURT:  Let's see . . . it shows that -- looks

22   like Kitchen -- the first time his name shows up is 1854.

23   Kitchen and Rotta show up and then I -- I mean, I don't know

24   what all these codes are, but that's the first time he shows up

25   and . . . that would make about -- that would make about right.

TRANSCRIBED FROM DIGITAL RECORDING

74

1          MS. MICHAEL:  Correct.

2          THE COURT:  So I --

3          MS. MICHAEL:  And that's what defense counsel was

4    just pointing out, that it appears to be an accurate time frame

5    based on when you look at it, in connection with the CAD --

6          THE COURT:  Okay.

7          MS. MICHAEL:  -- and the unit log.

8          THE COURT:  So I'm going to find that the warning was

9    at 1609 and the interview started at 1913.  Okay.  Great.

10          Go ahead.

11          MS. MICHAEL:  And then, Your Honor, I do believe the

12   last sort of set of facts that were presented by defense

13   counsel, again, the Government was interpreting that as a

14   voluntariness argument where defense was talking about what

15   Detective Kitchen was wearing, whether he identified himself as

16   a police officer, the facts --

17          THE COURT:  You know, the mask is a little

18   disconcerting, I would think; right?  I mean, where -- what's

19   a -- you know, a citizen is arrested and then, you know, Rotta

20   shows up.  Apparently he's got the badge, so that's a little

21   reassuring but then he brings him over to some character in --

22   you know, with a -- with a -- hiding his face.  I mean, that --

23   isn't that -- wouldn't that cause you concern if you were the

24   defendant?

25          MS. MICHAEL:  Well, Your Honor, I -- perhaps.  But

TRANSCRIBED FROM DIGITAL RECORDING

75

1    the problem is there hasn't been that information placed on the

2    record, in terms -- it was just an argument.  No one is --

3           THE COURT:  No.  No.  He -- he said -- because

4    Officer -- or Officer Rotta said that it was standard practice

5    for this detective, because he was an undercover detective, he

6    had distinctive facial hair and things of that nature, that he

7    would hide his face when he would interview a witness.

8           MS. MICHAEL:  Correct, Your Honor.  But in terms of

9    the defendant being scared or threatened --

10          THE COURT:  Oh.

11          MS. MICHAEL:  -- the defendant -- we don't know the

12   defendant's state of mind.

13          THE COURT:  State of mind.  All right.  True.

14          MS. MICHAEL:  So -- so what the Government is arguing

15   is that what we do have and what is required under the case law

16   is to look at the totality of the circumstances.  Obviously the

17   Government's required to show that the waiver was voluntary.

18   However, if the defense is trying to say that -- I'm sorry, a

19   statement was obtained involuntarily, they have to show

20   coercion on behalf of law enforcement, and just making

21   arguments that, you know, someone felt threatened or

22   uncomfortable or didn't know if he was law enforcement or not,

23   I don't believe that's what the totality of the circumstances

24   or the evidence provided to the Court supports.

25          It is quite a high -- a high standard, Your Honor,

TRANSCRIBED FROM DIGITAL RECORDING

76

1    and I do have a few cases that I -- that I can note in terms,

2    Your Honor, where confession is involuntarily coerced, either

3    by physical intimidation or psychological pressure, which is

4    *United States vs. Haswood,* 350 F.3d 1024, 1027, Ninth Circuit.

5    "In determining whether defendant's confession was voluntary,

6    the question is whether the defendant's will was overborne at

7    the time he confessed."  That's *Clark vs. Murphy,* 331 F.3d

8    1062, at 1072, Ninth Circuit.  There's additional quotations

9    for that.  And the -- "In the end result, we must consider the

10   totality of the circumstances involved and their effect upon

11   the will of the defendant," and that's *U.S. vs. Crawford,* which

12   is also a Ninth Circuit case that was citing -- I'm sorry,

13   *Schneckloth vs. Bustamonte* but, I guess my point, Your Honor,

14   is that just based -- based what's on -- what's on the record,

15   and that's why I specifically wanted to play the defendant's

16   statement --

17            THE COURT:  Um-hmm.

18            MS. MICHAEL:  -- so Your Honor could hear the

19   demeanor of Detective Kitchen and the response of the

20   defendant -- I mean, there's -- there's quite a few facts that

21   support that it was not coerced.

22            THE COURT:  Um-hmm.

23            MS. MICHAEL:  The casualness of the encounter.

24   Your Honor can hear the tone of Detective Kitchen and the tone

25   of the defendant.  I mean, if he was so scared, he doesn't

TRANSCRIBED FROM DIGITAL RECORDING

77

1    scream out for help.  He doesn't say, "Who are you?  What's

2    happening?"  There's -- there's nothing to indicate that.  He's

3    been in police custody the entire time.  I mean, even based on

4    the defendant's statement himself, this is not his first

5    encounter with law enforcement.  He did ask questions of the

6    patrol units.  I'd say it would be unreasonable for anyone to

7    assume that some random person is going to show up with a mask

8    and ask them questions and then provide personal information

9    such as your date of birth, Social Security number, your ---

10   your prior criminal history.  You know, he knows he's talking

11   to a police officer.  And I think it's very clear from how he

12   responds that he's not threatened or coerced into doing

13   anything.  I understand, Your Honor, that some of the tactics

14   may not be looked upon favorably by some individuals, but none

15   of the interrogation -- none of the ways that Detective Kitchen

16   interrogated him, according to, again, case law, are a problem.

17   He didn't make --

18             THE COURT:  Well, yeah.  I -- yeah.  Because I -- I

19   think, you know, naturally when you're reading along with the

20   transcript and you're hearing the words, and there's no

21   question that the detective was a very experienced

22   interviewer/interrogator and he used his experience to motivate

23   the defendant to change his position.  Because at the beginning

24   he was saying, "No, I don't know anything about it," you know,

25   the car was maybe broken into, "I never" -- and then, of

TRANSCRIBED FROM DIGITAL RECORDING

78

1    course, at the end of the time he changed his story and

2    obviously he wouldn't have changed his story had not Detective

3    Kitchen sort of taken him down the road.  But the question is,

4    is that -- I think what you're saying, does that really amount

5    to making it an involuntary admission.

6              MS. MICHAEL:  Correct.

7              THE COURT:  I mean, it was certainly an admission

8    that was motivated by the questioning, but there must be a line

9    there in the -- in the continuum of getting someone to talk.

10   And, you know, there's no question . . . "Your kids are in the

11   next room and I'm not going to let them out until you tell me."

12   All right.  But, you know, that wasn't -- clearly not that.

13   But it is on the continuum here.  I have to give it some

14   serious thought.  So, go ahead and finish --

15             MS. MICHAEL:  Oh -- I'm --

16             THE COURT:  -- but I just want to let you know where

17   I'm going here.

18             MS. MICHAEL:  Understood, Your Honor.

19             And I think what, again, helps in terms of facts at

20   looking at that, look at where the interview took place.

21             THE COURT:  Um-hmm.

22             MS. MICHAEL:  You know, it's outside.  It's in the

23   presence of two officers.  Look at the length of the interview.

24   We're talking about 19 minutes, at most.  We're not talking

25   about hours and hours of a detective going over and over

TRANSCRIBED FROM DIGITAL RECORDING

79

 1    something.

 2            Also look at the language in the questions that are

 3    used.  Detective Kitchen doesn't particularly change anything

 4    he's asking or saying at the point that the defendant does, in

 5    fact, confess.  You know, the defendant felt strong enough or

 6    comfortable enough to deny it all the way up to about -- until

 7    about 15 minutes into the interview, and there's nothing

 8    particular that Detective Kitchen does or changes in the way of

 9    his interrogation that causes the defendant to change his

10    answer.  It's almost surprising.  You almost miss it when you

11    read the transcript --

12            THE COURT:  Well --

13            MS. MICHAEL:  -- because he just says, "How long have

14    you had the gun?" and all of a sudden he says, "Oh, I don't

15    know, two or three weeks."  I mean, there's --

16            THE COURT:  A couple of weeks.  Yeah.

17            MS. MICHAEL:  -- there's -- there's -- it really is

18    something you could almost miss if you were not specifically

19    looking for it because -- because of how the conversation

20    occurred.  So I think those are the factors that are really

21    important to look at, you know, the time frame, the questions,

22    the demeanor, the location.

23            You know, and even when he gave that response, it

24    didn't -- again, you know, the -- it's not like the detective

25    smelled blood or anything and kept asking and getting more

TRANSCRIBED FROM DIGITAL RECORDING

80

1    aggressive.  He just asked him a couple more follow-up

2    questions, you know, about the gun and continued.

3            And he didn't specifically make any promises or

4    threats.  Obviously they talk generally about individuals

5    cooperating or not cooperating.  You know, and again, this is

6    an individual -- and this is from his statement -- who has had

7    encounters with law enforcement before and throughout that

8    talks about understanding the circumstances and understanding

9    the situation.  So, that is part of the Court's analysis, it

10   can be, is the defendant's personal history --

11           THE COURT:  Um-hmm.

12           MS. MICHAEL:  -- and experience in the past as to

13   whether, you know, this is a law enforcement officer taking

14   advantage of let's say a juvenile, or taking advantage of

15   someone who has never had any contact with law enforcement

16   before, or -- you know, or doing it down at a station house, in

17   a more custodial setting.  Those are scenarios where I believe

18   courts have found that that is what pressures someone to

19   confess.  Because the whole point is, no one wants a confession

20   that is not -- that is not credible.

21           THE COURT:  Let me -- let me just maybe redirect

22   things a little bit.

23           MS. MICHAEL:  Yes, Your Honor.

24           THE COURT:  If -- of course, if I were to find that

25   the standard Miranda card that was used back then, you know,

TRANSCRIBED FROM DIGITAL RECORDING

81

1    doesn't comport with Ninth Circuit case law and so it wasn't a

2    good enough warning, the content of the warning was defective,

3    then the voluntariness is no longer an issue; right?  I mean,

4    that's the end of the inquiry.

5              So why don't you focus on that.

6              MS. MICHAEL:  On that.  Yes, Your Honor.  I can do

7    that.

8              And, Your Honor, in terms of the Miranda issue, what

9    I'd like to point out, you know, obviously I understand that

10   defense counsel has briefed this, but I do believe their

11   briefing and argument is a little bit misguided.  Miranda

12   analysis by courts, it's not a one-size-fits-all type of

13   scenario.  I think the courts have been very clear that there

14   are four rights that Miranda requires and I just -- you know,

15   Your Honor, I'm just going to read them real quickly.

16             THE COURT:  Okay.

17             MS. MICHAEL:  That the defendant has the right to --

18             THE COURT:  Take your time.

19             MS. MICHAEL:  That's okay.

20             That the defendant has the right to remain silent;

21   that anything he says can be used against him in a court of

22   law; that he has the right to the presence of an attorney; and

23   that if he cannot afford an attorney, one will be appointed for

24   him prior to any questioning if he so desires.

25             THE COURT:  Yeah, but there is that Ninth Circuit

## **Certificate of Service**

I hereby certify that on February 20, 2018, I mailed my Judicial Notice of Bad Behaviour, to the following:

Clerk of the Court
Lloyd D. George U.S. Courthouse
333 Las Vegas Blvd. South, Rm. 1334
Las Vegas, Nevada


**\*Copy of Receipt Requested\***


*Omar Qazi*
N.S.D.C.
2190 E. Mesquite Ave.
Pahrump, Nevada

Omar Qazi
N.S.D.C.
2190 E. Mesquite Ave,
Pahrump, Nevada
Zip Code Exempt (DMM 122.32)

c/o: Clerk of the Court
Lloyd D. George U.S. Courthouse.
333 Las Vegas Blvd. So. - Rm, 1334
Las Vegas, Nevada [89101]

Correspondence originated from a detention facility. The facility is not responsible for the contents herein




US POSTAGE
$01.84°
First-Class
Mailed From 89060
02/22/2018
0654 0061638671