REQUEST FOR PROSECUTION

PAGE 1 OF 2

AGENCY CASE No: 150106-2982

**SUBMITTING AGENCY**

| AGENCY: | WMPD | PHONE: | | AGENCY NOTES: |
| DETAIL: | FCB / FIREARMS | FAX: | | 2015 JAN 7 AM 7 47 |
| OFFICER: | F. BIEN | P#: | 7946 | RECEIVED |

**DEFENDANT INFORMATION**

A | NAME: QAZI, OMAR WISIM 27 | ID No: 1993576 | ARR
A | AKA: | | PAD
  | ☐ AFFIDAVIT FOR WARRANT  ☒ DECLARATION OF ARREST  ☐ REQUEST SUMMONS  ☒ SCOPE  ☐ FBI  ☐ CII | | RET

A | NAME: | ID No: | ARR
  | AKA: | | PAD
  | ☐ AFFIDAVIT FOR WARRANT  ☐ DECLARATION OF ARREST  ☐ REQUEST SUMMONS  ☐ SCOPE  ☐ FBI  ☐ CII | | RET

**DA OFFICE USE ONLY**

| CASE NO: 15F00233X  TRACK 02 | ATTY Campo | DATE |

**CHARGE INFORMATION**

| SEQ NO: | A | CHARGES | NRS | EVENT NO: | DATE / TIME | LOCATION / ZIP | VICTIM |
|---|---|---|---|---|---|---|---|
| 1 | A | OWN / POSS F/A BY PROHIBITED PERSON ☒F ☐GM ☐M | 202.360 | S/A | 1-6-15 1615 | HARMON/KOVAL LVN 89169 | NV |

ATTY NOTES: Smith & Wesson 22 SN M37231 BWBBH (NV/2015)

| 2 | A | PCS-WITH INTENT TO SELL (METH/MARIJUANA) ☒F ☐GM ☐M (X2) | 453.337 | S/A | S/A | S/A | S/A |

ATTY NOTES:
① marijuana
③ meth
Approved, but pls scrub ODUs ASAP — not in onbase!

| | | ☐F ☐GM ☐M | | | | | |

ATTY NOTES:

| | | ☐F ☐GM ☐M | | | | | |

ATTY NOTES:

DEFENDANT'S EXHIBIT 501

CLARK COUNTY DISTRICT ATTORNEY, SUBMISSION FORM No. 1A/1995
AUTOMATED BY LVMPD / FEBRUARY 1996

001

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## WITNESS LIST

AGENCY CASE NO: 150106-2982

| Wit Codes | | | | | | |
|---|---|---|---|---|---|---|
| O | NAME | J. GLOVER | | ID/P No. 13976 | | Residence |
| | SSN | | | DOB | | Employment |
| | RES | | City | State | ZIP | |
| | | Street 1 | | | | Email Address |
| | EMPL | LVMPD | | | | |
| | | Business Name / Title | | | | |
| | | Street 1 | City | State | ZIP | FAX |

| Wit Codes | | | | | | |
|---|---|---|---|---|---|---|
| O | NAME | F. BIEN | | ID/P No. 7946 | | Residence |
| | SSN | | | DOB | | 702-574-790 |
| | RES | | | | | Employment |
| | | Street 1 | City | State | ZIP | |
| | EMPL | LVMPD | | | | Email Address |
| | | Business Name / Title | | | | |
| | | Street 1 | City | State | ZIP | FAX |

| Wit Codes | | | | | | |
|---|---|---|---|---|---|---|
| O | NAME | M. KITCHENS | | ID/P No. 6474 | | Residence |
| | SSN | | | DOB | | Employment |
| | RES | | | | | |
| | | Street 1 | City | State | ZIP | |
| | EMPL | | | | | Email Address |
| | | Business Name / Title | | | | |
| | | Street 1 | City | State | ZIP | FAX |

| Wit Codes | | | | | | |
|---|---|---|---|---|---|---|
| | NAME | | | ID/P No. | | Residence |
| | SSN | | | DOB | | Employment |
| | RES | | | | | |
| | | Street 1 | City | State | ZIP | |
| | EMPL | | | | | Email Address |
| | | Business Name / Title | | | | |
| | | Street 1 | City | State | ZIP | FAX |

| Witness Codes: | V: Victim | VR: Victim Related | O: Officer |
|---|---|---|---|
| OOS: Out-Of-State | H: Hostile | DR: Defendant Related | M: Minor |

15F002333X - QAZI, OMAR          Page 2 of 13

Clark County District Attorney
Submission Form No. 2/1995

002

## LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## TEMPORARY CUSTODY RECORD

Page 1 of 1

I.D. # 1923576  Event #: 150106-2482

I.D. ESTAB. BY: SCOPE

**INTAKE NAME (AKA, ALIAS, ETC.)** Last: QAZI | First: OMAR | Middle

**TRUE NAME** Last | First | Middle

**DATE OF ARREST:** 1-6-15 | **TIME OF ARREST:** 1615

**ADDRESS:** 1880 E. Rochelle Ave | CITY: LV | STATE: NV | ZIP: 89119

**RACE:** M | **SEX:** M | **HEIGHT:** 6'2" | **WEIGHT:** 210 | **HAIR:** BL | **EYES:** BRO | Citizen Arrest: Y/N

Speak English? Yes / No

PRESENT OR LAST PLACE OF EMPLOYMENT

PLACE OF BIRTH: LA CA

**DATE OF BIRTH:** (#–Street–City–State–Zip) 1880 ROCHELLE

**LOCATION OF CRIME** | SOCIAL SECURITY # | LOCATION OF ARREST

Sector/Beat: M3 | PCN #

| BKG. CODE | CHARGE CRO / NRS # | | M | GM | F | A&R TYPE | EVENT NUMBER | WAR# / NCIC NUMBER | LV | JC | COURT DC | OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OWN & POSSESS F/A | 202.360 | A20000 | | ☒ | | PC | S/A | — | ☐ | ☒ | ☐ | ☐ |
| | BY PROHIBITED PERSON | | | | ☒ | | PC | S/A | — | ☐ | ☒ | ☐ | ☐ |
| | RES—WITS(Members) | 452.357 | #500 | | | | | | | | | | |

51960

5141

**ARREST TYPE:**

☒ PC – PROBABLE CAUSE  ☐ BS – BONDSMAN SURRENDER  ☐ BW – BENCH WARRANT  ☐ WA – WARRANT  ☐ RM – REMAND  ☐ GJI – GRAND JURY IND.

**Arresting Officer's Signature** (Print Name): J.C. BLGL  P# 7846 / LVMPD  Agency

(Print Name): D. GLOVER /13976 / LVMPD  Agency

**Transporting Officer's Signature** (Print Name)  P# Agency

FOR PROBABLE CAUSE/NCIC HIT ARREST SEE PAGE TWO FOR DETAILS.

☐ BENCH WARRANT SERVED ON
☐ WARRANT SERVED ON
☐ GRAND JURY INDICTMENT SERVED ON

TYPE OF I.D. FOR VERIFICATION: NV D.L.

**Time Stamp at BOOKING**

JAN 06 2015

OTHER COURT: ☐ ☐ ☐ ☐ ☐

APPROVAL CONTROL # FOR ADDITIONAL CHARGES:

OFFICER MUST SIGN SECOND PAGE WITH ORIGINAL SIGNATURE.

PHOTO

Date: _____  Rel. To: _____

By: _____

DATE OFFICE

Las Vegas Metropolitan Police Department

H99215

UNLAWFUL DISSEMINATION of this Restricted Information is PROHIBITED. Violation will subject the offender to Criminal and Civil liability.

(1) CENTRAL RECORDS = ORIGINAL

LVMPD 22 (REV. 6-09)

A.P. #:

003

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**DECLARATION OF ARREST**

I.D. # 199 3576

Page 1 of 1

True Name: QAZI, OMAR WASIM     Date of Arrest 1-6-15    Time of Arrest 1615

OTHER CHARGES RECOMMENDED FOR CONSIDERATION:

THE UNDERSIGNED MAKES THE FOLLOWING DECLARATIONS SUBJECT TO THE PENALTY FOR PERJURY AND SAYS: That I am a peace officer with LVMPD (Department), Clark County, Nevada, being so employed for a period of 12 years (months). That I learned the following facts and circumstances which lead me to believe that the above named subject committed (or was committing) the offense of OWN/POSS. F/A BY PROH PERS POS WITS (MBH TRANS) at the location of HARMON/KOVAL LVN 89169 (ADDRESS/CITY/STATE/ZIP) and that the offense occurred at approximately 1615 hours on the 6 day of JANUARY 2015, in the county of ☒Clark or ☐City of Las Vegas, NV.

DETAILS FOR PROBABLE CAUSE:

SEE ARREST REPORT PER LT. SMITH (FIREARMS SECTION)

Wherefore, Declarant prays that a finding be made by a magistrate that probable cause exists to hold said person for preliminary hearing (if charges are a felony or gross misdemeanor) or for trial (if charges are a misdemeanor).

**Declarant must sign second page with original signature.**

Declarant's Signature

F. BIEN
Print Declarant's Name

7946
P#

LVMPD 22-16 (Rev. 6-12)

15F00233X/02

### LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## ARREST REPORT

☐ City    ☒ County    ☒ Adult    ☐ Juvenile    Sector/Beat   **M3**

| ID/EVENT# | ARRESTEE'S NAME (Last) | (First) | (Middle) | S.S.# |
|---|---|---|---|---|
| 1993576 | Qazi | Omar | Wasim | |

| ARRESTEE'S ADDRESS | (Number, Street, City, State, Zip Code) |
|---|---|
| | 1880 Rochelle #12 Las Vegas, NV 89119 |

**CHARGES**
Own/possess gun by prohibited person, PCS Meth/Marijuana with intent to sell

| OCCURRED | DATE | DAY OF WEEK | TIME | LOCATION OF ARREST (Number, Street, City, State, Zip Code) |
|---|---|---|---|---|
| | 1-6-15 | Tue | 1553 | Harmon west of Koval Las Vegas, NV 89169 |

| RACE | SEX | D.O.B. | HT. | WT. | HAIR | EYES | PLACE OF BIRTH |
|---|---|---|---|---|---|---|---|
| H | M | | 6'2" | 210 | Blk | Bro | |

| ARRESTING OFFICER #1: | P#: | ARRESTING OFFICER #2: | P#: |
|---|---|---|---|
| F. Bien | 7946 | | |

**CONNECTING REPORTS** (Type or Event Number)
150106-2982; Felony arret packet, Judgment of Convictions

APPROVED BY (PRINTED NAME):     B. Wolfenbarger P# 5980

**CIRCUMSTANCES OF ARREST:**

Detectives Involved:
F. Bien P# 7946
M. Kitchen P# 6474

Sergeant Involved:
B. Wolfenbarger P# 5980

Officer Involved:
J. Glover P# 13976

Location:
Harmon west of Koval
Las Vegas, NV 89169

Suspect/Arrestee:
Qazi, Omar
ID# 1993576

Vehicle:
Gold 1995 Saturn SL1
NV/ 916-ARL
VIN: 1G8ZH5281SZ394827

LVMPD 602 (Rev, 5/18/11) WORD 2010

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/EVENT #:     1993576

**Firearm:**
Black revolver with brown wood handles and 6 rounds of ammunition.
Make: Smith and Wesson
Model: 34-1
Serial Number: M37231
Caliber: .22 LR
Barrel: 4 inches
Made: USA

**Narrative:**
On 1-6-14 at 1553 hours, Officer J. Glover operating as marked patrol unit 7M13 was traveling west on Harmon at the East 370 block. A gold Saturn bearing NV/916-ARL pulled out of the Harbor Island apartments onto Harmon to go west. The vehicle failed to yield right of way and the officer had to slam on his brakes to avoid an accident. The officer decided to initiate a traffic stop by activating his overhead red/blue emergency lights. The vehicle came to a stop on Harmon just west of Koval. Once Officer Glover approached the driver's side window he detected an odor of Marijuana emitting from the vehicle. The driver and sole occupant was asked to exit the vehicle and surrender his driver's license. The driver was identified as Omar Qazi, ID# 1993576. Due to the fact there was an odor of Marijuana coming from inside the vehicle, Officer Glover then conducted a Probable Cause vehicle search in an attempt to locate the Marijuana contraband. In the center console there was an ashtray that was loose. The ashtray was lifted up very easily and underneath there was a bag of what appeared to be Marijuana, Crystal Meth, and a black revolver firearm. The narcotics were recovered; however the firearm was left in place to preserve DNA evidence.

A records check of Qazi was conducted and it was determined that he is a convicted felon out of Nevada for Battery with Substantial Bodily Harm in 2012. Qazi was placed in handcuffs and under arrest at that time by Officer Glover and the Firearms Investigation Unit was notified. Upon my arrival I received a full brief of the incident from Officer Glover and applied for a Telephonic Search warrant to recover the Firearm and a DNA sample. The warrant was approved by the Honorable C. Hafen at 1803 Hours. ████████████████████
████████████████████████████ At 1815 hours, I obtained the DNA sample from Qazi, and then recovered the firearm. The firearm barrel was facing forward laying on its side with the trigger and handle facing the passenger seat. The firearm was in a position that it could have easily been placed there by the driver while the vehicle was in motion and before it came to a stop. Digital photos of the vehicle and firearm were taken by Detective Kitchen in my presence. I recovered the firearm forensically sound using fresh latex gloves to preserve any DNA that would have been left on the firearm. The firearm was determined to be a Smith and Wesson, .22 revolver with six rounds of live ammunition in the cylinder and a serial number of M37231.

I then obtained the narcotics from Officer Glover. Both the Marijuana and Methamphetamine were field tested positive back at Headquarters by myself in the presence of Detective Kitchen. The narcotics were packaged as follows:

**Marijuana:**
1 small baggie weighing .7 grams gross
1 small baggie weighing .8 grams gross
1 medium baggie weighing 2.6 grams gross          Total gross weight = 4.1 grams gross

Page 2 of 3

006

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/EVENT #:  **1993576**

Methamphetamine:
1 small baggie weighing .4 grams gross
1 small baggie weighing .4 grams gross          Total gross weight = 1.2 grams gross
1 small baggie weighing .4 grams gross

Due to the fact that Qazi is a convicted felon ████████████████████████ he was booked for
one count of Own/possess gun by prohibited person. Furthermore, based on my training and experience and
several narcotic type arrests that I have made in the past, it is probable that the narcotics was packaged in
such a way that it would be reasonable to show it was for sale and not personal use. Even though Qazi would
not admit knowledge of the narcotics, it is reasonable that he knew the narcotics were there because the
firearm was underneath the narcotics.

Both the firearm and narcotics were impounded at Headquarters and the Judgment of Conviction for Qazi was
faxed to CCDC records to be included in the Felony Arrest Packet.

Page 3 of 3

007

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# ARREST REPORT
## "PRINT"

☐ City   ☒ County   ☒ Adult   ☐ Juvenile   Sector/Beat   M3

"Click to Enter/Change Event or ID Number"

| ID/EVENT# | ARRESTEE'S NAME (Last) | (First) | (Middle) | S.S.# |
|---|---|---|---|---|
| 150106-2982 | Qazi | Omar | Wasim | |

| ARRESTEE'S ADDRESS | (Number, Street, City, State, Zip Code) |
|---|---|
| | 1880 Rochelle #12 Las Vegas, NV 89119 |

**CHARGES**
Own/possess gun by prohibited person, PCS Meth/Marijuana with intent to sell

| OCCURRED | DATE | DAY OF WEEK | TIME | LOCATION OF ARREST (Number, Street, City, State, Zip Code) |
|---|---|---|---|---|
| | 1-6-15 | Tue | 1553 | Harmon west of Koval Las Vegas, NV 89169 |

| RACE | SEX | D.O.B. | HT. | WT. | HAIR | EYES | PLACE OF BIRTH |
|---|---|---|---|---|---|---|---|
| H | M | | 6'2" | 210 | Blk | Bro | |

| ARRESTING OFFICER #1: | P#: | ARRESTING OFFICER #2: | P#: |
|---|---|---|---|
| F. Bien | 7946 | | |

| CONNECTING REPORTS (Type or Event Number) |
|---|
| Felony arret packet, Judgment of Convictions |

APPROVED BY (PRINTED NAME):   B. Wolfenbarger P# 5980

CIRCUMSTANCES OF ARREST:

Detectives Involved:
F. Bien P# 7946
M. Kitchen P# 6474

Sergeant Involved:
B. Wolfenbarger P# 5980

Officer Involved:
J. Glover P# 13976

Location:
Harmon west of Koval
Las Vegas, NV 89169

Suspect/Arrestee:
Qazi, Omar
ID# 1993576

Vehicle:
Gold 1995 Saturn SL1
NV/ 916-ARL
VIN: 1G8ZH5281SZ394827

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/EVENT #: __150106-2982__

**Firearm:**
Black revolver with brown wood handles and 6 rounds of ammunition.
Make:  Smith and Wesson
Model:  34-1
Serial Number: M37231
Caliber: .22 LR
Barrel: 4 Inches
Made: USA

**Narrative:**
On 1-6-14 at 1553 hours, Officer J. Glover operating as marked patrol unit 7M13 was traveling west on Harmon at the East 370 block. A gold Saturn bearing NV/916-ARL pulled out of the Harbor Island apartments onto Harmon to go west. The vehicle failed to yield right of way and the officer had to slam on his brakes to avoid an accident. The officer decided to initiate a traffic stop by activating his overhead red/blue emergency lights. The vehicle came to a stop on Harmon just west of Koval. Once Officer Glover approached the driver's side window he detected an odor of Marijuana emitting from the vehicle. The driver and sole occupant was asked to exit the vehicle and surrender his driver's license. The driver was identified as Omar Qazi, ID# 1993576. Due to the fact there was an odor of Marijuana coming from inside the vehicle, Officer Glover then conducted a Probable Cause vehicle search in an attempt to locate the Marijuana contraband. In the center console there was an ashtray that was loose. The ashtray was lifted up very easily and underneath there was a bag of what appeared to be Marijuana, Crystal Meth, and a black revolver firearm. The narcotics were recovered; however the firearm was left in place to preserve DNA evidence.

A records check of Qazi was conducted and it was determined that he is a convicted felon out of Nevada for Battery with Substantial Bodily Harm in 2012. Qazi was placed in handcuffs and under arrest at that time by Officer Glover and the Firearms Investigation Unit was notified.  Upon my arrival I received a full brief of the incident from Officer Glover and applied for a Telephonic Search warrant to recover the Firearm and a DNA sample.  The warrant was approved by the Honorable C. Hafen at 1803 Hours. █████████████████████████████████████████████████████████████████████████████████ At 1815 hours, I obtained the DNA sample from Qazi, and then recovered the firearm.  The firearm barrel was facing forward laying on its side with the trigger and handle facing the passenger seat.  The firearm was in a position that it could have easily been placed there by the driver while the vehicle was in motion and before it came to a stop.  Digital photos of the vehicle and firearm were taken by Detective Kitchen in my presence.  I recovered the firearm forensically sound using fresh latex gloves to preserve any DNA that would have been left on the firearm.  The firearm was determined to be a Smith and Wesson, .22 revolver with six rounds of live ammunition in the cylinder and a serial number of M37231.

I then obtained the narcotics from Officer Glover.  Both the Marijuana and Methamphetamine were field tested positive back at Headquarters by myself in the presence of Detective Kitchen.  The narcotics were packaged as follows:

**Marijuana:**
1 small baggie weighing .7 grams gross
1 small baggie weighing .8 grams gross          Total gross weight = 4.1 grams gross
1 medium baggie weighing 2.6 grams gross

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/EVENT #:     **150106-2982**

Methamphetamine:
1 small baggie weighing .4 grams gross
1 small baggie weighing .4 grams gross          Total gross weight = 1.2 grams gross
1 small baggie weighing .4 grams gross

Due to the fact that Qazi is a convicted felon ███████████████████████ he was booked for
one count of Own/possess gun by prohibited person.  Furthermore, based on my training and experience and
several narcotic type arrests that I have made in the past, it is probable that the narcotics was packaged in
such a way that it would be reasonable to show it was for sale and not personal use.  Even though Qazi would
not admit knowledge of the narcotics, it is reasonable that he knew the narcotics were there because the
firearm was underneath the narcotics.

Both the firearm and narcotics were impounded at Headquarters and the Judgment of Conviction for Qazi was
faxed to CCDC records to be included in the Felony Arrest Packet.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# OFFICER'S REPORT

"Click to Edit Event# on ALL Pages"          Event #:   **150106-2982**

"Click to Edit Date/Time of Report"          *"PRINT"*

Search Warrant Service

SUBJECT

| DIVISION REPORTING: | Firearms Investigation Unit | DIVISION OF OCCURRENCE: | Convention Center Area Command |
|---|---|---|---|
| DATE & TIME OCCURRED: | 1-6-15 / 1553 Hours | LOCATION OF OCCURRENCE: | Harmon west of Koval, Las Vegas, NV |

NARRATIVE:

**Detectives Involved:**
F. Bien P# 7946
M. Kitchen P# 6474

**Officer Involved:**
J. Glover P# 13976

**Sergeant Approving Warrant:**
B. Wolfenbarger P# 5980

**DA Approving Warrant:**
Lynn Robinson

**Judge Approving Warrant:**
Honorable C. Hafen

**Location:**
Harmon west of Koval
Las Vegas, NV 89169

**Suspect/Arrestee:**
Qazi, Omar
ID# 1993576

**Vehicle:**
Gold 1995 Saturn SL1
NV/ 916-ARL
VIN: 1G8ZH5281SZ394827

| Date and Time of Report: | 1-7-15 / 1250 | Officer: | F. Bien | P#: | 7946 |
|---|---|---|---|---|---|
| Approved By: | B. Wolfenbarger P# 5980 | Officer: | | P#: | |

SIGNATURE:

LVMPD 82 (Rev.8/01) - WORD 2010                                          Page 011

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION

Event #: ___150106-2982___

**Firearm:**
Black revolver handgun with brown wood handles and 6 rounds of ammunition.

Make: Smith and Wesson          Caliber: .22 LR
Model: 34-1                     Barrel: 4 inches
Serial Number: M37231           Made: USA

**Property Impounded:**
See property report

**Property recovery phase:**
Once the warrant was approved by Judge Hafen at 1803 hours, Detective Kitchen took overall photographs of the vehicle and firearm that was still in the center console. I then obtained the DNA swab at 1815 hours from Qazi who was in custody in the back of the marked patrol unit. Once the sample was obtained, I pulled the firearm from the vehicle and had Detective Kitchen take close up photographs to show the make model and serial number. The firearm was obtained forensically sound using a fresh pair of latex gloves to preserve DNA evidence. The firearm had six live round of .22 ammunition in the cylinder. After the firearm was recovered the vehicle was searched for any other evidence that was included in the items sought to be seized in my search warrant. There were no other items of evidentiary value found in the vehicle.

The narcotics were previously recovered by Officer Glover and were already removed from the vehicle prior to my arrival. The narcotics were recovered from Officer Glover and brought back to Headquarters where they were tested and weighed. Both the firearm and narcotics were impounded as evidence at Headquarters.

The illegal narcotics were as follows:

Marijuana:
1 small baggie weighing .7 grams gross
1 small baggie weighing .8 grams gross          Total gross weight = 4.1 grams gross
1 medium baggie weighing 2.6 grams gross


Methamphetamine:
1 small baggie weighing .4 grams gross
1 small baggie weighing .4 grams gross          Total gross weight = 1.2 grams gross
1 small baggie weighing .4 grams gross

**Vehicle Disposition:**
After the service of the search warrant, the Duplicate Original Search Warrant and Return were left in the passenger seat of the Saturn and photographed in place. The vehicle was then released to Qazi's girlfriend at his request. Her name is Crystal Clamenza, DOB: ▓▓▓▓▓ Driver's license number ▓▓▓▓▓▓▓▓. I had to leave the scene, so the patrol officer handled the release of the vehicle.




LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# MARIJUANA
## PRELIMINARY FIELD TEST CHECKLIST AND RESULTS

| Subject QAZI, OMAR | | Event # 150106 · 2982 | |
|---|---|---|---|
| ID# 1993576 | Date 01·06·15 | Pkg # 03 | Item # 03 |
| Examiner F. BIEN | | P# 7946 | Date Certified X—2003 |

**EXAMINER SHALL READ, PERFORM, AND CHECK EACH APPLICABLE STEP**

WEIGHT: 4.1 _____ grams / ☐ NET ☑ GROSS (check one)   Lot #: 252.586/2

☑ 1. Officer's opinion based upon circumstances of seizure and appearance of substance indicates marijuana.

☑ 2. Hold test kit so that writing on kit faces operator in a readable position.

☑ 3. Check that all three ampoules within the kit are intact.

☑ 4. Remove plastic clip, open kit, and insert sample using uncontaminated instrument.

☑ 5. Replace plastic clip, closing kit.

☑ 6. With the printed side of the test pack facing you, break the first (left) ampoule.

☑ 7. Agitate sample gently for at least one full minute.

☑ 8. Observe no color or slight "straw yellow" field.

☑ 9. Break clear middle ampoule, and agitate gently.

☑ 10. Observe possible initial "light flash green" color for 1-2 seconds followed by blue-violet (purple) color. If no blue-violet (purple) color after 2 minutes, stop test, go to step 15.

☑ 11. Break remaining clear ampoule.

☑ 12. Agitate sample gently until color layers separate.

☑ 13. Observe two levels of color, upper level gray-blue, lower level blue-violet (purple).

☑ 14. Result **POSITIVE** for marijuana.   OR   ☐   15. Result **INCONCLUSIVE** for marijuana.

**SIGNATURES**

| Signature   FB 7946 | Witness   M 6474 |
|---|---|

· LVMPD 157 (REV. 4-10)   DISTRIBUTION: WHITE · RECORDS   YELLOW · NARCOTICS   PINK · PLACE INSIDE EVIDENCE BAG

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# ODV FIELD TESTS FOR METHAMPHETAMINE
## CHECKLISTS AND RESULTS

| Subject QAZI, OMAR | | Event # 150106-2982 | |
|---|---|---|---|
| ID # 1993576 | Date 01.06.15 | Pkg # 04 | Item # 04 |
| Examiner F. BIEN | | P# 7946 | Date Certified 8-2003 |

**EXAMINER SHALL READ, PERFORM, AND CHECK EACH APPLICABLE STEP**

WEIGHT: 1.0 grams / ☐ NET ☑ GROSS (check one)

| MARQUIS REAGENT | METHAMPHETAMINE REAGENT |
|---|---|
| ☑ 1. Lot # of Marquis Reagent 1674132 | ☑ 1. Lot # of Methamphetamine Reagent 2529621 |
| ☑ 2. The physical appearance of the evidence is consistent with illicit methamphetamine and is not a tablet, capsule, or liquid. | ☑ 2. Result of Marquis Reagent indicates sample may contain methamphetamine. |
| ☑ 3. Hold the pouch such that writing faces the operator. Backing of pouch is white. | ☑ 3. Hold the pouch such that writing faces the operator. Backing of pouch is white. |
| ☑ 4. Examine the ampule. It is intact and the liquid is colorless. | ☑ 4. Examine the ampules. There are 3 intact ampules. Reading from left to right, the liquids are colorless, light tan, and colorless. |
| ☑ 5. Remove the clip. | ☑ 5. Remove the clip. |
| ☑ 6. Insert a small amount of sample using an uncontaminated instrument. | ☑ 6. Insert a small amount of sample using an uncontaminated instrument. |
| ☑ 7. Replace the clip and tap the pouch to drive the sample to the bottom. | ☑ 7. Replace the clip and tap the pouch to drive the sample to the bottom. |
| ☑ 8. Break the ampule. Agitate pouch. | ☑ 8. Break the left ampule. Agitate pouch. Break the middle ampule. Agitate pouch. Break the right ampule. Agitate pouch. |
| ☑ 9. Observe for a color change. | ☑ 9. Observe for a color change. |
| ☑ 10. Development of an orange color that changes to brown within 12 seconds: the sample may contain methamphetamine. Proceed to Methamphetamine Reagent. | ☑ 10. Immediate development of a dark blue or blue-violet color: test is positive for methamphetamine. |
| ☐ 11. Any other color reaction: result is inconclusive for methamphetamine. Terminate testing. | ☐ 11. Any other color reaction: result is inconclusive for methamphetamine. |

**SIGNATURES**

| Signature _____ 7946 | Witness _____ 6474 |
|---|---|

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**PROPERTY REPORT**

| Date of LVMPD Possession | Time of LVMPD Possession | Page(s) |
|---|---|---|
| 01/06/15 | 1815 | 1 OF 1 |

Event # 1 5 0 1 0 6 - 2 9 8 2

**Incident:** SEARCH WARRANT

**EVIDENCE**
☒ Felony   ☐ Gross Misd   ☐ Misdemeanor
List Other Related Event #'s (if any):

☐ **NO EVIDENTIARY Value:**
☐ No Owner Identified
☐ Destroy
☐ Return To DMV

☐ **SAFEKEEPING**
Must provide Owner info in Persons Section AND Identify Owner # for each item Listed

**FIREARM IMPOUNDED DUE TO:**
☐ Temporary Protective Order (TPO)
☐ Extended Order of Protection

Task Force Officers from Other Jurisdictions:
PRINT LVMPD SGT Name & P#

| Impounding Officer (Print Name): F. BIEN | Unit: FAZ | P# / Initials: F7946B |
|---|---|---|
| Supervisor Approving (Signature): A. WOLFENBARGER | Unit: G636FA | P# / Initials: A5980W |

**PERSONS - (S)USPECT / (V)ICTIM / (O)WNER / (F)INDER**

| SO ☐ OO ☐ VO ☐ FO ☐ # | Last Name: QAZI | First Name, MI: OMAR, W | DOB: 11-9-87 | Phone #: — | Charge(s): PPD F/A |
|---|---|---|---|---|---|
| Street Address: 1880 ROCHELLE | City: LV | State: NV | Zip Code: | Arrest Date: 01/06/15 | ID#: 1993576 |

| SO ☐ OO ☐ VO ☐ FO ☐ # | Last Name: | First Name, MI: | DOB: | Phone #: | Charge(s): |
|---|---|---|---|---|---|
| Street Address: | City: | State: | Zip Code: | Arrest Date: | ID#: |

| SO ☐ OO ☐ VO ☐ FO ☐ # | Last Name: | First Name, MI: | DOB: | Phone #: | Charge(s): |
|---|---|---|---|---|---|
| Street Address: | City: | State: | Zip Code: | Arrest Date: | ID#: |

**FIELD RELEASE ONLY**

| Released Item(s) # | By Officer P# & Initials | Date Released | Released to Owner (Above Person) # | Owner's Signature |
|---|---|---|---|---|

(Relating to Impound) BELOW ITEMS RECOVERED DURING SERVICE OF SEARCH WARRANT UNDER ABOVE EVENT.

| PKG # | ITEM # | OWNER # | Make or Brand | MODEL | COLOR | Serial # / OAN State & Gov. Issued ID #'s | Qty. | PROPERTY DESCRIPTION *If firearms MUST list: 1) Barrel Length 2) Country Made/Importer 3) Caliber 4) Action Type (S/A, Auto, Bolt, Revolver, Etc.) |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | — | — | — | — | 1 | BUCCAL SWAB FOR OMAR QAZI ID#1993576 |
| 2 | 2 | 1 | S&W | 34-1 | BLK/ PRD | M37231 | 1 | 4" BARREL, USA, .22LR, REVOLVER & AMMO |
| 3 | 3 | 1 | — | — | — | — | — | 4.1 GRAMS OF ODU POS MARIJUANA W/ TEST SHEET |
| 3 | 4 | 1 | — | — | — | — | — | 1.2 GRAMS OF ODU POS METHAMPHETAMINE W/ TEST SHEET |

LVMPD 87-A (Rev. 3/12)   ↑ Corresponds to # Listed in PERSONS section (Suspect / Victim / Owner / Finder)

Distribution: White: Records/Onbase | Yellow: Evidence Vault | Pink: Citizen

015

Event Number: _150106-2982_

## LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## DUPLICATE ORIGINAL SEARCH WARRANT
### NRS 179.045

STATE OF NEVADA )
                ) ss:
COUNTY OF CLARK )

    The State of Nevada, to any Peace Officer in the County of Clark, Proof having been made before me by Detective _F. BIEN 7946_, by oral statement given under oath, that there is probable cause to believe that certain evidence, to wit:

1. Any and all firearms, to include but not limited to _BLACK REVOLVER_.
2. All Firearms related accessories to include but not limited to holsters, cleaning kits, gun parts, magazines, and ammunition.
3. Receipts for ammunition, firearms and firearm accessories.
(4) _EPETHELIAL CELLS FROM THE MOUTH OF OMAR_ _QAZI ID # 1993576 TO BE COLLECTED VIA BUCCAL SWAB._
( ) _____
( ) _____
( ) _____
(5). Articles of personal property which would tend to establish the identity of persons in control of said premises or in control of specific areas within the premises where items set forth above are located such as; canceled mail envelopes, rental agreements and receipts, utility bills, vehicle registration.
(6). Items which tend to show a possessory interest in the items sought such as photographs, undeveloped film, digital media storage devices, diaries or letters.

Are presently located at:

(1) _GOLD 1995 SATURN SL1 BEARING NV PLATE 916-ARL WITH A UNIQUE VIN # 1G8ZH528152394807. THE VEHICLE IS CURRENTLY PARKED AND UNOCCUPIED ON HARMON WEST BOUND, JUST WEST OF KOVAL, CLARK COUNTY LAS VEGAS NEVADA._

(2) _BODY OF OMAR QAZI ID# 1993576, FURTHER DESCRIBED AS A HISPANIC MALE, 6'2" TALL, 210 POUNDS WITH BLACK HAIR AND BROWN EYES. QAZI IS CURRENTLY IN CUSTODY AT HARMON WEST OF KOVAL._

Page 2 of 2

Event Number: 15010<u>6- 2982</u>

and I am satisfied that there is probable cause to believe that said property is located as set forth above and that based upon the oral statement of Detective <u>F. BIEN    7941</u>, that there is sufficient grounds for the issuance of the Search Warrant.

You are hereby commanded to search forthwith said premises for said property, serving this warrant at (any hour of the day or night *or* between the house of 0700 hours and 1900 hours), and if the property is there to seize it, prepare a written inventory of the property seized and make a return to me within ten days.

DATED this <u>10</u> day of <u>JANUARY</u>, 2014 at <u>5  1803</u> hours.

Judge's name (affixed by officer) <u>C. HAFEN</u>.

Signed by <u>FB. / F. BIEN</u>     P# <u>7941</u>, acting upon oral authorization of Judge <u>C. HAFEN</u>.

Witnessed by <u>J. GLOVER</u>     P# <u>13976</u>.

Endorsed this ___ day of _____, 2014.

_____

Judge
**(TO BE AFFIXED BY JUDGE)**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## APPLICATION FOR TELEPHONIC SEARCH WARRANT

EVENT #: LLV150106002982

**The following is the transcription of the recorded Application for Search Warrant between affiant, Detective Frank Bien (FB), and Judge Conrad Hafen (CH).**

FB:     LVMPD Event Number 150106-2982. Judge Hafen, for the record, this line is being recorded, do I have your permission to continue?

CH:     Yes.

FB:     This is Detective F., as in Frank, Bien, Baker-Ida-Easy-Nora, P Number 7946 of the Firearms Investigation Section, and I am making an application for a Telephonic Search Warrant pursuant to NRS 179.045. I am talking to Judge Hafen. The date is 1/6/15, and the time of this call is 1756 hours. Judge Hafen, my right hand is raised, could you please swear me in?

CH:     Okay, do you swear that the facts and information you're about to present are true and correct to the best of your ability, so help you God?

FB:     I do.

CH:     Okay, proceed.

FB:     Judge Hafen, my application is as follows. I, Detective F. Bien, P Number 7946 am employed by the Las Vegas Metropolitan Police Department and have been so employed for a period of 12 years. I am currently assigned to the Firearms Investigation Unit and I have been assigned to this detail for 2 years. I am presently investigating the crime of Own/Possess Gun by a Prohibited Person, which occurred at Harmon, just west of Koval, Las Vegas, Clark County, Nevada, on or about 1553 hours on the 6th Day of January, 2015. That there is probable cause to

Page 1

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## APPLICATION FOR TELEPHONIC SEARCH WARRANT

EVENT #: LLV150106002982

believe that certain property hereinafter described will be found at the following described premises, to-wit:

1. Gold 1995 Saturn SL1, bearing Nevada plate 916-Adam-Robert-Lincoln, with a unique VIN Number 1-George-8-Zebra-Henry-5281-Sam-Zebra-394827. The vehicle is currently parked and unoccupied on Harmon westbound, just west of Koval, Clark County, Las Vegas, Nevada.

2. Body of Omar Qazi, spelled Q-A-Z-I, ID Number 1993576, further described a Hispanic male, six-foot – two inches tall, 210 pounds, with black hair and brown eyes. Qazi is currently in custody at Harmon, west of Koval.

The property referred to and sought to be seized consists of the following:

1. Any and all firearms to include, but not limited to, a black revolver.

2. All firearms-related accessories to include, but not limited to, holsters, cleaning kits, gun parts, magazines, and ammunition.

3. Receipts for ammunition, firearms, and firearm accessories.

4. Epithelial cells from the mouth of Omar Qazi, ID Number 1993576, to be obtained via buccal swab.

5. Articles of personal property which would tend to establish the identity of person in control of said premises or in control of specific areas within the premises where items set forth above are located, such as cancelled mail envelopes, rental agreements and receipts, utility bills, and vehicle registration.

Page 2

019

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## APPLICATION FOR TELEPHONIC SEARCH WARRANT

EVENT #: LLV150106002982

6. Items which would tend to show a possessory interest in the items sought, such as photographs, undeveloped film, digital media storage device, diaries, or letters.

The items sought to be seized constitute evidence which would tend to show the identity of persons responsible for the crime of Own/Possess Gun by a Prohibited Person as set forth in this affidavit. In support of the assertion to constitute the existence of probable cause, the following facts are offered. On 1/6/2015 at 1553 hours, Officer J. Glover, spelled G-L-O-V-E-R, P Number 13976, operating as marked patrol unit 7-Mary-13, was travelling west on Harmon at the 370 block. A gold Saturn bearing Nevada license plate 916-Adam-Robert-Lincoln failed to yield right of way when pulling out of a private drive, causing the officer to slam on his brakes to avoid an accident. A vehicle stop was conducted on Harmon, just west of Koval. Upon approaching the driver and sole occupant, the officer could detect an odor of marijuana emitting from the vehicle. The driver was asked to step out of the vehicle, and he was identified as Omar Qazi, ID Number 1993576 by his Nevada driver's license. A probable cause vehicle search was conducted based on the odor of marijuana. Officer Glover found marijuana, methamphetamines, and a black revolver in the center console under the ashtray. The illegal narcotics were removed; however, the firearm was left in place to preserve DNA evidence. A records check of Qazi indicated that he is a convicted felon out of Nevada in 2012 for Battery with Substantial Bodily Harm. Due to the fact that prohibited persons

Page 3

020

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## APPLICATION FOR TELEPHONIC SEARCH WARRANT

EVENT #: LLV150106002982

such as ex-felons cannot legally purchase or sell firearms through legitimate commerce, firearms such as the above-listed sought-after items become extremely valuable possessions to prohibited persons. Prohibited subjects then tend to keep these coveted firearms for long periods of time. They also tend to collect accessories to the firearms. Items such as holsters, cleaning kits, extra magazines, ammunitions, and firearm parts are often found in the offender's property. Because of their prohibited status, offenders often keep these items close to them in their vehicle to prevent inadvertent discovery. Due to the nature of the sought items, they would be extremely valuable in proving the State's case of Prohibited Person in Possession of Firearm. Based on the above-described facts and circumstances, your affiant has probable cause to believe that his DNA may be found on the evidence. During your affiant's professional training and experience, your affiant has conducted and assisted in dozens of investigations involving firearms. During these investigations, your affiant has learned that suspects can leave DNA on items that they touch while engaging in illegal activity. Also, your affiant knows that prohibited persons such as ex-felons know not to possess firearms, and a reasonable person would believe that they would possess a firearm to engage in criminal activity. Your affiant is therefore seeking court authorization to obtain epithelial cells from the mouth of Omar Qazi, ID Number 1993576, to be collected via a buccal swab in a medically acceptable manner for further testing and analysis. Furthermore, the samples collected may be compared

Page 4

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## APPLICATION FOR TELEPHONIC SEARCH WARRANT

EVENT #: LLV150106002982

with any DNA samples that may be recovered from the processing of the black revolver. In my experience, it is possible, though rare, that subjects of this search may refuse to cooperate in the manner necessary to collect the biological evidence pursuant to this warrant. I therefore request that, if necessary, I and/or other police officers may use the minimum amount of force necessary to restrain the subject and obtain the sample in the safest and most humane manner possible. Judge Hafen, this ends the probable cause details. Do you want me read to the duplicate original search warrant?

CH:  No.

FB:  Judge Hafen, this ends the search warrant portion. Judge Hafen, do you find probable cause exists for the issuance of a search warrant?

CH:  Yes.

FB:  Do I have your permission to affix your name to the duplicate search warrant?

CH:  Yes.

FB:  This application and signing of the search warrant was witnessed by Officer J. Glover, P Number 13976. Judge Hafen, this ends our conversation. Thank you for your time.

CH:  Okay, thank you.

FB:  Have a wonderful day.

CH:  Alright, thanks.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## APPLICATION FOR TELEPHONIC SEARCH WARRANT

EVENT #: LLV150106002982

This transcription has been typed by Joseph Belmonte, P# 14991, on January 7th, 2015 at 1320 hours and is true and accurate.

Transcriber's Signature, P#

I, Frank Bien, P# 7946, having reviewed this transcription, affirm that it is true and correct.

Detective Signature, P#

Certification:

Having read the transcription of the recorded application for the telephonic search warrant issued by this court on January 6th, 2015, under Event 150106-2982, with Detective F. Bien as Affiant, and having reviewed the application, it appears that the transcription is accurate.

Judge's Signature

023

150106-2982

Page __1__ of __1__

## RETURN

(Must be made within 10 days of issuance of Warrant)

The Search and Seizure Warrant authorizing a search and seizure at the following described location(s):

① GOLD 1995 SATURN SL1, NV PLATE 916-ARL, VIN #1G8ZH5281SZ349827

② BODY OF OMAR QAZI ID#1993576, HISPANIC MALE, 6'2", 210 LBS

PRESENTLY LOCATED AT HARMON WEST OF KOVAL, LAS VEGAS, NV 89169.

was executed on __01/06/15__

(month, day, year)

A copy of this Inventory was left with __AT PLACE OF SEARCH__

(name of person or at the place of search)

The following is an inventory of property taken pursuant to the warrant:

— BUCCAL SWAB FOR OMAR QAZI ID#1993576

— REVOLVER, SERIAL NUMBER M37231

This inventory was made by: __F. BIEN P#7946__

__M. KITCHEN P#6474__

(at least two officers including affiant if present. If person from whom property is taken is present include that person.)

LVMPD 718 (REV. 6-04)

024

00020564
01/21/2015

Notes:

QAZI, OMAR



DEFENDANT'S
EXHIBIT
502



062



U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Las Vegas I Field Office*

2-24-15

www.atf.gov

786020:JG

ATF CASE NUMBER: 786020-15-0064

This recommendation for prosecution relates to alleged violations of the Federal Firearm laws for
unlawfully possessing a firearm in Clark County, Judicial District of Nevada.

### DEFENDANT

Omar QAZI

### STATUTES VIOLATED:

Title 18 U.S.C. Section 922 (g)(1) – Possession of a Firearm by a Convicted Felon.

### DOCUMENTS SUBMITTED IN SUPPORT OF PROSECUTION

1. ATF Report of Investigation (ROI – #1) Las Vegas Metropolitan Police Department arrest of QAZI
   for being a convicted felon in possession of a firearm / Interstate Nexus Report.

2. Las Vegas Metropolitan Police Department Report # 150106-2982 – Las Vegas Metropolitan
   Police Department arrest of QAZI for being a convicted felon in possession of a firearm and
   possession of 4.1 gross grams of marijuana as well as possession of 1.2 gross grams of
   methamphetamine.

3. Certificate of Felony Judgment of Conviction of QAZI, for felony battery with substantial bodily
   harm and misdemeanor battery constituting domestic violence, 11-C-273567, by the District Court
   of Nevada, County of Clark

4. Certificate of Misdemeanor Judgment of Conviction of QAZI, for battery domestic violence 2nd
   offense, 09-F-22814X, by the Justice Court of Las Vegas Nevada, County of Clark

5. Criminal History as to: QAZI

6. FBI / Las Vegas AFIS  Fingerprint Report as to: QAZI



064

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Report of Investigation**

| Title of Investigation: QAZI, Omar | Investigation Number: 786020-15-0064 | Report Number: 1 |
|---|---|---|

## SUMMARY OF EVENT:

This is a Project Safe Neighborhood Investigation. On January 6, 2015, Las Vegas Metropolitan Police Department (LVMPD) arrested Omar QAZI (U/M, DOB: 11-09-87) for being a convicted felon in possession of a firearm.

## NARRATIVE:

1. On January 6, 2015, LVMPD conducted a traffic stop of a vehicle in which QAZI was the driver and sole occupant. As the Officer approached the vehicle he could smell the odor of marijuana coming from inside of the vehicle. The Officer conducted a search of the vehicle and located in the center console a Smith and Wesson, model 34-1, .22 caliber revolver with serial number M37231, three (3) separate baggies of marijuana for total approximate weight of 4.1 gross grams and three (3) separate baggies of methamphetamine for a total weight of approximately 1.2 gross grams. QAZI stated that he had the gun and uses it for protection. See LVMPD Police Report # 150106-2982 for further details.

2. On January 16, 2015, S/A Grace requested an Interstate Nexus Determination from S/A La Russo. Based on the above description of the firearm, which was obtained per the above reference police report, S/A LaRusso determined that the firearm was not manufactured in the state of Nevada.

Attachments:
LVMPD Police Report #150106-2982

| Prepared by: Jason M. Grace | Title: Special Agent, Las Vegas I Field Office | Signature: | Date: 1-21-15 |
|---|---|---|---|
| Authorized by: John E. Wester | Title: Resident Agent in Charge, Las Vegas I Field Office | Signature: | Date: 1/23/15 |
| Second level reviewer (optional): Joseph M. Riehl | Title: Special Agent in Charge, San Francisco Field Division | Signature: | Date: 1/23/15 |

Page 1 of 1

ATF EF 3120.2 (10-2004)
For Official Use Only

065

JLClient Print Output Document                                          Page 1 of 2

```
ORIG: LVM023965  LVM04889              CJIS:RQ        01/21/2015-13:38:40
RESP: DMVI      ( NVO029263460 )       DMVI:SRQ       01/21/2015-13:38:41
FOLLOWING IS THE NEVADA DMV RESPONSE FOR YOUR QUERY ON:
LIC: 916ARL
                       *** VEHICLE INFORMATION ***
LIC: 916ARL   LIY: 2015
           LIT: STANDARD             STYLE: SUNSET
   REG STATUS: ACTIVE                EFF DATE: 10242014
   PLATE STATUS: IN USE              EXP DATE: 10242015

VIN: 1G8ZH5281SZ394827  VYR: 1995   VMA: SATURN
   STYLE: VEH-SEDAN 4 DR    BODY TYPE: VEH-SEDAN 4 DR   #AXLES/SEATS: 2
   FUEL: GASOLINE  WGT: 0  CYLINDER: 04  LAST TRANS DATE: 10242014

                   *** CURRENT REGISTERED OWNER(S) ***
NAME: QAZI, GLORIA UGARTE
       OWNER TYPE: REGISTERED  SOC:           DOB:
           ADDRESS: 4801 SPENCER ST APT 21   COUNTY: CLARK   EFF DATE:
   CITY/STATE/ZIP: LAS VEGAS, NV  891196240

                   *** INSURANCE INFORMATION ***
COMPANY: INFINITY AUTO INSURANCE COMPAN  POLICY NUMBER: 127700034584001
EFF DATE: 10222014   EXP DATE: 10242015   TYPE: VEHICLE SPECIFIC
INS VERIF ACTION:      SR22 ISSUE DATE:

                   *** TITLE INFORMATION ***
TITLE NUMBER: NV005962282
NAME: QAZI, GLORIA UGARTE       MAIL TO:
       TITLE TYPE: REGISTERED  SOC:           DOB:
           ADDRESS: 4801 SPENCER ST APT 21        EFF DATE:
   CITY/STATE/ZIP: LAS VEGAS, NV  891196240

                   *** PERMIT INFORMATION ***
NAME:                  EVENT:
   START DATE: 10212014   END DATE: 10312014   # DAYS:
       CURRENT CITY/STATE: , NV
   DESTINATION CITY/STATE: , NV


                   *** PREVIOUS REGISTERED OWNER 1 ***
LIC: 163WRA   LIY: 2013
           LIT: STANDARD             STYLE: SUNSET
   REG STATUS: SURRENDERED           EFF DATE: 07162013
   PLATE STATUS: RELEASED            EXP DATE: 07062013

NAME: QAZI, GLORIA UGARTE
       OWNER TYPE: REGISTERED  SOC:           DOB:
           ADDRESS: 4801 SPENCER ST APT 21   COUNTY: CLARK   EFF DATE:
   CITY/STATE/ZIP: LAS VEGAS, NV  891196240

                   *** PREVIOUS REGISTERED OWNER 2 ***
LIC: 940WCG   LIY: 2010
           LIT: STANDARD             STYLE: SUNSET
   REG STATUS: SURRENDERED           EFF DATE: 07062010
   PLATE STATUS: RELEASED            EXP DATE: 08122010

NAME: WAGNER, JAMES E
       OWNER TYPE: REGISTERED  SOC: 549153410  DOB: 10281962
           ADDRESS: 1650 E SAHARA AVE STE 4A   COUNTY: CLARK   EFF DATE:
   CITY/STATE/ZIP: LAS VEGAS, NV  891043495

                   *** PREVIOUS REGISTERED OWNER 3 ***
LIC: 619TRB   LIY: 2007
           LIT: STANDARD             STYLE: SUNSET
   REG STATUS: EXPIRED               EFF DATE: 06022007
   PLATE STATUS: RELEASED            EXP DATE: 06022007

NAME: HANLEY, DONALD JAMES
       OWNER TYPE: REGISTERED  SOC:           DOB:
           ADDRESS: PO BOX 400098   COUNTY: CLARK   EFF DATE:
```



JLClient Print Output Document

CITY/STATE/ZIP: LAS VEGAS, NV  891400098

*** PREVIOUS REGISTERED OWNER 4 ***

LIC: 644GBR   LIY: 2006
        LIT: STANDARD                      STYLE: SUNSET
    REG STATUS: SURRENDERED            EFF DATE: 06022006
  PLATE STATUS: RELEASED               EXP DATE: 08172006

NAME: BALLARD, BONNIE S
    OWNER TYPE: REGISTERED    SOC:              DOB:
        ADDRESS: 6705 STERLING SPRINGS PKWY    COUNTY: CLARK    EFF DATE:
  CITY/STATE/ZIP: LAS VEGAS, NV  891080229

ORIGINAL DOCUMENT ON FILE AT
NEVADA DEPARTMENT OF MOTOR VEHICLES PER NRS 52.205(3)





106



EVT JMLV150106002982:   TYPE: 467                     PRI  : 6
LOC : WO                 BLDG:                        APT  :
ADDR: E HARMON AVE&KOVAL LN   XST :                   CITY : CC
CADD:                    CNAM:                        CPHONE:
MAP : 0282455            S/B : M3                     SRA  : K429
P/U : 7M13               OFF1: 13976                  OFF2 :
DATE: 2015/01/06         INIT: 15:53:31               AREA : CC
911 : NO                 CLSE: 22:04:31               DISP : A

| Time | Code | Unit | | | | | |
|---|---|---|---|---|---|---|---|
| 15:53:31 | CM | | Primary Event: MAIN Opened: 15/01/06 15:53 | | | 23 | LV13547 |
| 15:53:31 | EU | | INITIATED BY | FRM- | TO-LV13547 | 23 | LV13547 |
| 15:53:31 | CM | | Verification Bypassed Inc- LLV150106002982 Addr-HARMON/WO KOVAL | | | 23 | LV13547 |
| 15:53:31 | CM | | Initial Traffic Stop by LV/7M13 at 15:53:31 on 15/01/06 | | | 23 | LV13547 |
| 15:53:31 | EU | | PN | FRM- | TO-NV-916ARL | 23 | LV13547 |
| 15:53:31 | USOF | 7M13 | 467 | | | 23 | LV13547 |
| 15:53:31 | EU | 7M13 | PU | FRM- | TO-LV/7M13 | 23 | LV13547 |
| 15:53:46 | EU | 7M13 | L | FRM- | | 23 | LV13547 |
| 15:53:47 | EU | 7M13 | AD | FRM-HARMON/WO KOVAL | | 23 | LV13547 |
| 15:59:01 | USAS | 3M21 | E HARMON AVE&KOVAL LN | | 467 | 23 | LV13547 |
| 15:59:10 | CM | | 7M13 C4 REQ ANOTHER UNIT F/VEH SEARCH  1559HRS | | 467 | 23 | LV13547 |
| 16:02:21 | USER | 3M21 | E HARMON AVE&KOVAL LN | | 467 | 00 | LV10042 |
| 16:04:52 | USAR | 3M21 | E HARMON AVE&KOVAL LN | | | | |
| 16:07:02 | UO | 7M13 | Overdue: Operator: LV/13547    Console: 23 | | | 23 | LV13547 |
| 16:11:24 | CM | | 7M13  C4  1 IN CUST // 413 FOUND IN THE VEH  1611HRS | | 467 | 13 | LV8358 |
| 16:38:19 | USER | FA2 | E HARMON AVE&KOVAL LN | | 467 | 13 | LV8358 |
| 16:38:29 | USAR | FA2 | E HARMON AVE&KOVAL LN | | 467 | 23 | LV13547 |
| 16:49:44 | USAS | 749 | E HARMON AVE&KOVAL LN | | | 00 | LV255Y5 |
| 16:56:14 | US | 749 | RD | Rider Added: 4682224/CC32 | | 00 | LV255Y5 |
| 16:56:14 | US | 749 | UU Area:CC  Veh:P10189   Unit Update | | | 00 | LV255Y5 |
| 16:56:14 | US | 749 | CU  1M MT | | 467 | 00 | LV8903 |
| 16:56:37 | USER | 749 | E HARMON AVE&KOVAL LN | | | 23 | LV8671 |
| 17:39:14 | CM | | 7M13/C4 1738 | | 467 | 23 | LV8671 |
| 17:39:20 | USAR | 749 | E HARMON AVE&KOVAL LN | | 467 | 00 | LV8902 |
| 17:51:35 | USAR | 749 | E HARMON AVE&KOVAL LN | | 467 | 00 | LV13976 |
| 18:34:42 | USTR | 7M13 | CCDC | | 467 | 00 | LV8902 |
| 18:46:28 | USCL | 749 | | | 467 | 00 | LV13976 |
| 18:49:40 | USAS | 7M13 | CCDC | | 467 | 00 | LV10042 |
| 18:51:06 | USCL | 3M21 | | | 467 | 11 | LV14760 |
| 18:54:33 | USAO | FA2 | HQ | | 467 | 11 | LV14760 |
| 18:54:58 | USER | FA4 | HQ | | 467 | 11 | LV14760 |
| 18:54:58 | USER | FA6 | HQ | | 467 | 11 | LV14760 |
| 18:55:07 | USAR | FA4 | HQ | | 467 | 11 | LV14760 |
| 18:55:07 | USAR | FA6 | HQ | | | 11 | LV14760 |
| 18:55:17 | CM | | FA2 C/4 VIA LL   1855 | | 467 | 00 | LV13976 |
| 19:33:53 | USCL | 7M13 | | | | 00 | LV13976 |
| 19:33:53 | EU | 7M13 | D | FRM- | TO-A  MAIN | 11 | LV9458 |
| 21:03:26 | USCL | FA6 | | | 467 | 05 | LV8020 |
| 22:03:49 | USCL | FA2 | | | 467 | 23 | LV5951 |
| 22:04:31 | USCL | FA4 | | | 467 | | |
| 22:04:31 | CM | | Route Closed: MAIN | | | | |

3/18/2015 5:52:09 PM

LVMPD - COMMUNICATION CENTER
EVENT SEARCH

22:04:31  CM        Incident Closed: 15/01/06 22:04

3/18/2015 5:52:09 PM

108

LVMPD BI Web

UNIT LOG BY INCIDENT # - LAS VEGAS METROPOLITAN POLICE DEPARTMENT
For Incident Number(s): LLV150106002982

Wednesday - Mar 18, 2015 5:53 PM
Requested by: N13042@LVMPD_NT

| Unit | Event Number | P/unit | Date | Time | Code | Type | Officer 1 # and name | Officer 2 # and name | D | Pri | Comment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7M13 | LLV150106002982 | 7M13 | 01/08/2015 | 16:53:31 | USOF | 467 | 13976 GLOVER, JOSHUA A | | A | 6 | HARMON/W0 KOVAL |
| 3M21 | LLV150106002982 | 7M13 | 01/08/2015 | 16:59:01 | USAS | 467 | 10042 VODORE, ROBERT | | A | 6 | E HARMON AVE/KOVAL LN |
| 3M21 | LLV150106002982 | 7M13 | 01/08/2015 | 16:02:21 | USER | 467 | 10042 VODORE, ROBERT | | A | 6 | E HARMON AVE/KOVAL LN |
| 3M21 | LLV150106002982 | 7M13 | 01/08/2015 | 16:04:52 | USAR | 467 | 10042 VODORE, ROBERT | | A | 6 | E HARMON AVE/KOVAL LN |
| 7M13 | LLV150106002982 | 7M13 | 01/08/2015 | 16:07:02 | UO | 467 | 13976 GLOVER, JOSHUA A | | A | 6 | Override: Operator: LVI13547  Console: 23 |
| FA2 | LLV150106002982 | 7M13 | 01/08/2015 | 16:38:19 | USER | 467 | 7946 BIEN, FRANK A | | A | 6 | E HARMON AVE/KOVAL LN |
| FA2 | LLV150106002982 | 7M13 | 01/08/2015 | 16:38:29 | USAR | 467 | 7946 BIEN, FRANK A | | A | 6 | E HARMON AVE/KOVAL LN |
| 749 | LLV150106002982 | 7M13 | 01/08/2015 | 16:49:44 | USAS | 467 | 8902 STEINMETZ, WILLIAM J | | A | 6 | E HARMON AVE/KOVAL LN |
| 749 | LLV150106002982 | 7M13 | 01/08/2015 | 16:56:14 | RD | 467 | 8902 STEINMETZ, WILLIAM J | | A | 6 | Rider Added: 4892224/CC32 |
| 749 | LLV150106002982 | 7M13 | 01/08/2015 | 16:56:14 | UU | 467 | 8902 STEINMETZ, WILLIAM J | | A | 6 | Unit Update |
| 749 | LLV150106002982 | 7M13 | 01/08/2015 | 16:56:14 | CU | 467 | 8902 STEINMETZ, WILLIAM J | | A | 6 | 1M MT |
| 749 | LLV150106002982 | 7M13 | 01/08/2015 | 16:56:38 | USER | 467 | 8902 STEINMETZ, WILLIAM J | | A | 6 | E HARMON AVE/KOVAL LN |
| 749 | LLV150106002982 | 7M13 | 01/08/2015 | 17:39:20 | USAR | 467 | 8902 STEINMETZ, WILLIAM J | | A | 6 | E HARMON AVE/KOVAL LN |
| 749 | LLV150106002982 | 7M13 | 01/08/2015 | 17:51:35 | USAR | 467 | 8902 STEINMETZ, WILLIAM J | | A | 6 | E HARMON AVE/KOVAL LN |
| 7M13 | LLV150106002982 | 7M13 | 01/08/2015 | 18:34:42 | USTB | 467 | 13976 GLOVER, JOSHUA A | | A | 6 | CCDC |
| 7M13 | LLV150106002982 | 7M13 | 01/08/2015 | 18:48:28 | USAB | 467 | 8902 STEINMETZ, WILLIAM J | | A | 6 | CCDC |
| 7M13 | LLV150106002982 | 7M13 | 01/08/2015 | 18:49:40 | USAB | 467 | 13976 GLOVER, JOSHUA A | | A | 6 | CCDC |
| 3M21 | LLV150106002982 | 7M13 | 01/08/2015 | 18:51:08 | USCL | 467 | 10042 VODORE, ROBERT | | A | 6 | |
| 7M13 | LLV150106002982 | 7M13 | 01/08/2015 | 18:54:34 | USAO | 467 | 13976 BIEN, FRANK A | | A | 6 | HQ |
| FA2 | LLV150106002982 | 7M13 | 01/08/2015 | 18:54:59 | USER | 467 | 8474 KITCHEN, MICHAEL J | | A | 6 | HQ |
| FA4 | LLV150106002982 | 7M13 | 01/08/2015 | 18:54:59 | USER | 467 | 13422 ROTTA, RYAN ALLEN | | A | 6 | HQ |
| FA8 | LLV150106002982 | 7M13 | 01/08/2015 | 18:55:07 | USAR | 467 | 13422 ROTTA, RYAN ALLEN | | A | 6 | HQ |
| FA4 | LLV150106002982 | 7M13 | 01/08/2015 | 18:55:07 | USAR | 467 | 8474 KITCHEN, MICHAEL J | | A | 6 | HQ |
| FA6 | LLV150106002982 | 7M13 | 01/08/2015 | 19:33:54 | USCL | 467 | 13976 GLOVER, JOSHUA A | | A | 6 | HQ |
| 7M13 | LLV150106002982 | 7M13 | 01/08/2015 | 19:33:54 | D | 467 | 13976 GLOVER, JOSHUA A | | A | 6 | |
| 7M13 | LLV150106002982 | 7M13 | 01/08/2015 | 21:03:27 | USCL | 467 | 13422 ROTTA, RYAN ALLEN | | A | 6 | |
| FA8 | LLV150106002982 | 7M13 | 01/08/2015 | 22:03:49 | USCL | 467 | 7946 BIEN, FRANK A | | A | 6 | |
| FA2 | LLV150106002982 | 7M13 | 01/08/2015 | 22:03:49 | USCL | 467 | 7946 BIEN, FRANK A | | A | 6 | |
| FA4 | LLV150106002982 | 7M13 | 01/08/2015 | 22:04:31 | USCL | 467 | 8474 KITCHEN, MICHAEL J | | A | 6 | |

End of Unit Log for Incident Number: LLV150106002982

109



DEFENDANT'S
EXHIBIT
506





```
 1   CASE NO.:  C-15-307496-1

 2   DEPT NO.:  2

 3

 4        IN THE JUSTICE COURT OF LAS VEGAS TOWNSHIP

 5             COUNTY OF CLARK, STATE OF NEVADA

 6                         -oOo-

 7   STATE OF NEVADA,          )
                               )
 8          Plaintiff,         )
                               )
 9          vs.                )
                               )   Case No. 15F00233X
10   OMAR QAZI,                )
                               )
11          Defendant.         )
     _____  )

12

13

14              REPORTER'S TRANSCRIPT OF

15                PRELIMINARY HEARING

16    BEFORE THE HONORABLE JOSEPH S. SCISCENTO
                 JUSTICE OF THE PEACE

17

18              TUESDAY, JUNE 23, 2015

19
     APPEARANCES
20
     For the State:      JONATHAN COOPER, ESQ.
21                       Deputy District Attorney

22

23   For the Defendant:  OMAR QAZI, Pro Se

24   Also Present:  Jennifer Waldo, Esq.

25   Reported By:  Jennifer O'Neill, CCR No. 763
```

Electronically Filed
07/12/2015 12:03:01 PM

CLERK OF THE COURT


DEFENDANT'S EXHIBIT
508

1

000113

1                    W I T N E S S E S

2                                             PAGE

3

4    STATE'S

5    JOSHUA GLOVER

6    Direct Examination by Mr. Cooper            11
     Cross-Examination by Mr. Qazi              19
7

8    FRANK BIEN

9    Direct Examination by Mr. Cooper            40
     Cross-Examination by Mr. Qazi              54
10   Redirect Examination by Mr. Cooper          71

11

12   DEFENSE'S

13   GLORIA QAZI

14   Direct Examination by Mr. Qazi              72
     Cross-Examination by Mr. Cooper            80
15

16                    *  *  *  *  *

17

18                    E X H I B I T S

19                         Marked    Admitted

20   STATE'S

21   Exhibit 1                          40

22   Exhibit 2                          48

23   Exhibit 3                          48

24                    -oOo-

25

2

```
 1          LAS VEGAS, NEVADA; JUNE 23, 2015; 9:00 A.M.
 2                              -o0o-
 3
 4          THE COURT:  Omar Wasim Qazi, 15F00233X.
 5          MR. QAZI:  Yes, sir.
 6          THE COURT:  Mr. Qazi is present in custody.
 7          What do we got?
 8          MR. COOPER:  Your Honor, can we just trail
 9   this matter briefly?
10          THE COURT:  All right.  Have a seat, sir.
11   We'll get back to you in a few minutes.
12          Are you standby?
13          MS. WALDO:  I'm standby, Your Honor.
14          (Whereupon, other matters were heard.)
15          THE COURT:  Omar Qazi, 15F00233X.  This is
16   the time set for the preliminary hearing.
17          State, are you ready to proceed?
18          MR. COOPER:  Yes, Your Honor.
19          THE COURT:  Mr. Qazi, are you ready to
20   proceed?
21          MR. QAZI:  Yes, sir.
22          THE COURT:  Do you have a piece of paper over
23   there and a pencil to work with?
24          MS. WALDO:  Yes, Your Honor.
25          MR. QAZI:  Yes, Your Honor.
```

3

1           THE COURT:  How many witnesses do we have on
2  this matter?
3           MS. WALDO:  I believe two, Your Honor.
4           THE COURT:  Counsel, you're standby.  You're
5  to say nothing.
6           MR. COOPER:  Your Honor --
7           THE COURT:  You're standby.  You have to sit
8  behind him.
9           MS. WALDO:  What?
10          MR. COOPER:  And, Your Honor, the only other
11 thing I would say is I do have two lay witnesses
12 outside on my Cook matter.  Obviously, if the Court
13 wants to go with this one first, I'm ready to go on
14 this one.  They're two lay witnesses versus two police
15 officers.  Whatever the Court's preference.
16          THE COURT:  Hopefully we'll be quick on this
17 matter.
18          MR. COOPER:  It should be quick, hopefully.
19          THE COURT:  On the Qazi matter?
20          MR. COOPER:  It should be quick.
21          THE COURT:  Mr. Qazi, do you have any
22 witnesses you're going to be calling at this time?
23          MR. QAZI:  My mother, if I can.
24          THE COURT:  Okay.  She's here.  Then what
25 we're going to need to do, ma'am, I need you to wait

                                                      4

1  outside, because you're going to be called as a

2  witness, so you cannot be here during the testimony.

3  Do you understand?

4          Offer of proof, sir.  What's she going to be

5  testifying to about today?

6          MR. QAZI:  I'm sorry?

7          THE COURT:  What's she going to be testifying

8  to about?

9          MR. QAZI:  About the car, the shape of the

10  car, how it was -- if it was intact or not, and

11  basically about her vehicle.

12          THE COURT:  Her vehicle?

13          MR. QAZI:  Yes.

14          THE COURT:  Okay.  State, I'm going to --

15  we'll allow that witness to come in, I guess.

16          Anything further before we proceed?

17          MR. COOPER:  Nothing from the State, Your

18  Honor.

19          THE COURT:  Mr. Qazi, no?  All right.

20  Anybody who's a witness or potential witness, please

21  wait outside.  Do not discuss your testimony with any

22  other witnesses.

23          State, your first witness will be?

24          MR. COOPER:  The State's first witness is

25  Officer Glover.

5

```
 1              THE COURT:  Glover?

 2              MR. QAZI:  Sir, sir --

 3              THE COURT:  Officer Glover.

 4              MR. QAZI:  -- am I going to be cuffed like

 5   this the whole time?

 6              THE COURT:  Unfortunately, because you're a

 7   federal prisoner, we have certain restrictions that we

 8   cannot override.  So you're going to have to as best as

 9   you can -- that's the way -- I don't know if we can

10   release a hand on that.

11              MR. QAZI:  I'm being prejudiced, you know, by

12   not being able to correctly make notes.

13              MR. COOPER:  I think he can write, Your

14   Honor.  I've seen other inmates write in belly chains.

15              MR. QAZI:  You know, I'm going to also be

16   cross-examining as well.

17              THE COURT:  You cross-examine from that seat.

18   I don't know if we can give him additional --

19              THE CORRECTIONS OFFICER:  I can loosen it up

20   for him.

21              THE COURT:  If you can loosen it up a little.

22              THE CORRECTIONS OFFICER:  Stand up for me.

23              THE COURT:  Does that give you a little more

24   space and ability to -- understand, sir, that because

25   you're in federal custody, we have certain restrictions
```

                                                          6

1  that they must follow.  I understand it may be a little
2  restrictive for you to write, but you do have the
3  ability to write.  We have provided you with a -- did
4  we give him a yellow pad?

5            THE MARSHAL:  Yes, sir.

6            THE COURT:  You have a yellow pad.  That is
7  your work product, sir.  That's your attorney -- that's
8  your stuff.  They will not be able to review that.

9            Do you understand?

10            MR. QAZI:  Okay.

11            THE COURT:  They are notes that you've taken.
12  They're like attorney notes.  They cannot be reviewed.

13            MR. QAZI:  Can I ask a question of the Court?

14            THE COURT:  Yes.

15            MR. QAZI:  We are on the record, right?

16            THE COURT:  Sir, please rise.  Yes.

17            MR. QAZI:  Okay.  Well, prior to coming here,
18  when I was in federal custody and when they transferred
19  me over here to State, I had a manila envelope with all
20  my documents and paperwork, and I was not able to bring
21  it with me.  So I just want, you know -- and it was not
22  on my behalf, the error.  It was on their fault, on the
23  State officers bringing me here.  So I would like the
24  Court to know that that hinders me from doing a proper
25  defense.

7

1          THE COURT:  It probably does.  And,
2  unfortunately, you know -- and I've explained this to
3  you, and the frustration that I feel is why anybody in
4  their right mind would ever try to represent themself
5  makes no sense to me --

6          MR. QAZI:  That's not -- that is beside the
7  issue.

8          THE COURT:  -- especially when there are
9  people that are seasoned in this.  But that being said,
10  I cannot order a federal magistrate or federal court or
11  federal detention center to do anything other than to
12  produce you.

13          MR. QAZI:  I'm just letting you know that I'm
14  being deprived of my constitutional rights.  From the
15  very beginning, all my due process and my
16  constitutional rights have been violated, and I want
17  this Court to take judicial notice of that.

18          THE COURT:  All right.  Will do.

19          MR. COOPER:  And, Your Honor, that's
20  something, in my opinion, that judicial notice can't be
21  taken of, but ...

22          THE COURT:  I'm taking notice of the fact
23  that his books or his documents that he had were not
24  provided to him --

25          MR. COOPER:  And, Your Honor --

8

000120

1           THE COURT:   -- in transport.

2           MR. COOPER:   -- the problem is the State

3  doesn't -- I don't know if he ever had any notes.   I

4  have no idea.

5           THE COURT:   I know.  As I explained, I can't

6  force the federal government to release any documents.

7  And that's the problem that I can't tell them to

8  order -- if it was State court, I could order them to

9  release the documents here, so that you could review

10 them.  All right.  So that's a restriction that we have

11 to run up against because of his representation.

12          MR. QAZI:  And the chief at the federal

13 institution also allowed me to bring a CD disk

14 recording, but due to the fact that the door was not

15 able to open, they were not able to get the disk, also.

16 And that's on file, too, that I can verify that, you

17 know, which is also, you know, stopping me from

18 presenting a defense.  You know, and also legal copies.

19 I had all types of issues, but ...

20          THE COURT:  But you want to go forward on

21 your right to have a prelim within 15 days?

22          MR. QAZI:  I do want to go forward.  I want

23 this hearing as my offer of proof.

24          THE COURT:  You know, this is -- and it's

25 just frustrating, because all of this stuff I could

1  have told you was going to occur, in the sense of

2  you're going to run up on roadblocks on this.  But you

3  wanted to invoke the right to have a prelim within 15

4  days, because there had been enough delays, even though

5  I had urged you at least to get a continuance so you

6  can get all of this stuff in order.

7           MR. QAZI:  See, the thing is, it's been

8  continued.

9           THE COURT:  That being said, you've made that

10 decision.  That's your rights, and so we're going to go

11 forward today.

12          MR. QAZI:  Your Honor, it's been continued

13 three or four times.  And also is there --

14          THE COURT:  You did not want it continued.

15          MR. QAZI:  Is there any affidavits or

16 declarations that show the reasons that it was

17 continued that I can have a copy of?

18          THE COURT:  They're probably on record.  I

19 don't know what was -- I don't know.  They're probably

20 on record, the transcripts or something like that.

21 We're here today.  We're going forward on the prelim.

22          MR. QAZI:  All right.

23          THE COURT:  State, your first witness.

24          MR. COOPER:  Yes, Your Honor.  The State's

25 first witness is Officer Glover.

10

1          THE COURT:  Officer, please stand up.  Raise
2   your right hand.  Face the clerk, to be sworn.
3   Whereupon,
4                    JOSHUA GLOVER,
5   was called as a witness, and having been first duly
6   sworn, was examined and testified as follows:
7          THE CLERK:  Please be seated.  If you can say
8   and spell your first and last name.
9          THE WITNESS:  Joshua Glover.  J-O-S-H-U-A
10  G-L-O-V-E-R.
11         THE COURT:  State, you may proceed.
12         MR. COOPER:  And, Your Honor, permission to
13  approach the witness really quick.  I'm just giving him
14  his subpoena, so when he leaves, I don't forget it.
15         THE COURT:  Yes.
16
17                 DIRECT EXAMINATION
18  BY MR. COOPER:
19     Q.   Mr. Glover, how are you currently employed?
20     A.   With the Las Vegas Metropolitan Police
21  Department, as a police --
22     Q.   And how long have you been employed in that
23  capacity?
24     A.   Just over six years.
25     Q.   Now, specifically, in your capacity as a

                                                       11

1  Las Vegas Metropolitan Police Department officer, do

2  you conduct traffic stops?

3      A.   Yes, I do.

4      Q.   I want to turn your attention to January 6th

5  of 2015.

6           Do you recall this day?

7      A.   Yes, I do.

8      Q.   And specifically, on this day were you

9  working?

10     A.   Yes, I was.

11     Q.   What shift did you work on January 6, 2015?

12     A.   Swing shift.

13     Q.   And what time does swing shift start?

14     A.   1500 hours, which was 3:00 p.m.

15     Q.   Now, specifically, in the early portion of

16 your shift, do you recall responding or conducting any

17 type of traffic stop?

18     A.   Yes, I do.

19     Q.   And was that on a gold Saturn?

20     A.   Yes, it was.

21     Q.   Briefly describe for the Court the nature and

22 the reason you conducted that traffic stop.

23     A.   I was driving westbound on Harmon towards

24 Koval.  And as I was approaching Harbor Island

25 Apartments, which is 370 East Harmon, a gold Saturn

12

000124

 1  pulled out from the driveway, from one of the east

 2  driveways -- there's two -- without stopping, without

 3  yielding, and I had to apply my brakes swiftly and

 4  quickly to avoid colliding with his rear end.

 5       Q.   Now, at some point did you get an occasion to

 6  pull the vehicle over?

 7       A.   Yes.

 8       Q.   And when you pulled that vehicle over, do you

 9  recognize anyone in court here today that was also

10  present in that vehicle?

11       A.   Yes, I do.

12       Q.   And may you just describe something he's

13  wearing.

14       A.   Yellow shirt.

15            MR. COOPER:  May the record reflect the

16  witness has identified the defendant?

17            THE COURT:  It shall.

18  BY MR. COOPER:

19       Q.   Now, was there anyone else in the vehicle

20  when you pulled it over?

21       A.   No, there was not.

22       Q.   Now, describe this vehicle.  Was it a

23  two-door or a four-door, if you remember?

24       A.   I don't recall.

25       Q.   Okay.  But it was a gold Saturn?

                                                          13

```
 1      A.    Correct.

 2      Q.    And are you aware if it had Nevada plate

 3   916ARL?

 4      A.    I believe that's correct.

 5      Q.    When you pulled the vehicle over, what's the

 6   first thing you noticed regarding the vehicle?

 7      A.    As I approached the driver window, he didn't

 8   roll it down all the way, and for safety reasons I

 9   always have all drivers of vehicles roll all their

10   windows down.  As he rolled the window down completely,

11   I smelled a faint odor of marijuana.

12      Q.    And was that based on your training and

13   experience?

14      A.    That's correct.

15      Q.    As a police officer, do you have to have

16   adequate training in order to actually be in the field

17   as a police officer?

18      A.    Yes, you do.

19      Q.    Do you have to go through a police academy?

20      A.    Yes.

21      Q.    Do you have to go through field training?

22      A.    Yes.

23      Q.    Do you have refresher courses as well, in

24   terms of investigations, as well as officer safety

25   issues?
```

14

1     A.    Yes.

2     Q.    And during all this training, were you taught

3  or trained what the smell of marijuana actually smells

4  like?

5     A.    Yes, I was.

6     Q.    And was the smell coming from his vehicle

7  identifiable to you, based on your training and

8  experience, as marijuana?

9     A.    Yes, it was.

10    Q.    What did you do as a result of that smell?

11    A.    I had the driver exit the vehicle and

12  conducted a probable cause search of the vehicle.

13    Q.    Where was the defendant at when you were

14  searching the vehicle?

15    A.    He was at the front of my patrol vehicle.

16    Q.    And when you searched the vehicle, describe

17  for the Court how you go through your search.

18    A.    It's very methodical.  I start with the

19  driver's area, the driver's door, the seat area, under

20  the seat, the dash steering column.

21    Q.    And during the search, were you searching for

22  marijuana?

23    A.    I was searching for marijuana, yes.

24    Q.    Did you find anything related to marijuana or

25  any other criminal activity during your search for

                                                   15

1  marijuana?

2       A.   Yes, I did.

3       Q.   What did you locate?

4       A.   I noticed the center console cup holder was

5  loose.  I pulled it out and saw a bag -- a clear bag

6  with a green, leafy substance that I knew to be

7  marijuana.

8       Q.   At some point did you decide to remove that

9  marijuana from the area?

10      A.   Yes, I did.

11      Q.   And when you removed it, did you see anything

12 else of evidentiary value?

13      A.   Yes.  I saw a black revolver, firearm.

14      Q.   As soon as you removed the marijuana, was

15 that black revolver just readily apparent at that

16 point?

17      A.   Yes, it was.

18      Q.   Did you see any other drugs or drug-related

19 items in the vehicle as well?

20      A.   In the same bag that the marijuana was in,

21 there was also smaller baggies with a crystal-like

22 substance that I knew most likely to be

23 methamphetamine.

24      Q.   And you said when you stopped the vehicle, it

25 smelled like marijuana to you.

16

1          Was that the smell of burnt marijuana, like
2   someone had smoked marijuana in the vehicle, or was it
3   just the smell of fresh marijuana, if you can even tell
4   the difference between the two?

5          A.   You can't really tell the difference between
6   the two.

7          Q.   But it was readily apparent when you opened
8   the vehicle -- I mean, when you rolled down that
9   window -- or he rolled down the window?

10         A.   Yes.

11         Q.   Where were you, approximately, when you
12  pulled this vehicle over?  I think you said the Harbor
13  Island Apartments.

14         A.   Well, when I conducted the traffic stop, we
15  were actually still on Harmon, but just west of Koval.

16         Q.   And is that located here in Clark County,
17  Nevada?

18         A.   Yes, it is.

19              MR. COOPER:   Court's indulgence.

20  BY MR. COOPER:

21         Q.   Now, when you actually had an occasion to see
22  that firearm in the -- it was under the cup holder?

23         A.   Correct.

24         Q.   What did you do next?

25         A.   I immediately notified firearms detectives.

000129

1    Q.   And did firearms detectives actually respond?

2    A.   Yes, they did.

3    Q.   Did you leave that firearm there for them to

4  respond?

5    A.   Yes.

6         MR. COOPER:   No further questions of this

7  witness, Your Honor.

8         THE COURT:   For the record, Mr. Qazi, we do

9  have standby counsel.   I believe Miss Waldo.   She's

10  sitting behind you in this matter.   Standby counsel

11  basically is not supposed to provide any information or

12  advice, but I usually have them sit behind.   I'm going

13  to ask, Miss Waldo -- if you have any objection -- sit

14  next to Mr. Qazi, so you can give him any assistance.

15         MR. QAZI:   I'm sorry?

16         MS. WALDO:   No, Your Honor.

17         THE COURT:   I'm going to have her sit next to

18  you.   I want to make sure if you do have a question,

19  you can at least consult her.   All right.   Even though

20  she's standby counsel.

21         Do you understand?

22         MR. QAZI:   Okay.

23         THE COURT:   She's not there for your advice.

24  You're supposed to be able to do this on your own.

25         MR. QAZI:   I understand.

18

1              THE COURT:  But I do want you to have the
2    ability, if you do have a question or two, at least she
3    can be there to maybe answer that question.
4              MR. QAZI:  Okay.
5              THE COURT:  You can sit down, if you want to.
6    You can stand up.  You may begin the cross-examination,
7    sir.
8
9                        CROSS-EXAMINATION
10   BY MR. QAZI:
11        Q.   Officer Glover --
12        A.   Yes.
13        Q.   -- is your name?
14        A.   Yes.
15        Q.   All right.  So you've been with the
16   department six years, Las Vegas Metro Police
17   Department?
18        A.   Correct.
19        Q.   All right.  And you said you started your
20   swing shift at about 1500 hours?
21        A.   That's correct.
22        Q.   Okay.  Now, when you -- you said that I --
23   when I was pulling out of the Harbor Island Apartments
24   that I did not come to a complete stop?
25        A.   Correct.

                                                        19

1      Q.    And that I just went in front of your
2  vehicle?

3      A.    Correct.

4      Q.    Okay.  And the failure to yield, is that the
5  traffic violation?

6      A.    Yes.  I believe it's failure to yield --

7      Q.    Right-of-way?

8      A.    Yeah.

9            -- right-of-way from a private drive.

10     Q.    Okay.  Now, would the dash camera from your
11  patrol vehicle show that?

12     A.    I don't have a dash camera.

13     Q.    Your patrol vehicle doesn't have a dash
14  camera?

15           MR. COOPER:  Objection, Your Honor.  Asked
16  and answered.

17           THE COURT:  I'll let him ask it again.  I
18  think he's confirming.

19           THE WITNESS:  No, it does not have a dash
20  camera.

21  BY MR. QAZI:

22     Q.    Has it ever had a dash camera?

23     A.    No, it has not.  Not that I'm aware of.

24     Q.    Can your inventory list of the equipment in
25  the vehicle show that?

                                                    20

1            THE COURT:  Do you understand the question?

2            THE WITNESS:  From the time that I've been

3    assigned that patrol vehicle, it did not have a dash

4    camera.

5    BY MR. QAZI:

6        Q.   And how long were you assigned that patrol

7    vehicle?

8        A.   I don't recall.

9        Q.   You don't recall.  Okay.

10           THE COURT:  Let me stop you there.

11           Were you wearing any body cameras that day?

12           THE WITNESS:  No, I was not.

13           THE COURT:  All right.  Were there any

14   recordings that day --

15           THE WITNESS:  The officer --

16           THE COURT:  -- which would show the stop?

17           THE WITNESS:  No.

18           THE COURT:  Or the violation?  That being the

19   right to -- failure to yield.

20           THE WITNESS:  No.

21           THE COURT:  I'm sorry, Mr. Qazi.  You may

22   proceed.

23           MR. QAZI:  I may ask for a subpoena to the

24   Harbor Island Apartments.

25           THE COURT:  You have every right to do so,

21

1  yes.

2  BY MR. QAZI:

3      Q.   Was there a reason that it took you from the

4  Harbor Island all the way till the traffic light to hit

5  your emergency lights?

6           MR. COOPER:  Objection, Your Honor.  That's

7  actually -- it's going to be asking for -- it's -- I

8  forgot my exact wording.  Assuming facts not in

9  evidence.

10          MR. QAZI:  Well, I'm asking the reasonable

11  suspicion on --

12          MR. COOPER:  It's assuming facts not in

13  evidence.  There's no evidence.

14          THE COURT:  Well, I think he can -- he knows

15  if they -- when they stopped.  I'll allow it.  I think

16  it does go for some investigative --

17          MR. COOPER:  Your Honor, the only problem is

18  what's in his head is not evidence.  The only evidence

19  that came out is --

20          THE COURT:  In this, why he didn't do it.

21          MR. COOPER:  I'm sorry, Your Honor.  My

22  understanding of the question was:  Why did it take you

23  till the traffic light to turn your lights and sirens

24  on?  But that was never -- no facts have ever been

25  elicited that it took him till the traffic light for

                                                        22

1  him to turn his lights on.  So he's assuming facts not

2  in evidence.  He may say it didn't take me to the

3  light.  I don't know what he's going to say.  But

4  that's assuming facts not in evidence.  He has to

5  rephrase the question.

6             THE COURT:  Let's establish, then, how long

7  it took from the time of the violation -- the alleged

8  violation, where you came out of the driveway, to the

9  time that the lights came on.  How far was that?  Was

10 it to the light?

11            THE WITNESS:  It very well could have been.

12 I don't recall when I activated my lights and siren.

13            THE COURT:  You activated them immediately

14 upon seeing the violation?

15            THE WITNESS:  I don't believe I did.

16            THE COURT:  Okay.  How long from the time

17 that you saw the alleged violation that you testified

18 to, to the time that you turned the lights on?  How

19 long was that?

20            THE WITNESS:  Do you want distance or time?

21            THE COURT:  Either one you can give me.

22            THE WITNESS:  Okay.  Maybe ten seconds.  Ten,

23 15 seconds.

24            THE COURT:  And you were traveling in the

25 vehicle at that time?

23

1           THE WITNESS:  Correct.

2           THE COURT:  Going the posted speed limit?

3           THE WITNESS:  Correct.

4           THE COURT:  Which would have been at 25 miles

5   an hour in a residential?

6           THE WITNESS:  Thirty-five, I believe.

7           THE COURT:  So you're going 35 for ten

8   seconds.  Ten seconds from the time of the initial to

9   the time of the -- initiating the lights at 35 miles an

10  hour?

11          THE WITNESS:  Correct.

12          THE COURT:  Okay.  Mr. Qazi, you may proceed.

13  BY MR. QAZI:

14      Q.   So you were at 35 miles an hour.  Did it --

15  when you hit your brakes, did it cause you to screech

16  the tires, or?

17      A.   I don't believe my tires screeched, no, but I

18  did have to apply my brakes quickly.

19      Q.   And how far of a distance would you say,

20  approximately, I was from -- when I pulled in front of

21  you?

22      A.   I don't recall.

23      Q.   A two- or three-second gap, or?

24      A.   How far was I?

25      Q.   How far -- was it like a one-second gap?

                                                        24

1  Like, I was just right in front you? Was it three or

2  four seconds?

3          THE COURT:  I think more distance than time.

4          MR. QAZI:  Yeah.  As far as like a car

5  distance, as far as how far past --

6          THE COURT:  Instead of counting the time

7  out -- from the time between that -- the distance --

8          THE WITNESS:  Possibly one car length.

9          THE COURT:  So what would you agree is one

10  car length?  20 feet?

11          THE WITNESS:  20 feet.  Sure.

12  BY MR. QAZI:

13     Q.   20 feet.  Okay.

14          THE COURT:  State, I don't know if you would

15  agree with that too.

16          MR. COOPER:  It doesn't matter to me.

17  BY MR. QAZI:

18     Q.   Once I was -- once you conducted the traffic

19  stop, do you recall going to the passenger's side at

20  all?

21     A.   I believe at a certain point I did approach

22  the passenger's side.

23     Q.   Was that the first time or the second time?

24     A.   I don't recall, because I know I approached

25  your vehicle more than once.

25

1    Q.   And were the other windows down?

2    A.   I don't recall.

3    Q.   When you first came and, you know, asked my

4  travel destinations, you know, about the traffic

5  violation, and such, right?

6    A.   Correct.

7    Q.   Then after I gave you my ID, registration,

8  insurance, you went back to your patrol vehicle; is

9  that correct?

10   A.   That sounds right.

11   Q.   Is that when you did a criminal search of --

12  a record search on my name, or?

13   A.   I would have, yeah.

14   Q.   And then when you came back the second time,

15  that's when you ordered me out of the vehicle; is that

16  correct?

17   A.   Yes.

18   Q.   Okay.  So what was the reason for having me

19  step out of the vehicle?

20   A.   Again, I smelled an odor of marijuana coming

21  from your vehicle.  I believe when I looked at your

22  records search, I saw that you were a convicted person,

23  so I asked you to step out of the vehicle.

24   Q.   Did you smell it on the first approach or the

25  second approach?

26

000138

1     A.    The first approach.

2     Q.    The first approach?

3     A.    Yeah.

4     Q.    How come it was never mentioned to me, your

5  partner, or dispatch or anything?

6          MR. COOPER:  Objection, Your Honor.  Assuming

7  facts not in evidence.

8          THE COURT:  Well, what was not?  The first --

9          MR. QAZI:  The alleged smell of marijuana.

10         MR. COOPER:  Your Honor, his question was how

11  come you did not mention it to dispatch.  He has no

12  knowledge of how he -- whether or not he had mentioned

13  it to dispatch.

14         MR. QAZI:  I have --

15         THE COURT:  Hold on.

16         MR. QAZI:  -- Metro radio recordings.  I do

17  have all of them.

18         THE COURT:  Well, then you can ask him

19  specifically, You never mentioned this.  You never told

20  dispatch --

21         MR. QAZI:  Let me rephrase.

22  BY MR. QAZI:

23    Q.    Did you mention any smell of marijuana to

24  your partner, me, or to dispatch?

25         THE COURT:  Let me stop you.  It's a compound

                                                          27

1  question.  One at a time.  Relevancy and --

2  BY MR. QAZI:

3      Q.  Did you tell anyone about the --

4          THE COURT:  -- primacy and relevancy.

5  BY MR. QAZI:

6      Q.  -- smell of marijuana to myself?

7      A.  Did I tell you that I told anybody?

8      Q.  No.  Did you ask me about the smell at any

9  time?

10      A.  No, I did not.

11      Q.  Did you ask any time to your partner that

12  showed up?

13      A.  I don't recall.  I may have.

14      Q.  Okay.  Did you mention it over to dispatch?

15      A.  No, I don't believe I did.

16      Q.  Okay.  Now, was there a reason that you felt

17  maybe I was armed and dangerous, that you did a

18  pat-down search?

19      A.  Yes.  Coming from 370 East Harmon, I've had

20  several violent calls for service there.  It's a high

21  crime and drug area.  Your record showed that you were

22  a convicted person for a violent felony crime, and you

23  appeared to be a little bit nervous when you came out

24  of the vehicle.  So, yes, I did conduct a pat-down for

25  weapons.

28

000140

1     Q.   Okay.  Well, so based on my past record?

2          MR. COOPER:  Objection, Your Honor.

3    Mischaracterization of the testimony.

4          THE COURT:  I think that was one of the

5    criteria.  So I'll allow the question to stand.

6          It was a criteria you used, correct?

7          THE WITNESS:  Correct.

8          THE COURT:  All right.  Do you understand

9    that was the question.  One of the criteria he

10   mentioned was your past record.

11   BY MR. QAZI:

12     Q.   Okay.  And that it was a high crime area?

13     A.   Yes.

14     Q.   Okay.  Now, on completing the pat-down, was

15   there any -- anything showing that there was a weapon

16   on my body?

17     A.   I don't believe so.

18     Q.   Was that a justified reason for you to go in

19   my pocket and take crystal gemstones and the shark

20   tooth out of my pocket?

21          MR. COOPER:  Objection, Your Honor.  First

22   off, assuming facts not in evidence.  Second off, it's

23   argumentative.  And third off, there would be

24   relevance, Your Honor.  Obviously, he's not testified

25   to anything related to anything about crystal

29

1  gemstones, nor do we know --

2          MR. QAZI:  Well, the gemstone is in the body
3  camera.

4          THE COURT:  Let him finish, and then we'll go
5  from there.

6          MR. COOPER:  Nor do we know if crystal
7  gemstones ever existed.  So it would be relevance,
8  because that has nothing to do with the charges here.
9  It would be -- it would go straight to assuming facts
10  not in evidence, because there's been no evidence
11  presented that he ever took any gemstones.  And those
12  would be my two objections.

13          THE COURT:  All right.  Your response --

14          MR. QAZI:  I have the body camera.

15          THE COURT:  -- to the objection?  What is the
16  relevancy of him reaching in your pocket?

17          MR. QAZI:  The relevancy is I have the body
18  cam footage showing that the crystal gemstones that he
19  removed from my pocket and the shark tooth was put on
20  the hood of his car.  And for that reason, I am asking
21  what was the justification on going into the pocket to
22  remove the gemstones that were shown on the video.

23          MR. COOPER:  Your Honor, that's not relevant.
24  He hasn't stated anything relevant.  He just wants to
25  ask a question that has nothing to do --

                                                    30

000142

1          MR. QAZI:  It's relevant to the case, because

2  it's in the footage.

3          MR. COOPER:  He obviously doesn't understand

4  what relevance is.

5          THE COURT:  Well, the problem is this:

6  There's a search of the person and the body which

7  doesn't provide any contraband, correct?  You searched

8  Mr. Qazi.

9          THE WITNESS:  Do you want me to address the

10  crystal stones?

11          THE COURT:  Well, that search, there was

12  nothing produced?

13          THE WITNESS:  Correct.

14          THE COURT:  You stopped him initially for

15  a -- you stopped him.  You brought him out of the car

16  for a pat-down for weapons.

17          THE WITNESS:  Correct.

18          THE COURT:  And then Mr. Qazi indicated that

19  you reached into his pocket and pulled out a crystal

20  and a shark tooth?

21          MR. QAZI:  Three crystal gemstones and a

22  shark tooth.

23          THE COURT:  Is that correct?

24          THE WITNESS:  Yes.

25          THE COURT:  All right.  He's answered the

31

1  question.  Anything further you want to go forward with

2  that?

3  BY MR. QAZI:

4      Q.   What was the reason for reaching into the

5  pocket to grab the crystal gemstones?

6           MR. COOPER:  Objection, Your Honor.

7  Relevance.

8           THE COURT:  I'm going to allow the question

9  to stand.  It's somewhat of a search, but I don't know

10  if anything came of the search.

11          THE WITNESS:  If during a pat-down through

12  plain feel I determine that something may be

13  contraband, other than a weapon that's readily

14  identifiable, I can retrieve that item.

15          You contained in your right front coin pocket

16  those crystal gems, which, again, due to my training

17  and experience, I have come into contact with people

18  that carry illegal narcotics, such as methamphetamine,

19  which is a crystal-like substance, in their right front

20  coin pocket.

21          During my pat-down I felt the small rock-like

22  substances in your coin pocket.  And I believe I told

23  you this, and I removed them, and they were crystals.

24  And then you explained that they were not crystal meth.

25  It was --

32

1  BY MR. QAZI:

2      Q.   Gemstones?

3      A.   Gemstones, correct.

4           THE COURT:  Does that answer the question,

5  sir?

6           MR. QAZI:  Yes.  I don't believe that's a

7  justified reason, because I believe --

8           MR. COOPER:  Objection.  Argumentative.

9           THE COURT:  That's argumentative.  I

10 understand where you're going with this, and I gave you

11 some leeway to establish the stop and any further

12 violation, if there was.

13          So that being said, then, the next issue is

14 then the search of the vehicle.

15 BY MR. QAZI:

16     Q.   Okay.  So it's proper procedure to go into

17 pockets if you feel that it's other related to weapons?

18          MR. COOPER:  Objection, Your Honor.  First

19 off, calls for relevance.  Nothing was ever found in

20 his pockets.  So that's relevance.  Second --

21          MR. QAZI:  It was found --

22          THE COURT:  You're asking for a legal

23 conclusion on this matter.

24          MR. COOPER:  Exactly.

25          THE COURT:  What you want to do is focus on

33

000145

1  the facts of what occurs and ask him and set him on his
2  statement of what he did.  Then later on, you then
3  attack the -- based on the facts he stated, on legal
4  conclusion -- you file motions, basically, based on
5  what he says, based on legal theory.

6          MR. COOPER:  And, Your Honor, obviously, I
7  understand that he's not, I guess -- he hasn't been to
8  law school, but the State would lodge an objection,
9  obviously.  I think at this point he's going outside
10 the scope of exactly what he can cross-examine on,
11 first.

12         Second off, obviously, the Court is giving
13 him a lot of leeway and also giving him advice.  I
14 think he should be treated just like any other
15 attorney.

16         THE COURT:  I understand.  I've given you
17 some leeway on establishing the search of the person.

18         MR. QAZI:  I understand.

19         THE COURT:  And I think you've set forth some
20 information.

21         MR. QAZI:  The reason I'm bringing all these
22 issues up is because it's what's included into the
23 whole events.

24         THE COURT:  I understand.  And so I think you
25 have established the search and you've got the facts

                                                    34

1  out there.

2  BY MR. QAZI:

3      Q.   So after putting that on the hood of the car,

4  the gemstones, that's when you immediately handcuffed

5  me; is that correct?

6      A.   I believe I handcuffed you when I felt the

7  gemstones, yes.

8      Q.   So at that point I was arrested; is that

9  right?

10     A.   You were detained.

11     Q.   I was detained?

12     A.   Uh-huh.

13     Q.   Okay.  Now, after telling you that they were

14  crystal gemstones and not no type of drug, was I

15  still -- I was still being detained for a specific

16  reason?

17     A.   Yes.  I was going to search your vehicle,

18  because I smelled the odor of marijuana.

19     Q.   So was there any exigent circumstances to --

20  for the failure to not obtain a warrant?

21          MR. COOPER:  Objection, Your Honor.  First

22  off, that's no longer the statute.  That's no longer

23  the legal analysis in Nevada.  And second off, the word

24  "exigent circumstances" calls for a legal conclusion.

25          THE COURT:  All right.  You can't ask him to

35

1  come up with a legal conclusion.  Meaning that exigent

2  circumstances were this, this, and this.  You have to

3  ask him what the facts were, why he did that.

4  BY MR. QAZI:

5    Q.   Was there any exigent circumstances?

6         THE COURT:  But understand, also, the State

7  has correctly stated that the automobile exception was

8  reinstated a few months ago in Nevada, which allows an

9  officer --

10        MR. QAZI:  Not of my knowledge.  It's

11 still -- the Supreme Court is still --

12        MR. COOPER:  It has been.  Trust me.  I'm an

13 attorney.

14        THE COURT:  What they have done is they have

15 allowed a stop of a vehicle and a search of a vehicle,

16 based on probable cause, without a warrant as to the

17 mobility of the vehicle.  But that doesn't mean that

18 you can't focus in on the search itself.  So right now

19 that's the law of the Supreme Court, as the report has

20 come down.

21 BY MR. QAZI:

22   Q.   Well, was there any exigent circumstances?

23        MR. COOPER:  Same objection, Your Honor.  He

24 needs to rephrase the question, Your Honor.  He can't

25 ask exigent circumstances.  That calls for a legal

36

1  conclusion.  He can ask about the facts.

2          THE COURT:  Yeah.  You need to rephrase your

3  questions as to why he was searching, what he was

4  looking for.

5  BY MR. QAZI:

6      Q.  Was there any emergency situation or the

7  inherent mobility of the vehicle that it was -- you

8  were unable to apply for a warrant -- I mean call for a

9  warrant?

10     A.  I'm not required to by the Nevada Supreme

11 Court.  Your vehicle was occupied, mobile, and I

12 conducted a probable cause search of your vehicle.

13     Q.  Which was not searched incident to arrest,

14 right?

15     A.  Correct.

16     Q.  Okay.  So I was detained and -- hold on.

17 There was no -- the car was not readily mobile at that

18 time, was it, when I was handcuffed?  Was there anyone

19 else that could have destroyed the evidence of the

20 contraband that you believe that was present or the car

21 being moved away?

22          MR. COOPER:  Objection, Your Honor.  Compound

23 question.

24          THE COURT:  Rephrase the question, but just

25 ask if it's mobile, was anybody present, anybody else

                                                    37

1  there, anybody have the keys, things like that.

2  BY MR. QAZI:

3      Q.   Was there anyone else present in the vehicle

4  that could have moved the car?

5      A.   There was no one else in the vehicle that

6  could have moved the car at that time.

7      Q.   And I was handcuffed in front of the patrol

8  vehicle; is that correct?

9      A.   Correct.

10      Q.   So when -- and there was no emergency or

11  anything -- was there any emergency towards the

12  situation?

13      A.   No.

14          MR. COOPER:   I have to object to that one,

15  Your Honor, as well.

16          THE COURT:   I'll allow him to say the

17  emergency.   It would be -- use it as a common phrase

18  word instead of a legal conclusion.

19          THE WITNESS:   There was no emergency at that

20  time.

21  BY MR. QAZI:

22      Q.   Okay.   Is it proper procedure to call for a

23  warrant if you have probable cause?

24          MR. COOPER:   Objection, Your Honor.   First

25  off, I guess --

38

1          THE COURT:  I'm going to sustain the
2  objection on this one.

3          MR. QAZI:  No more questions at this time.

4          THE COURT:  Any follow-ups?

5          MR. COOPER:  No, Your Honor.

6          THE COURT:  Is this witness free to go?

7          MR. COOPER:  He is, Your Honor.

8          THE COURT:  Officer, you're free to leave.
9  Please do not discuss your testimony with any other
10  witnesses.

11          State.

12          MR. COOPER:  Your Honor, the State's next
13  witness is Detective Bien.  Bien, B-I-E-N.

14          THE COURT:  That's him.

15          MR. COOPER:  This is Officer Glover, Your
16  Honor.  Detective Bien, he testified at the previous
17  prelim.

18          THE COURT:  That's right.

19          MR. COOPER:  And, Your Honor, also, as we're
20  waiting for him to come in, I do have and I have
21  previously marked as State's Proposed Exhibit No. 1, a
22  certified copy of the defendant's most recent judgment
23  of conviction for a felony conviction.  It came out of
24  Case No. C-273567, out of Department 7.  It is a
25  certified copy, and if they look on the back, there is

39

1  the raised seal.  The State would move to admit that,

2  pursuant to statute.

3          THE COURT:  Any objection to Exhibit 1 coming

4  in?  That being the certified copy of judgment of

5  conviction.

6          MR. QAZI:  No.

7              **(Whereupon, State's Exhibit 1 was**

8              **marked.)**

9          THE COURT:  Detective, please remain

10  standing.  Raise your right hand.  Face the clerk to be

11  sworn.

12  Whereupon,

13                  FRANK BIEN,

14  was called as a witness, and having been first duly

15  sworn, was examined and testified as follows:

16          THE CLERK:  Please be seated.

17          THE WITNESS:  My first name is Frank.

18  Spelled F-R-A-N-K.  Last name Bien.  Spelled B, as in

19  boy, I-E-N.

20          THE COURT:  State, you may proceed.

21          MR. COOPER:  Thank you, Your Honor.

22

23                  DIRECT EXAMINATION

24  BY MR. COOPER:

25      Q.   Detective Bien, I want to turn your attention

                                                    40

1  to January 6, 2015.

2          Do you recall this day?

3      A.   Yes, sir.

4      Q.   And specifically on this day, were you acting

5  as a detective with the Las Vegas Metropolitan Police

6  Department?

7      A.   Yes, sir.

8      Q.   And specifically, did you respond to a

9  traffic stop in the area of West Harmon for a possible

10  recovery of a weapon?

11      A.   Yes.  That's correct.

12      Q.   Do you recognize anyone in court here today

13  that was present at that traffic stop?

14      A.   Yes.

15      Q.   And can you please point at him and describe

16  something he's wearing?

17      A.   The defendant.  He's wearing the yellow

18  shirt, with the black eye patch.

19          MR. COOPER:  May the record reflect the

20  witness has identified the defendant?

21          THE COURT:  It shall.

22          MR. COOPER:  Thank you.

23  BY MR. COOPER:

24      Q.   When you came in contact with this

25  individual, did you become aware that an officer with

41

1 Metro, by the last name of Glover, had conducted a
2 traffic stop and found possible contraband?

3      A.   That's correct.

4      Q.   At that point was the scene turned over to
5 you?

6      A.   Yes, sir.

7      Q.   And when the scene was turned over to you,
8 what, if anything, did you do?

9      A.   As soon as the scene was turned over to me, I
10 received a briefing from the officer -- the patrol
11 officer who conducted the vehicle stop, who caught me
12 up to speed as to the circumstances of what had
13 occurred.

14          After that I instructed my fellow detectives
15 to conduct an interview with the defendant.  In the
16 meantime, I applied for a telephonic search warrant for
17 the recovery of the firearm, based on the defendant's
18 criminal history.

19      Q.   And you did, in fact, recover that firearm?

20      A.   That is correct.

21      Q.   And are you aware if it was Smith & Wesson
22 .22-caliber firearm, bearing Serial No. M37231, or
23 would your report --

24      A.   I don't want to testify to that, just because
25 I would have to recall my memory with my police report.

42

1    Q.   Would that have been written in your report?

2    A.   It's written in my arrest report.

3    Q.   If I showed you a copy of your report, would

4 it refresh your recollection as to what that serial,

5 make, and model is?

6         THE COURT:  Make sure you show the defendant,

7 you show Mr. Qazi.

8         MR. COOPER:  That's what I'm showing him.

9         MR. QAZI:  I object to that.

10        THE COURT:  What he's doing is refreshing

11 recollection.  He's showing you what he's going to show

12 him and only to refresh the recollection.

13        Your objection is what, sir?

14        MR. QAZI:  The foundation on -- you know, his

15 recollection should be present the way he knows it.

16        THE COURT:  If he doesn't remember, if

17 there's something that he can use to remember, he's

18 allowed to use that.  Almost any document.  They have

19 to show you what document they intend to use, and you

20 can ask him about the document and how it refreshes his

21 recollection.  Based on that, I'm going to allow him to

22 use that to refresh his recollection.

23        MR. COOPER:  Thank you, Your Honor.

24 Permission to approach the witness, Your Honor?

25        THE COURT:  You may.

43

1  BY MR. COOPER:

2      Q.  I'm now showing you -- well, do you recognize

3  that report?

4      A.  Yes.

5      Q.  Is that the report you wrote in this matter?

6      A.  It is my report.

7      Q.  And specifically, on the top of that second

8  page there, just let me know when your memory has been

9  refreshed.

10     A.  Yeah.

11     Q.  Has your memory been refreshed?

12     A.  Yes.

13     Q.  And is that serial number M37231?

14     A.  Yes.  That's correct.  It's the

15  Smith & Wesson.

16     Q.  And it was a .22-caliber Smith & Wesson?

17     A.  Yes.  That's correct.

18     Q.  Was that a revolver, if you remember?

19     A.  It was a revolver.

20     Q.  Now, where was that weapon located?

21     A.  In the center console.

22     Q.  And, to your knowledge, was anything else

23  located in that center console?

24     A.  There was.  The officer instructed me, prior

25  to my arrival, that there was some narcotics that were

44

1  inside the center console above the firearm.

2      Q.   And the narcotics, are you talking about

3  methamphetamine and marijuana?

4      A.   That is correct.

5      Q.   And did Officer Glover give you those items,

6  in order for you to conduct a field test on them?

7      A.   I requested that I receive those items so

8  that I could field test them positive in the field and

9  then impound them as evidence, along with the firearm.

10 That's correct.

11     Q.   Did you, in fact, conduct that ODV field

12 test?

13     A.   I did.

14          MR. COOPER:  Permission to approach the

15 witness, Your Honor?

16          THE COURT:  You may.

17 BY MR. COOPER:

18     Q.   I'm now showing you what's previously been

19 marked as State's Exhibit 2 and State's Exhibit 3.

20          Do you recognize these?

21     A.   I do.

22     Q.   Specifically looking at State's Exhibit 2,

23 how do you recognize it?

24     A.   The ODV field test for methamphetamine.

25     Q.   And is that for the incident we're talking

                                                         45

1  about now?

2       A.   That's correct.

3       Q.   And specifically, it looks like in the upper

4  left-hand corner there, it has a name.

5            What does that name say?

6       A.   Last name Qazi.  First name Omar.

7       Q.   And is that the same name that's on State's

8  Exhibit 3?

9       A.   Same name, that's correct.

10      Q.   Do you recognize State's Exhibit 3?

11      A.   That's the same field test form that we used,

12  except it's for marijuana.

13      Q.   And it looks like under examiner there's a

14  name on both of those.

15           Do you see that?

16      A.   I am the examiner of both.

17      Q.   And on the left-hand side of both those

18  documents there's a whole bunch of check marks and

19  numbering of different steps.

20           Do you see those?

21      A.   Yes.

22      Q.   Did you follow all the steps that you're

23  supposed to when you conducted this test?

24      A.   I did.  I always do.

25      Q.   Have you previously been certified in

46

1  conducting ODV tests?

2       A.   I was.

3       Q.   And were you certified at this time?

4       A.   I was certified during this time.

5       Q.   Okay.  And did you follow all your training

6  and experience when you conducted these tests?

7       A.   I did.

8       Q.   And what was the result of the test for

9  methamphetamine?

10      A.   Positive.

11      Q.   And what was the result for the test of

12  marijuana?

13      A.   Positive.

14      Q.   Specifically on the methamphetamine, what was

15  the weight on that?

16      A.   1.2 grams gross.

17      Q.   And are you aware if that was conducted -- if

18  that methamphetamine was in one bag or multiple bags,

19  if you remember?

20      A.   I don't recall.

21      Q.   Would you have dictated that in your report?

22      A.   Possibly.

23      Q.   If you saw a copy of your report, would it

24  refresh your recollection?

25      A.   Yes.

47

1      Q.   Okay.  What about the marijuana?  Do you

2  remember if that was in one bag or multiple bags?

3      A.   I don't remember.

4      Q.   If that was in your report, too, would it

5  refresh your recollection?

6      A.   It would.

7           MR. COOPER:  And at this point, Your Honor,

8  the State would move to admit State's Exhibit 2 and

9  State's Exhibit 3.

10          THE COURT:  Any objection to Exhibits 2 and 3

11  coming in?  Those are the ODV tests.

12          Do you have a copy of those, sir?

13          MR. QAZI:  Yes.

14          THE COURT:  Any objection to 2 and 3 coming

15  in?

16          MR. QAZI:  No.

17          THE COURT:  Exhibits 2 and 3 shall be

18  admitted at this time.

19              (Whereupon, State's Exhibits 2 and 3

20               were admitted.)

21          MR. COOPER:  Your Honor, permission to

22  approach the witness?

23          THE COURT:  As to refreshing recollection --

24          MR. COOPER:  Yes, Your Honor.

25          THE COURT:  -- as to the -- I'll allow that

48

1  to happen.

2          MR. COOPER:  Thank you.

3  BY MR. COOPER:

4      Q.   Just go ahead and review that second page of

5  the report -- specifically the bottom portion and

6  page 3 of your report -- and let me know if your memory

7  is refreshed as to the packaging of the methamphetamine

8  and marijuana.

9      A.   Yeah.

10     Q.   Okay.  Has your memory been refreshed?

11     A.   Yes.

12     Q.   Now, specifically the marijuana, how was that

13  packaged, if you remember?

14     A.   In individual -- three different individual

15  packages.

16     Q.   And the methamphetamine, how was that

17  packaged?

18     A.   The same.  Three different individual

19  packages.

20     Q.   Now, the methamphetamine, was each individual

21  package weighing the exact same amount, if you

22  remember?

23     A.   I apologize.  I don't remember.

24     Q.   Was that contained in your report, though?

25     A.   The weights.  I put the amounts and the

49

1 weights and everything specifically in my report.

2        MR. COOPER:  Permission to approach the

3 witness again, Your Honor?

4        THE COURT:  You may.

5 BY MR. COOPER:

6    Q.  Just go ahead and read that third page for me

7 and let me know if your memory is refreshed as to the

8 weights of all three of the bags.

9        On the methamphetamine, were all three of

10 those bags weighing the same exact amount?

11    A.  That's correct.  .4 grams gross.

12    Q.  And --

13        THE COURT:  You said .4?

14        THE WITNESS:  .4.

15 BY MR. COOPER:

16    Q.  Now, prior to being a detective with

17 firearms, what other positions have you held with

18 Metro?

19    A.  I've been on the department for over

20 12 years, so I've worked gang investigations, firearms

21 investigations.

22    Q.  Have you worked narcotics investigations?

23    A.  I haven't worked in the narcotics section.

24 However, I have worked investigations involving

25 narcotics on several occasions.

50

1    Q.   And before you were a detective, were you, in

2 fact, a patrol officer?

3    A.   I was.

4    Q.   And as a patrol officer, did you conduct

5 investigations determining whether or not someone had

6 methamphetamine on them, or stuff like that?

7    A.   Several.

8    Q.   And based on your 12 years as a police

9 officer and your training, was there something unique

10 about the fact that he had multiple baggies of the same

11 exact type of substance?

12    A.   Yes.  Based on my training and experience in

13 dealing with narcotics, it's been my knowledge that

14 persons who commonly carry narcotics in several

15 different baggies, specifically weighing the same

16 amount, is indicative of narcotic sales.

17    Q.   And the marijuana, that was also in different

18 baggies as well?

19    A.   That's correct.  Three different baggies.

20         MR. COOPER:  Court's indulgence.

21         THE COURT:  All right.

22 BY MR. COOPER:

23    Q.   No one else in the vehicle that you're aware

24 of?

25    A.   Not to my understanding.  I wasn't the person

51

1 that conducted the vehicle stop, but I was instructed

2 that he was the sole occupant.

3     Q.   And at some point the defendant had an

4 occasion to speak to another detective with the

5 firearms bureau?

6     A.   That's correct.

7     Q.   And are you aware if that detective recorded

8 the defendant's statement?

9     A.   It's my understanding that the recording --

10 the statement was recorded, that is correct.

11          MR. QAZI:  I object to that.

12          THE COURT:  We haven't got there yet.

13          MR. COOPER:  I'm just asking if it was

14 recorded.

15          THE COURT:  Is the recording going to come

16 in?

17          MR. COOPER:  I don't plan on it.

18          THE COURT:  Okay.

19          MR. COOPER:  Yet.

20          THE COURT:  All right.  I'm assuming you're

21 objecting to what?  Hearsay?

22          MR. QAZI:  To the detective that conducted

23 the recording.

24          THE COURT:  Well, he only asked if he knows

25 if there's a recording, but I don't know if you're

52

000164

1   going to play it yet.

2              MR. COOPER:  I'm not going to play the

3   recording.

4              THE COURT:  Or introduce it as evidence.

5              MR. COOPER:  The recording, no.

6              THE COURT:  Or any portion -- I mean are you

7   asking him --

8              MR. COOPER:  I plan on asking him just one

9   question, but obviously he can object to the question

10  if he feels like it's legally unsound.

11             THE COURT:  And the question is going to be?

12  BY MR. COOPER:

13     Q.   Did you have an occasion to review the taped

14  statement of the defendant prior to today, if you

15  remember or if you know?

16     A.   I'm going to say I don't remember if I

17  reviewed it or not.

18     Q.   That's fine.

19     A.   I want to be sure.

20             MR. COOPER:  Court's indulgence.

21             No further questions, Your Honor.

22             THE COURT:  All right.  Mr. Qazi,

23  cross-examination of this witness.

24  ///

25  ///

53

1                    CROSS-EXAMINATION

2  BY MR. QAZI:

3       Q.   Okay.  Your name was?

4       A.   Detective Bien.

5       Q.   Detective Bien?

6       A.   Yes, sir.

7       Q.   So the arrest report that was written was

8  written by you?

9       A.   Yes, sir.

10      Q.   So according to the arrest report, it says

11 January 6, 2014.

12           Was it 2014 or was it 2015?

13      A.   2015.

14      Q.   Okay.  And are you the arresting officer?

15      A.   Yes.

16      Q.   You are the arresting officer.  Okay.

17           Did you read me my Miranda at any time?

18      A.   No.

19      Q.   So how is it that according to the arrest

20 report it says that Officer Glover handcuffed and

21 arrested myself if you were the arresting officer?

22      A.   He placed you under arrest for the narcotics

23 originally, and then I assumed the control over the

24 arrest.  So, essentially, you were placed in handcuffs,

25 although I was the arresting officer.

                                                    54

1    Q.   So Officer Glover was the first arresting
2  officer; is that what you're saying?

3    A.   He was the individual that placed you in
4  handcuffs.

5    Q.   Now, so when you took over, where was the
6  evidence found that you're claiming that you had found?

7    A.   What evidence specifically are you referring
8  to?

9    Q.   The black revolver.

10    A.   In the center console.

11    Q.   Okay.  Was the center console a cup holder or
12  an ashtray or what kind of -- what was in the center
13  console?

14    A.   Maybe rephrase your question.

15    Q.   Was it underneath a certain area of the
16  console, or can you describe how -- where it was found
17  in the middle console?

18    A.   I would have to see the pictures to refresh
19  my memory.

20          MR. QAZI:  Can we produce that, or?

21          THE COURT:  Do you have those pictures now?

22          MR. COOPER:  I don't have them.

23          MR. QAZI:  They should be in the --

24          THE COURT:  Is there anything in the reports?

25          MR. QAZI:  I do have them personally, but,

55

1   like I said, they're not in court right now.

2          THE COURT:  What was the question about the

3   console?

4          THE WITNESS:  If you allow me to read my

5   arrest report, I believe I put it in my arrest report,

6   the location of the firearm.

7          THE COURT:  Is it the location of it or it

8   is --

9          MR. QAZI:  Well, the way --

10          THE COURT:  -- the way the cup holder --

11          MR. QAZI:  -- the way the middle console

12   looked and where it was found.

13          THE COURT:  All right.  Would you, reviewing

14   your arrest report, be able to answer that question?

15          THE WITNESS:  I think so.

16          THE COURT:  What I'm going to do, Mr. Qazi,

17   I'm going to allow him to review his arrest report,

18   which may be in there as to the center console.

19          THE WITNESS:  I remember now.

20          THE COURT:  All right.  If you can just turn

21   that upside down.

22          THE WITNESS:  Sure.  No problem.

23          THE COURT:  After reviewing that, were you

24   able to answer Mr. Qazi's question?

25          THE WITNESS:  Yes, sir.  So when I refer to

000168

1    the center console of the vehicle, I'm referring to the

2    entire center section of the vehicle.  Just to the

3    right of the driver's seat, there's a center console.

4    There was an ashtray there.  And that ashtray, once you

5    lift that ashtray up, then inside the center console is

6    where the firearm and the narcotics were discovered.

7    BY MR. QAZI:

8        Q.  So there was an ashtray in the middle which

9    was easily removed, and it was found underneath that?

10       A.  That's correct.  Yes.

11       Q.  All right.  Well, in the picture I have in

12   evidence, it will show that the ashtray is up where the

13   cup holder is at, and then the gear shift --

14            MR. COOPER:  Objection, Your Honor.  He's

15   testifying.

16   BY MR. QAZI:

17       Q.  -- and then it's the middle console.

18            THE COURT:  Well, you need to lock him into

19   that question or his answers.  And then if the evidence

20   shows something different, then you proceed on that.

21            MR. QAZI:  Well, that's what I'm trying to

22   get at.  The evidence does show --

23            MR. COOPER:  He's testifying.

24            THE COURT:  That's what I'm saying.  You have

25   to ask him the questions and he locks himself into that

57

1 line of answers. And if the evidence shows something

2 different, then you can present that later.

3 BY MR. QAZI:

4   Q.   Okay. Did it look like consoles were removed

5 from the car?

6         THE COURT: What do you mean by "consoles"?

7 My understanding of a console is a big thing. A big

8 plastic --

9         MR. QAZI: Well, there was a few consoles.

10 Like the center console by the radio or, you know, the

11 consoles of the car. Like the interior of the car.

12         THE COURT: Where you put stuff?

13         MR. QAZI: Basically.

14         THE COURT: Cup holders and ashtrays.

15         MR. QAZI: Or just the covers of, let's say,

16 wires or anything that's --

17         THE WITNESS: So I think I can answer his

18 question, Your Honor.

19         THE COURT: Yes.

20         THE WITNESS: When I say the word "center

21 console", what I'm referring to is the entire center

22 section of the vehicle between the driver and the

23 passenger. So when I say "center console," I mean that

24 center area, not just the -- if there is a device

25 that -- a little storage area where you would put your

58

1  sunglasses or whatever, not just that.  The whole

2  entire center console.

3          In the photos it will show that in that

4  center area between the two seats there is an ashtray.

5  That ashtray was lifted up.  Not by me.  By -- as the

6  testimony you heard from the other officer -- I'm sure,

7  I could assume -- that's where the firearm was

8  discovered.

9  BY MR. QAZI:

10     Q.   Okay.  According to Glover's testimony that

11  it was the center console cup holder, which is

12  inconsistent with --

13          MR. COOPER:  And, Your Honor --

14          THE COURT:  That's an improper question to

15  ask, as to verify the other person's testimony.  So he

16  remembers that it was an ashtray.  That's his

17  testimony.  That being Detective Bien, that's his

18  testimony that it was an ashtray that was removed and

19  under that was found a gun.

20  BY MR. QAZI:

21     Q.   Was there any other consoles removed in the

22  interior of the car or any damage done?

23          THE COURT:  If you know.

24          THE WITNESS:  Not to the best of my

25  knowledge.

59

1          THE COURT: Did you remove any consoles?

2          THE WITNESS: I did not, no.

3   BY MR. QAZI:

4     Q.   All right. Did it seem like the radio was

5   intact?

6          THE COURT: Working or that it was -- parts

7   were removed?

8          MR. QAZI: If it was there intact, everything

9   was fine with it.

10         THE WITNESS: I don't remember anything about

11  the radio, because it didn't have anything to do with

12  my investigation. My investigation was to recover the

13  firearm. And I didn't recover the firearm from the

14  radio, so I don't recall.

15  BY MR. QAZI:

16    Q.   You didn't see the interior destroyed in any

17  way type of form?

18    A.   I didn't -- if you're asking me if I

19  destroyed the interior, I did not destroy the interior.

20    Q.   No. I'm asking if you seen the car, was it

21  destroyed at all? Like any consoles that were taken

22  off that were not -- like other than being intact?

23         MR. COOPER: Objection, Your Honor.

24  Relevance. What does that have to do with finding a

25  weapon?

60

000172

1          THE COURT:  If you can answer the question,
2  I'll allow you to answer it so we can move on.
3          Did it look like any damage was done to it by
4  the search?
5          THE WITNESS:  At what point in time?  Damage
6  when I first arrived or damage --
7  BY MR. QAZI:
8      Q.   When you went there to recover the evidence.
9          THE COURT:  Here's the problem.  He stated
10  all he did was remove the firearm.
11          You did not perform any further searches?
12          THE WITNESS:  I didn't tear the vehicle
13  apart.  I didn't damage the vehicle, nor did any of my
14  coworkers.
15  BY MR. QAZI:
16      Q.   So no one damaged -- it looked like it would
17  be intact?  You're saying the middle console is the way
18  it is, right?
19          MR. COOPER:  And, Your Honor, I mean it's
20  100 percent speculation.  How does he know what the
21  middle console looked like before?
22          MR. QAZI:  I have picture evidence.
23          THE COURT:  I'll sustain the objection.
24  We're going to move on from here.  I need you to ask
25  some other questions.

000173

1         MR. QAZI:  Your Honor, I have the picture
2  evidence showing how the center console looked and --
3         THE COURT:  Well, you've asked him about the
4  center console.  We've gotten that point about the
5  radio.  I think we're getting a little off course here.
6  BY MR. QAZI:
7     Q.   All right.  So at what time did you call in
8  for your telephonic search warrant?
9     A.   I don't recall.
10    Q.   You don't recall?
11    A.   I don't remember it through memory, that is.
12  It would be on the transcription of the telephonic
13  search warrant, though.
14        MR. QAZI:  Can we show that to --
15        MR. COOPER:  Your Honor, I'm going to object
16  again to relevance.
17        THE COURT:  How long after you got there did
18  you call for the search warrant?  Do you recall?
19        THE WITNESS:  It didn't take me very long,
20  Your Honor.  I received a briefing.  I started working
21  on it almost immediately.  I would venture to guess,
22  without refreshing my memory, it was -- the beginning
23  of the application for the telephonic search warrant
24  was within an hour of my arrival.
25        THE COURT:  All right.  Will that suffice,

62

1  Mr. Qazi?

2           MR. QAZI:  Yes.

3  BY MR. QAZI:

4       Q.  And about how long after the arrest were

5  you -- did you show up to the scene?

6           THE COURT:  Let me stop you there.  1803,

7  would you say, was that -- in your report it says that

8  Judge Hafen signed the search warrant.

9           Would you agree with that testimony -- or

10  with that statement?

11           THE WITNESS:  At the very beginning of my

12  application, it would say, The date is, and, The time

13  is, at the beginning of the recording, Your Honor.

14           THE COURT:  I'm saying 1803 is when Judge

15  Hafen approved it.  So within five or ten minutes of

16  that is when you applied for it?

17           THE WITNESS:  Yes, Your Honor.  That's

18  correct.

19           THE COURT:  Mr. Qazi, do you understand?

20           MR. QAZI:  Yes.

21           THE COURT:  Within about five or ten of 1803,

22  that being the hour, he applied, so.

23           MR. QAZI:  So it was at 1803.  Okay.  The

24  application for the telephonic search warrant, can I

25  state what's in it?

63

1           THE COURT:  What's in what?

2           MR. QAZI:  In the search warrant.

3           MR. COOPER:  Your Honor, I'm objecting.

4   That's testimony.

5           THE COURT:  You have to ask him.

6           MR. QAZI:  Can I state what was mentioned in

7   the search warrant itself, as far as what was said to

8   the judge to get the warrant?

9           MS. WALDO:  Judge, can we take a brief

10  indulgence really quick.

11          THE COURT:  Sure.

12               (Whereupon, other matters were heard.)

13          THE COURT:  State of Nevada versus Omar Qazi.

14  This is a continuation of the preliminary hearing.

15  Continue on with cross-examination.  I forgot where we

16  were at.

17  BY MR. QAZI:

18      Q.   On the application, you are the applicant for

19  the telephonic search warrant; is that correct?

20      A.   Yes, sir.

21      Q.   So do you recall that it was done at

22  1803 hours?

23      A.   Thereabouts.  Without seeing the actual

24  application, the transcription, I can't testify

25  honestly to the date [sic].  I would have to refresh my

                                                          64

1  memory.

2      Q.  That was according to your arrest report.
3  According to the telephonic search warrant, it says
4  1756 hours.

5          MR. COOPER:  Objection, Your Honor.  He's
6  testifying.

7          THE COURT:  Well, I think he's questioning
8  him, so I'll allow that question to stand.  That is
9  when it was initially begun and approved, at 1803.

10         Does that seem right?

11         THE WITNESS:  It would seem right.  But,
12  again, without reviewing my --

13         THE COURT:  Can we just agree on these
14  times -- just to move along -- if that's in there.  Or
15  do you have the search warrant itself, so we can say?

16         MR. COOPER:  I have the application of the
17  search warrant, Your Honor.

18         THE COURT:  What time was it attested to?

19         MR. COOPER:  I can tell you, Your Honor, on
20  the application for the search warrant it says that on
21  January 6, 2015, at 1756 hours is when the call
22  started.

23         THE COURT:  And then 1803 was the final.

24         MR. COOPER:  Your Honor, permission to
25  approach the witness, just so we can speed this along,

65

1 just to make sure we're all on the same page here.

2         THE COURT:  Okay.

3 BY MR. QAZI:

4    Q.  I just wanted to see if -- it was basically

5 approved at 1803?

6    A.  1756 hours was the time that I applied for

7 the application and affidavit with a judge.  I think at

8 the end, I give the date and time again.  I think.  I

9 can't remember for sure.

10        THE COURT:  So within that ten minute time.

11        THE WITNESS:  So I mean the application and

12 affidavit for telephonic search warrant typically takes

13 ten to fifteen minutes, given the complexity of the

14 case.  But then, again, I can testify that at

15 1756 hours is when I began my conversation with the

16 judge.

17 BY MR. QAZI:

18    Q.  Okay.  When you and your partner showed up to

19 the scene, were you in uniform or civilian clothing?

20        MR. COOPER:  Objection, Your Honor.

21 Relevance.

22        THE COURT:  I'll allow the question, so we

23 can move on.

24        THE WITNESS:  Civilian clothes.

25

66

1  BY MR. QAZI:

2      Q.   Did you show any type of authority?

3           MR. COOPER:  Objection.

4           THE COURT:  Sustained as to relevance.   I

5  don't --

6           MR. QAZI:  Well, I was removed from the

7  immediate vicinity, away from patrol officers in the

8  vehicle.

9           MR. COOPER:  Objection, Your Honor.  He's

10  testifying.

11          THE COURT:  Well, he's making an argument, so

12  I'll allow it.  Go ahead.

13          MR. QAZI:  I was taken away about 15 yards

14  away from the scene.

15          THE COURT:  And you could not view the search

16  itself?

17          MR. QAZI:  I could not view -- I could not be

18  around the patrol officers, the search, anything.  So I

19  was --

20          THE COURT:  Well, that being said,

21  regardless, I mean, whether he's showing authority or

22  showing badges or anything like that --

23          MR. QAZI:  Well, it made me feel like I was

24  being kidnapped.

25          THE COURT:  Then I'm going to sustain the

67

1 objection as to relevance.  We're only focusing on the

2 search and what he did with what he found.

3 BY MR. QAZI:

4     Q.   Okay.  Detective M. Kitchen was your partner?

5     A.   Yes, sir.

6     Q.   Did he -- was he covering up his face at the

7 time of when I approached him?

8          MR. COOPER:  Objection, Your Honor.

9 Relevance.

10         THE COURT:  What's the relevancy in that,

11 sir?

12         MR. QAZI:  You know, is that proper

13 procedure, because he had his face covered?

14         THE COURT:  He may.  He may be doing it for

15 other reasons.  That's something you have to address

16 with him.  That being said, I'll sustain the objection.

17 BY MR. QAZI:

18     Q.   So was he also in civilian clothing?

19     A.   Yes.

20     Q.   And he didn't have no type of show of

21 authority?

22         THE COURT:  Sustain the -- there was an

23 objection previously of the same question.

24         MR. QAZI:  Yes.

25         THE COURT:  He's there.  They're searching.

68

000180

1  They're in plain clothes.  We've got that.  All right.

2  BY MR. QAZI:

3      Q.   Now, was it a marked vehicle that you guys

4  arrived in or was it unmarked?

5      A.   Unmarked.

6      Q.   Unmarked.  Okay.  And they were dark-colored

7  vehicles?

8           MR. COOPER:  Objection, Your Honor.

9  Relevance.  I mean, what are we doing here?

10          THE COURT:  Sir, I don't know where we're

11  going with this.

12          MR. QAZI:  I'm just getting at the point

13  where -- how I was taken away from the scene.

14          THE COURT:  All right.  You were taken away.

15  There's no doubt about that.  I'm okay -- you've

16  already established that.  You've established they were

17  in plain clothes.  What color their car is, I don't

18  think, because they're officers --

19          MR. QAZI:  Well, if there's any evidence that

20  could show that --

21          THE COURT:  To show what as to probable

22  cause?  Whether or not it's more probable than not that

23  the crime was committed and that you committed it?

24          MR. QAZI:  Well, it was also where the

25  investigation was taking place at, as far as my -- the

                                                          69

```
 1  interrogation by his partner.
 2           THE COURT:  Interrogation?
 3           MR. QAZI:  Yes.  That's where the
 4  interrogation was --
 5           THE COURT:  We haven't even got into the
 6  interrogation.
 7           MR. QAZI:  Well, that's --
 8           THE COURT:  I don't think it was admitted,
 9  because it was hearsay.  We never got into the
10  interrogation.  So that's a can of worms you don't want
11  to open up.
12           MR. QAZI:  Okay.
13           THE COURT:  Sorry, State.
14           MR. COOPER:  It's all good.
15  BY MR. QAZI:
16      Q.   Did you promise any leniency in court for
17  cooperating?
18      A.   No.
19      Q.   Did you leave a phone number with me?
20      A.   I don't recall.
21      Q.   Were you present when -- never mind.
22           So were you the transporting officer to the
23  CCDC?
24      A.   No.
25
```

70

1          MR. QAZI:  No further questions.

2          THE COURT:  Any follow-ups based on that?

3

4                    REDIRECT EXAMINATION

5  BY MR. COOPER:

6      Q.   This all happened in Clark County, correct?

7      A.   Yes, sir.

8          MR. COOPER:  No further questions, Your

9  Honor.

10          THE COURT:  Is this witness free to go?

11          MR. COOPER:  Yes.

12          MR. QAZI:  Yes.

13          THE COURT:  At this time I'm going to release

14  you, Officer.  Thank you for your testimony.  Please do

15  not discuss your testimony with any other witnesses.

16          State, I have Exhibits 1, 2, and 3 admitted

17  at this time.

18          Anything further of the State?

19          MR. COOPER:  Court's indulgence.  Let me just

20  verify the -- no, Your Honor.  The criminal complaint

21  appears to be in order.  Yes.

22          With the admission of our exhibits, the State

23  has no further witnesses.

24          THE COURT:  Mr. Qazi, the State has rested.

25          Do you wish to call a witness?

                                                      71

1          MR. QAZI:  Yes, please.

2          THE COURT:  All right.  Your first witness

3  will be?

4          MR. QAZI:  Gloria Ogarti [ph] Qazi, my

5  mother.

6          THE COURT:  All right.  Miss Qazi.

7          MR. QAZI:  Owner of the vehicle.

8          THE COURT:  Ma'am, if you can come take the

9  stand.  What I need you to do is to remain standing.

10  Raise your right hand.  Face the clerk to be sworn.

11  Whereupon,

12                    GLORIA QAZI,

13  was called as a witness, and having been first duly

14  sworn, was examined and testified as follows:

15          THE CLERK:  Please have a seat.  State and

16  spell your first and last name for the record.

17          THE WITNESS:  Yes.  My name is Gloria.  Same

18  last name, Q-A-Z-I.

19          THE COURT:  Ma'am, you may have a seat.  If

20  you want to move closer to the microphone.  All right.

21          State -- I'm sorry.  Defense, you may

22  proceed.  All right.  You may proceed.

23                  DIRECT EXAMINATION

24  BY MR. QAZI:

25      Q.   So your name is Gloria Qazi, right?

72

000184

1     A.   Yes.

2     Q.   Okay.  Are you the owner of the gold Saturn

3  vehicle?

4     A.   Yes.

5          MR. COOPER:  Objection, Your Honor.  I just

6  want to clarify what Saturn vehicle we're talking

7  about.

8          THE COURT:  Are we talking about the one that

9  was searched that day?

10         MR. QAZI:  Yes.

11         THE COURT:  Can we stipulate to that?

12         MR. COOPER:  That's fine, as long as he's

13 clear.

14         THE COURT:  It's the gold Saturn that was

15 searched the day that you were driving?

16         MR. QAZI:  Uh-huh.

17         THE COURT:  All right.

18 BY MR. QAZI:

19    Q.   Was I allowed to drive that car that day?

20    A.   Yes.

21    Q.   Was the vehicle intact prior to lending me

22 the vehicle?

23    A.   Yes.

24    Q.   Did officers call you to pick up the vehicle

25 after the search?

73

1     A.   No.

2     Q.   No.  Okay.  And who picked up the vehicle
3  from the scene?

4     A.   Crystal.

5     Q.   Crystal.  Okay.

6          THE COURT:  Can you give a background on who
7  Crystal is.  Sister?  Aunt?  Girlfriend?

8          MR. QAZI:  It's girlfriend.  My girlfriend.

9          THE WITNESS:  His girlfriend.

10         MR. QAZI:  It's in the arrest report.

11  BY MR. QAZI:

12    Q.   Okay.  And upon receiving the vehicle, did
13  you notice anything different with the interior of the
14  vehicle?

15    A.   Well, everything was spread out, you know.
16  And the door -- even the door was like -- I used to be
17  able to close it, you know, regular.  Now I had to like
18  pull it up and push it.  It's like the person behind
19  me, the passenger, cannot open.  If they open the door,
20  I cannot get out.  And before it just -- we used to
21  open both doors easily.  Now, it's that.  I noticed.
22  But, you know, it doesn't matter to me, you know.  It's
23  just a car.  But that happened.  And right now I just
24  went to move my car --

25         THE COURT:  Okay.  Let me stop you there.

                                                    74

1 Just answer the question without adding too much to it.

2         You may proceed.

3 BY MR. QAZI:

4     Q.   Okay.  Was the -- were the consoles at all

5 looked to be normal, like the middle console or by the

6 radio area or anything?

7     A.   No.  Everything was just like in the floor.

8         THE COURT:  Okay.  I need you to describe,

9 because she's writing these things down.  When you do

10 this, I understand that means that they're thrown all

11 over the place.  But you need to be able to say that,

12 because she's writing that down.  That's the record.

13         Without making gestures, tell us what you

14 saw.

15         THE WITNESS:  Yes.  The trays from the -- I

16 never was able to move those trays, and they were on

17 the floor.  And the -- I don't know what it's called.

18 The sides of the console were also out of place.  And

19 the metal thing something is missing.  I never pay too

20 much attention, because I don't play music, nothing

21 like that.  I don't know where it went.

22         THE COURT:  The metal thing?  Do you mean the

23 radio?

24         THE WITNESS:  Yes.  I don't know.  The DVD.

25 Something.  I don't know the names of those, because I

75

1  don't --

2         THE COURT:  Something was moved from the

3  radio?

4         THE WITNESS:  Yes.  Something.

5         THE COURT:  That was the front face plate, if

6  you will, or the cover, or?  I'm asking you.  I'm not

7  trying to --

8         THE WITNESS:  It's just like it was from the

9  radio or something like that.  It was missing from

10 there.

11        THE COURT:  The entire radio?

12        THE WITNESS:  Yeah.  They left the whole spot

13 open.

14        THE COURT:  So they actually removed the

15 radio?

16        THE WITNESS:  Yeah.  I guess so, because I

17 don't see it.  I find something else, another black

18 part, but that doesn't belong to my car.

19        THE COURT:  So there's a whole missing radio?

20        THE WITNESS:  Yeah.

21        THE COURT:  Did you ever find that radio?

22        THE WITNESS:  I seen some other part that

23 doesn't belong to my car.

24        THE COURT:  Did you ever find the radio?

25        THE WITNESS:  No.

76

1          THE COURT:  So there's a whole, big,

2  rectangular, empty space?

3          THE WITNESS:  It's empty space.  And then

4  there's something that I don't know what it is, is

5  there, but it doesn't belong to my car.

6          THE COURT:  Okay.

7          THE WITNESS:  This black part.

8          THE COURT:  I'm sorry.  You may go ahead.

9  BY MR. QAZI:

10     Q.   What was this kind of black box?  Are you

11  talking about a certain console that was removed that

12  somehow --

13          MR. COOPER:  Objection, Your Honor.  He's

14  leading.

15  BY MR. QAZI:

16     Q.   -- doesn't look to be in the right place?

17          MR. COOPER:  Leading.

18          THE COURT:  I'm going to allow a little

19  leeway on this one.  Go ahead.  Reask the question

20  again.

21  BY MR. QAZI:

22     Q.   Was it like a part of a console of the

23  vehicle, the interior that was removed from not a

24  normal place?

25          MR. COOPER:  I mean, Your Honor.

                                                      77

1          THE COURT:  I'm not sure I understand the

2  question.

3          MR. QAZI:  Well, she's saying that she seen

4  like a black box, or.

5          THE COURT:  That was not part of the vehicle?

6          MR. QAZI:  Exactly.

7          THE COURT:  Do you know where that came from?

8          THE WITNESS:  No.

9          THE COURT:  Okay.  Sustain the objection,

10  then.  The objection was leading, because you were

11  trying to tell her the answer to say.

12  BY MR. QAZI:

13     Q.   And you said there was trays on the floor.

14  Could you describe the trays?

15     A.   The tray I had never moved, because they were

16  hard to move, they were also on the floor.  And let me

17  see.  What else?  Oh, I just been noticing a lot that

18  my car is always -- not always -- sometimes I find it

19  open and I know that I had locked it.

20          First I used to --

21          MR. COOPER:  Objection, Your Honor.

22          THE WITNESS:  I used to --

23          THE COURT:  Let me stop you there.

24          MR. COOPER:  This is nonresponsive.

25          THE COURT:  This is a little beyond what

                                                      78

1  we're talking about here.  I think we're talking about

2  the vehicle after it was recovered, what she noticed.

3          THE WITNESS:  Okay.

4          THE COURT:  All right.

5  BY MR. QAZI:

6     Q.  Okay.  Have you lent the car to anyone else?

7     A.  Yeah.  Off and on.

8          THE COURT:  Let's get a time frame.  Prior to

9  this date?

10         MR. QAZI:  Within that week of --

11         THE COURT:  January 6.

12         MR. QAZI:  -- January 6, 2015.

13         THE WITNESS:  Yes.  I had lent it to -- just

14  to people that wants to borrow it, you know, like some

15  neighbors or some of your friends.  But I don't know --

16  I don't know their names.

17  BY MR. QAZI:

18     Q.  Okay.  Was there any warrants left in the

19  vehicle?

20         THE COURT:  Warrants?

21  BY MR. QAZI:

22     Q.  Any paperwork left by officers?

23     A.  There were like three pages, pink pages, and

24  I mailed them to you.

25         MR. QAZI:  Okay.  That's all for now.

000191

1          THE COURT:  All right.  No further questions.

2          State.

3

4                    CROSS-EXAMINATION

5  BY MR. COOPER:

6      Q.   All right.  I'm sorry, ma'am.  What was your

7  first name, again?

8      A.   Gloria.

9      Q.   Gloria.  Is it okay if I call you Gloria?

10     A.   Yes.

11     Q.   Thank you.  So you obviously -- the defendant

12 is your son?

13     A.   He's my son.

14     Q.   And you obviously love your son?

15     A.   (Witness nods head.)

16          THE COURT:  Hold on.  Ma'am, I need you to

17 answer yes or no.  Don't make the gestures.  Yes or no.

18          THE WITNESS:  Yes.  Sorry.

19 BY MR. COOPER:

20     Q.   And you obviously don't want to see your son

21 get in trouble or anything like that, right?

22     A.   Right.

23     Q.   Okay.  So let's go back to January of 2015.

24          In January of 2015, I think you said that you

25 were just loaning your vehicle to people?

                                                      80

1    A.    Yeah.   They just asked me, can I go to the --

2   it was some people I knew.   Can I go to the doctor or

3   to the hospital, and I cannot say no.

4    Q.    And --

5    A.    Or just like when I give a ride, you know.

6    Q.    So you were just -- did you know these

7   people?

8    A.    Acquainted.   I'm acquainted to them.

9    Q.    So you would just loan your vehicle to

10   anyone?

11    A.    They are people that I have seen most of the

12   time, yes.

13    Q.    How many vehicles did you have?

14    A.    I had only one.   I used to have two, but I

15   have only one.

16    Q.    So in January 2015, you only had one vehicle?

17    A.    Yes.

18    Q.    And do you work?

19    A.    Yes.

20    Q.    Where do you work at?

21    A.    I work in a time-share.

22    Q.    And what are your usual hours that you go to

23   and from work?

24    A.    From 11:00 to 7:30.

25    Q.    So 11:00 to 7:30 p.m.?

81

1    A.    Yes.

2    Q.    And do you work Monday through Friday or do
3  you work on weekends?

4          MR. QAZI:  I object.  Relevance.

5          THE COURT:  Yes.  Counsel.

6          MR. COOPER:  I'm laying a foundation.

7          THE COURT:  Focus on January 6th.

8          MR. COOPER:  I'm talking about specifically
9  this whole January time period when she's talking about
10 lending her vehicle to people.  I just want to know
11 what her work schedule is, to determine how she was
12 going to and from work if she was lending her vehicle
13 to people.

14         THE COURT:  All right.  You get a little
15 leeway on this.

16 BY MR. COOPER:

17   Q.    So you can answer that.  When do you usually
18 work?  Monday through Friday?  Saturday or Sunday?

19   A.    It varies, but usually -- let's see.  I
20 have -- it had been changed, because sometimes I asked
21 them to take time off, so I don't remember my schedule.

22   Q.    Now, January of 2015, were you working
23 40 hours a week, or how many hours a week were you
24 working?

25   A.    I think 40.

                                                    82

1     Q.    Okay.  And you obviously had to go to and

2  from work from your house?

3     A.    I work very close.  I can walk.

4     Q.    You walk to your work?

5     A.    I can walk.

6     Q.    So who were these people you were loaning the

7  vehicle to?

8     A.    I had lent it to neighbors.

9          MR. QAZI:  I object, Your Honor.

10         THE COURT:  As to?

11         MR. QAZI:  As to the relevancy on who she

12  lend it to.

13         MR. COOPER:  It goes directly to his defense,

14  Your Honor.

15         THE COURT:  The problem is you did ask her --

16  you did ask her if she lent it out to various people,

17  which is somewhat of a defense, so they are entitled to

18  at least question those people -- I mean, question the

19  people that it was given to.

20         Do you see what I'm saying?

21         MR. QAZI:  Well, I'm not asking exactly who

22  was lent the car, you know.

23         MR. COOPER:  Obviously, he doesn't get to --

24         THE COURT:  No.  Go ahead.

25         MR. QAZI:  That's fine.  Go ahead.

83

1  BY MR. COOPER:

2      Q.   So you said neighbors.  So let's focus on the

3  neighbors first.

4           We're talking about, let's say, from

5  January 1st until January 6th, we're talking about that

6  five-day time period.

7           Are you with me?

8      A.   Uh-huh.

9           THE COURT:  That's a "yes"?

10          THE WITNESS:  Yes.

11 BY MR. COOPER:

12     Q.   In that time period, did you loan your

13 vehicle to any neighbors?

14     A.   From that time period, yes.  The neighbors,

15 no.  I remember giving the key -- I have a problem with

16 the car, so I give the key to one of my neighbors.

17     Q.   So let's stop there.  What was that

18 neighbor's name?

19     A.   Her name is Sherry.  She was going to give it

20 to somebody else to fix my car, but I don't know.  They

21 took too long to fix it.

22     Q.   You said her name is Sherry?

23     A.   Yes.

24     Q.   And what's Sherry's last name?

25     A.   I don't know.

84

1     Q.   Okay.  Does she live in your apartment

2  complex?

3     A.   No.  She went to Washington.

4     Q.   She moved to Washington?

5     A.   Yes.

6     Q.   Did she used to live in your apartment

7  complex?

8     A.   She used to.

9     Q.   And was it in the same building?  Where was

10  her -- how did you know Sherry in your apartment

11  complex?

12     A.   Because she was my neighbor.

13     Q.   Was it your apartment was here.  Her

14  apartment was right next door or was it her apartment

15  was on the opposite side of the apartment complex?

16     A.   It was like in the corner.  It's in the

17  corner of my apartment.

18     Q.   Do you have Sherry's phone number?

19     A.   No.

20     Q.   So how did you get in contact with Sherry?

21     A.   She -- no.  No.  No.  You're talking about

22  back then.  She knew this other guy that was going to

23  fix my car, but ...

24     Q.   And I understand what you're trying to say.

25  I promise you, your son is going to get an opportunity

85

1  to talk to you about that.  I'm focusing with you

2  specifically on how -- you said Sherry was your

3  neighbor.

4           Did you just see Sherry around, or?

5     A.   Yes.

6     Q.   Okay.  Now, why would you give Sherry the

7  keys to your car?  Because she was going to get it

8  fixed for you?

9     A.   She had a friend that she said that he was

10 going to fix it.

11    Q.   So were you and Sherry's friends?

12    A.   Yes.

13    Q.   So how did you contact Sherry in January of

14 2015?

15    A.   Because I used to see her all the time, you

16 know.

17    Q.   You didn't have her phone number ever?

18    A.   No.  Because we just like neighbors.  She

19 will be all the time outside.  She smoke, you know,

20 cigarette, so she had to be outside the apartment.

21    Q.   So you gave your keys to someone who you

22 couldn't even contact?

23    A.   No.  I can go to the door.

24         THE COURT:  All right.  Let me stop you.

25 That's argumentative.  I think she's testified to that.

                                                    86

1  Let's move on.

2  BY MR. COOPER:

3      Q.   So who else did you give your car to in

4  January?

5      A.   In January?

6      Q.   And we're talking about January 1st through

7  January 6th.

8      A.   January 6th?

9      Q.   Just to put it in, I guess, into perspective,

10  January 6th would be the day that the police searched

11  your vehicle.

12      A.   At that time I think it's only -- I think

13  it's only her and I know other people too, but I can't

14  remember their names.

15      Q.   You gave your vehicle to other people too?

16      A.   Yeah.  But I know them, though.

17      Q.   How many other people?

18      A.   Like two more guys.

19      Q.   And how do you know those two guys?

20      A.   They were his friends, but I don't know their

21  names.

22      Q.   And you gave the vehicle directly to them.

23  You didn't give the vehicle to your son?

24      A.   Well, they just want to borrow it.  I said,

25  okay, just bring it right back, and they did.

87

1    Q.   And you don't know their names?

2    A.   No.

3    Q.   So you were just handing your keys out to
4 people whose names you didn't even know?

5    A.   No.  I see them being around.  They're his
6 friends.

7    Q.   How do you know they were his friends?

8    A.   Because they would come to see him and they
9 would go out.

10   Q.   Where was your son at during this whole time
11 period?  He didn't have to use the vehicle?

12   A.   Yeah.  He also borrowed my car.

13   Q.   But there was times where your son's friends
14 just came over and you gave them the keys without your
15 son knowing?

16   A.   Well, like --

17        MR. QAZI:  Sir, I object.

18        THE COURT:  Hold on.  Hold on.

19        MR. QAZI:  He already said that question.

20        THE COURT:  Asked and answered?  I think it's
21 a little different.

22        MR. COOPER:  It is a different question.

23        THE COURT:  You gave them to his friends
24 without your son knowing about it that date, so.

25        MR. QAZI:  Okay.

                                                          88

1            THE WITNESS:  He doesn't need to know.  It's

2  my car.

3            THE COURT:  Do you know these friends' names?

4            THE WITNESS:  I don't know their names.

5            THE COURT:  Have you seen them -- do they

6  still live in the apartment complex?

7            THE WITNESS:  No.

8            THE COURT:  Have you seen them since

9  January 6th?

10            THE WITNESS:  No, I haven't seen them since

11  then.

12  BY MR. COOPER:

13      Q.   So why would you give the keys to your son's

14  friends instead of giving it to your son?

15      A.   Because my son wasn't around, and then they

16  came and I gave it to them, and they brought the key

17  back.

18      Q.   So his friends would come around your house

19  without your son even being there?

20      A.   I mean, they're his friends.  It's okay.  I'm

21  an old person.  I'm not a young lady.

22      Q.   Okay.  And this all happened between

23  January 1st -- we're talking about five days here.

24  January 1st and January 6th.

25            So then when were you using your car if you

89

1  were letting everyone else use it?

2          MR. QAZI:  I object, Your Honor.

3          THE COURT:  Sustained.  It's argumentative.

4  BY MR. COOPER:

5      Q.  When were you using your car?

6      A.  When I would use it?

7      Q.  Yes.

8      A.  At that time I used to walk more.  Now I'm

9  not walking as well, because I had a surgery, cancer

10  operation.  So I was walking better before and I didn't

11  have to -- like I was saying, I can walk to my job.  I

12  still can do it but not as fast.

13     Q.  I don't think you understood my question.  My

14  question was:  When were you using your vehicle

15  between -- we're talking about between January 1st and

16  January 6th.

17     A.  Off and on.

18     Q.  Off and on?

19     A.  Is that the answer you want?

20     Q.  Whatever the truth is.

21     A.  Off and on.

22         THE COURT:  Anything further on this?  I

23  think we've established that she's loaned some people

24  the vehicle.

25         MR. COOPER:  Yes.  I'm going to move on.

                                                    90

1  Only one more question.

2  BY MR. COOPER:

3    Q.   So when you let these people use your

4  vehicle, after they used it, is it safe to say you went

5  back into your vehicle?

6    A.   Yeah.

7    Q.   Okay.  And those consoles we're talking

8  about, were those ever in a different spot or were they

9  always right where they were when you left them?

10   A.   Everything was okay.

11   Q.   All right.  So now let's talk about

12  January 6th.  So January 6th, are you at home?  Are you

13  at work?

14   A.   What day was that?

15   Q.   The day the police searched your vehicle.

16   A.   No.  But what day was that?  Monday?

17  Tuesday?

18   Q.   What day of the week?  I'm not sure.  You

19  don't remember where you were when the police searched

20  your vehicle?

21   A.   I can't remember.

22   Q.   It was a Tuesday.

23   A.   It was a Tuesday.  I was home.

24   Q.   Okay.  And your son asked you for the keys to

25  the car or did he have his own set?

91

1       A.   He had his copy.

2       Q.   He has a copy of the keys?

3       A.   Uh-huh.

4       Q.   So was he allowed to just take the car any
5  time he wanted to?

6       A.   Yes.

7       Q.   He didn't have to tell you before he took the
8  car or anything like that?

9       A.   Sometimes he would tell me.  Sometimes he
10  didn't.

11       Q.   Okay.

12       A.   But by the end of the day, I knew he had it.

13       Q.   So are you at home when he leaves with the
14  car?  Do you remember him actually leaving with the
15  vehicle?

16       A.   I know he was going to the doctor.  He had a
17  psychiatry appointment or something.  The doctor refer
18  him to a psychiatrist.

19       Q.   Okay.  Do you remember what time of the day
20  this was?

21       A.   Daytime.

22       Q.   I'm sorry?

23       A.   It was daytime that he was going to go to the
24  doctor.

25       Q.   Now, this might be hard for you to think

                                                      92

1  back, but think back for me.  Was this before noon or

2  was this after noon?

3       A.   It must have been after noon.  I don't know.

4       Q.   How long was he gone with the vehicle that

5  day?

6       A.   Oh, no.  I don't know.  I cannot remember

7  that.

8       Q.   Well, I mean by that, was it only a couple

9  minutes or was it hours?

10      A.   He had it hours.

11      Q.   He had it hours?

12      A.   Yeah.

13      Q.   Now --

14           MR. COOPER:  Court's indulgence.

15  BY MR. COOPER:

16      Q.   Did your son live with you?

17      A.   Off and on.  He had -- he used to be with his

18  girlfriend, so he used to be with her.

19      Q.   I'm talking about January 6, 2015.  Did he

20  live with you?

21      A.   I can't remember.  I don't remember.  His

22  girlfriend may be able to answer that.  I don't

23  remember.

24      Q.   Okay.  Well, when he had the key to your car,

25  there was times where he didn't live with you and had a

                                                      93

1  key to your car?

2      A.   Yes.

3      Q.   So would he just come over to your apartment

4  and just take the car and go?

5      A.   Yes.  If he didn't need it, he would leave it

6  there, and then I would be able to use it.  At that

7  time, like I was saying, I was able to walk.  I didn't

8  need it.

9      Q.   So your son was the primary user of that

10 vehicle then?

11          MR. QAZI:  I object.

12          MR. COOPER:  And for what reason?

13          THE COURT:  Well --

14          MR. QAZI:  Relevancy.

15          THE WITNESS:  Both.

16          THE COURT:  I think we've established --

17          MR. QAZI:  It's her vehicle.

18          THE COURT:  -- mutual control of the vehicle.

19 Yes?

20          MR. COOPER:  I'm sorry, Your Honor.  Was

21 that --

22          THE COURT:  I guess he controlled it.  He can

23 own, possess, and drive it.

24          MR. COOPER:  Well, she's saying she walked

25 everywhere.

94

1          THE COURT:  Yes.

2          MR. COOPER:  So that's why I'm just asking --

3   and I'm obviously allowed to lead on cross, and she can

4   answer the question any way she wants.  I don't know

5   why that question was objected to.

6          MR. QAZI:  Your Honor, she also said she was

7   off and on.  It's her vehicle.

8          THE COURT:  You guys are killing me.  Go

9   ahead and ask the question.  I mean this horse ain't

10  going to die any further.

11         MR. COOPER:  I know, Your Honor.

12         THE COURT:  So the fact is this car was made

13  available to a lot of people.  That's what she's

14  testified to.

15         MR. COOPER:  Allegedly.

16         THE COURT:  There were three people that she

17  specifically stated.  He had the keys, was able to use

18  it, use it at any time.  He didn't even have to tell

19  her.  He could grab the keys.  Whether he lived there

20  or not lived there --

21         MR. COOPER:  Right.

22  BY MR. COOPER:

23     Q.  I guess to just follow up my question:  You

24  said you walked most of the time.  When you went to

25  work and everything like that, you were walking, right?

95

000207

```
 1      A.    Uh-huh.

 2            THE COURT:  Yes?

 3  BY MR. COOPER:

 4      Q.    I'm sorry.  Was that a "yes"?

 5      A.    Yes.

 6      Q.    And these other people would only use the car

 7  occasionally; is that safe to say?

 8      A.    Yes.

 9      Q.    So the primary user of that vehicle, was that

10  the defendant?  And by "primary," I mean --

11      A.    Both.  Both.

12      Q.    -- the person that used the vehicle the most.

13  Was that the defendant?  I'm sorry.  Was that your son?

14      A.    No.  I would say half and half.

15      Q.    You and your son used the vehicle half and

16  half?

17      A.    Yes.

18      Q.    That's fine.  So do you own any guns?

19      A.    What's that?

20      Q.    Do you own any guns?

21      A.    No.

22      Q.    Do you --

23            THE COURT:  Really?  You can ask the

24  question, but ...

25            MR. COOPER:  Court's indulgence.
```

96

000208

1           THE COURT:  I'm not stopping you.

2  BY MR. COOPER:

3      Q.   Did you ever put a gun in the vehicle?

4      A.   No.

5      Q.   And the two people that had keys to the

6  vehicle were you and your son?  I think that's what you

7  said, right?  You had a set of keys to the vehicle?

8      A.   Yeah.

9      Q.   And your son had a set of keys to the

10 vehicle?

11     A.   Yes.

12     Q.   Those are the only two sets of keys?

13     A.   Yes.

14     Q.   You didn't put any drugs in the car, right?

15          THE COURT:  Ma'am, answer yes or no.

16          THE WITNESS:  No.

17 BY MR. COOPER:

18     Q.   You didn't smoke marijuana in the car?

19     A.   No, I didn't.

20          MR. QAZI:  I object.

21          THE COURT:  Well, I'm going to allow the

22 question to stand.

23 BY MR. COOPER:

24     Q.   And you don't own a black revolver or

25 anything like that, do you?

97

1    A.   No.  No.

2    Q.   Do you have any other children?

3    A.   No.

4    Q.   Okay.  And when your -- did anyone else live

5    in your --

6         THE COURT:  Are you okay, ma'am?  Do you need

7    to stand up?

8         THE WITNESS:  Yes.

9         THE COURT:  You may stand up.  If you feel

10   comfortable standing up.

11        MR. COOPER:  I'm so close to being done, Your

12   Honor.  I know I've beat this horse, but just maybe two

13   more questions.

14        THE COURT:  All right.

15   BY MR. COOPER:

16   Q.   When you lived with your son, did anyone else

17   live there?

18   A.   No.

19   Q.   I'm sorry.  Was that a "no"?

20   A.   No.

21   Q.   Okay.  And in the whole month of January, did

22   anyone else live in your apartment with you, other --

23        MR. QAZI:  I object.  What's the relevancy?

24        THE COURT:  Let him finish the question.

25

98

1  BY MR. COOPER:

2      Q.   -- other than either just yourself or you

3  with your son?

4          THE COURT:  I'll allow the question to stand.

5          THE WITNESS:  My grandson.

6  BY MR. COOPER:

7      Q.   How old is your grandson?

8      A.   Five years old.

9      Q.   Is that -- I'm assuming that's your son's

10 child?

11     A.   Yes.

12         MR. COOPER:  No further questions, Your

13 Honor.

14         THE COURT:  All right.  Any redirect?  Any

15 more questions you wish to ask, follow-up questions?

16         MR. QAZI:  No, sir.

17         THE COURT:  Is she free to leave?

18         MR. QAZI:  Yes.

19         THE COURT:  Ma'am, hold on a second.  We may

20 be able to help you down.  Miss Qazi, thank you for

21 your testimony.  Please do not discuss your testimony

22 with any other witnesses.

23         Defense, anything further?  Any other

24 witnesses you wish to call at this time?

25         MR. QAZI:  No.

99

1    THE COURT:  All right.  You rest at this
2  time?
3    MR. QAZI:  Can we argue the case?
4    THE COURT:  Well, yes.  But I'm asking you
5  this:  One other thing is do you understand you have a
6  right to testify and a right not to testify?  Are you
7  going to be testifying --
8    MR. QAZI:  I'll rest.
9    THE COURT:  -- at this proceeding here today?
10    MR. QAZI:  I'll rest.
11    THE COURT:  So you're deciding not to
12  testify.
13    Do you understand that?
14    MR. QAZI:  Yes.
15    THE COURT:  Now, you're not giving up any
16  rights to testify at any other proceedings.
17    MR. QAZI:  I understand.
18    THE COURT:  It's just this proceeding.  This
19  proceeding only.
20    MR. QAZI:  I understand.
21    THE COURT:  And you understand that nobody
22  can comment on the fact of whether you decide to
23  testify or not to testify.  So I can't say you should
24  have testified or should not have testified.
25    Do you understand?

100

1          MR. QAZI:  Yes.

2          THE COURT:  This is your decision to make.

3   You are counsel of -- so you've decided not to testify,

4   correct, sir?

5          MR. QAZI:  That's correct.

6          THE COURT:  All right.  Defense has rested.

7          State, save and rebut?

8          MR. COOPER:  Save and rebut, Your Honor.

9          THE COURT:  Defense, your argument.

10         MR. QAZI:  There's a lot of inconsistencies

11  in the arrest reports and, you know --

12         MR. COOPER:  Objection, Your Honor.  Arguing

13  facts not in evidence.

14         THE COURT:  Let me stop you there.  All I

15  focus on is what was presented here.

16         MR. QAZI:  Okay.

17         THE COURT:  The arrest reports, I'm not

18  looking to.

19         MR. QAZI:  Well, it was part of what was

20  said.

21         THE COURT:  It was -- no.  Well, what was

22  testified here is what we're focusing on.

23         MR. QAZI:  Well, let's start with Officer

24  Glover.  Throughout the whole case and from the arrest

25  report, it clearly says that he was the arresting

101

1  officer that handcuffed me and, you know, that arrested

2  me.

3          THE COURT:  Yes.

4          MR. QAZI:  So why would the arrest report,

5  the filing -- how do you call it -- the booking sheet

6  and all documents have Officer Bien as arresting

7  officer?

8          THE COURT:  All right.  This is a probable

9  cause hearing, though.

10          Do you understand that?

11          MR. QAZI:  Yes.  I understand.

12          THE COURT:  So all I'm really focusing on --

13  and there may be some inconsistencies and you've

14  brought some out.  You brought out about searches and

15  stuff like that.  That's a question that needs to be

16  addressed.  I'm looking at was there a crime?  Is it a

17  possibility you committed the crime.

18          Most of these issues that you're going to be

19  talking about have to be -- are going to be focused on

20  at a later date.

21          Do you understand?

22          MR. QAZI:  Well, the other thing is where is

23  the probable cause that the officer really did smell

24  marijuana?  And, you know, if there was any exigent

25  circumstances or anything for him to go forward without

                                                    102

1  a warrant, to do a warrantless search like that.

2  Unless there's like an exception to the warrant

3  requirement, that's a violation of the fourth amendment

4  to the Constitution.

5          THE COURT:  All right.

6          MR. QAZI:  Also, as far as the unlawful frisk

7  which produced crystal gemstones that were removed from

8  my pocket and also was never recovered, was basically

9  lost or stolen by officers, so.  I believe I'm being

10  held unconstitutionally.  Everything from the very

11  start.  I rest my case.

12         THE COURT:  All right.  State.

13         MR. COOPER:  Your Honor, I think obviously

14  slight or marginal evidence has been met in this case.

15  Specifically, he was the only occupant of the vehicle.

16  You heard his mother testify that he did, in fact, have

17  keys to the vehicle.  You heard her testify that she

18  put no gun in the vehicle.  She owned no guns, didn't

19  know anything about a black revolver, nor did she know

20  anything about drugs.

21         The only two people that had access to that

22  vehicle with actual keys are the defendant and his

23  mother.  And the defendant obviously was driving the

24  vehicle when it was pulled over and, in fact, in the

25  vehicle we found marijuana, which the officer testified

103

1  to, that in his training and experience, was consistent
2  with that of sell.

3        We had methamphetamine, which the officer
4  testified to, that in his training and experience, was
5  consistent with sell.  It was all in the defendant's
6  possession.  Whether he wants to say it was -- I mean,
7  whether it was actual or constructive, it was all in
8  his possession.  And at the very, very least, it was
9  joint, because it was in possession of his mother as
10  well, because she had access to the vehicle.  However,
11  obviously, I don't think she had anything to do with
12  it, according to her own testimony.

13        THE COURT:  All right.

14        MR. COOPER:  But, Your Honor, it's --

15        THE COURT:  The stop that he's talking about,
16  the exigent circumstances, address that very --

17        MR. COOPER:  And, Your Honor, the exigent
18  circumstances, the Nevada Supreme Court has previously
19  stated.  I forget the case name now, off the top of my
20  head.  But, essentially, they have changed the
21  requirement for search warrants needed on an
22  automobile.  That requirement now is consistent with
23  the federal law, which says that there only need to be
24  probable cause, to search a vehicle without a search
25  warrant.

104

1         The probable cause stems from the fact that
2   the officer did testify that in his training and
3   experience he smelled marijuana.  It was consistent
4   with marijuana, in his training and experience, and he
5   removed the defendant from the vehicle, which he's
6   lawfully allowed to do, under case law.  And he
7   subsequently searched the vehicle, which he's lawfully
8   allowed to do, under case law, and that search yielded
9   the drugs.  Which at that point, the defendant, there
10  was enough probable cause to arrest him, and they got
11  the search warrant for the vehicle.
12        THE COURT:  All right.  Here's what we've
13  got.  Mr. Qazi, here's what we've got.  This is a
14  probable cause hearing, which means slight or marginal
15  evidence of whether or not there's some evidence to say
16  that you may or may not have committed the crime.  We
17  did get a judgment of conviction, certified copy, which
18  shows you're an ex-felon.  There was a car that you
19  were driving where they found a firearm, and there was
20  some controlled substance packaged in a manner which
21  may give some indication there was an intent to sell,
22  because of the ways they were set.
23        There's some issues you brought up about
24  searches and stuff.  I understand the pat-down and then
25  the subsequent search into the pocket.  That may or may

105

000217

1  not be a violation.  That may have exceeded the scope

2  of the pat-down.  Unfortunately, you were relying upon

3  other case law, prior case law of the Supreme Court

4  which allows a search of a vehicle because of its

5  mobility, based only on probable cause, without a

6  search warrant.

7          MR. QAZI:  Which is unlawful.

8          THE COURT:  Well, that's an argument that the

9  Nevada Supreme Court has taken up and has made a ruling

10  on, which was just a recent ruling.  I'll give you

11  that.  It was only a few months ago that they made that

12  ruling.

13          So based on that, I do find that the State

14  has met its burden at the probable cause hearing at

15  this time.

16          I am going to hold you to answer these

17  charges up in the Eighth Judicial District Court.  It's

18  an out of custody return court date.  He's currently in

19  custody only on federal matters.  We don't have him in

20  custody on these, right?

21          MR. COOPER:  I believe he's not in custody on

22  this matter.

23          THE COURT:  I'm going to hold you to answer

24  these matters up in the Eighth Judicial District Court

25  on the next return court date.

106

1           That date is going to be:

2           MR. QAZI:  Your Honor.

3           THE CLERK:  July 2nd, 10:00 a.m., lower

4    level, Courtroom A.

5           THE COURT:  Yes, sir.

6           MR. QAZI:  Am I -- is there still bail

7    posted?  Is it revoked?

8           THE COURT:  You're not in custody in this

9    case.

10          MR. QAZI:  Well, what I want to know is:  Is

11   it revoked, because from what my mother was telling me,

12   that she was still paying the bail.

13          THE COURT:  She doesn't have to pay the bail.

14          MR. QAZI:  I told her not to.  She doesn't

15   understand what's going on.

16          MR. COOPER:  Your Honor, obviously, if the

17   defendant wants to be remanded -- he can't be remanded

18   on this case, because he's in federal custody.

19          MR. QAZI:  Basically, what I want is the bail

20   to be --

21          THE COURT:  The bond is exonerated.  So

22   because you're in federal custody, we're giving you an

23   out of custody date.

24          Now, again, Mr. Qazi, you have asked a lot of

25   questions, pertinent questions.  I understand where

107

1  you're going with the search and everything.   I

2  understand.   And that's kind of the same thing that I

3  would have done as a defense attorney.

4           That being said, I'm going to ask you to

5  please reconsider representing yourself on this matter.

6  And I would ask that you consider having Miss Waldo

7  take over this matter.   Again, you're going to have to

8  re-address, as to the issue of Faretta, whether you

9  should continue to represent yourself, but I think you

10  could work together with Miss Waldo, because she's seen

11  what kind of questions and where you're going at.   But

12  I would prefer to have somebody who's educated and

13  trained in the law representing you.

14           Do you understand?

15           MR. QAZI:  Uh-huh.

16           THE COURT:  You are facing a federal matter,

17  which this can have an effect on you.   There's a lot of

18  issues here, which I'm sure Miss Waldo will talk to you

19  about.   So, again, I'm going to urge you to consider

20  that, and at the time of arraignment, you can make that

21  determination.   All right?

22           MR. QAZI:  Okay.   Can I ask?

23           THE COURT:  Court is in recess.

24           MR. QAZI:  Can I ask a question to the Court?

25           THE COURT:  I have ten minutes to go before

108

1  the next case.

2          MR. QAZI:  Is it both -- both venues proper

3  in federal and state to try me?

4          THE COURT:  Yes.

5          MR. COOPER:  We previously addressed this,

6  Your Honor.

7          MR. QAZI:  Another thing.

8          THE COURT:  Ex-felon in possession is a

9  federal offense and a State offense.  If it's Feds

10  filed this and you're convicted or plead on that, then

11  the State statute, as I still recall the last time I

12  saw it, was that they could not go forward -- the State

13  could not.  That doesn't mean the Feds can't.

14          MR. QAZI:  So they cannot convict twice, but

15  they can try it twice?

16          MR. COOPER:  The State -- if the State

17  convicts first, the Feds can then convict again.

18          THE COURT:  Yes.  This is something that --

19          MR. QAZI:  Another thing, though, is that at

20  arraignment, I believe that the gun was dismissed here,

21  so I would like to bring that up, because it was

22  dismissed, and then it was brought back up on the last

23  hearing.

24          THE COURT:  I don't think we ever

25  dismissed -- they thought they were going to dismiss,

                                                    109

1   and that's why --

2              MR. QAZI:  No.  It was --

3              THE COURT:  -- Miss Doyle --

4              MR. QAZI:  -- considered dismissed.

5              THE COURT:  Then get the transcripts, and if

6   it was dismissed, then you can address that.

7                   (The proceedings concluded.)

8

9                        *  *  *  *  *

10             ATTEST:  Full, true, and accurate
                        transcript of proceedings.
11

12

13

14
                        _____
                        /S/   Jennifer O'Neill
15                      JENNIFER O'NEILL, CCR No. 763

16

17

18

19

20

21

22

23

24

25

                                                        110

1                    REPORTER'S CERTIFICATE

2  STATE OF NEVADA)

3  COUNTY OF CLARK)

4

5        I, Jennifer O'Neill, a certified court reporter

6  in and for the State of Nevada, hereby certify that

7  pursuant to NRS 239B.030 I have not included the Social

8  Security number of any person within this document.

9        I further certify that I am not a relative or

10  employee of any party involved in said action, nor a

11  person financially interested in the action.

12        Dated in Las Vegas, Nevada this 7th day of July,

13  2015.

14

15                    /S/   Jennifer O'Neill
                      _____
16                    JENNIFER O'NEILL, CCR No. 763

17

18

19

20

21

22

23

24

25

                                                        111

**-**

**-oOo [3]** 1/6 2/24 3/2

**.**

**.22 [2]** 42/22 44/16
**.22-caliber [2]** 42/22 44/16
**.4 [3]** 50/11 50/13 50/14
**.4 grams [1]** 50/11

**1**

**1.2 [1]** 47/16
**100 percent [1]** 61/20
**10:00 a.m [1]** 107/3
**11 [1]** 2/6
**11:00 [2]** 81/24 81/25
**12 [1]** 51/8
**12 years [1]** 50/20
**15 [3]** 9/21 10/3 23/23
**15 yards [1]** 67/13
**1500 [2]** 12/14 19/20
**15F00233X [3]** 1/9 3/4 3/15
**1756 [1]** 66/6
**1756 hours [3]** 65/4 65/21 66/15
**1803 [7]** 63/6 63/14 63/21 63/23
65/9 65/23 66/5
**1803 hours [1]** 64/22
**19 [1]** 2/6
**1st [5]** 84/5 87/6 89/23 89/24 90/15

**2**

**20 feet [3]** 25/10 25/11 25/13
**2014 [2]** 54/11 54/12
**2015 [16]** 1/18 3/1 12/5 12/11 41/1
54/12 54/13 65/21 79/12 80/23 80/24
81/16 82/22 86/14 93/19 111/13
**23 [2]** 1/18 3/1
**239B.030 [1]** 111/7
**25 miles [1]** 24/4
**273567 [1]** 39/24
**2nd [1]** 107/3

**3**

**35 [3]** 24/7 24/9 24/14
**370 [1]** 28/19
**370 East [1]** 12/25
**3:00 p.m [1]** 12/14

**4**

**40 [3]** 2/9 2/21 82/25
**40 hours [1]** 82/23
**48 [2]** 2/22 2/23

**5**

**54 [1]** 2/9

**6**

**6th [11]** 12/4 82/7 84/5 87/7 87/8
87/10 89/9 89/24 90/16 91/12 91/12

**7**

**71 [1]** 2/10
**72 [1]** 2/14
**763 [3]** 1/25 110/15 111/15
**7:30 [2]** 81/24 81/25
**7th [1]** 111/12

**8**

**80 [1]** 2/14

**9**

**916ARL [1]** 14/3
**9:00 [1]** 3/1

**A**

**a.m [2]** 3/1 107/3
**ability [3]** 6/24 7/3 19/2
**able [6]** 6/12 7/8 7/20 9/15 9/15
18/24 56/14 56/24 74/17 75/11 75/16
93/22 94/6 94/7 95/17 99/20
**about [48]** 5/5 5/8 5/9 5/11 19/20
26/4 28/3 28/8 29/25 37/1 43/20 45/2
46/1 48/1 51/10 56/2 60/10 62/3 62/4
63/4 63/21 63/25 69/15 73/7 73/8
77/11 79/1 79/1 82/8 82/9 84/4 84/5
85/21 86/1 87/6 88/24 89/23 90/15
91/8 91/11 93/19 102/14 102/19
103/19 103/20 104/15 105/23 108/19
**above [1]** 45/1
**academy [1]** 14/19
**access [2]** 103/21 104/10
**according [6]** 54/10 54/19 59/10
65/2 65/3 104/12
**accurate [1]** 110/10
**acquainted [2]** 81/8 81/8
**acting [1]** 41/4
**action [2]** 111/10 111/11
**activated [2]** 23/12 23/13
**activity [1]** 15/25
**actual [3]** 64/23 103/22 104/7
**actually [8]** 14/16 15/3 17/15 17/21
18/1 22/7 76/14 92/14
**adding [1]** 9/11
**additional [1]** 6/18
**address [5]** 31/9 68/15 104/16 108/8
110/6
**addressed [2]** 102/16 109/5
**adequate [1]** 14/16
**admission [1]** 71/22
**admit [2]** 40/1 48/8
**admitted [5]** 2/19 48/18 48/20 70/8
71/16
**advice [3]** 18/12 18/23 34/13
**affidavit [2]** 66/7 66/12
**affidavits [1]** 10/15
**after [12]** 26/7 35/3 35/13 42/14
56/23 62/17 63/4 73/25 79/2 91/4
93/2 93/3
**again [14]** 20/17 26/20 32/16 50/3
62/16 65/12 66/8 66/14 77/20 80/7
107/24 108/7 108/19 109/17
**against [1]** 9/11
**ago [2]** 36/8 106/11
**agree [4]** 25/9 25/15 63/9 65/13
**ahead [8]** 49/4 50/6 67/12 77/8
77/19 83/24 83/25 95/9
**ain't [1]** 95/9
**all [78]** 3/10 5/19 7/19 8/15 8/18
9/10 9/19 9/25 10/6 10/22 14/8 14/9
14/9 15/2 18/19 19/15 19/19 21/13
22/4 25/20 27/17 29/8 30/13 31/25
34/21 35/25 46/22 47/5 50/8 50/9
51/21 52/20 53/22 56/13 56/20 57/11
60/4 60/21 61/10 62/7 62/25 66/1
69/1 69/14 70/14 71/6 72/2 72/6
72/20 72/22 73/17 75/4 75/10 79/4
79/25 80/1 80/6 82/14 86/15 86/19
86/24 89/22 91/11 98/14 99/14 100/1
101/6 101/14 102/6 102/8 102/12
103/5 103/12 104/5 104/7 104/13

**alleged [3]** 23/7 23/17 27/9
**Allegedly [1]** 95/15
**allow [16]** 5/15 22/15 29/5 32/8
38/16 43/21 48/25 56/4 56/17 61/2
65/8 66/22 67/12 77/18 97/21 99/4
**allowed [8]** 9/13 36/15 43/18 73/19
92/4 95/3 105/6 105/8
**allows [2]** 36/8 106/4
**allows an [1]** 36/8
**almost [2]** 43/18 62/21
**along [3]** 45/9 65/14 65/25
**already [2]** 69/16 88/19
**also [21]** 1/24 6/15 9/13 9/15 9/17
9/18 10/13 13/9 16/21 34/13 36/6
39/19 51/17 68/18 69/24 75/18 78/16
88/12 95/6 103/6 103/8
**although [1]** 54/25
**always [5]** 14/9 46/24 78/18 78/18
91/9
**am [6]** 6/4 30/20 46/16 106/16 107/6
111/9
**amendment [1]** 103/3
**amount [3]** 49/21 50/10 51/16
**amounts [1]** 49/25
**analysis [1]** 35/23
**and 3 [1]** 48/10
**another [4]** 52/4 76/17 109/7 109/19
**answer [17]** 19/3 33/4 56/14 56/24
58/17 61/1 61/2 75/1 78/11 80/17
82/17 90/19 93/22 95/4 97/15 106/16
106/23
**answered [3]** 20/16 31/25 88/20
**answers [2]** 57/19 58/1
**any [67]** 4/21 5/21 9/3 9/6 10/15
12/16 15/25 16/18 18/11 18/13 18/14
21/11 21/13 27/23 28/8 28/11 29/15
30/11 31/7 33/11 34/14 35/19 36/5
36/22 37/6 38/11 39/4 39/9 40/3
43/18 48/10 48/14 53/6 54/17 59/21
59/22 60/1 60/16 60/21 61/3 61/11
61/13 67/2 69/19 70/16 71/2 71/15
79/18 79/22 84/13 92/4 95/4 95/10
95/18 96/18 96/20 97/14 98/2 99/14
99/14 99/22 99/23 100/15 100/16
102/24 111/8 111/10
**anybody [6]** 5/20 8/3 28/7 37/25
37/25 38/1
**anyone [11]** 13/9 13/19 28/3 37/18
38/3 41/12 79/6 81/10 98/4 98/16
98/22
**anything [32]** 5/16 8/11 15/24 16/11
27/5 29/15 29/25 29/25 30/24 32/1
32/10 38/11 42/8 44/22 55/24 58/16
60/10 60/11 67/18 67/22 71/18 74/13
75/6 80/21 90/22 92/8 97/25 99/23
102/25 103/19 103/20 104/11
**anything that's [1]** 58/16
**apart [1]** 61/13
**apartment [12]** 85/1 85/6 85/10
85/13 85/14 85/14 85/15 85/17 86/20
89/6 94/3 98/22
**Apartments [4]** 12/25 17/13 19/23
21/24
**apologize [1]** 49/23
**apparent [2]** 16/15 17/7
**APPEARANCES [1]** 1/19
**appeared [2]** 28/23
**appears [1]** 71/21
**applicant [1]** 64/18

**A**

application [9] 62/23 63/12 63/24
 64/18 64/24 65/16 65/20 66/7 66/11
applied [4] 42/16 63/16 63/22 66/6
apply [3] 13/3 24/18 37/8
appointment [1] 92/17
approach [11] 11/13 25/21 26/24
 26/25 27/1 27/2 43/24 45/14 48/22
 50/2 65/25
approached [3] 14/7 25/24 68/7
approaching [1] 12/24
approved [3] 63/15 65/9 66/5
approximately [2] 17/11 24/20
are [38] 3/12 3/17 3/19 7/11 7/15
 8/8 8/9 11/19 14/2 42/21 45/2 47/17
 48/11 52/7 53/6 54/14 54/16 55/7
 64/18 69/9 73/2 73/8 77/10 81/11
 81/22 83/17 84/7 91/12 91/12 92/13
 95/8 97/12 98/6 100/6 101/3 102/19
 103/22 108/16
area [11] 15/19 15/19 16/9 28/21
 29/12 41/9 55/15 58/24 58/25 59/4
 75/6
argue [1] 100/3
Arguing [1] 101/12
argument [3] 67/11 101/9 106/8
argumentative [5] 29/23 33/8 33/9
 86/25 90/3
armed [1] 28/17
around [5] 67/18 86/4 88/5 89/15
 89/18
arraignment [2] 108/20 109/20
arrest [19] 37/13 43/2 54/7 54/10
 54/19 54/22 54/24 56/5 56/5 56/14
 56/17 63/4 65/2 74/10 101/11 101/17
 101/24 102/4 105/10
arrested [3] 35/8 54/21 102/1
arresting [7] 54/14 54/16 54/21
 54/25 55/1 101/25 102/6
arrival [2] 44/25 62/24
arrived [2] 61/6 69/4
as [78] 5/1 6/8 6/8 6/16 9/5 9/23
 11/5 11/6 11/21 11/25 12/24 14/7
 14/10 14/15 14/17 14/23 14/24 14/24
 15/8 15/10 16/14 16/14 16/19 25/4
 25/4 25/5 25/5 32/18 36/16 36/19
 37/3 38/15 38/17 39/19 39/21 40/14
 40/15 40/18 41/5 42/9 42/9 42/12
 43/4 45/9 45/19 48/23 48/25 49/7
 50/7 51/4 51/8 51/18 53/4 56/18 59/5
 59/15 64/7 64/7 67/4 68/1 69/21
 69/25 69/25 72/13 72/14 73/12 73/12
 83/10 83/11 90/9 90/12 102/6 103/6
 103/6 104/9 108/3 108/8 109/11
ashtray [10] 55/12 57/4 57/4 57/5
 57/8 57/12 59/4 59/5 59/16 59/18
ashtrays [1] 58/14
ask [28] 7/13 18/13 20/17 21/23
 27/18 28/8 28/11 30/25 34/1 35/25
 36/3 36/25 37/1 37/25 43/20 57/25
 59/15 61/24 64/5 83/15 83/16 95/9
 96/23 99/15 108/4 108/6 108/22
 108/24
asked [10] 20/15 26/3 26/23 52/24
 62/3 81/1 82/20 88/20 91/24 107/24
asking [13] 22/7 22/10 30/20 33/22
 52/13 53/7 53/8 60/18 60/20 76/6
 83/21 95/2 100/4
assigned [2] 21/3 21/6
assistance [1] 18/14

assume [1] 59/7
assumed [1] 54/23
assuming [9] 22/8 22/12 23/1 23/4
 27/6 29/22 30/9 52/20 99/9
at [80] 4/22 9/12 10/5 13/5 15/13
 15/15 16/8 16/15 18/19 19/2 19/20
 23/25 24/4 24/9 24/14 25/19 25/21
 26/21 28/1 28/8 34/9 35/8 37/17 38/6
 38/19 39/3 39/16 41/13 41/15 42/4
 45/22 47/3 48/7 48/18 52/3 54/17
 57/13 57/22 60/21 61/5 62/7 63/11
 63/13 63/23 64/16 64/21 65/9 65/21
 66/5 66/7 66/14 68/6 69/12 69/25
 71/13 71/17 75/4 81/20 83/18 87/12
 88/10 90/8 91/12 91/13 92/13 94/6
 95/18 99/24 100/1 100/9 100/16
 102/16 102/20 104/8 105/9 106/14
 106/14 108/11 108/20 109/19
at 1803 [1] 65/9
attack [1] 34/3
attention [3] 12/4 40/25 75/20
ATTEST [1] 110/10
attested [1] 65/18
attorney [6] 1/21 7/7 7/12 34/15
 36/13 108/3
Aunt [1] 74/7
authority [3] 67/2 67/21 68/21
automobile [2] 36/7 104/22
available [1] 95/13
avoid [1] 13/4
aware [7] 14/2 20/23 41/25 42/21
 47/17 51/23 52/7
away [6] 37/21 67/7 67/13 67/14
 69/13 69/14

**B**

B-I-E-N [1] 39/13
back [12] 3/11 26/8 26/14 39/25
 80/23 85/22 87/25 89/17 91/5 93/1
 93/1 109/22
background [1] 74/6
badges [1] 67/22
bag [5] 16/5 16/5 16/20 47/18 48/2
baggies [5] 16/21 51/10 51/15 51/18
 51/19
bags [4] 47/18 48/2 50/8 50/10
bail [4] 107/6 107/12 107/13 107/19
based [14] 14/12 15/7 29/1 34/3
 34/4 34/5 36/16 42/17 43/21 51/8
 51/12 71/2 106/5 106/13
basically [7] 5/11 18/11 34/4 58/13
 66/4 103/8 107/19
be [72] 4/16 4/18 4/20 4/22 5/1 5/2
 5/4 5/7 5/23 6/4 6/15 7/1 7/8 7/12
 8/20 11/2 11/7 11/16 16/6 16/22
 18/24 19/3 22/7 28/23 29/23 30/7
 30/9 30/12 32/12 34/14 38/17 40/10
 40/16 43/15 48/7 53/11 53/19 55/23
 56/14 56/18 61/17 62/12 67/17 68/14
 71/21 72/3 72/10 74/16 75/5 75/11
 77/16 86/19 86/20 87/10 92/25 93/17
 93/18 93/22 94/6 99/20 100/7 102/13
 102/15 102/18 102/19 102/19 104/23
 106/1 107/1 107/17 107/17 107/20
bearing [1] 42/22
beat [1] 98/12
because [42] 5/1 6/6 6/24 9/11 9/25
 10/4 25/24 30/8 30/10 31/1 33/7
 34/22 35/18 42/24 60/11 68/13 69/18
 70/9 75/9 75/12 75/20 75/25 76/16
 78/10 78/15 82/20 85/12 86/7 86/15

86/18 88/8 89/15 90/9 104/9 104/10
 105/22 106/4 107/11 107/18 107/22
 108/10 109/21
become [1] 41/25
been [28] 8/16 10/4 10/7 10/12 11/5
 11/22 19/15 21/2 22/24 23/11 24/4
 30/10 34/7 36/12 40/14 43/1 44/8
 44/11 45/18 46/25 49/10 50/19 51/13
 72/13 78/17 82/20 93/3 103/14
before [9] 1/16 5/16 51/1 61/21
 74/20 90/10 92/7 93/1 108/25
began [1] 66/15
begin [1] 19/6
beginning [4] 8/15 62/22 63/11
 63/13
begun [1] 65/9
behalf [1] 7/22
behind [4] 4/8 18/10 18/12 74/18
being [22] 6/11 6/12 8/9 8/14 10/9
 21/18 33/13 35/15 37/21 40/4 50/16
 59/17 60/22 63/22 67/20 67/24 68/16
 88/5 89/19 98/11 103/9 108/4
believe [20] 4/3 14/4 18/9 20/6
 23/15 24/6 24/17 25/21 26/21 28/15
 29/17 32/22 33/6 33/7 35/6 37/20
 56/5 103/9 106/21 109/20
belly [1] 6/14
belong [3] 76/18 76/23 77/5
beside [1] 8/6
best [2] 6/8 59/24
better [1] 90/10
between [8] 17/4 17/5 25/7 58/22
 59/4 89/22 90/15 90/15
beyond [1] 78/25
BIEN [11] 2/8 39/13 39/13 39/16
 40/13 40/18 40/25 54/4 54/5 59/17
 102/6
big [3] 58/7 58/7 77/1
bit [1] 28/23
black [10] 16/13 16/15 41/18 55/9
 76/17 77/7 77/10 78/4 97/24 103/19
body [6] 21/11 29/16 30/2 30/14
 30/17 31/6
bond [1] 107/21
booking [1] 102/5
books [1] 8/23
borrow [2] 79/14 87/24
borrowed [1] 88/12
both [9] 46/14 46/16 46/17 74/21
 94/15 96/11 96/11 109/2 109/2
bottom [1] 49/5
box [2] 77/10 78/4
boy [1] 40/19
brakes [3] 13/3 24/15 24/18
brief [1] 64/9
briefing [2] 42/10 62/20
briefly [3] 3/9 12/21
bring [4] 7/20 9/13 87/25 109/21
bringing [2] 7/23 34/21
brought [6] 31/15 89/16 102/14
 102/14 105/23 109/22
building [1] 85/9
bunch [1] 46/18
burden [1] 106/14
bureau [1] 52/5
burnt [1] 17/1
but [52] 7/2 8/9 8/21 9/14 9/19 9/20
 10/2 13/25 17/7 17/15 18/12 19/1
 22/24 23/3 24/17 32/9 34/8 36/6
 36/17 37/24 52/1 52/25 53/9 55/25

**B**

but... [28] 65/11 66/14 74/22 74/23
75/11 76/18 77/5 79/15 81/14 82/19
84/20 85/23 87/13 87/16 87/20 88/13
90/12 91/16 92/12 93/1 96/24 98/12
100/4 104/14 104/20 108/9 108/11
109/14

**C**

C-15-307496-1 [1] 1/1
caliber [2] 42/22 44/16
call [10] 37/8 38/22 62/7 62/18 65/21
71/25 73/24 80/9 99/24 102/5
called [5] 5/1 11/5 40/14 72/13 75/17
calling [1] 4/22
calls [4] 28/20 33/19 35/24 36/25
cam [1] 30/18
came [12] 22/19 23/8 23/9 26/3
26/14 28/23 32/10 39/23 41/24 78/7
88/14 89/16
camera [8] 20/10 20/12 20/14 20/20
20/22 21/4 30/3 30/14
cameras [1] 21/11
can [71] 3/8 4/23 6/9 6/9 6/13 6/18
6/19 6/21 7/13 9/16 10/6 10/17 11/7
17/3 18/14 18/19 19/3 19/5 19/6
20/24 22/14 23/21 27/18 32/14 34/10
37/1 41/15 43/17 43/20 53/9 55/16
55/20 56/20 58/2 58/17 61/1 61/2
62/14 63/24 64/6 64/9 65/13 65/15
65/19 65/25 66/14 66/23 70/10 72/8
73/11 74/6 81/1 81/2 82/17 83/3 83/5
86/23 90/11 90/12 94/2 95/3 96/23
100/3 100/22 108/17 108/20 108/22
108/24 109/15 109/17 110/6
can't [15] 8/20 9/5 9/7 17/5 35/25
36/18 36/24 64/24 66/9 87/13 91/21
93/21 100/23 107/17 109/13
cancer [1] 90/9
cannot [9] 5/2 6/8 7/12 8/10 74/19
74/20 81/3 93/6 109/14
capacity [2] 11/23 11/25
car [48] 5/9 5/10 25/4 25/8 25/10
30/20 31/15 35/3 37/17 37/20 38/4
38/6 58/5 58/11 58/11 59/22 60/20
69/17 73/19 74/23 74/24 76/18 76/23
77/5 78/18 79/6 83/22 84/16 84/20
85/23 86/7 87/3 88/12 89/2 89/25
90/5 91/25 92/4 92/8 92/14 93/24
94/1 94/4 95/12 96/6 97/14 97/18
105/18
carry [2] 32/18 51/14
case [17] 1/1 1/9 31/1 39/24 66/14
100/3 101/24 103/11 103/14 104/19
105/6 105/8 106/3 106/3 107/9
107/18 109/1
caught [1] 42/11
cause [14] 15/12 24/15 36/16 37/12
38/23 69/22 102/9 102/23 104/24
105/1 105/10 105/14 106/5 106/14
CCDC [1] 70/23
CCR [3] 1/25 110/15 111/15
CD [1] 9/13
center [23] 8/11 16/4 44/21 44/23
45/1 55/10 55/11 55/12 56/18 57/1
57/2 57/2 57/5 58/10 58/20 58/21
58/23 58/24 59/2 59/4 59/11 62/2
62/4
certain [5] 6/7 6/25 25/21 55/15
77/11

CERTIFICATE [1] 111/1
certified [8] 39/22 39/25 40/4 46/25
47/3 47/4 105/17 111/5
certify [2] 111/6 111/9
chains [1] 6/14
changed [2] 82/20 104/20
charges [2] 30/8 106/17
check [1] 46/18
chief [1] 9/12
child [1] 99/10
children [1] 98/2
cigarette [1] 86/20
circumstances [10] 35/19 35/24
36/2 36/5 36/22 36/25 42/12 102/25
104/16 104/18
civilian [3] 66/19 66/24 68/18
claiming [1] 55/6
clarify [1] 73/6
CLARK [4] 1/5 17/16 71/6 111/3
clear [2] 16/5 73/13
clearly [1] 101/25
clerk [3] 11/2 40/10 72/10
close [3] 74/17 83/3 98/11
closer [1] 72/20
clothes [3] 66/24 69/1 69/17
clothing [2] 66/19 68/18
coin [3] 32/15 32/20 32/22
colliding [1] 13/4
color [1] 69/17
colored [1] 69/6
column [1] 15/20
come [13] 5/15 19/24 27/4 27/11
32/17 36/1 36/20 39/20 52/15 72/8
88/8 89/18 94/3
comfortable [1] 98/10
coming [7] 71/7 15/6 26/20 28/19
40/3 48/11 48/14
comment [1] 100/22
committed [4] 69/23 69/23 102/7
105/16
common [1] 38/17
commonly [1] 51/14
complaint [1] 71/20
complete [1] 19/24
completely [1] 14/10
completing [1] 29/14
complex [5] 85/2 85/7 85/11 85/15
89/6
complexity [1] 66/13
compound [2] 27/25 37/22
concluded [1] 110/7
conclusion [6] 33/23 34/4 35/24
36/1 37/1 38/18
conduct [6] 12/2 28/24 42/15 45/6
45/11 51/4
conducted [12] 12/22 15/12 17/14
25/18 37/12 42/1 42/11 46/23 47/6
47/17 52/1 52/22
conducting [2] 12/16 47/1
confirming [1] 20/18
consider [2] 108/6 108/19
considered [1] 110/4
consistent [4] 104/1 104/5 104/22
105/3
console [30] 45/24 45/25 45/1
55/10 55/11 55/13 55/16 55/17 56/3
56/11 56/18 57/1 57/3 57/5 57/17
58/7 58/10 58/21 58/23 59/2 59/11
61/17 61/21 62/2 62/4 75/5 75/18
77/11 77/22

consoles [9] 58/4 58/6 58/9 58/11
59/21 60/1 60/21 75/4 91/7
Constitution [1] 103/4
constitutional [2] 8/14 8/16
constructive [1] 104/7
consult [1] 18/19
contact [5] 32/17 41/24 85/20 86/13
86/22
contained [2] 32/15 49/24
continuance [1] 10/5
continuation [1] 64/14
continue [2] 64/15 108/9
continued [4] 10/8 10/12 10/14
10/17
contraband [4] 31/7 32/13 37/20
42/2
control [2] 54/23 94/18
controlled [2] 94/22 105/20
conversation [1] 66/15
convict [2] 109/14 109/17
convicted [3] 26/22 28/22 109/10
conviction [4] 39/23 39/23 40/5
105/17
convicts [1] 109/17
Cook [1] 4/12
COOPER [5] 1/20 2/6 2/9 2/10 2/14
cooperating [1] 70/17
copies [1] 9/18
copy [10] 10/17 39/22 39/25 40/4
43/3 47/23 48/12 92/1 92/2 105/17
corner [3] 46/4 85/16 85/17
correct [24] 14/1 14/4 14/14 17/23
19/18 19/21 19/25 20/3 24/1 24/3
24/11 26/6 26/9 26/16 29/6 29/7 31/7
31/13 31/17 31/23 33/3 35/5 37/15
38/8 38/9 41/11 42/3 42/20 44/14
44/17 45/4 45/10 46/2 46/9 50/11
51/19 52/6 52/10 57/10 63/18 64/19
71/6 101/4 101/5
correctly [2] 6/12 36/7
could [18] 9/8 9/9 9/25 23/11 37/19
38/4 38/6 45/8 59/7 67/15 67/17
67/17 69/20 78/14 95/19 108/10
109/12 109/13
couldn't [1] 86/22
counsel [6] 4/4 18/9 18/10 18/20
82/5 101/3
counting [1] 25/6
COUNTY [4] 1/5 17/16 71/6 111/3
couple [1] 93/8
course [1] 62/5
courses [1] 14/23
court [27] 1/4 4/12 7/13 7/24 8/10
8/17 9/8 12/21 13/9 15/17 34/12
36/11 36/19 37/11 41/12 56/1 70/16
104/18 106/3 106/9 106/17 106/18
106/24 106/25 108/23 108/24 111/5
Court's [7] 4/15 17/19 51/20 53/20
71/19 93/14 96/25
Courtroom [1] 107/4
Courtroom A [1] 107/4
cover [1] 76/6
covered [1] 68/13
covering [1] 68/6
covers [1] 53/8
coworkers [1] 61/14
crime [7] 28/21 28/22 29/12 69/23
102/16 102/17 105/16
criminal [4] 15/25 26/11 42/18 71/20
criteria [3] 29/5 29/6 29/9

**C**

cross [13]  2/6 2/9 2/14 6/16 6/17
19/6 19/9 34/10 53/23 54/1 64/15
80/4 95/3
cross-examination [9]  2/6 2/9 2/14
19/6 19/9 53/23 54/1 64/15 80/4
cross-examine [2]  6/17 34/10
cross-examining [1]  6/16
crystal [17]  16/21 29/19 29/25 30/6
30/18 31/10 31/16 31/21 32/5 32/16
32/19 32/24 35/14 74/4 74/5 74/7
103/7
crystal-like [2]  16/21 32/19
crystals [1]  32/23
cuffed [1]  6/4
cup [7]  16/4 17/22 55/11 56/10 57/13
58/14 59/11
currently [2]  11/19 106/18
custody [11]  3/6 6/25 7/18 106/18
106/19 106/20 106/21 107/8 107/18
107/22 107/23

**D**

damage [5]  59/22 61/3 61/5 61/6
61/13
damaged [1]  61/16
dangerous [1]  28/17
dark [1]  69/6
dark-colored [1]  69/6
dash [7]  15/20 20/10 20/12 20/13
20/19 20/22 21/3
date [10]  63/12 64/25 66/8 79/9
88/24 102/20 106/18 106/25 107/1
107/23
Dated [1]  111/12
day [19]  12/6 12/8 21/11 21/14 41/2
41/4 73/9 73/15 73/19 84/6 87/10
91/14 91/15 91/16 91/18 92/12 92/19
93/5 111/12
days [3]  9/21 10/4 89/23
daytime [2]  92/21 92/23
dealing [1]  51/13
decide [2]  16/8 100/22
decided [1]  101/3
deciding [1]  100/11
decision [2]  10/10 101/2
declarations [1]  10/16
defendant [18]  1/11 1/23 13/16
15/13 41/17 41/20 42/15 43/6 52/3
53/14 80/11 96/10 96/13 103/22
103/23 105/5 105/9 107/17
defendant's [4]  39/22 42/17 52/8
104/5
defense [9]  7/25 9/18 72/21 83/13
83/17 99/23 101/6 101/9 108/3
DEFENSE'S [1]  2/12
delays [1]  10/4
department [7]  11/21 12/1 19/16
19/17 39/24 41/6 50/19
Department 7 [1]  39/24
deprived [1]  8/14
DEPT [1]  1/2
Deputy [1]  1/21
describe [8]  22/21 23/12 33/12
15/16 41/15 55/16 75/8 78/14
destinations [1]  26/4
destroy [1]  60/19
destroyed [4]  37/19 60/16 60/19
60/21
detained [4]  35/10 35/11 35/15

37/16
detective [14]  39/13 39/16 40/9
40/25 41/5 50/16 51/1 52/4 52/7
52/22 54/4 54/5 59/17 68/4
detectives [3]  17/25 18/1 42/14
detention [1]  8/11
determination [1]  108/21
determine [2]  32/12 82/11
determining [1]  51/5
device [1]  58/24
dictated [1]  47/21
did [98]  7/3 10/14 12/11 13/5 15/10
15/24 16/2 16/3 16/8 16/10 16/11
16/18 17/24 18/1 18/2 18/3 19/24
21/3 22/22 23/15 24/14 24/15 24/18
25/21 26/11 26/24 27/11 27/23 28/3
28/7 28/8 28/10 28/11 28/14 28/15
28/17 28/24 34/2 36/3 41/8 41/25
42/8 42/19 45/5 45/11 45/13 46/22
46/24 47/5 47/7 51/4 53/13 54/17
58/4 60/1 60/2 60/4 60/19 61/3 61/10
61/11 61/13 62/7 62/17 63/5 67/2
68/2 68/6 70/16 70/19 73/24 74/12
76/21 76/24 81/6 81/13 83/15 83/16
84/12 85/6 85/10 85/20 86/4 86/13
87/3 87/25 91/25 93/16 93/19 97/3
98/4 98/16 98/21 102/23 103/16
103/19 105/2 105/17
didn't [26]  14/7 22/20 23/2 60/11
60/13 60/16 60/18 61/12 61/13 62/19
68/20 86/17 87/23 88/4 88/11 90/10
92/7 92/10 93/25 94/5 94/7 95/18
97/14 97/18 97/19 103/18
die [1]  95/10
difference [2]  17/4 17/5
different [12]  46/19 49/14 49/18
51/15 51/17 51/19 57/20 58/2 74/13
88/21 88/22 91/8
Direct [6]  2/6 2/9 2/14 11/17 40/23
72/23
directly [2]  83/13 87/22
discovered [2]  57/6 59/8
discuss [4]  5/21 39/9 71/15 99/21
disk [2]  9/13 9/15
dismiss [1]  109/25
dismissed [5]  109/20 109/22 109/25
110/4 110/6
dispatch [6]  27/5 27/11 27/13 27/20
27/24 28/14
distance [5]  23/20 24/19 25/3 25/5
25/7
District [3]  1/21 106/17 106/24
do [111]  3/7 3/22 4/1 4/1 4/21 4/25
5/3 5/21 7/2 7/9 8/11 8/18 9/22 12/1
12/3 12/6 12/7 12/16 12/18 13/8
13/11 14/15 14/18 14/19 14/21 14/23
15/10 17/24 18/8 18/18 18/21 18/24
19/1 19/2 21/1 21/25 22/20 23/20
25/19 27/16 29/8 30/1 30/6 30/8
30/25 31/9 33/25 33/9 39/20 41/2
41/12 42/8 44/2 45/20 45/21 45/23
46/10 46/15 46/20 46/24 48/1 48/12
55/21 55/25 56/16 58/6 60/11 60/24
62/18 63/19 64/21 65/15 71/14 71/25
72/9 75/9 75/22 78/7 81/18 81/20
82/2 82/2 82/17 83/20 85/18 87/19
88/7 89/3 89/5 90/12 92/14 92/19
96/18 96/20 96/22 97/25 98/2 98/6
99/21 100/5 100/13 100/25 102/5
102/10 102/21 103/1 104/11 105/6

105/8 106/13 108/14
doctor [4]  81/2 92/16 92/17 92/24
document [4]  43/18 43/19 43/20
111/8
documents [6]  7/20 8/23 9/6 9/9
46/18 102/6
does [6]  6/23 8/1 12/13 20/19
22/16 33/4 46/5 57/22 60/24 61/20
65/10 85/1
doesn't [17]  9/3 20/13 25/16 31/3
31/7 36/11 43/16 74/22 76/18 76/23
77/5 77/16 83/23 89/1 107/13 107/14
109/13
doing [4]  7/24 43/10 68/14 69/9
don't [71]  6/9 6/18 9/3 10/19 10/19
11/14 13/24 20/12 21/8 21/9 23/3
23/12 23/15 24/17 24/24 25/24 25/24
26/2 28/13 28/15 29/17 32/9 33/6
42/24 47/20 48/3 49/23 52/17 52/25
53/16 55/22 60/10 60/14 62/9 62/10
62/11 67/5 69/10 69/17 70/8 70/10
70/20 75/17 75/20 75/21 75/24 75/25
76/1 76/17 77/4 79/15 79/16 80/17
80/20 82/21 84/20 84/25 87/20 88/1
89/4 90/13 91/19 93/3 93/6 93/21
93/22 95/4 97/24 104/11 106/19
109/24
done [6]  36/14 59/22 61/3 64/21
98/11 108/3
door [9]  9/14 13/23 13/23 15/19
74/16 74/16 74/19 85/14 86/23
doors [1]  74/21
doubt [1]  69/15
down [20]  14/8 14/10 14/10 17/8
17/9 19/5 26/1 28/18 28/24 29/14
31/16 32/11 32/21 36/20 56/21 75/9
75/12 99/20 105/24 106/2
Doyle [1]  110/3
drive [3]  20/9 73/19 94/23
driver [3]  14/7 15/11 58/22
driver's [3]  15/19 15/19 57/3
drivers [1]  14/9
driveway [2]  13/1 23/8
driveways [1]  13/2
driving [4]  12/23 73/15 103/23
105/19
drug [3]  16/18 28/21 35/14
drug-related [1]  16/18
drugs [4]  16/18 97/14 103/20 105/9
due [3]  8/15 9/14 32/16
duly [3]  11/5 40/14 72/13
during [8]  5/2 15/2 15/21 15/25
32/11 32/21 47/4 88/10
DVD [1]  75/24

**E**

each [1]  49/20
early [1]  12/15
easily [2]  57/9 74/21
east [3]  12/25 13/1 28/19
educated [1]  32/12
effect [1]  108/17
Eighth [2]  106/17 106/24
either [2]  23/21 99/2
elicited [1]  22/25
else [17]  13/19 16/12 37/19 37/25
38/3 38/5 44/22 51/23 76/17 78/17
79/6 84/20 87/3 90/1 98/4 98/16
98/22
emergency [6]  22/5 37/6 38/10
38/11 38/17 38/19

**E**

employed [2] 11/19 11/22
employee [1] 111/10
empty [2] 77/2 77/3
end [3] 13/4 66/8 92/12
enough [2] 10/4 105/10
entire [4] 57/2 58/21 59/2 76/1
entitled [1] 83/17
envelope [1] 7/19
equipment [1] 20/24
error [1] 7/22
especially [1] 8/8
ESQ [2] 1/20 1/24
essentially [2] 54/24 104/20
establish [2] 23/6 33/11
established [5] 34/25 69/16 69/16
90/23 94/16
establishing [1] 34/17
even [9] 10/4 17/3 18/19 70/5 74/16
86/22 88/4 89/19 95/18
events [1] 34/23
ever [13] 8/4 9/3 20/22 22/24 30/7
30/11 33/19 76/21 76/24 86/17 91/8
97/3 109/24
every [1] 21/25
everyone [1] 90/1
everything [8] 50/1 60/8 74/15 75/7
91/10 95/25 103/10 108/1
everywhere [1] 94/25
evidence [28] 22/9 22/13 22/13
22/18 22/18 23/2 23/4 27/7 29/22
30/10 30/10 37/19 45/9 53/4 55/6
55/7 57/12 57/19 57/22 58/1 61/8
61/22 62/2 69/19 101/13 103/14
105/15 105/15
evidentiary [1] 16/12
ex [2] 105/18 109/8
ex-felon [2] 105/18 109/8
exact [4] 22/8 49/21 50/10 51/11
exactly [4] 33/24 34/10 78/6 83/21
examination [17] 2/6 2/6 2/9 2/9
2/10 2/14 2/14 11/17 19/6 19/9 40/23
53/23 54/1 64/15 71/4 72/23 80/4
examine [2] 6/17 34/10
examined [3] 11/6 40/15 72/14
examiner [2] 46/13 46/16
examining [1] 6/16
exceeded [1] 106/1
except [1] 46/12
exception [2] 36/7 103/2
Exhibit [13] 2/21 2/22 2/22 39/6
40/3 40/7 45/19 45/19 45/22 46/8
46/10 48/8 48/9
Exhibit 1 [1] 40/3
Exhibit 2 [3] 45/19 45/22 48/8
Exhibit 3 [4] 45/19 46/8 46/10 48/9
exhibits [5] 48/10 48/17 48/19 71/16
71/22
Exhibits 1 [1] 71/16
Exhibits 2 [1] 48/10 48/17
exigent [9] 35/19 35/24 36/1 36/5
36/22 36/25 102/24 104/16 104/17
existed [1] 30/7
exit [1] 15/11
exonerated [1] 107/21
experience [9] 14/13 15/8 32/17
47/6 51/12 104/1 104/4 105/3 105/4
explained [3] 8/2 9/5 32/24
eye [1] 41/18

**F**

F-R-A-N-K [1] 40/18
face [6] 11/2 40/10 68/6 68/13 72/10
76/5
facing [1] 108/16
fact [11] 8/22 9/14 42/19 45/11 51/2
51/10 95/12 100/22 103/16 103/24
105/1
facts [14] 22/8 22/12 22/24 23/1
23/4 27/7 29/22 30/9 34/1 34/3 34/25
36/3 37/1 101/13
failure [4] 20/4 20/6 21/19 35/20
faint [1] 14/11
far [10] 23/9 24/19 24/24 24/25 25/4
25/5 25/5 64/7 69/25 103/6
Faretta [1] 108/8
fast [1] 90/12
fault [1] 65/23
federal [15] 6/7 6/25 7/18 8/10 8/10
8/11 9/6 9/12 104/23 106/19 107/18
107/22 108/16 109/3 109/9
Feds [1] 109/9 109/13 109/17
feel [5] 8/3 32/12 33/17 67/23 98/9
feels [1] 53/10
feet [3] 25/10 25/11 25/13
fellow [1] 42/14
felon [2] 105/18 109/8
felony [2] 28/22 39/23
felt [3] 28/16 32/21 35/6
few [4] 3/11 36/8 58/9 106/11
field [8] 14/16 14/21 45/6 45/8 45/8
45/11 45/24 46/11
fifteen [1] 66/13
file [2] 9/16 34/4
filed [1] 109/10
filing [1] 102/5
final [1] 65/23
financially [1] 111/11
find [6] 15/24 76/17 76/21 76/24
78/18 106/13
finding [1] 60/24
fine [5] 53/18 60/9 73/12 83/25
96/18
finish [2] 30/4 98/24
firearm [15] 16/13 17/22 18/3 42/17
42/19 42/22 45/1 45/9 56/6 57/6 59/7
60/13 60/13 61/10 105/19
firearms [5] 17/25 18/1 50/17 50/20
52/5
first [31] 4/13 5/23 5/24 10/23 10/25
11/5 11/8 14/6 25/23 26/3 26/24 27/1
27/2 27/8 29/21 33/18 34/11 35/21
38/24 40/14 40/17 46/6 55/1 61/6
72/2 72/13 72/16 78/20 80/7 84/3
109/17
five [6] 24/6 63/15 63/21 84/6 89/23
99/8
five-day [1] 84/6
fix [4] 84/20 84/21 85/23 86/10
fixed [1] 86/8
floor [4] 75/7 75/17 78/13 78/16
focus [5] 25/25 36/18 82/7 84/2
101/15
focused [1] 102/19
focusing [4] 68/1 86/1 101/22
102/12
follow [7] 7/1 39/4 46/22 47/5 71/2
95/23 99/15
follow-up [1] 99/15
follow-ups [2] 39/4 71/2

follows [3] 11/6 40/15 72/14
footage [2] 30/18 31/2
for some [1] 22/16
force [1] 9/6
forget [1] 11/14 104/19
forgot [2] 22/8 64/15
form [2] 46/11 60/17
forth [1] 34/19
forward [7] 9/2 9/22 10/11 10/21
32/1 102/25 109/12
found [12] 33/19 33/21 42/2 55/6
55/6 55/16 56/12 57/9 59/19 68/2
103/25 105/19
foundation [2] 43/14 82/6
four [3] 10/13 13/23 25/2
four-door [1] 13/23
fourth [1] 103/3
frame [1] 79/8
FRANK [3] 2/8 40/13 40/17
free [4] 39/6 39/8 71/10 99/17
fresh [1] 17/3
Friday [2] 82/2 82/18
friend [1] 86/9
friends [10] 79/15 86/11 87/20 88/6
88/7 88/13 88/23 89/14 89/18 89/20
friends' [1] 89/3
frisk [1] 103/6
front [8] 15/15 20/1 24/20 25/1
32/15 32/19 38/7 76/5
frustrating [1] 9/25
frustration [1] 8/3
Full [1] 110/10
further [16] 5/16 18/6 32/1 33/11
53/21 61/11 71/1 71/8 71/18 71/23
80/1 90/22 95/10 99/12 99/23 111/9

**G**

G-L-O-V-E-R [1] 11/10
gang [1] 50/20
gap [2] 24/23 24/25
gave [8] 26/7 33/10 86/21 87/15
87/22 88/14 88/23 89/16
gear [1] 57/13
gems [1] 32/16
gemstone [1] 30/2
gemstones [14] 29/19 30/1 30/7
30/11 30/18 30/22 31/21 32/5 33/2
33/3 35/4 35/7 35/14 103/7
gestures [2] 75/13 80/17
get [17] 3/11 9/15 10/5 10/6 13/5
57/22 64/8 74/20 79/8 80/21 82/14
83/23 85/20 85/25 86/7 105/17 110/5
getting [2] 62/5 69/12
girlfriend [6] 74/7 74/8 74/8 74/9
93/18 93/22
give [17] 6/18 6/23 7/4 18/14 23/21
45/5 66/8 74/6 81/5 84/16 84/19 86/6
87/3 87/23 89/13 105/21 106/10
given [3] 34/16 66/13 83/19
giving [7] 11/13 34/12 34/13 84/15
89/14 100/15 107/22
GLORIA [8] 2/13 72/4 72/12 72/17
72/25 80/8 80/9 80/9
GLOVER [15] 2/5 5/25 6/1 6/3 10/25
11/4 11/9 11/19 19/11 39/15 42/1
45/5 54/20 55/1 101/24
Glover's [1] 59/10
go [36] 4/13 4/13 9/20 9/22 10/10
14/19 14/21 15/17 22/16 29/18 30/4
30/9 32/1 33/16 39/6 49/4 50/6 67/12
71/10 77/8 77/19 80/23 81/1 81/2

**G**

go... [12] 81/22 83/1 83/24 83/25 86/23 88/9 92/23 94/4 95/8 102/25 108/25 109/12
goes [1] 83/13
going [65] 4/22 4/25 5/1 5/4 5/7 5/14 6/4 6/8 6/15 10/1 10/2 10/10 10/21 18/12 18/17 22/7 23/3 24/2 24/7 25/19 30/21 32/8 33/10 34/9 35/17 39/1 43/11 43/21 52/15 53/1 53/2 53/11 53/16 56/16 56/17 61/24 62/15 67/25 69/11 71/13 77/18 82/12 84/19 85/22 85/25 86/7 86/10 90/25 92/16 92/23 95/10 97/21 100/7 102/18 102/19 106/16 106/23 107/1 107/15 108/1 108/4 108/7 108/11 108/19 109/25
gold [5] 12/19 12/25 13/25 73/2 73/14
gone [1] 93/4
good [1] 70/14
got [10] 3/7 34/25 52/12 62/17 69/1 70/5 70/9 105/10 105/13 105/13
gotten [1] 62/4
government [1] 9/6
grab [2] 32/5 95/19
grams [2] 47/16 50/11
grandson [2] 99/5 99/7
green [1] 16/6
gross [2] 47/16 50/11
guess [8] 4/15 34/7 38/25 62/21 76/16 87/9 94/22 95/23
gun [4] 59/19 97/3 103/18 109/20
guns [3] 96/18 96/20 103/18
guy [1] 85/22
guys [4] 69/3 87/18 87/19 95/8

**H**

had [49] 7/19 8/23 9/3 9/19 10/4 10/5 13/3 14/2 15/11 17/2 17/21 20/22 27/12 28/19 42/1 42/12 51/5 51/10 52/3 55/6 68/13 74/17 78/15 78/19 79/13 81/14 81/16 82/20 83/1 83/8 86/9 86/20 90/9 92/1 92/12 92/16 93/10 93/11 93/17 93/24 93/25 95/17 97/5 97/7 97/9 103/21 104/3 104/10 104/11
Hafen [2] 63/8 63/15
half [4] 96/14 96/14 96/15 96/16
hand [6] 6/10 11/2 40/10 46/4 46/17 72/10
handcuffed [6] 35/4 35/6 37/18 38/7 54/20 102/1
handcuffs [2] 54/24 55/4
handing [1] 88/3
happen [1] 49/1
happened [3] 71/6 74/23 89/22
Harbor [5] 12/24 17/12 19/23 21/24 22/4
hard [2] 78/16 92/25
Harmon [5] 12/23 12/25 17/15 28/19 41/9
has [24] 13/16 20/22 20/23 23/4 27/11 30/8 30/25 36/7 36/12 36/19 41/20 44/8 44/11 46/4 49/10 71/23 71/24 92/2 101/6 103/14 104/18 106/9 106/9 106/14
hasn't [2] 30/24 34/7
have [126]
haven't [4] 50/23 52/12 70/5 89/10

having [5] 11/5 26/18 40/14 72/13 108/6
he [108] 6/13 8/23 9/3 11/14 14/7 14/10 15/15 17/9 22/14 22/14 22/20 23/2 23/4 27/11 27/12 27/12 29/9 30/11 30/18 30/24 30/24 31/3 34/2 34/3 34/5 34/7 34/10 34/14 36/3 36/23 36/24 37/1 37/3 37/3 39/7 39/16 43/15 43/16 43/17 51/10 52/2 52/24 52/24 53/9 53/10 54/22 55/3 57/25 59/15 61/9 61/10 61/20 63/22 68/2 68/2 68/6 68/6 68/13 68/14 68/14 68/18 68/20 83/23 86/9 88/11 88/12 88/19 89/1 91/25 92/1 92/2 92/4 92/5 92/7 92/7 92/9 92/9 92/12 92/13 92/16 92/16 92/23 93/4 93/10 93/11 93/17 93/17 93/18 93/19 93/24 93/25 94/3 94/5 94/5 94/22 94/22 95/17 95/18 95/19 95/19 101/25 103/15 103/16 104/6 105/3 105/4 105/6 107/17
he's [31] 13/12 20/18 23/1 23/3 29/24 31/25 34/7 34/9 41/16 41/17 43/10 43/11 43/11 43/17 57/14 57/23 65/5 65/7 67/9 67/11 67/21 68/25 73/12 77/13 80/13 104/15 105/5 105/7 106/18 106/21 107/18
head [3] 22/18 80/15 104/20
heard [5] 3/14 59/6 64/12 103/16 103/17
hearing [8] 1/15 3/16 9/23 64/14 102/9 105/14 106/14 109/2
hearsay [2] 52/21 70/9
held [2] 50/17 103/10
help [1] 99/20
her [25] 5/11 5/12 18/17 18/19 78/11 82/10 82/11 82/12 83/15 83/16 84/19 84/22 85/10 85/13 85/14 86/15 86/17 87/13 93/18 94/17 95/7 95/19 103/17 104/12 107/14
here [23] 4/24 5/2 7/17 7/19 7/23 9/9 10/21 13/9 17/16 30/18 41/12 61/24 62/5 66/1 69/9 79/1 85/13 89/23 100/9 101/15 101/22 108/18 109/20
here's [3] 61/9 105/12 105/13
hereby [1] 111/6
high [2] 28/20 29/12
him [47] 4/8 6/18 6/20 7/4 8/24 11/13 18/14 20/17 22/25 23/1 27/18 30/4 30/16 31/14 31/15 31/15 34/1 34/1 34/13 34/13 35/25 36/3 38/16 39/14 39/20 41/15 43/8 43/12 43/20 43/21 53/7 53/8 56/17 57/18 57/25 62/3 64/5 65/8 68/7 68/16 88/8 92/14 92/18 98/24 102/25 105/10 106/19
himself [1] 57/25
hinders [1] 7/24
his [44] 8/23 8/23 9/11 11/14 13/4 15/6 22/18 23/1 27/10 30/20 31/19 33/20 34/1 43/14 43/20 43/22 56/17 57/19 58/17 59/16 59/17 68/6 68/13 70/1 74/9 83/13 87/20 88/5 88/7 88/23 89/18 89/20 91/25 92/1 93/17 93/21 103/16 103/22 104/1 104/4 104/8 104/9 105/2 105/4
history [1] 42/18
hit [2] 22/4 24/15
hold [8] 27/15 37/16 80/16 88/18 88/18 99/19 106/16 106/23

holder [6] 16/4 17/22 55/11 56/10 57/13 59/11
holders [1] 58/14
home [3] 91/12 91/23 92/13
honestly [1] 64/25
Honor [91] 3/8 3/13 3/18 3/24 3/25 4/3 4/6 4/10 5/18 6/14 8/19 8/25 10/12 10/24 11/12 18/7 18/16 20/15 22/17 22/21 27/6 27/10 29/2 29/21 29/24 30/23 32/6 33/18 34/6 35/21 36/23 36/24 37/22 38/15 38/24 39/5 39/7 39/12 39/16 39/19 40/21 42/3 43/24 45/15 48/7 48/21 48/24 50/3 53/21 57/14 58/18 59/13 60/23 61/19 62/1 62/15 62/20 63/13 63/17 64/3 65/5 65/7 65/19 65/24 66/20 67/9 68/8 69/8 71/9 71/20 73/5 77/13 77/25 78/21 83/9 83/14 90/2 94/20 95/6 95/11 98/12 99/13 101/8 101/12 103/13 104/14 104/17 107/12 107/16 109/6
HONORABLE [1] 1/16
hood [2] 30/20 35/3
hopefully [2] 4/16 4/18
horse [2] 95/9 98/12
hospital [1] 81/3
hour [5] 24/5 24/10 24/14 62/24 63/22
hours [13] 12/14 19/20 64/20 65/4 65/21 66/6 66/15 81/22 82/23 82/23 93/9 93/10 93/11
house [2] 83/2 89/18
how [41] 4/1 5/10 11/19 11/22 15/17 21/6 23/6 23/9 23/16 23/18 24/19 24/24 24/25 25/5 27/4 27/10 27/12 43/20 45/23 49/12 49/16 54/19 55/16 61/20 62/2 62/17 63/4 69/13 81/13 82/11 82/23 85/10 85/20 86/2 86/13 87/17 87/19 88/7 93/4 99/7 102/5
However [2] 50/24 104/10
huh [6] 35/12 73/16 84/8 92/3 96/1 108/15

**I**

I'll [15] 20/17 22/15 29/5 38/16 48/25 61/2 61/23 65/8 66/22 67/12 68/16 99/4 100/8 100/10 106/10
I'm [84] 3/13 4/13 5/6 5/14 6/11 6/15 8/13 8/13 8/22 11/13 18/12 18/15 18/17 20/17 22/25 23/1 27/18 32/8 34/21 36/12 37/10 39/1 43/8 43/21 44/2 45/18 52/13 52/20 53/2 53/16 56/16 56/17 57/1 57/21 57/24 58/21 59/6 60/20 62/13 65/3 64/25 67/25 69/12 69/15 71/13 72/21 76/6 76/6 77/8 77/18 78/1 80/6 81/8 82/6 82/8 83/20 83/21 86/1 89/20 89/21 90/8 90/25 91/18 92/22 93/19 94/20 95/2 95/3 96/4 96/13 97/1 97/21 98/11 98/19 99/9 100/4 101/17 102/12 102/16 103/9 106/23 108/4 108/18 108/19
I've [6] 6/14 8/2 21/2 28/19 34/16 50/19 50/20 98/12
I-E-N [1] 40/19
ID [1] 26/7
idea [1] 9/4
identifiable [2] 15/7 32/14
identified [2] 13/16 41/20
if [81] 4/12 4/23 5/10 6/9 6/18 6/21 9/3 9/8 11/7 13/23 14/2 17/3 18/13

**I**

**if...** [68] 18/18 19/2 19/5 22/15 25/14
30/6 32/10 32/11 33/12 33/17 37/25
38/23 39/25 42/8 42/21 43/3 43/16
43/16 44/18 47/17 47/17 47/19 47/23
48/2 48/4 49/6 49/13 49/21 50/7 52/7
52/13 52/24 52/25 52/25 53/10 53/14
53/15 53/16 54/21 56/4 56/20 57/19
58/1 58/24 59/23 60/8 60/18 60/18
60/20 61/1 65/14 66/4 69/19 72/8
72/19 74/19 76/5 80/9 82/12 83/16
89/25 94/5 98/9 102/24 107/16 109/9
109/16 110/5
**illegal** [1] 32/18
**immediate** [1] 67/7
**immediately** [4] 17/25 23/13 35/4
62/21
**impound** [1] 45/9
**improper** [1] 59/14
**in** [187]
**incident** [2] 37/13 45/25
**included** [2] 34/22 111/7
**inconsistencies** [2] 101/10 102/13
**inconsistent** [1] 59/12
**indicated** [1] 31/18
**indication** [1] 105/21
**indicative** [1] 51/16
**individual** [6] 41/25 49/14 49/14
49/18 49/20 55/3
**indulgence** [7] 17/19 51/20 53/20
64/10 71/19 93/14 96/25
**information** [2] 18/11 34/20
**inherent** [1] 37/7
**initial** [1] 24/8
**initially** [1] 31/14 65/9
**initiating** [1] 24/9
**inmates** [1] 6/14
**inside** [2] 45/1 57/5
**instead** [3] 25/6 38/18 89/14
**institution** [1] 9/13
**instructed** [3] 42/14 44/24 52/1
**insurance** [1] 26/8
**intact** [6] 5/10 60/5 60/8 60/22 61/17
73/21
**intend** [1] 43/19
**intent** [1] 105/21
**interested** [1] 111/11
**interior** [7] 58/11 59/22 60/16 60/19
60/19 74/13 77/23
**interrogation** [5] 70/1 70/2 70/4
70/6 70/10
**interview** [1] 42/15
**into** [13] 30/21 31/19 32/4 32/17
33/16 34/22 57/18 57/25 70/5 70/9
87/9 91/5 105/25
**introduce** [1] 53/4
**inventory** [1] 20/24
**investigation** [3] 60/12 60/12 69/25
**investigations** [6] 14/24 50/20 50/21
50/22 50/24 51/5
**investigative** [1] 22/16
**invoke** [1] 10/3
**involved** [1] 111/10
**involving** [1] 50/24
**is** [145]
**is still** [1] 36/11
**Island** [5] 12/24 17/13 19/23 21/24
22/4
**issue** [3] 8/7 33/13 108/8
**issues** [6] 9/19 14/25 34/22 102/18

**it** [237]
**it's** [51] 9/24 10/7 10/12 15/18 20/6
22/7 22/7 22/12 27/25 28/20 29/22
31/1 31/2 32/9 33/16 33/17 34/22
36/10 37/25 43/2 44/14 46/12 51/13
52/9 53/10 57/17 61/19 69/22 70/14
73/14 74/8 74/10 74/18 74/21 74/22
75/17 76/8 77/3 85/16 87/12 87/13
88/20 89/1 89/20 90/3 94/17 95/7
100/18 104/14 106/17 109/9
**item** [1] 32/14
**items** [3] 16/19 45/5 45/7
**its** [2] 106/4 106/14
**itself** [4] 36/18 64/7 65/15 67/16

**J**

**J-O-S-H-U-A** [1] 11/9
**January** [32] 12/4 12/11 41/1 54/11
65/21 79/11 79/12 80/23 80/24 81/16
82/7 82/9 82/22 84/5 84/5 86/13 87/4
87/5 87/6 87/7 87/8 87/10 89/9 89/23
89/24 89/24 90/15 90/16 91/12 91/12
93/19 98/21
**January 1st** [5] 84/5 87/6 89/23
89/24 90/15
**January 2015** [1] 81/16
**January 6** [7] 12/11 41/1 54/11
65/21 79/11 79/12 93/19
**January 6th** [11] 12/4 82/7 84/5
87/7 87/8 87/10 89/9 89/24 90/16
91/12 91/12
**January of** [1] 82/22
**Jennifer** [5] 1/24 1/25 110/15 111/5
111/15
**job** [1] 90/11
**joint** [1] 104/9
**JONATHAN** [1] 1/20
**JOSEPH** [1] 1/16
**JOSHUA** [3] 2/5 11/4 11/9
**judge** [6] 63/8 63/14 64/8 64/9 66/7
66/16
**judgment** [3] 39/22 40/4 105/17
**judicial** [4] 8/17 8/20 106/17 106/24
**July** [2] 107/3 111/12
**July 2nd** [1] 107/3
**JUNE** [2] 1/18 3/1
**just** [64] 3/8 7/21 8/13 9/25 11/13
11/24 13/12 16/15 17/3 17/15 20/1
25/1 30/24 34/14 37/24 42/24 44/8
49/4 50/6 52/13 53/8 56/20 57/2
58/15 58/24 59/1 65/13 65/14 65/25
66/1 66/4 69/12 71/19 73/5 74/20
74/23 74/23 75/1 75/7 76/8 78/17
79/13 80/25 81/1 81/5 81/6 81/9
82/10 86/4 86/18 87/9 87/24 87/25
88/3 88/14 92/4 94/3 94/4 95/2 95/23
98/12 99/2 100/18 106/10
**JUSTICE** [2] 1/4 1/16
**justification** [1] 30/21
**justified** [2] 29/18 33/7

**K**

**key** [5] 84/15 84/16 89/16 93/24 94/1
**keys** [16] 38/1 86/7 86/21 88/3 88/14
89/13 91/24 92/2 95/17 95/19 97/5
97/7 97/9 97/12 103/17 103/22
**kidnapped** [1] 67/24
**killing** [1] 95/8
**kind** [4] 55/12 77/10 108/2 108/11
**Kitchen** [1] 68/4

**knew** [5] 16/6 16/22 81/2 85/22
92/12
**know** [80] 6/9 6/11 6/15 6/18 7/21
7/24 8/2 8/13 9/3 9/5 9/17 9/17 9/18
9/24 10/19 10/19 23/3 25/14 25/24
26/3 26/4 30/1 30/6 32/9 43/14 44/8
49/6 50/7 52/25 53/15 58/10 59/23
61/20 68/12 69/10 74/15 74/17 74/22
74/22 75/17 75/21 75/24 75/25 77/4
78/7 78/19 79/14 79/15 79/16 81/5
81/6 82/10 83/22 84/20 84/25 85/10
86/16 86/19 87/13 87/16 87/19 87/20
88/1 88/4 88/7 89/1 89/3 89/4 92/16
93/3 93/6 95/4 95/11 98/12 101/11
102/1 102/24 103/19 103/19 107/10
**knowing** [2] 88/15 88/24
**knowledge** [5] 27/12 36/10 44/22
51/13 59/25
**knows** [3] 22/14 43/15 52/24
**Koval** [2] 12/24 17/15

**L**

**lady** [1] 89/21
**LAS** [7] 1/4 3/1 11/20 12/1 19/16
41/5 111/12
**Las Vegas** [4] 11/20 12/1 19/16 41/5
**last** [9] 11/8 40/18 42/1 46/6 72/16
72/18 84/24 109/11 109/22
**later** [3] 34/2 58/2 102/20
**law** [8] 34/8 36/19 104/23 105/6
105/8 106/3 106/3 108/13
**lawfully** [2] 105/6 105/7
**lay** [2] 4/11 4/14
**laying** [1] 82/6
**lead** [1] 95/3
**leading** [3] 77/14 77/17 78/10
**leafy** [1] 16/6
**least** [5] 10/5 18/19 19/2 83/18
104/8
**leave** [5] 18/3 39/8 70/19 94/5 99/17
**leaves** [2] 11/14 92/13
**leaving** [1] 92/14
**leeway** [5] 33/11 34/13 34/17 77/19
82/15
**left** [6] 46/4 46/17 76/12 79/18 79/22
91/9
**left-hand** [2] 46/4 46/17
**legal** [9] 9/18 33/22 34/3 34/5 35/23
35/24 36/1 36/25 38/18
**legally** [1] 53/10
**lend** [1] 83/12
**lending** [3] 73/21 82/10 82/12
**length** [2] 25/8 25/10
**leniency** [1] 70/16
**lent** [5] 79/6 79/13 83/8 83/16 83/22
**let** [17] 20/17 21/10 27/21 27/25
30/4 44/8 49/6 50/7 63/6 71/19 74/25
78/16 78/23 86/24 91/3 98/24 101/14
**let's** [11] 23/6 58/15 79/8 80/23
82/19 84/2 84/4 84/17 87/1 91/11
101/23
**letting** [2] 8/13 90/1
**level** [1] 107/4
**lift** [1] 57/5
**lifted** [1] 59/5
**light** [5] 22/4 22/23 22/25 23/3 23/10
**lights** [7] 22/5 22/23 23/1 23/9 23/12
23/18 24/9
**like** [58] 6/4 7/12 7/23 10/20 15/4
16/21 16/25 17/1 24/25 25/1 25/4
32/19 32/21 34/14 38/1 46/3 46/13

**L**

like... [41]  51/6 53/10 56/1 58/4
58/10 58/11 60/4 60/21 60/22 61/3
61/16 61/21 67/22 67/23 74/16 74/17
74/18 75/5 75/7 75/21 76/8 76/9
77/22 78/4 79/14 79/23 80/21 81/5
85/16 86/18 87/18 88/16 90/11 92/8
94/7 95/25 97/25 102/15 103/1 103/2
109/21
likely [1]  16/22
limit [1]  24/2
line [1]  58/1
list [1]  20/24
little [10]  6/21 6/23 7/1 28/23 58/25
62/5 77/18 78/25 82/14 88/21
live [9]  85/1 85/6 89/6 93/16 93/20
93/25 98/4 98/17 98/22
lived [3]  95/19 95/20 98/16
loan [2]  81/9 84/12
loaned [1]  90/23
loaning [2]  80/25 83/6
locate [1]  16/3
located [2]  17/16 44/20 44/23
location [2]  56/6 56/7
lock [1]  57/18
locked [1]  78/19
locks [1]  57/25
lodge [1]  34/8
long [11]  11/22 21/6 23/6 23/16
23/19 62/17 62/19 63/4 73/12 84/21
93/4
longer [2]  35/22 35/22
look [4]  39/25 58/4 61/3 77/16
looked [6]  26/21 56/12 61/16 61/21
62/2 75/5
looking [4]  37/4 45/22 101/18
102/16
looks [2]  46/3 46/13
loose [1]  16/5
loosen [2]  6/19 6/21
lost [1]  103/9
lot [6]  34/13 78/17 95/13 101/10
107/24 108/17
love [1]  80/14
lower [1]  107/3

**M**

M. [1]  68/4
M. Kitchen [1]  68/4
M37231 [2]  42/22 44/13
ma'am [8]  4/25 72/8 72/19 80/6
80/16 97/15 98/6 99/19
made [5]  10/9 67/23 95/12 106/9
106/11
magistrate [1]  8/10
mailed [1]  79/24
make [8]  6/12 18/18 43/5 43/6 66/1
80/17 101/2 108/20
makes [1]  8/5
making [2]  67/11 75/13
manila [1]  7/19
manner [1]  105/20
many [4]  4/1 81/13 82/23 87/17
marginal [2]  103/14 105/14
marijuana [32]  14/11 15/3 15/8
15/22 15/23 15/24 16/1 16/7 16/9
16/14 16/20 16/25 17/1 17/2 17/3
26/20 27/9 27/23 28/6 35/18 45/3
46/12 47/12 48/1 49/8 49/12 51/17
97/18 102/24 103/25 105/3 105/4

marked [5]  2/19 39/21 40/8 45/19
69/3
marks [1]  46/18
matter [14]  3/9 4/2 4/12 4/17 4/19
18/10 25/16 33/23 44/5 74/22 106/22
108/5 108/7 108/16
matters [4]  3/14 64/12 106/19
106/24
may [34]  7/1 11/11 13/12 13/15 19/6
21/21 21/23 23/2 24/12 28/13 32/12
40/20 41/19 43/25 45/16 50/4 56/18
68/14 68/14 72/19 72/21 72/22 75/2
77/8 93/22 98/9 99/19 102/13 105/16
105/16 105/21 105/25 105/25 106/1
106/25 106/25 106/25 106/25 106/25 106/25 106/25 106/25
98/12
me [55]  6/22 7/19 7/21 7/23 7/24 8/5
9/13 9/17 21/10 23/2 23/21 25/16
26/15 26/18 27/4 27/21 27/24 27/25
28/8 31/9 35/5 36/12 42/9 42/11 44/8
44/24 49/6 50/6 50/7 54/17 56/4 59/5
60/18 62/19 63/6 67/23 70/19 71/9
73/21 74/19 74/22 74/25 78/16 78/23
81/1 84/7 86/24 92/9 93/1 95/8
101/14 102/1 102/2 107/11 109/3
mean [19]  17/8 36/17 37/8 53/6 58/6
58/23 61/19 66/11 62/21 69/9 75/22
77/25 83/18 89/20 93/8 95/9 96/10
104/6 109/13
Meaning [1]  36/1
means [2]  75/10 105/14
meantime [1]  42/16
memory [10]  42/25 44/8 44/11 49/6
49/10 50/7 55/19 62/11 62/22 65/1
mention [3]  27/11 27/23 28/14
mentioned [5]  27/4 27/12 27/19
29/10 64/6
met [2]  103/14 106/14
metal [2]  75/19 75/22
meth [1]  32/24
methamphetamine [13]  16/23
32/18 45/3 45/24 47/9 47/14 47/18
49/7 49/16 49/20 50/9 51/6 104/3
methodical [1]  15/18
Metro [4]  19/16 27/16 42/1 50/18
Metropolitan [3]  11/20 12/1 41/5
microphone [1]  72/20
middle [7]  55/17 56/11 57/8 57/17
61/17 61/21 75/5
might [1]  92/25
miles [3]  24/4 24/9 24/14
mind [2]  8/4 70/21
minute [1]  66/10
minutes [5]  3/11 63/15 66/13 93/9
108/25
Miranda [1]  54/17
Mischaracterization [1]  29/3
Miss [8]  18/9 18/13 72/6 99/20 108/6
108/10 108/18 110/3
Miss Doyle [1]  110/3
Miss Qazi [1]  72/6
Miss Waldo [4]  18/9 108/6 108/10
108/18
missing [3]  75/19 76/9 76/19
mobile [3]  37/11 37/17 37/25
mobility [3]  36/17 37/7 106/5
model [1]  43/5
Monday [3]  82/2 82/18 91/16
month [1]  98/21
months [2]  36/8 106/11

more [10]  6/23 25/3 25/25 39/3
69/22 87/18 90/8 91/1 98/13 99/15
most [6]  16/22 39/22 81/11 95/24
96/12 102/18
mother [6]  4/23 72/5 103/16 103/23
104/9 107/11
motions [1]  34/4
move [12]  40/1 48/8 61/2 61/24
65/14 66/23 72/20 74/24 75/16 78/16
87/1 90/25
moved [6]  37/21 38/4 38/6 76/2
78/15 85/4
Mr [7]  2/6 2/6 2/9 2/9 2/10 2/14 2/14
Mr. [20]  3/6 3/19 4/21 5/19 11/19
18/8 18/14 21/21 24/12 31/8 31/18
43/7 53/22 56/16 56/24 63/1 63/19
71/24 105/13 107/24
Mr. Glover [1]  11/19
Mr. Qazi [18]  3/6 3/19 4/21 5/19
18/8 18/14 21/21 24/12 31/8 31/18
43/7 53/22 56/16 63/1 63/19 71/24
105/13 107/24
Mr. Qazi's [1]  56/24
much [2]  75/1 75/20
multiple [3]  47/18 48/2 51/10
music [1]  75/20
must [2]  7/1 93/3
mutual [1]  94/18
my [83]  4/12 4/23 7/20 7/22 8/14
8/15 8/15 8/20 9/23 13/3 15/15 22/8
22/21 23/12 24/17 24/18 26/3 26/7
26/12 29/1 29/16 29/19 29/20 30/12
30/19 32/16 32/21 36/10 40/17 42/14
42/25 42/25 43/2 44/6 44/25 50/1
51/12 51/13 51/25 52/9 54/17 55/19
56/4 56/5 58/7 59/24 60/12 60/12
61/13 62/22 62/24 63/11 64/25 65/12
66/15 69/25 72/4 72/17 74/8 74/24
76/18 76/23 77/5 78/18 80/13 82/21
84/16 84/20 85/12 85/17 85/23 88/12
89/2 89/15 90/11 90/13 90/13 95/23
99/5 103/8 103/11 104/19 107/11
myself [2]  28/6 54/21

**N**

name [24]  11/8 19/13 26/12 40/17
40/18 42/1 46/4 46/5 46/6 46/6 46/7
46/9 46/14 54/3 72/16 72/17 72/18
72/25 80/7 84/18 84/19 84/22 84/24
104/19
names [8]  75/25 79/16 87/14 87/21
88/1 88/4 89/3 89/4
narcotic [1]  51/16
narcotics [10]  32/18 44/25 45/2
50/22 50/23 50/25 51/13 51/14 54/22
57/6
nature [1]  12/21
need [14]  4/25 4/25 37/2 57/18
61/24 72/9 75/8 75/11 80/16 89/1
94/5 94/8 98/6 104/23
needed [1]  104/21
needs [2]  36/24 102/15
neighbor [2]  85/12 86/3
neighbor's [1]  84/18
neighbors [8]  79/15 83/8 84/2 84/3
84/13 84/14 84/16 86/18
nervous [1]  28/23
NEVADA [14]  1/5 1/3 1/3 1/1 14/2 17/17
35/23 36/8 37/10 64/13 104/18 106/9
111/2 111/6 111/12
never [10]  22/24 27/4 27/19 27/19

**N**

never... [6] 70/9 70/21 75/16 75/19 78/15 103/8
next [8] 17/24 18/14 18/17 33/13 39/12 85/14 106/25 109/1
no [96] 1/1 1/2 1/9 1/25 5/19 8/5 9/4 13/21 18/6 18/16 20/19 20/23 21/12 21/17 21/20 22/13 22/24 24/17 27/11 28/8 28/10 28/15 30/10 35/14 35/22 35/22 37/17 38/5 38/10 38/13 38/19 39/3 39/5 40/6 48/16 51/23 53/5 53/21 54/18 56/22 60/2 60/20 61/16 68/20 69/15 70/18 70/24 71/1 71/8 71/20 71/23 74/1 74/2 75/7 76/25 78/8 80/1 80/17 80/17 81/3 83/24 84/15 85/3 85/19 85/21 85/21 85/21 86/18 86/23 88/2 88/5 89/7 89/10 91/16 93/6 96/14 96/21 97/4 97/15 97/16 97/19 98/1 98/1 98/3 98/18 98/19 98/20 99/12 99/16 99/25 101/21 103/18 103/18 110/2 110/15 111/15
No. [3] 39/21 39/24 42/22
No. 1 [1] 39/21
No. C-273567 [1] 39/24
No. M37231 [1] 42/22
nobody [1] 100/21
nods [1] 80/15
nonresponsive [1] 78/24
noon [3] 93/1 93/2 93/3
nor [5] 30/1 30/6 61/13 103/19 111/10
normal [2] 75/5 77/24
not [93] 5/10 5/21 6/12 7/8 7/20 7/21 8/6 8/23 9/14 9/15 10/14 13/21 18/11 18/23 19/24 20/19 20/23 20/23 21/3 21/12 22/8 22/12 22/18 23/1 23/4 27/7 27/8 27/11 27/12 28/10 29/22 29/24 30/10 30/23 32/24 34/7 35/14 35/20 36/10 37/10 37/13 37/17 39/9 51/5 51/25 53/2 53/17 56/1 58/24 59/1 59/5 59/24 60/2 60/19 60/22 61/11 67/15 67/17 67/17 69/22 69/22 71/15 76/6 77/23 78/1 78/5 78/18 83/21 89/21 90/9 90/12 91/18 95/20 97/1 99/21 100/6 100/11 100/15 100/23 100/24 101/3 101/13 101/17 105/15 105/16 106/1 106/21 107/8 107/14 109/12 109/13 111/7 111/9
notes [4] 6/12 7/11 7/12 9/3
nothing [7] 4/5 5/17 30/8 30/25 31/12 33/19 75/20
notice [4] 8/17 8/20 8/22 74/13
noticed [4] 14/6 16/4 74/21 79/2
noticing [1] 78/17
notified [1] 17/25
now [38] 11/25 12/15 13/5 13/19 13/22 17/21 19/22 20/10 28/16 29/14 35/13 36/18 44/2 44/20 45/18 46/1 49/12 49/20 50/16 55/5 55/21 56/1 56/19 69/3 74/17 74/21 74/23 79/25 82/22 86/6 90/8 91/11 92/25 93/13 100/15 104/19 104/22 107/24
NRS [1] 111/7
number [5] 44/13 70/19 85/18 86/17 111/8
numbering [1] 46/19

**O**

O'Neill [4] 1/25 110/15 111/5 111/15
object [12] 38/14 43/9 52/11 53/9 62/15 82/4 83/9 88/17 90/2 94/11 97/20 98/23
objected [1] 95/5
objecting [2] 52/21 64/3
objection [38] 18/13 20/15 22/6 27/6 29/2 29/21 30/15 32/6 33/8 33/18 34/8 35/21 36/23 37/22 38/24 39/2 40/3 43/13 48/10 48/14 57/14 60/23 61/23 65/5 66/20 67/3 67/9 68/1 68/8 68/16 68/23 69/8 73/5 77/13 78/9 78/10 78/21 101/12
objections [1] 30/12
obtain [1] 35/20
obviously [17] 4/12 29/24 31/3 34/6 34/9 34/12 53/9 80/11 80/14 80/20 83/1 83/23 95/3 103/13 103/23 104/11 107/16
occasion [4] 13/5 17/21 52/4 53/13
occasionally [1] 96/7
occasions [1] 50/25
occupant [2] 52/2 103/15
occupied [1] 37/11
occur [1] 10/1
occurred [1] 42/13
occurs [1] 34/1
odor [3] 14/11 26/20 35/18
ODV [4] 45/11 45/24 47/1 48/11
off [18] 29/22 29/22 29/23 33/19 34/12 35/22 35/23 38/25 60/22 62/5 79/7 82/21 90/17 90/18 90/21 93/17 95/7 104/19
offense [2] 109/9 109/9
offer [2] 5/4 9/23
officer [39] 5/25 6/3 10/25 11/1 12/1 14/15 14/17 14/24 19/11 21/15 36/9 39/8 39/15 41/25 42/10 42/11 44/24 45/5 51/2 51/4 51/9 54/14 54/16 54/20 54/21 54/25 55/1 55/2 59/6 70/22 71/14 101/23 102/1 102/6 102/7 102/23 103/25 104/3 105/2
officers [8] 4/15 7/23 67/7 67/18 69/18 73/24 79/22 103/9
Ogarti [1] 72/4
Oh [2] 78/17 93/6
okay [75] 4/24 5/14 7/10 7/17 13/25 18/22 19/4 19/22 20/4 20/10 21/9 23/16 23/22 24/12 25/13 26/18 28/14 28/16 29/1 29/12 29/14 33/16 35/13 37/16 38/22 47/5 48/1 49/10 52/18 54/3 54/14 54/16 55/11 58/4 59/10 63/23 66/2 66/18 68/4 69/6 69/15 70/12 73/2 74/2 74/5 74/12 74/25 75/4 75/8 77/6 78/9 79/3 79/6 79/18 79/25 80/9 80/23 83/1 85/1 86/6 87/25 88/25 89/20 89/22 91/7 91/10 91/24 92/11 92/19 93/24 98/4 98/6 98/21 101/16 108/22
old [3] 89/21 99/7 99/8
OMAR [6] 1/10 1/23 3/4 3/15 64/6 64/13
on [133]
once [4] 25/18 25/18 25/25 57/4
one [26] 4/13 4/14 13/1 23/21 24/25 25/8 25/9 28/1 29/4 29/9 38/5 38/14 39/2 47/18 48/2 51/23 53/8 61/16 73/8 77/19 81/14 81/15 81/16 84/16 91/1 100/5

**one-second** [1] 24/25
only [22] 4/10 22/17 22/18 43/12 52/24 68/1 81/14 81/15 81/16 87/12 87/13 91/1 93/8 96/6 97/12 100/19 103/15 103/21 104/23 106/5 106/11 106/19
oOo [3] 1/6 2/24 3/2
open [7] 9/15 70/11 74/19 74/19 74/21 76/13 78/19
opened [1] 17/7
operation [1] 90/10
opinion [1] 8/20
opportunity [1] 85/25
opposite [1] 85/15
or [104] 5/10 5/20 8/10 8/10 8/23 10/13 10/15 10/20 12/16 13/23 15/3 15/24 16/18 17/2 17/9 18/11 19/2 21/18 23/20 24/16 24/23 24/23 25/1 25/23 26/12 26/24 27/5 27/5 27/12 27/24 37/6 37/20 38/10 42/22 47/18 48/2 51/5 51/6 53/4 53/6 53/15 53/17 54/12 55/11 55/12 55/16 55/20 56/7 57/19 58/10 58/15 58/16 59/1 59/22 60/6 61/6 63/9 63/15 63/21 65/14 66/19 67/21 67/22 69/4 69/22 75/5 75/6 76/6 76/6 76/9 78/4 79/15 80/17 80/17 80/21 81/2 81/5 82/2 82/18 82/23 85/14 86/4 91/8 91/25 92/8 92/17 93/1 93/9 95/20 97/15 97/24 99/2 100/23 100/24 102/25 103/9 103/14 104/7 105/14 105/15 105/16 105/25 109/10 111/9
order [7] 8/10 9/8 9/8 10/6 14/16 45/6 71/21
ordered [1] 26/15
originally [1] 54/23
other [36] 3/14 4/10 5/22 6/14 8/11 15/25 16/18 26/1 32/13 33/17 34/14 39/9 50/17 59/6 59/15 59/21 60/22 61/25 64/12 68/15 71/15 76/22 85/22 87/13 87/15 87/17 96/6 98/2 98/22 99/2 99/22 99/23 100/5 100/16 102/22 106/3
our [1] 71/22
out [26] 13/1 16/5 19/23 22/19 23/8 25/7 26/15 26/19 26/23 28/23 29/20 31/15 31/19 35/1 39/23 39/24 74/15 74/20 75/18 83/16 88/3 88/9 102/14 102/14 106/18 107/23
outside [6] 4/12 5/1 5/21 34/9 86/19 86/20
over [20] 3/22 7/19 11/24 13/6 13/8 13/20 14/5 17/12 28/14 42/4 42/7 42/9 50/19 54/23 55/5 75/11 88/14 94/3 103/24 108/7
override [1] 6/8
own [7] 18/24 91/25 94/23 96/18 96/20 97/24 104/12
owned [1] 103/18
owner [2] 72/7 73/2

**P**

p.m [2] 12/14 81/25
package [1] 49/21
packaged [3] 49/13 49/17 105/20
packages [2] 49/15 49/19
packaging [1] 49/7
pad [2] 7/4 7/6
page [4] 2/2 44/8 49/4 49/6 50/6 66/1
page 3 [1] 49/6

**P**

pages [2] 79/23 79/23
paper [1] 3/22
paperwork [2] 7/20 79/22
part [6] 76/18 76/22 77/7 77/22 78/5
101/19
partner [6] 27/5 27/24 28/11 66/18
68/4 70/1
parts [1] 60/6
party [1] 111/10
passenger [2] 58/23 74/19
passenger's [2] 25/19 25/22
past [3] 25/5 29/1 29/10
pat [8] 28/18 28/24 29/14 31/16
32/11 32/21 105/24 106/2
pat-down [8] 28/18 28/24 29/14
31/16 32/11 32/21 105/24 106/2
patch [1] 41/18
patrol [12] 15/15 20/11 20/13 21/3
21/6 26/8 38/7 42/10 51/2 51/4 67/7
67/18
pay [2] 75/19 107/13
paying [1] 107/12
PEACE [1] 1/16
pencil [1] 3/23
people [24] 8/9 32/17 79/14 80/25
81/2 81/7 81/11 82/10 82/13 83/6
83/16 83/18 83/19 87/13 87/15 87/17
88/4 90/23 91/3 95/13 95/16 96/6
97/5 103/21
percent [1] 61/20
perform [1] 61/11
period [5] 82/9 84/6 84/12 84/14
88/11
permission [6] 11/12 43/24 45/14
48/21 50/2 65/24
person [10] 26/22 28/22 31/6 34/17
51/25 74/18 89/21 96/12 111/8
111/11
person's [1] 59/15
personally [1] 55/25
persons [1] 51/14
perspective [1] 87/9
pertinent [1] 107/25
ph [1] 72/4
phone [3] 70/19 85/18 86/17
photos [1] 59/3
phrase [1] 38/17
pick [1] 73/24
picked [1] 74/2
picture [3] 57/11 61/22 62/1
pictures [2] 55/18 55/21
piece [1] 3/22
pink [1] 79/23
place [5] 69/25 75/11 75/18 77/16
77/24
placed [3] 54/22 54/24 55/3
plain [3] 32/12 69/1 69/17
Plaintiff [1] 1/8
plan [2] 52/17 53/8
plastic [1] 58/8
plate [1] 14/2 76/5
play [3] 53/1 53/2 75/20
plead [1] 109/10
please [13] 5/20 7/16 11/1 11/7 39/9
40/9 40/16 41/15 71/14 72/1 72/15
99/21 108/5
pocket [12] 29/19 29/20 30/16 30/19
30/21 31/19 32/3 32/15 32/20 32/22
103/8 105/25

pockets [2] 33/17 33/20
point [14] 13/5 16/8 16/16 25/21
34/9 35/8 41/15 42/4 48/7 52/3 61/5
62/4 69/12 105/9
police [14] 4/14 11/20 11/21 12/1
14/15 14/17 14/19 19/16 41/5 42/25
51/8 87/10 91/15 91/19
portion [3] 12/15 49/5 53/6
positions [1] 50/17
positive [3] 45/8 47/10 47/13
possess [1] 94/23
possession [4] 104/6 104/8 104/9
109/8
possibility [1] 102/17
possible [2] 41/9 42/2
Possibly [2] 25/8 47/22
posted [2] 24/2 107/7
potential [1] 5/20
prefer [1] 108/12
preference [1] 4/15
prejudiced [1] 6/11
prelim [4] 9/21 10/3 10/21 39/17
preliminary [3] 1/15 3/16 64/14
present [10] 1/24 3/6 13/10 37/20
37/25 38/3 41/13 43/15 58/2 70/21
presented [2] 30/11 101/15
presenting [1] 9/18
previous [1] 39/16
previously [6] 39/21 45/18 46/25
68/23 104/18 109/5
primacy [1] 28/4
primary [3] 94/9 96/9 96/10
prior [7] 7/17 44/24 50/16 53/14
73/21 79/8 106/3
prisoner [1] 6/7
private [1] 20/9
Pro [1] 1/23
probable [14] 15/12 36/16 37/12
38/23 69/21 69/22 102/8 102/23
104/24 105/1 105/10 105/14 106/5
106/14
probably [3] 8/1 10/18 10/19
problem [8] 9/2 9/7 22/17 31/5
56/22 61/9 83/15 84/15
procedure [3] 33/16 38/22 68/13
proceed [11] 3/17 3/20 5/16 11/11
21/22 24/12 40/20 57/20 72/22 72/22
75/2
proceeding [3] 100/9 100/18 100/19
proceedings [3] 100/16 110/7
110/10
process [1] 8/15
produce [2] 61/2 55/20
produced [2] 31/12 103/7
product [1] 7/7
promise [2] 70/16 85/25
proof [2] 5/4 9/23
proper [5] 7/24 33/16 38/22 68/12
109/2
Proposed [1] 39/21
provide [2] 18/11 31/7
provided [2] 7/3 8/24
psychiatrist [1] 92/18
psychiatry [1] 92/17
pull [2] 13/6 74/18
pulled [9] 13/1 13/8 13/20 14/5 16/5
17/12 24/20 31/3 31/19 103/24
pulling [1] 19/23
pursuant [2] 40/2 111/7
push [1] 74/18

put [9] 30/19 49/25 56/5 58/12 58/25
87/9 97/3 97/14 103/18
putting [1] 35/3

**Q**

Q-A-Z-I [1] 72/18
QAZI [34] 1/10 1/23 2/6 2/9 2/13
2/14 3/4 3/6 3/15 3/19 4/19 4/21 5/19
18/8 18/14 21/21 24/12 31/8 31/18
43/7 46/6 53/22 56/16 63/1 63/19
64/13 71/24 72/4 72/6 72/12 72/25
99/20 105/13 107/24
Qazi's [1] 56/24
question [52] 7/13 18/18 19/2 19/3
21/1 22/22 23/5 27/10 28/1 29/5 29/9
30/25 32/1 32/8 33/4 36/24 37/23
37/24 53/9 53/9 53/11 55/14 56/2
56/14 56/24 57/19 58/18 59/14 61/1
65/8 66/22 68/23 75/1 77/19 78/2
83/18 83/18 88/19 88/22 90/13 90/14
91/1 95/4 95/5 95/9 95/23 96/24
97/22 98/24 99/4 102/15 108/24
questioning [1] 65/7
questions [16] 18/6 37/3 39/3 53/21
57/25 61/25 71/1 71/8 80/1 98/13
99/12 99/15 99/15 107/25 107/25
108/11
quick [5] 4/16 4/18 4/20 11/13 64/10
quickly [2] 13/4 24/18

**R**

radio [15] 27/16 58/10 60/4 60/11
60/14 62/5 75/6 75/23 76/3 76/9
76/11 76/15 76/19 76/21 76/24
Raise [3] 11/1 40/10 72/10
raised [1] 40/1
re [1] 108/8
re-address [1] 108/8
reached [1] 31/19
reaching [2] 30/16 32/4
read [3] 50/6 54/17 56/4
readily [4] 16/15 17/7 32/13 37/17
ready [3] 3/17 3/19 4/13
really [6] 11/13 17/5 64/10 96/23
102/12 102/23
rear [1] 13/4
Reask [1] 77/19
reason [11] 12/22 22/3 26/18 28/16
29/18 30/20 32/4 33/7 34/21 35/16
94/12
reasonable [1] 22/10
reasons [3] 10/16 14/8 68/15
rebut [2] 101/7 101/8
recall [21] 12/6 12/16 13/24 21/8
21/9 23/12 24/22 25/19 25/24 26/2
28/13 41/2 42/25 47/20 60/14 62/9
62/10 62/18 64/21 70/20 109/11
receive [1] 45/7
received [2] 42/10 62/20
receiving [1] 74/12
recent [3] 39/22 106/10
recess [1] 108/23
recognize [6] 13/9 41/12 44/2 45/20
45/23 46/10
recollection [9] 43/4 43/11 43/12
43/15 43/21 43/22 47/24 48/5 48/23
reconsider [1] 108/5
record [12] 7/15 10/18 10/20 13/15
18/8 26/12 28/21 29/1 29/10 41/19
72/16 75/12
recorded [3] 52/7 52/10 52/14

**R**

**recording [8]** 9/14 52/9 52/15 52/23 52/25 53/3 53/5 63/13
**recordings [2]** 21/14 27/16
**records [1]** 26/22
**recover [4]** 42/19 60/12 60/13 61/8
**recovered [2]** 79/2 103/8
**recovery [2]** 41/10 42/17
**rectangular [1]** 77/2
**redirect [3]** 2/10 71/4 99/14
**refer [2]** 56/25 92/17
**referring [3]** 55/7 57/1 58/21
**reflect [2]** 13/15 41/19
**refresh [7]** 43/4 43/12 43/22 47/24 48/5 55/18 64/25
**refreshed [5]** 44/9 44/11 49/7 49/10 50/7
**refresher [1]** 14/23
**refreshes [1]** 43/20
**refreshing [3]** 43/10 48/23 62/22
**regarding [1]** 14/6
**regardless [1]** 67/21
**registration [1]** 26/7
**regular [1]** 74/17
**reinstated [1]** 36/8
**related [4]** 15/24 16/18 29/25 33/17
**relative [1]** 111/9
**release [4]** 6/10 9/6 9/9 71/13
**relevance [14]** 29/24 30/7 31/4 32/7 33/19 33/20 60/24 62/16 66/21 67/4 68/1 68/9 69/9 82/4
**relevancy [8]** 28/1 28/4 30/16 30/17 68/10 83/11 94/14 98/23
**relevant [3]** 30/23 30/24 31/1
**relying [1]** 106/2
**remain [2]** 40/9 72/9
**remanded [2]** 107/17 107/17
**remember [27]** 13/23 43/16 43/17 44/18 47/19 48/2 48/3 49/13 49/22 49/23 53/15 53/16 56/19 60/10 62/11 66/9 82/21 84/15 87/14 91/19 91/21 92/14 92/19 93/6 93/21 93/21 93/23
**remembers [1]** 59/16
**remove [4]** 16/8 30/22 60/1 61/10
**removed [15]** 11/1 16/14 30/19 32/23 57/9 58/4 59/18 59/21 60/7 67/6 76/14 77/11 77/23 103/7 105/5
**rephrase [6]** 23/5 27/21 36/24 37/2 37/24 55/14
**report [28]** 36/19 42/23 42/25 43/1 43/2 43/3 44/3 44/5 44/6 47/21 47/23 48/4 49/5 49/6 49/24 50/1 54/7 54/10 54/20 56/5 56/5 56/14 56/17 63/7 65/2 74/10 101/25 102/4
**Reported [1]** 1/25
**reporter [1]** 111/5
**REPORTER'S [2]** 1/14 111/1
**reports [3]** 55/24 101/11 101/17
**represent [2]** 8/4 108/9
**representation [1]** 9/11
**representing [2]** 108/5 108/13
**requested [1]** 45/7
**required [1]** 37/10
**requirement [3]** 103/3 104/21 104/22
**residential [1]** 24/5
**respond [3]** 18/1 18/4 41/8
**responding [1]** 12/16
**response [1]** 30/13
**rest [4]** 100/1 100/8 100/10 103/11

**rested [2]** 71/24 101/6
**restriction [1]** 9/10
**restrictions [2]** 6/7 6/25
**restrictive [1]** 7/2
**result [3]** 15/10 47/8 47/11
**retrieve [1]** 32/14
**return [2]** 106/18 106/25
**review [5]** 7/8 9/9 49/4 53/13 56/17
**reviewed [2]** 7/12 53/17
**reviewing [3]** 56/13 56/23 65/12
**revoked [2]** 107/7 107/11
**revolver [7]** 16/13 16/15 44/18 44/19 55/9 97/24 103/19
**ride [1]** 81/5
**right [85]** 3/10 5/19 7/15 8/4 8/18 9/10 9/21 10/3 10/22 11/2 18/19 19/15 19/19 20/7 20/9 21/13 21/19 21/25 25/1 26/5 26/10 29/8 30/13 31/25 32/15 32/19 35/9 35/25 36/18 37/14 39/18 40/10 51/21 52/20 53/22 56/1 56/13 56/20 57/3 57/11 60/4 61/18 62/7 62/25 65/10 65/11 69/14 72/2 72/6 72/10 72/20 72/22 72/25 73/17 74/23 77/16 79/4 80/1 80/6 80/21 80/22 82/14 85/14 86/24 87/25 91/9 91/11 95/21 95/25 97/7 97/14 98/14 99/14 100/1 100/6 100/6 101/6 102/8 103/5 103/12 104/13 105/12 106/20 108/21
**right-of-way [2]** 20/7 20/9
**rights [4]** 8/14 8/16 10/10 100/16
**rise [1]** 7/16
**roadblocks [1]** 10/2
**rock [1]** 32/21
**rock-like [1]** 32/21
**roll [2]** 14/8 14/9
**rolled [3]** 14/10 17/8 17/9
**ruling [3]** 106/9 106/10 106/12
**run [2]** 9/11 10/2

**S**

**safe [2]** 91/4 96/7
**safety [2]** 14/8 14/24
**said [26]** 8/9 10/9 16/24 17/12 19/19 19/22 33/13 50/13 56/1 64/7 67/20 68/16 78/13 80/24 84/2 84/22 86/2 86/9 87/24 88/19 95/6 95/24 97/7 101/20 108/4 111/10
**sales [1]** 51/16
**same [15]** 16/20 36/23 46/7 46/9 46/11 49/18 49/21 50/10 51/10 51/15 66/1 68/23 72/17 85/9 108/2
**Saturday [1]** 82/18
**Saturn [6]** 12/19 12/25 13/25 73/2 73/6 73/14
**save [2]** 101/7 101/8
**saw [7]** 16/5 16/13 23/17 26/22 47/23 75/14 109/12
**say [26]** 4/5 4/11 11/7 23/2 23/3 24/19 38/16 46/5 53/16 58/15 58/20 58/23 63/7 63/12 65/15 75/11 78/11 81/3 84/4 85/24 91/4 96/7 96/14 100/23 104/6 105/15
**saying [9]** 55/2 57/24 61/17 63/14 78/3 83/20 90/11 94/7 94/24
**says [8]** 34/5 54/10 54/20 63/7 65/3 65/20 101/25 104/23
**scene [8]** 42/4 42/7 42/9 63/5 66/19 67/14 69/13 74/3
**schedule [2]** 82/11 82/21
**school [1]** 34/8

**SCISCENTO [1]** 1/16
**scope [2]** 34/10 106/1
**screech [1]** 24/15
**screeched [1]** 24/17
**Se [1]** 1/23
**seal [1]** 40/1
**search [49]** 15/12 15/17 15/21 15/25 26/11 26/12 26/22 28/18 31/6 31/11 32/9 32/10 33/14 34/17 34/25 35/17 36/15 36/18 37/12 42/16 61/4 62/8 62/13 62/18 62/23 63/8 63/24 64/2 64/7 64/19 65/3 65/15 65/17 65/20 66/12 67/15 67/18 68/2 73/25 103/1 104/21 104/24 104/24 105/8 105/11 105/25 106/4 106/6 108/1
**searched [9]** 15/16 31/7 37/13 73/9 73/15 87/10 91/15 91/19 105/7
**searches [3]** 61/11 102/14 105/24
**searching [5]** 15/14 15/21 15/23 37/3 68/25
**seasoned [1]** 8/9
**seat [7]** 3/10 6/17 15/19 15/20 57/3 72/15 72/19
**seated [2]** 11/7 40/16
**seats [1]** 59/4
**second [12]** 24/23 24/25 25/23 26/14 26/25 29/22 33/20 34/12 35/23 44/7 49/4 99/19
**seconds [5]** 23/22 23/23 24/8 24/8 25/2
**section [3]** 50/23 57/2 58/22
**Security [1]** 111/8
**see [18]** 10/7 16/11 16/18 17/21 46/15 46/20 55/18 60/16 66/4 76/17 78/17 80/20 82/19 83/20 86/4 86/15 88/5 88/8
**seeing [2]** 23/14 64/23
**seem [3]** 60/4 65/10 65/11
**seen [9]** 6/14 60/20 76/22 78/3 81/11 89/5 89/8 89/10 108/10
**sell [3]** 104/2 104/5 105/21
**sense [2]** 8/5 10/1
**serial [2]** 42/22 43/4 44/13
**service [1]** 28/20
**set [7]** 3/16 34/1 34/19 91/25 97/7 97/9 105/22
**sets [1]** 97/12
**several [2]** 24/20 50/25 51/7 51/14
**shall [3]** 13/17 41/21 48/17
**shape [1]** 5/9
**share [1]** 81/21
**shark [4]** 29/19 30/19 31/20 31/22
**she [39]** 5/4 5/7 19/2 78/3 79/2 82/11 82/12 83/11 83/16 84/19 85/1 85/3 85/4 85/6 85/8 85/12 85/21 85/22 86/7 86/9 86/9 86/18 86/19 86/20 94/24 95/3 95/4 95/6 95/6 95/16 99/17 103/17 103/18 103/19 104/10 104/12 107/13 107/14 she's [13] 4/24 18/9 18/20 18/23 75/9 75/12 78/3 82/9 86/25 90/23 94/24 95/13 108/10
**sheet [1]** 102/5
**Sherry [8]** 84/19 84/22 85/10 85/20 86/2 86/4 86/6 86/13
**Sherry's [3]** 84/24 85/18 86/11
**shift [6]** 12/11 12/12 12/13 12/16 19/20 57/13
**shirt [2]** 13/14 41/18
**should [8]** 4/18 4/20 34/14 43/15

**S**

should... [4] 55/23 100/23 100/24 108/9
show [17] 10/16 20/11 20/25 21/16 43/6 43/7 43/11 43/19 57/12 57/22 59/3 62/15 67/2 68/20 69/20 69/21
showed [4] 28/12 28/21 43/3 66/18
showing [9] 29/15 30/18 43/8 43/11 44/2 45/18 62/2 67/21 67/22
shown [1] 30/22
shows [3] 57/20 58/1 105/18
sic [1] 64/25
side [4] 25/19 25/22 46/17 85/15
sides [1] 75/18
signed [1] 63/8
since [2] 89/8 89/10
sir [29] 3/5 3/10 3/21 5/4 6/2 6/2 6/24 7/5 7/7 7/16 19/7 33/5 41/3 41/7 42/6 43/13 48/12 54/6 54/9 56/25 64/20 68/5 68/11 69/10 71/7 88/17 99/16 101/4 107/5
siren [1] 23/12
sirens [1] 22/23
Sister [1] 74/7
sit [5] 4/7 18/12 18/13 18/17 19/5
sitting [1] 18/10
situation [2] 37/6 38/12
six [2] 11/24 19/16
slight [2] 103/14 105/14
small [1] 32/21
smaller [1] 16/21
smell [11] 15/3 15/6 15/10 17/1 17/3 26/24 27/9 27/23 28/6 28/8 102/23
smelled [5] 14/11 16/25 26/20 35/18 105/3
smells [1] 15/3
Smith [3] 42/21 44/15 44/16
smoke [2] 86/19 97/18
smoked [1] 17/2
so [121]
Social [1] 111/7
sole [1] 52/2
some [20] 13/5 16/8 22/16 33/11 34/17 34/19 44/25 52/3 61/25 76/22 79/14 79/15 81/2 90/23 102/13 102/14 105/15 105/20 105/21 105/23
somebody [2] 84/20 108/12
somehow [1] 77/12
someone [3] 17/2 51/5 86/21
something [19] 8/20 10/20 13/12 32/12 41/16 43/17 51/9 57/20 58/1 68/15 75/19 75/25 76/2 76/4 76/9 76/17 77/4 92/17 109/18
sometimes [4] 78/18 82/20 92/9 92/9
somewhat [2] 32/9 83/17
son [21] 80/12 80/13 80/14 80/20 85/25 87/23 88/10 88/15 88/24 89/14 89/15 89/19 91/24 93/16 94/9 96/13 96/15 97/6 97/9 98/16 99/3
son's [3] 88/13 89/13 99/9
soon [2] 16/14 42/9
sorry [14] 5/6 18/15 21/21 22/21 70/13 72/21 77/8 80/6 80/18 92/22 94/20 96/4 96/13 98/19
sounds [1] 26/10
space [3] 6/24 77/2 77/3
speak [1] 52/4
specific [1] 35/15

specifically [19] 11/25 12/8 12/15 27/19 41/4 41/8 44/7 45/22 46/3 47/14 49/5 49/12 50/1 51/15 55/7 82/8 86/2 95/17 103/15
speculation [1] 61/20
speed [3] 24/2 42/12 65/25
spell [2] 11/8 72/16
Spelled [2] 40/18 40/18
spot [2] 76/12 91/8
spread [1] 74/15
stand [11] 6/22 11/1 19/6 29/5 32/9 65/8 72/9 97/22 98/7 98/9 99/4
standby [7] 3/12 3/13 4/4 4/7 18/9 18/10 18/20
standing [3] 40/10 72/9 98/10
start [4] 12/13 15/18 101/23 103/11
started [3] 19/19 62/20 65/22
state [42] 1/5 1/7 1/20 3/17 5/14 5/17 5/23 7/19 7/23 9/2 9/8 10/23 11/11 25/14 34/8 36/6 39/11 40/1 40/20 48/8 63/25 64/6 64/13 70/13 71/16 71/18 71/22 71/24 72/15 72/21 80/2 101/7 103/12 106/13 109/3 109/9 109/11 109/12 109/16 109/16 111/2 111/6
STATE'S [15] 2/4 2/20 5/24 10/24 39/12 39/21 40/7 45/19 45/19 45/22 46/7 46/10 48/8 48/9 48/19
stated [6] 30/24 34/3 36/7 61/9 95/17 104/19
statement [5] 34/2 52/8 52/10 53/14 63/10
statute [3] 35/22 40/2 109/11
steering [1] 15/20
stems [1] 105/1
step [2] 26/19 26/23
steps [2] 46/19 46/22
still [10] 17/15 35/15 35/15 36/11 36/11 89/6 90/12 107/6 107/12 109/11
stipulate [1] 73/11
stolen [1] 31/10
stones [1] 31/10
stop [22] 12/17 12/22 17/14 19/24 21/10 21/16 25/19 27/25 33/11 36/15 41/9 41/13 42/2 42/11 52/1 63/6 74/25 78/23 84/17 86/24 101/14 104/15
stopped [4] 16/24 22/15 31/14 31/15
stopping [3] 9/17 13/2 97/1
stops [1] 12/2
storage [1] 58/25
straight [1] 30/9
stuff [7] 7/8 9/25 10/6 51/6 58/12 102/15 105/24
subpoena [2] 11/14 21/23
subsequent [1] 105/25
subsequently [1] 105/7
substance [5] 16/6 16/22 32/19 51/11 105/20
substances [1] 32/22
such [2] 26/5 32/18
suffice [1] 62/25
Sunday [1] 82/18
sunglasses [1] 59/1
supposed [3] 18/11 18/24 46/23
Supreme [5] 36/11 36/19 37/10 104/18 106/3 106/9
sure [12] 18/18 25/11 43/6 53/19 56/22 59/6 64/11 66/1 66/9 78/1

91/18 108/18
surgery [1] 90/9
suspicion [1] 22/11
sustain [6] 39/1 61/23 67/25 68/16 68/22 78/9
Sustained [2] 67/4 90/3
swiftly [1] 13/3
swing [3] 12/12 12/13 19/20
sworn [6] 11/2 11/6 40/11 40/15 72/10 72/14

**T**

take [11] 8/17 22/22 23/2 29/19 62/19 64/9 72/8 82/21 92/4 94/4 108/7
taken [7] 7/11 8/21 60/21 67/13 69/13 69/14 106/9
takes [1] 66/12
taking [2] 8/22 69/25
talk [3] 86/1 91/11 108/18
talking [19] 45/2 45/25 73/6 73/8 77/11 79/1 79/1 82/8 82/9 84/4 84/5 85/21 87/6 89/23 90/15 91/7 93/19 102/19 104/15
taped [1] 53/13
taught [1] 15/2
tear [1] 61/12
telephonic [8] 42/16 62/8 62/12 62/23 63/24 64/19 65/3 66/12
tell [11] 9/7 17/3 17/5 28/3 28/7 65/19 75/13 78/11 92/7 92/9 95/18
telling [2] 35/13 107/11
ten [9] 23/22 23/22 24/7 24/8 63/15 63/21 66/10 66/13 108/25
terms [1] 14/24
test [8] 45/6 45/8 45/12 45/24 46/11 46/23 47/8 47/11
testified [13] 11/6 23/17 29/24 39/16 40/15 72/14 86/25 95/14 100/24 100/24 101/22 103/25 104/4
testify [13] 42/24 64/24 66/14 100/6 100/6 100/12 100/16 100/23 100/23 101/3 103/16 103/17 105/2
testifying [7] 5/5 5/7 57/15 57/23 65/6 67/10 100/7
testimony [16] 5/2 5/21 29/3 39/9 59/6 59/10 59/15 59/17 59/18 63/9 64/4 71/14 71/15 99/21 99/21 104/12
tests [3] 47/1 47/6 48/11
than [7] 8/11 25/3 25/25 32/13 60/22 69/22 99/2
thank [7] 40/21 41/22 43/23 49/2 71/14 80/11 99/20
that [398]
that I [1] 19/22
that ten [1] 66/10
that's [72] 6/9 7/7 7/7 8/6 8/19 9/7 9/10 9/16 10/10 14/4 14/14 19/21 22/6 23/4 26/15 30/23 32/13 33/6 33/9 33/20 35/4 35/22 35/22 36/19 39/14 39/18 41/11 42/3 43/8 44/14 44/17 45/10 46/2 46/7 46/9 46/11 50/11 51/19 52/6 53/18 57/10 57/21 57/24 58/16 59/7 59/14 59/16 59/17 63/17 64/4 65/14 68/15 70/3 70/7 70/10 73/12 75/12 79/25 83/25 84/9 86/25 95/2 95/13 96/18 97/6 99/9 101/5 102/15 103/3 106/8 108/2 110/1
that's why [1] 95/2
their [10] 7/22 8/4 14/9 32/19 69/17

000235

**T**

**their... [5]** 79/16 87/14 87/20 88/1
89/4
**them [27]** 9/7 9/8 9/10 18/3 18/12
23/13 27/17 32/23 45/6 45/8 45/9
51/6 55/22 55/25 79/24 81/8 82/21
87/16 87/22 88/5 88/14 88/23 89/5
89/8 89/10 89/16 91/9
**themself [1]** 8/4
**then [37]** 4/24 23/6 26/7 26/14 27/18
30/4 31/18 32/24 33/13 33/14 34/2
34/2 45/9 54/23 57/5 57/13 57/17
57/19 57/20 58/2 65/23 66/14 67/25
77/3 78/10 85/22 89/11 89/15 89/25
94/6 94/10 105/24 109/10 109/17
109/22 110/5 110/6
**theory [1]** 34/5
**there [84]** 3/23 8/8 10/4 10/13 10/15
13/19 13/21 16/21 18/3 18/23 19/3
21/10 21/13 22/3 28/16 28/20 29/15
29/15 29/23 30/5 31/11 33/12 35/1
35/19 36/5 36/22 37/6 37/17 37/18
38/1 38/3 38/5 38/10 38/11 38/19
39/25 44/8 44/24 44/25 46/4 51/9
52/12 55/24 56/18 57/4 57/4 57/8
58/9 58/24 59/4 59/21 60/8 61/8
62/17 63/6 65/14 68/22 68/25 74/25
76/10 77/5 78/13 78/23 79/18 79/23
84/17 88/13 89/19 93/25 94/6 95/16
95/19 95/20 98/17 101/14 102/13
102/16 102/24 104/23 105/9 105/18
105/19 105/21 107/6
**there's [19]** 13/2 22/13 30/10 31/6
43/17 46/13 46/18 52/25 57/3 69/15
69/19 76/19 77/1 77/4 101/10 103/2
105/15 105/23 108/17
**Thereabouts [1]** 64/23
**these [14]** 34/21 45/20 47/6 65/13
75/9 81/6 83/6 89/3 91/3 96/6 102/18
106/16 106/20 106/24
**they [52]** 7/1 7/8 7/11 7/12 7/18
9/15 18/2 22/15 22/15 32/23 32/24
35/13 36/14 36/14 39/25 43/18 43/19
55/23 69/6 69/16 74/19 75/16 76/12
76/14 78/15 78/16 81/1 81/11 83/17
84/20 87/20 87/24 87/25 88/7 88/8
88/8 89/5 89/15 89/16 91/4 91/8 91/9
104/20 105/10 105/19 105/22 106/11
109/12 109/14 109/15 109/25 109/25
**they're [11]** 4/14 7/12 10/18 10/19
56/1 68/25 69/1 69/18 75/10 88/5
89/20
**thing [11]** 4/11 10/7 14/6 58/7 75/19
75/22 100/5 102/22 108/2 109/7
109/19
**things [2]** 38/1 75/9
**think [36]** 6/13 17/12 20/18 22/14
22/15 25/3 29/4 34/9 34/14 34/19
34/24 56/15 58/17 62/5 65/7 66/7
66/8 69/18 70/8 79/1 80/24 82/25
86/25 87/12 87/12 88/20 90/13 90/23
92/25 93/1 94/16 97/6 103/13 104/11
108/9 109/24
**third [2]** 29/23 50/6
**Thirty [1]** 24/6
**Thirty-five [1]** 24/6
**this [97]** 3/9 3/15 4/2 4/13 4/14 4/16
4/22 6/5 8/2 8/9 8/17 9/23 9/24 9/25
10/2 10/6 12/6 12/8 13/22 15/2 17/12
18/6 18/10 18/24 22/20 27/19 31/5

32/23 33/10 33/23 34/9 36/2 36/2
36/2 39/2 39/3 39/6 39/15 41/2 41/4
41/24 44/5 46/23 47/3 47/4 48/7
48/18 53/23 64/14 65/25 69/11 71/6
71/10 71/13 71/17 75/10 77/7 77/10
77/19 78/24 78/25 79/9 82/9 82/15
85/22 88/10 89/22 90/22 92/20 92/25
93/1 93/2 95/9 95/12 98/12 99/24
100/1 100/5 100/9 100/18 100/18
101/2 102/8 103/14 105/13 106/15
106/22 107/8 107/18 108/5 108/7
108/17 109/5 109/10 109/18 111/8
111/12
**those [18]** 30/11 32/16 45/5 45/7
46/14 46/17 46/20 48/11 48/12 50/10
55/21 75/16 75/25 83/18 87/19 91/7
91/8 97/12
**though [7]** 10/4 18/19 49/24 62/13
87/16 102/9 109/19
**thought [1]** 109/25
**three [11]** 10/13 24/23 25/1 31/21
49/14 49/18 50/8 50/9 51/19 79/23
95/16
**three-second [1]** 24/23
**through [8]** 14/19 14/21 15/17 32/11
62/11 82/2 82/18 87/6
**Throughout [1]** 101/24
**thrown [1]** 75/10
**till [3]** 22/4 22/23 22/25
**time [63]** 3/16 4/22 6/5 12/13 21/2
23/7 23/9 23/16 23/18 23/20 23/25
24/8 24/9 25/3 25/6 25/7 25/23 25/23
26/14 28/1 28/9 28/11 37/18 38/6
38/20 39/3 47/3 47/4 48/18 54/17
61/5 62/7 63/12 65/18 66/6 66/8
66/10 68/7 71/13 71/17 79/8 81/12
81/21 82/9 82/21 84/6 84/12 84/14
86/15 86/19 87/12 88/10 90/8 92/5
92/19 94/7 95/18 95/24 99/24 100/2
106/15 108/20 109/11
**time-share [1]** 81/21
**times [4]** 10/13 65/14 88/13 93/25
**tires [2]** 24/16 24/17
**today [7]** 5/5 10/11 10/21 13/9 41/12
53/14 100/9
**together [1]** 108/10
**told [5]** 10/1 27/19 28/7 32/22
107/14
**too [8]** 9/16 25/15 48/4 75/1 75/19
84/21 87/13 87/15
**took [7]** 22/3 22/25 23/7 30/11 55/5
84/21 92/7
**tooth [4]** 29/20 30/19 31/20 31/22
**top [2]** 44/7 104/19
**towards [2]** 12/23 38/11
**TOWNSHIP [1]** 1/4
**traffic [13]** 12/2 12/17 12/22 17/14
20/5 22/4 22/23 22/25 25/18 26/4
41/9 41/13 42/2
**trail [1]** 3/8
**trained [2]** 15/3 108/13
**training [13]** 14/12 14/16 14/21 15/2
15/7 32/16 47/5 51/9 51/12 104/1
104/4 105/2 105/4
**transcript [2]** 1/14 110/10
**transcription [2]** 62/12 64/24
**transcripts [2]** 10/20 110/5
**transferred [1]** 7/18
**transport [1]** 9/1
**transporting [1]** 70/22

**travel [1]** 26/4
**traveling [1]** 23/24
**tray [1]** 78/15
**trays [4]** 75/15 75/16 78/13 78/14
**treated [1]** 34/14
**trouble [1]** 80/21
**true [1]** 110/10
**Trust [1]** 36/12
**truth [1]** 90/20
**try [3]** 8/4 109/3 109/15
**trying [4]** 57/21 76/7 78/11 85/24
**TUESDAY [4]** 1/18 91/17 91/22 91/23
**turn [5]** 12/4 22/23 23/1 40/25 56/20
**turned [4]** 23/18 42/4 42/7 42/9
**twice [2]** 109/14 109/15
**two [19]** 4/3 4/11 4/14 4/14 13/2
13/23 17/4 17/6 19/2 24/23 30/12
59/4 81/14 87/18 87/19 97/5 97/12
98/12 103/21
**two-door [1]** 13/23
**type [6]** 12/17 35/14 51/11 60/17
67/2 68/20
**types [1]** 9/19
**typically [1]** 66/12

**U**

**Uh [6]** 35/12 73/16 84/8 92/3 96/1
108/15
**Uh-huh [6]** 35/12 73/16 84/8 92/3
96/1 108/15
**unable [1]** 37/8
**unconstitutionally [1]** 103/10
**under [7]** 15/19 17/22 46/13 54/22
59/19 105/6 105/8
**underneath [2]** 55/15 57/9
**understand [33]** 5/3 6/24 7/1 7/9
18/21 18/25 21/1 29/8 31/3 33/10
34/7 34/16 34/18 34/24 36/6 63/19
75/10 78/1 85/24 100/5 100/13
100/17 100/20 100/25 102/10 102/10
102/11 102/21 105/24 107/15 107/25
108/2 108/14
**understanding [4]** 22/22 51/25 52/9
58/7
**understood [1]** 90/13
**unfortunately [3]** 6/6 8/2 106/2
**uniform [1]** 66/19
**unique [1]** 51/9
**unlawful [2]** 103/6 106/7
**Unless [1]** 103/2
**unmarked [3]** 69/4 69/5 69/6
**unsound [1]** 53/10
**until [1]** 84/5
**up [33]** 6/19 6/21 6/22 9/11 10/2
11/1 19/6 28/12 34/22 36/1 42/12
57/5 57/12 59/5 63/5 66/18 68/6
70/11 73/24 74/2 74/18 95/23 98/7
98/9 98/10 99/15 100/15 105/23
106/9 106/17 106/24 109/21 109/22
**upon [3]** 23/14 74/12 106/2
**upper [1]** 46/3
**ups [2]** 39/4 71/2
**upside [1]** 56/21
**urge [1]** 108/19
**urged [1]** 10/5
**us [1]** 75/13
**use [13]** 38/17 43/17 43/18 43/19
43/22 88/11 90/1 90/6 91/3 94/6
95/17 95/18 96/6
**used [16]** 29/6 46/11 74/16 74/20
78/20 78/22 81/14 85/6 85/8 86/15

**U**

used... [6] 90/8 91/4 93/17 93/18 96/12 96/15
user [2] 94/9 96/9
using [3] 89/25 90/5 90/14
usual [1] 81/22
usually [31] 18/12 82/17 82/19

**V**

value [1] 16/12
varies [1] 82/19
various [1] 83/16
VEGAS [7] 1/4 3/1 11/20 12/1 19/16 41/5 111/12
vehicle [111] 5/11 5/12 13/6 13/8 13/10 13/19 13/22 14/5 14/6 15/6 15/11 15/12 15/14 15/15 15/16 16/19 16/24 17/2 17/8 17/12 20/2 20/11 20/13 20/25 21/3 21/7 23/25 25/25 26/8 26/15 26/19 26/21 26/23 28/24 33/14 35/17 36/15 36/15 36/17 37/7 37/11 37/12 38/3 38/5 38/8 42/11 51/23 52/1 57/1 57/2 58/22 61/12 61/13 67/8 69/3 72/7 73/3 73/6 73/21 73/22 73/24 74/2 74/12 74/14 77/23 78/5 79/2 79/19 80/25 81/9 81/16 82/10 82/12 83/7 84/13 87/11 87/15 87/22 87/23 88/11 90/14 90/24 91/4 91/5 91/15 91/20 92/15 93/4 94/10 94/17 94/18 95/7 96/9 96/12 96/15 97/3 97/6 97/7 97/10 103/15 103/17 103/18 103/22 103/24 103/25 104/10 104/24 105/5 105/7 105/11 106/4
vehicles [3] 14/9 69/7 81/13
venture [1] 62/21
venues [1] 109/2
verify [3] 9/16 59/15 71/20
versus [2] 4/14 64/13
very [10] 8/15 15/18 23/11 62/19 63/11 83/3 103/10 104/8 104/8 104/16
vicinity [1] 67/7
video [1] 30/22
view [2] 67/15 67/17
violated [1] 8/16
violation [10] 20/5 21/18 23/7 23/8 23/14 23/17 26/5 33/12 103/3 106/1
violent [2] 28/20 28/22

**W**

wait [2] 4/25 5/21
waiting [1] 39/20
Waldo [6] 1/24 18/9 18/13 108/6 108/10 108/18
walk [6] 83/3 83/4 83/5 90/8 90/11 94/7
walked [2] 94/24 95/24
walking [3] 90/9 90/10 95/25
want [26] 7/21 8/16 9/20 9/22 9/22 10/14 12/4 18/18 19/1 19/5 23/20 31/9 32/1 33/25 40/25 42/24 53/19 70/10 72/20 73/6 80/20 82/10 87/24 90/19 107/10 107/19
wanted [3] 10/3 66/4 92/5
wants [6] 4/13 30/24 79/14 95/4 104/6 107/17
warrant [26] 35/20 36/16 37/8 37/9 38/23 42/16 62/8 62/13 62/18 62/23 63/8 63/24 64/2 64/7 64/8 64/19 65/3 65/15 65/17 65/20 66/12 103/1 103/2

104/25 105/11 106/6
warrantless [1] 103/1
warrants [1] 79/18 79/20 104/21
was [323]
Washington [2] 85/3 85/4
Wasim [1] 3/4
wasn't [2] 51/25 89/15
way [12] 6/9 14/8 20/7 20/9 22/4 43/15 56/9 56/10 56/11 60/17 61/17 95/4
ways [1] 105/22
we [43] 3/7 3/8 4/1 5/16 6/7 6/7 6/9 6/18 6/25 7/3 7/4 7/15 9/10 17/14 18/8 30/1 30/6 46/11 52/12 55/20 61/2 62/14 64/9 64/15 65/13 65/15 65/25 66/22 69/9 70/5 70/9 73/8 73/11 74/20 86/18 99/19 100/3 103/25 104/3 105/16 106/19 109/5 109/24
we'll [4] 3/11 4/16 5/15 30/4
we're [22] 4/25 10/10 10/21 10/21 39/19 45/25 61/24 62/5 66/1 68/1 69/10 73/6 79/1 79/1 84/4 84/5 87/6 89/23 90/15 91/7 101/22 107/22
we've [6] 62/4 69/1 90/23 94/16 105/12 105/13
weapon [5] 29/15 32/11 44/10 44/20 60/25
weapons [3] 28/25 31/16 33/17
wearing [4] 13/13 21/11 41/16 41/17
week [4] 79/10 82/23 82/23 91/18
weekends [1] 82/3
weighing [3] 49/21 50/10 51/15
weight [1] 47/15
weights [3] 49/25 50/1 50/8
well [53] 6/16 7/17 14/23 14/24 16/19 17/14 22/10 22/14 23/11 27/8 27/18 29/1 30/2 30/5 31/11 36/22 38/15 44/2 51/18 52/24 56/9 57/11 57/18 57/21 58/9 62/3 65/7 67/6 67/11 67/20 67/23 69/19 69/24 70/7 74/15 78/3 83/21 87/24 88/16 90/9 93/8 93/24 94/13 94/24 97/21 100/4 101/19 101/21 101/23 102/22 104/10 106/8 107/10
went [8] 20/1 26/8 61/8 74/24 75/21 85/3 91/4 95/24
were [83] 3/14 8/23 9/15 12/8 15/2 15/13 15/21 17/11 17/15 21/6 21/11 21/13 23/24 24/14 26/1 26/22 28/21 30/22 32/23 32/24 35/10 35/13 36/2 36/3 37/8 41/4 44/25 47/3 48/20 50/9 51/1 51/1 54/21 54/24 56/23 57/6 58/4 60/7 60/21 60/22 63/4 64/12 64/16 66/19 69/6 69/14 69/16 70/11 70/22 73/15 75/4 75/16 75/18 78/10 78/15 78/16 79/23 80/25 81/6 82/22 82/23 83/6 83/6 86/11 87/20 88/3 88/7 89/25 90/1 90/5 90/14 91/8 91/8 91/9 91/19 95/16 95/25 97/6 103/7 105/19 105/22 106/2 109/25
Wesson [3] 42/21 44/15 44/16
west [2] 17/15 41/9
westbound [1] 12/23
what [96] 3/7 4/9 4/24 10/19 12/11 12/13 15/3 15/10 16/3 17/24 23/3 25/9 26/18 27/8 30/15 30/21 31/4 32/4 33/25 34/1 34/2 34/5 34/10 36/3 36/14 37/3 42/8 42/12 43/4 43/8 43/10 43/11 43/13 43/19 46/5 47/8

47/11 47/14 48/1 50/17 52/21 55/2 55/7 55/12 55/12 56/2 56/16 57/21 57/24 58/6 58/21 60/24 61/5 61/20 62/7 64/1 64/6 64/7 65/18 68/2 68/2 69/9 69/17 69/21 72/9 73/6 75/13 75/17 77/4 77/10 78/17 78/25 79/2 80/6 81/22 82/11 83/20 84/17 85/24 91/14 91/16 91/18 92/19 94/12 95/13 97/6 101/15 101/19 101/21 101/22 105/12 105/13 107/10 107/11 107/19 108/11
what's [13] 5/4 5/7 14/5 22/18 34/22 45/18 63/25 64/1 68/10 84/24 96/19 98/23 107/15
whatever [3] 4/15 59/1 90/20
when [68] 7/18 7/18 8/8 11/14 13/8 13/20 14/5 15/13 15/16 16/11 16/24 17/7 17/8 17/11 17/14 17/21 19/22 19/23 22/15 23/12 24/15 24/20 26/3 26/11 26/14 26/15 26/21 28/23 35/4 35/6 37/18 38/10 41/24 42/7 44/8 46/23 47/6 55/5 56/25 58/20 58/23 61/6 61/8 63/14 63/16 65/9 65/21 66/15 66/18 68/7 70/21 75/9 81/5 82/9 82/17 89/25 90/5 90/14 91/3 91/9 91/19 92/13 93/24 95/24 98/4 98/16 103/24
where [31] 15/13 17/11 23/8 33/10 44/20 55/5 55/16 56/12 57/6 57/12 58/12 58/25 59/7 64/15 69/10 69/13 69/24 70/3 75/21 78/7 81/20 85/9 88/10 88/13 91/9 91/19 93/25 102/22 105/19 107/25 108/11
Whereupon [7] 3/14 11/3 40/7 40/12 48/19 64/12 72/11
whether [10] 27/12 51/5 67/21 69/22 95/19 100/22 104/6 104/7 105/15 108/8
which [29] 9/17 12/14 12/25 21/16 24/4 31/6 32/16 32/19 36/8 37/13 56/18 57/8 59/11 83/17 103/7 103/25 104/3 104/23 105/5 105/7 105/9 105/14 105/17 105/20 106/4 106/7 106/10 108/17 108/18
who [10] 42/11 42/11 51/14 74/2 74/6 83/6 83/11 83/21 86/21 87/3
who's [2] 5/20 108/12
whole [11] 6/5 34/23 46/18 59/5 76/12 76/19 77/1 82/9 88/10 98/21 101/24
whose [1] 88/4
why [11] 8/3 22/20 22/22 36/3 37/3 86/6 89/13 95/2 95/5 102/4 110/1
will [20] 5/23 7/8 8/18 57/12 59/3 62/25 72/3 76/6 86/19 108/18
window [4] 14/7 14/10 17/9 17/9
windows [2] 14/10 26/1
wires [1] 58/16
wish [3] 71/25 99/15 99/24
within [8] 9/21 10/3 62/24 63/15 63/21 66/10 79/10 111/8
without [14] 13/2 13/2 36/16 62/22 64/23 65/12 75/1 75/13 88/14 88/24 89/19 102/25 104/24 106/5
witness [27] 5/2 5/15 5/20 5/20 5/23 5/24 10/23 10/25 11/5 11/13 13/16 18/7 39/6 39/13 40/14 41/20 43/24 45/15 48/22 50/3 53/23 65/25 71/10 71/25 72/2 72/13 80/15
witnesses [10] 4/1 4/11 4/14 4/22

000237

## W

**witnesses... [6]** 5/22 39/10 71/15 71/23 99/22 99/24
**word [3]** 35/23 38/18 58/20
**wording [1]** 22/8
**work [18]** 3/23 7/7 12/11 81/18 81/20 81/21 81/23 82/2 82/3 82/11 82/12 82/18 83/2 83/3 83/4 91/13 95/25 108/10
**worked [4]** 50/20 50/22 50/23 50/24
**working [5]** 12/9 60/6 62/20 82/22 82/24
**worms [1]** 70/10
**would [57]** 4/11 7/23 8/4 20/10 21/16 24/4 24/19 25/9 25/14 26/13 29/23 30/7 30/9 30/9 30/12 34/8 38/17 40/1 42/23 42/25 43/1 43/3 47/21 47/23 48/4 48/6 48/8 55/18 56/13 58/25 61/16 62/12 62/21 63/7 63/9 63/12 64/25 65/11 81/9 86/6 87/10 88/8 88/9 89/13 89/18 90/6 92/9 94/3 94/5 94/6 96/6 96/14 102/4 108/3 108/6 108/12 109/21
**write [4]** 6/13 6/14 7/2 7/3
**writing [2]** 75/9 75/12
**written [4]** 43/1 43/2 54/7 54/8
**wrote [1]** 44/5

## Y

**yards [1]** 67/13
**yeah [17]** 20/8 25/4 26/13 27/3 37/2 44/10 49/9 76/12 76/16 76/20 79/7 81/1 87/16 88/12 91/6 93/12 97/8
**years [5]** 11/24 19/16 50/20 51/8 99/8
**yellow [4]** 7/4 7/6 13/14 41/17
**yes [131]**
**yet [3]** 52/12 52/19 53/1
**yield [3]** 20/4 20/6 21/19
**yielded [1]** 105/8
**yielding [1]** 13/3
**you [527]**
**you're [34]** 4/4 4/4 4/7 4/22 5/1 6/6 6/8 6/25 10/2 18/24 24/7 33/10 33/22 39/8 46/22 51/23 52/20 52/25 55/2 55/6 60/18 61/17 85/21 85/24 100/11 100/15 102/18 105/18 107/8 107/22 108/1 108/7 108/11 109/10
**you've [10]** 7/11 10/9 19/15 34/19 34/25 62/3 69/15 69/16 101/3 102/13
**young [1]** 89/21
**your [235]**
**yourself [3]** 99/2 108/5 108/9





DEFENDANT'S
EXHIBIT
509



DEFENDANT'S
EXHIBIT
510





DEFENDANT'S
EXHIBIT
511





DEFENDANT'S
EXHIBIT
512



DEFENDANT'S
EXHIBIT
513

Las Vegas Review-Journal



Michael Kitchen, left, the Metro detective facing charges of assaulting and robbing a prostitute, makes his initial court appearance Jan. 27, in Las Vegas Justice Court.

# Evidence in gun case tied to embattled cop unsealed

*Lawyers for suspect in federal case get to review statements*

**By JEFF GERMAN**

LAS VEGAS REVIEW-JOURNAL

Defense lawyers in a federal firearms case will get to see evidence Las Vegas police have against an embattled detective charged with assaulting and robbing a prostitute.

Police had fought to keep the evidence secret, but U.S. Magistrate Judge Nancy Koppe said in court late Monday that a statement to police by Detective Michael Kitchen should be turned over because it is relevant to his credibility as a witness in the gun case.

Lawyers for the federal defendant, Richard Ward, are pushing to get evidence seized through a search warrant prepared by Kitchen quashed over due process violations. Kitchen, a 15-year department veteran, was accused of assault just hours after he testified against Ward in federal court.

Koppe said she is considering turning over more evidence police gathered against Kitchen to the defense and will issue a written ruling later this week. The additional evidence includes an analysis of Kitchen's cellphone records.

The defense suspects the records will show that even before he testified against Ward, Kitchen was making plans to see the prostitute — effectively planning to commit a crime.

Assistant Federal Public Defender William Carrico, who represents Ward, had asked Koppe to privately review police reports of both the internal and criminal investigations of Kitchen and then provide relevant information to the defense.

Police department lawyers, however, filed court papers arguing against giving any of the evidence to the defense on several grounds, including that the reports contain sensitive information about undercover activities of Kitchen and other detectives.

The lawyers also contended that investigations of Kitchen are ongoing and could be jeopardized.

Ward faces a felony charge of possessing an unregistered rifle with a silencer

that was seized at his home based on a search warrant Kitchen obtained following a police response to a disturbance call there.

Kitchen and other Las Vegas detectives assigned to the joint local-federal gun crimes task force found 78 firearms, including rifles illegally altered by shortening their barrels and adding silencers, a pistol with a silencer and an operation for manufacturing illegal silencers, according to a federal criminal complaint.

Carrico had challenged the constitutionality of the search warrant before Kitchen's arrest and supplemented his argument afterward with questions about the detective's conduct.

Kitchen has been charged with robbery, battery and attempted sexual assault charges; he is now suspended and free on $150,000 bail pending trial. He has a preliminary hearing on May 5 in Las Vegas Justice Court to determine if there is enough evidence to bind him over for trial.

According to a police report, Kitchen went to the apartment of a woman who works for an escort service about two hours after he testified in federal court on Jan. 22. The woman later told officers Kitchen became "angry and ultimately violent" when told her initial $100 fee was only for "time and company" and that sex would cost another $150.

Kitchen, who has denied wrongdoing, is alleged to have punched the woman, whose identity has not been made public, twice in the head and to have shoved her to the floor, breaking her wrist. He is also accused of taking five $100 bills from her bra before leaving the scene. He was arrested the following day.

Federal prosecutors acknowledged the criminal case against Kitchen "does not reflect positively" on him but contended the evidence sought by the defense has no bearing on the Ward case.

The prosecutors were in court Monday but did not take a position on whether Koppe should turn over the Kitchen evidence to Ward's lawyers.

Contact Jeff German at jgerman@reviewjournal.com or 702-380-8135. Find him on Twitter @JimmanRJ

DEFENDANT'S EXHIBIT
574



RJ Tuesday, August 4, 2015

FEDERAL COURT

# Defense in weapons case assails detective's credibility

## Police veteran on leave after confrontation with prostitute

By Jeff Germán
Las Vegas Review-Journal

A veteran Las Vegas police detective once charged with beating and robbing a prostitute testified on the witness stand Monday and attempted to persuade a federal judge to toss out evidence in a weapons case the detective helped put together.

Defense lawyers questioned Michael Kitchen's credibility as he testified that he put false information in a sworn affidavit to obtain permission to enter Richard Ward's home in May 2014 during a disturbance in the area.

Kitchen

DEFENDANT'S EXHIBIT
515



# PD: Detective insisted he was seeking massage in escort-beating case

*Posted: Jan 27, 2015 10:30 AM PST*
*Updated: Apr 07, 2015 10:37 AM PDT*

Written by Matt Guillermo  | CONNECT |



Michael Kitchen, a detective with
Las Vegas Metro police, was
arrested on Jan. 22, 2015. (Source:
LVMPD)

LAS VEGAS (FOX5) - A detective accused of beating a woman over a disagreed fee for sex insisted he was at the victim's apartment to get a massage and denied hitting her.

Details of Las Vegas Metro police Det. Michael Kitchen's arrest were disclosed Tuesday in an arrest report. Kitchen is facing counts of battery with intent to commit sexual assault resulting in substantial bodily harm, attempted sexual assault, battery with intent to commit a crime and robbery.

In documents, police were able to tie Kitchen to a Jan. 22 assault of a woman working as a prostitute through phone records, surveillance video and witnesses.

Citing the victim, police stated the woman had an arranged meeting with the suspect before 5:30 p.m. at her east Valley apartment. The woman later told officers the suspect grew angry when he was told the $100 he was quoted by her escort agency was only for 30 minutes of company only and sex was an extra fee.

In the report, the woman stated the suspect demanded his cash back and, after some arguing, shoved her. The woman said the man tried ripping her clothes off while also holding her down and hitting her in the face.

After grabbing the money from the victim's bra, the suspect ran from the building and then sped off in a vehicle.

The woman provided investigators with the phone number used to contact her for the arrangement, which records showed belonged to Kitchen.

In the report, Kitchen told investigators he met the woman through a social media site in search for a massage but denied hitting the woman. When confronted as to why he decided to pay $100 for a 30-minute massage rather than go to a chain business, he insisted the method he sought the rub-down wasn't unusual.

Investigators also confronted Kitchen about him changing license plates on his vehicle, which was seen by a witness at the scene. Kitchen insisted he didn't want any possible trouble with the woman's escort agency.

The woman was treated for a mild concussion, a fractured wrist and scratches to her breast area, police said.

## Most Popular Stories     More>>

| MENU |

Teen charged with encouraging her boyfriend to kill himself



Fire destroys 'world's largest biker bar'



Maricopa Mugs: August Arrest Photos Volume 4



[ more + ]



DEFENDANT'S
EXHIBIT
_516_

RJ reviewjournal.com                                        http://www.reviewjournal.com/news/las-vegas/former-metro-detective-reaches-plea-deal-alleged-attack-prostitute

## Former Metro detective reaches plea deal in alleged attack on prostitute

By DAVID FERRARA LAS VEGAS REVIEW-JOURNAL                                                    May 5, 2015 - 1:57pm

A former Las Vegas police detective accused in an attack on a prostitute cut a deal with prosecutors Tuesday that is expected to result in probation.

In a last-minute compromise made with prosecutors just before the start of a preliminary hearing, Michael Kitchen agreed to plead guilty to attempt theft or attempt battery with substantial bodily harm.

At a hearing later this month, Kitchen is expected to enter what's known as an Alford Plea to one of those charges. That means he doesn't admit guilt, but acknowledges prosecutors have enough evidence to prove his guilt. The charge would be entered in the court records as a "wobbler," or a case that can be treated either as a low-level felony or a gross misdemeanor.

Both prosecutors and defense lawyers agreed to treat the case as a gross misdemeanor, according to Kitchen's lawyer Josh Tomsheck.

Kitchen would likely get a maximum of three years probation in the case. Once he completes probation, the charge could be reduced to a simple misdemeanor, Tomsheck said.

The original charges against Kitchen — battery with intent to commit sexual assault resulting in substantial bodily harm, battery with intent to commit a crime, robbery, and attempted sexual assault — carried the possibility of life in prison.

"He wasn't given a negotiation based on who he is," Tomsheck said. "He was given a negotiation based on the strength of the state's case."

The victim told police that detective Michael Kitchen paid her $100 for her "time and company," and when she told him that sex would cost another $150, he became "angry and ultimately violent." The woman was later taken to Desert Springs Hospital, where she was diagnosed with a concussion and a fractured wrist.

Kitchen initially told officers he drove a police vehicle to an apartment in the 2500 block of Flamingo Road for a massage, as advertised on a website, a police report said. He told detectives a massage at a legitimate business is too expensive.

A detective in the firearms division, Kitchen started working for Metro in September 1999. He was paid $173,836 in 2013.

Tomsheck said Kitchen, who is no longer a Metro officer, "adamantly denies all the allegations."

Kitchen agreed to take the deal rather than "going to trial and risking everything," Tomsheck said.

Meanwhile, a federal judge ruled last week that defense lawyers in a separate firearms case should see evidence Las Vegas police have against Kitchen.

Police had fought to keep the evidence secret, but U.S. Magistrate Judge Nancy Koppe said that a statement to police by Kitchen should be turned over because it is relevant to his credibility as a witness in the gun case.

Lawyers for the federal defendant, Richard Ward, are pushing to get evidence seized through a search warrant prepared by Kitchen quashed over due process violations. Authorities said the incident with the prostitute occurred just hours after Kitchen testified against Ward in federal court.

Contact reporter David Ferrara at dferrara@reviewjournal.com or 702-380-1039. Find him on Twitter:@randompoker

Copyright @GateHouse Media Inc. 2015. All rights reserved. • Privacy Policy





DEFENDANT'S
EXHIBIT
518



DEFENDANT'S
EXHIBIT
579

DEFENDANT'S
EXHIBIT
520

DEFENDANT'S
EXHIBIT
521

15FO1079X/02

### LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## ARREST REPORT

☐ City    ☒ County    ☒ Adult    ☐ Juvenile    Sector/Beat    H4

| ID/EVENT# | ARRESTEE'S NAME *(Last)* | *(First)* | *(Middle)* | S.S.# |
|---|---|---|---|---|
| 1562835 | KITCHEN | MICHAEL | JOHN | |

| ARRESTEE'S ADDRESS | *(Number, Street, City, State, Zip Code)* |
|---|---|
| | |

**CHARGES**
BURGLARY-SEXUALLY MOTIVATED, ROBBERY, & BATTERY TO COMMIT SEX ASSAULT

| OCCURRED | DATE | DAY OF WEEK | TIME | LOCATION OF ARREST *(Number, Street, City, State, Zip Code)* |
|---|---|---|---|---|
| | 01/22/2015 | THURSDAY | 1710 | |

| RACE | SEX | D.O.B. | HT. | WT. | HAIR | EYES | PLACE OF BIRTH |
|---|---|---|---|---|---|---|---|
| | | | | | | | MOOREHEAD, MN |

| ARRESTING OFFICER #1: | P#: | ARRESTING OFFICER #2: | P#: |
|---|---|---|---|
| S. TAYLOR | 8718 | | |

| CONNECTING REPORTS (Type or Event Number) |
|---|
| 150122-3046 |

APPROVED BY *(PRINTED NAME)*:    C. HOOTEN P#5262

**CIRCUMSTANCES OF ARREST:**

**SUBJECTS INVOLVED:**

**VICTIM:** ▓▓▓▓▓▓▓ DOB ▓▓▓▓▓
**SUSPECT:** MICHAEL KITCHED DOB ▓▓▓▓▓
**WITNESS:** JEFF PARINSHON DOB ▓▓▓▓▓

**INITIAL RESPONSE:**
On January 22, 2014, at approximately 1729 hours, Officers Miller P#9142 and Nameth P#14885 were dispatched to a residence located at ▓▓▓▓▓▓▓▓▓▓▓ reference a battery complaint. They arrived at approximately 1747 hours to complete a preliminary investigation.

Miller documented he immediately noticed a large welt on the forehead of a female identified as ▓▓▓▓▓. Miller said he also observed scratches on her right breast. ▓▓▓ told officers that she is a prostitute and her escort agency set up a meeting with a male in her apartment, which is number ▓▓. Miller documented ▓▓▓ claim that when she told the male certain "rules" he became angry and ultimately violent, punching ▓▓▓ head and shoving her onto the floor. ▓▓▓ also claimed the male got on top of her and unzipped her pants. She claims the male removed the money from her bra and left the room.

▓▓▓ was transported to Desert Spring Hospital by Medic West #794, where she was diagnosed with a minor concussion and a fractured wrist.

Officer Miller later checked the number in Coplink to find that it may belong to a law enforcement officer. He informed his chain of command and Internal Affairs detectives responded, ultimately calling the sex assault detail.

LVMPD 602 (Rev. 5/19/11) WORD 2010

DEFENDANT'S EXHIBIT
522

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# CONTINUATION REPORT

ID/EVENT #:   150122-3046

I Det. S. Taylor P#8718 responded along with the rest of the sex crimes detail. Detective Pretti P#9639 and I accompanied the victim, ▇▇▇▇▇▇▇▇ to the University Medical Center (UMC) for a SANE examination.

## INTERVIEW WITH STEFF PARINSHON

Detective Hendricks P#6091, conducted a recorded interview with Parinshon. Sgt. Hooten assisted him. Parinshon explained he ran from his room to assist a female who was screaming and yelling that a male running from the building assaulted her. Parinshon said that upon seeing ▇▇▇ he immediately noticed the large contusion on her forehead.

Parinshon said he ran after the male only to see him driving away in a vehicle, he described as a late model Chevrolet. Parinshon said the vehicle traveled west from ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ He returned to speak with ▇▇▇ who told him she met the male through some form of social media.

Parinshon described the male as Caucasian 6'0" – 6'1" with a dark tank top, a blue cap with white insignia or letters, a full yet groomed beard, and dark shoes with a large build. The male was further described as 200 – 230 pounds with a large build. Parinshon said ▇▇▇ said she only knew the male by the name of ▇▇▇▇

## INTERVIEW WITH ▇▇▇▇▇▇▇▇▇▇▇

▇▇▇ agreed to speak with us once we arrived to UMC. She is admittedly a working prostitute employed by an Escort service. She explained the escort service set up some ads on Craigslist with photographs of herself and other females. ▇▇▇ said the service told her that a male would be coming to visit and she was notified when he was outside the building waiting for her. ▇▇▇ went outside and escorted the male into room number ▇▇▇

▇▇▇ said that once inside the room she explained some rules to the male, starting with the disposal of condoms. She claims the male agreed to her rule regarding condom disposal. ▇▇▇ reportedly asked the male for the predetermined amount of $100.00 allegedly determined by the escort service and agreed upon by clients. ▇▇▇ explained that the money she was just given is solely for 30 minutes of her time and company, and sexual intercourse would be an extra charge of $150.00. She said the male became angry and demanded his money back. After some time arguing over the fee, ▇▇▇ claims the male began to shove her across the apartment and she ultimately fell onto the bathroom floor where her head struck a door frame. At this point, ▇▇▇ alleges the male unzipped her jeans and she began to kick him repeatedly. She claimed to make a solid connection when kicking the male but was unable to explain where she may have kicked him. ▇▇▇ claims the male punched her head twice and she attempted to turn away from the blows and put her arms over her face. She said the male then pinned her down with his forearm and removed the $100.00 he had given her from the right side of her bra. The male left the apartment and ultimately fled from the building and subsequently the area.

▇▇▇ told me multiple people were in the hallway to bear witness as he left the building. She described the suspect as a muscular male wearing athletic gear, to include "basketball shorts." ▇▇▇ said the suspect's shoes may have some white or be mostly white and his shorts were gray or black. ▇▇▇ said the male had a wallet similar to the one worn by motorcycle riders with a chain, however he did not have the chain attached.

▇▇▇ appeared hesitant to answer questions that would implicate her escort service or a pimp known as "Skip," Ultimately claiming fear of retaliation.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# CONTINUATION REPORT

ID/EVENT #:   **150122-3046**

█████ gave LVMPD officers a number of ████████ as the number belonging to the alleged suspect.

## FOLLOW UP BY PATROL OFFICERS

The victim gave LVMPD Initial responders the phone number of the male, against whom she alleges the above listed crimes. Officer Miller checked the phone in the Coplink system finding it may belong to a police officer. He informed his chain of command.

Michael Kitchen was ultimately identified as the possible owner of the phone used to contact the victim's escort service. Kitchen, an LVMPD Detective, was identified as the subject on surveillance footage by his direct supervisor, Sergeant B. Wolfenbarger P#5980.

Security Staff member Dan Tallant born ████████████ assisted LVMPD personnel by downloading the surveillance footage.

## INTERVIEW WITH MICHAEL KITCHEN

Detectives conducted a knock and talk at the residence of Detective Kitchen, located at ████████████ Kitchen answered the door and agreed to accompany Detectives back to LVMPD Headquarters for an interview.

Detective Kitchen demanded to know facts about the incident before deciding if he would speak with me. After advising him of his constitutional rights per Miranda versus Arizona, Kitchen asked me to tell him what was being alleged against him. I told him that he has been accused of being involved in a physical altercation and that altercation included a battery. I gave him the address of ████████████ and he told me he was in fact at the apartment building to get a massage.

Kitchen said he utilized a website called backpage, which he claimed to use "every few months or so" to get a massage. Kitchen told me that he likes to use sites like backpage to meet with females in the manner he had utilized the day prior. I asked him if he ever used other massage venue like the large corporate chain called Massage Envy or some other legitimate massage and spa. Kitchen said, "yeah I been to Massage Envy, ya know, and the reason I stopped going to places like that is because it is too expensive." Since he arrived to pay ████ $100.00 for a 30 minute massage, I asked Kitchen to tell me how much a 30 minute massage would cost at Massage Envy. Initially stating that he did not know, Kitchen estimated that it would cost over $100.00 for a 1-hour massage. I confronted him on this fact knowing that is not the case. He later changed his reason for using backpage and social media versus a well-known masseuse. A check on the company's web site later confirmed that it would actually cost $49.99 for a 1-hour massage.

When asked, Kitchen said he did not think this manner of receiving a massage is abnormal because he had done it a couple times in the past with no problems. Since he said soreness was a reason for the massage, I asked him if he would tell me tell me what type of massage helps with soreness. Kitchen reminded me that neither of us have an extensive knowledge of massages.

I told Kitchen that, considering his current assignment and its specialization, I felt he was very knowledgeable of his environment and possibly ████ occupation. I also told him I believe he knows certain social media sites are used for criminal activity. Kitchen said he is aware of criminal activity on sites like backpage.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/EVENT #:    **150122-3046**

When asked, Kitchen said he changed the license plates on his truck because he just changes them a lot and he did not want to have any kind of confrontation from anyone or any company that may employ ████ He also said he deleted all of the text messages from his phone. When asked why by Detective Pretti, Kitchen said that he usually deletes texts and contacts when he is not using them anymore. Kitchen denied having any malicious intent when making the reservation to meet with ████ He also denied committing the above actions were to conceal some form of misconduct. He concluded by stating he would have just walked away from ████before battering her over $100.00.

I asked Kitchen if the web ad he used advertised massages. He displayed uncertainty, explaining there were multiple sections one could choose on the site and he believes he chose the section for massages.

The initial license plate on the vehicle when leaving the parking lot at ████████was ████████ The plate was changed to ████████.  Kitchen said that the license plates he used were issued to him by LVMPD Fleet Services.  This was later confirmed by Sgt. Hooten P#5262.

It was ultimately found that when working in an undercover capacity, Kitchen uses the name of ████████ as shown on a false driver's license issued courtesy of the Nevada DMV for the purposes of covert operations.

## INFORMATION FROM SANE NURSE DERMANALIAN
I spoke with Nurse Dermanalian regarding ████injuries.  She said ████ bra was torn, she had an injury to the back of her right shoulder, left ariola, right breast, left shoulder, wrist and forehead.

Nurse Dermanalian relayed that during her exam, ████disclosed that following her examination at Desert Springs Hospital, but prior to being contacted once more by Officer Miller and Officer Nameth, she met with and had sex with her boyfriend for comfort.

## CONCLUSION
Detective Hendricks applied for and obtained a search warrant for Kitchen's residence, his LVMPD vehicle, a late model white Chevy pickup truck, and evidence from Kitchen's person.  Such evidence includes hand swabs, buccal swabs, photos, and fingernail scrapings.

During a search incident to lawful arrest, $100.00 dollars in a denomination of 5 $20 bills were found on Kitchen's person.  In addition, he had in his possession, a button down billfold with a metal ring for a chain link.

**In conclusion and considering that:**

- ████made allegations that a male she met with as an escort, shoved her to the ground and unzipped her pants,
- ████also alleged her head hit a door frame when falling and she was punched twice by the male,
- ████alleges that the male then braced her against tor floor while forcefully removing $100.00 from the right cup of her bra he had just given allegedly her for sexual favors,
- ████has injuries to her face and breast that are consistent with her allegations,
- Multiple neighbors including Parinshon saw the male leaving after rushing to the sounds of ████screams,

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION REPORT

ID/EVENT #:     150122-3046

- Parinshon gave Detective Hendricks a description of the suspect, the vehicle he was driving, and the license plate,
- Parinshon said the victim told him she only knew the suspect by the name of █████
- Officers responded to a report of a battery made by Parinshon,
- █████ gave Officers a phone number of ████████ as the number used by the male prior to meeting at her apartment,
- A Coplink search revealed the number may belong to an LVMPD employee named Michael Kitchen,
- In the past Kitchen has used an undercover name of █████████
- Kitchen's direct supervisor confirmed his identity on video surveillance,
- Kitchen's assigned vehicle fits the description given by Parinshon,
- Kitchen fits the description given by Parinshon,
- Kitchen placed himself at the scene of the alleged incident,
- Kitchen confirmed he was using his assigned vehicle,
- Kitchen confirmed his work number is █████████
- Kitchen claimed to meet with █████ to get a massage because he knows it is cheaper than a popular chain the in the Las Vegas Valley,
- Kitchen did not actually know the prices of the massages at the chain when confronted and changed his claims to just wanting a massage from an attractive female,
- Medical staff at Desert Springs Hospital and SANE Nurse Dermanalian documented ██████ injuries,
- And The injuries are consistent with her claims,
- Which are that Kitchen pushed her to the ground just before unzipping her pants, punched her face and braced his forearm against her to facilitate the removal of $100.00 from the right cup of her bra.

I feel there is probable cause to arrest Kitchen for Attempt Sex Assault, Robbery, and Battery with intent to commit sex assault. He was taken into custody without incident and transported to the Clark County Detention Center.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT

**HQ**

JAN 0 8 2015

Location: _____ HQ

**TEMPORARY EVIDENCE/PROPERTY CONTROL LOG**

USE SEPARATE LINE FOR EACH PACKAGE ! USE SEPARATE LINE FOR EACH PACKAGE

| EVENT # | PKG # | DESCRIPTION | DATE | TIME | Officer's P# & Initials | Supervisor P# & Initials | Evid. Cust. P# & Initials | DATE REMOVED | * NOSE | ** DE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1-6-15 | 1735 | K5746L | | 8480 13740 | 1 | 8 15 | |
| 131112-3386 | 1 | CD | | | | | | | | |
| 140112-3427 | 1 | CD | 1-6-15 | 1735 | K5746L | | 8480 13740 | | | |
| 140707-0191 | 1 | CD | 1-6-15 | 1735 | K5746L | | 8480 13740 | | | |
| 140728-0045 | 1 | CD | 1-6-15 | 1735 | K5746L | | 8480 13740 | | | |
| 150103-0060 | 1 | DNA | 1-6-15 | 1900 | M1474K | | 8480 13740 | | | |
| 150106-2982 | 1 | DNA | 1-6-15 | 1905 | F7946B | | 8480 13740 | | | |
| 150106-2982 | 2 | GUN    S&W | 1-6-15 | 1905 | F7946B | | 8480 13740 | | G | |
| 150106-2982 | 3 | MARIJUANA, METH | 1-6-15 | 1905 | F7946B | | 8480 13740 | | N | |
| 110104-7778 | 1 | 4-CD's | 1-6-15 | 1936 | K5746L | | 8480 13740 | | | |
| 100414-3488 | 1 | 6-CASE FILES | 1-6-15 | 2003 | K5746L | | 8480 13740 | | | |
| 100414-3488 | 2 | 3 CASE FILES | 1-6-15 | 2003 | K5746L | | 8480 13740 | | | |
| 150105-3562 | 1 | AUDIO | 1-6-15 | 2014 | T6360K | | 8480 13740 | | | |
| 150105-3562 | 1 | BUCCALS (3) | 1-6-15 | 2014 | T6360K | | 8480 13740 | 33 prs | | |
| 141228-0365. | 1 | BUCCAL KIT | 1-6-15 | 2020 | SC878M | | 8480 13740 | | | |
| 150105-3562 | 2 | VIDEO | 1-6-15 | 2084 | T6360K | | 8480 13740 | 1 8 15 | | |

* Notation of Secured Evidence
** Data Entry

LVMPD 128 (Rev. 6/06) • INFOPATH 2007

DEFENDANT'S EXHIBIT
523

140

Skip to Main Content Logout My Account Search Menu New District Criminal Search Refine Search Close Location : District Court Criminal   Images Help

# REGISTER OF ACTIONS
## CASE NO. C-15-307496-1

State of Nevada vs Omar Qazi

| | |
|---|---|
| Case Type: | Felony/Gross Misdemeanor |
| Date Filed: | 06/23/2015 |
| Location: | Department 10 |
| Cross-Reference Case Number: | C307496 |
| Defendant's Scope ID #: | 1993576 |
| ITAG Booking Number: | 1500000927 |
| ITAG Case ID: | 1658221 |
| Lower Court Case # Root: | 15F00233 |
| Lower Court Case Number: | 15F00233X |
| Metro Event Number: | 1501062982 |

## PARTY INFORMATION

| | | | |
|---|---|---|---|
| Defendant | Qazi, Omar Wasim | DOB: 11/09/1987 | **Lead Attorneys** Jennifer M. Waldo *Retained* 702-830-7925(W) |
| Plaintiff | State of Nevada | | Steven B Wolfson 702-671-2700(W) |

## CHARGE INFORMATION

| Charges: Qazi, Omar Wasim | Statute | Level | Date |
|---|---|---|---|
| 1. POSSESSION OF FRIEARM BY EX-FELON | 202.360.1 | Felony | 01/06/2015 |
| 2. POSSESSION OF CONTROLLED SUBSTANCE WITH INTENT TO SELL | 453.337.2a | Felony | 01/06/2015 |
| 3. POSSESSION OF CONTROLLED SUBSTANCE WITH INTENT TO SELL | 453.337.2a | Felony | 01/06/2015 |

## EVENTS & ORDERS OF THE COURT

07/02/2015 | **Initial Arraignment** (10:00 AM) (Judicial Officer De La Garza, Melisa)

**Minutes**
07/02/2015 10:00 AM
- Deputized Law Clerk Steven Rose present on behalf of the State of Nevada. Mr. Rose advised the State is not going to pursue the case, and will dismiss without prejudice; COURT SO ORDERED. NIC (COC - FED)

Parties Present
Return to Register of Actions



DEFENDANT'S EXHIBIT
524

Case 2:15-cr-00014-APG-VCF   Document 452-1   Filed 07/05/18   Page 184 of 295
Case 2:15-cr-00014-APG-VCF   Document 105-2   Filed 12/03/15   Page 2 of 2
Page 1 of 1

Skip to Main Content  Logout  My Account  Search Menu  New District Criminal Search  Refine Search  Back      Location : District Court Criminal   Images Help

# REGISTER OF ACTIONS
## CASE NO. C-15-307496-1

| State of Nevada vs Omar Qazi | § | Case Type: | Felony/Gross Misdemeanor |
|---|---|---|---|
| | § | Date Filed: | 06/23/2015 |
| | § | Location: | Department 10 |
| | § | Cross-Reference Case Number: | C307496 |
| | § | Defendant's Scope ID #: | 1993576 |
| | § | ITAG Booking Number: | 1500000927 |
| | § | ITAG Case ID: | 1658221 |
| | § | Lower Court Case # Root: | 15F00233 |
| | § | Lower Court Case Number: | 15F00233X |
| | § | Metro Event Number: | 1501062982 |
| | § | | |
| | § | | |

---

### PARTY INFORMATION

| | | | Lead Attorneys |
|---|---|---|---|
| Defendant | Qazi, Omar Wasim | | Jennifer M. Waldo |
| | | DOB: 11/09/1987 | Retained |
| | | | 702-830-7925(W) |
| | | | |
| Plaintiff | State of Nevada | | Steven B Wolfson |
| | | | 702-671-2700(W) |

---

### CHARGE INFORMATION

| Charges: Qazi, Omar Wasim | Statute | Level | Date |
|---|---|---|---|
| 1. POSSESSION OF FRIEARM BY EX-FELON | 202.360.1 | Felony | 01/06/2015 |
| 2. POSSESSION OF CONTROLLED SUBSTANCE WITH INTENT TO SELL | 453.337.2a | Felony | 01/06/2015 |
| 3. POSSESSION OF CONTROLLED SUBSTANCE WITH INTENT TO SELL | 453.337.2a | Felony | 01/06/2015 |

---

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**
07/02/2015 (Judicial Officer: Walsh, Jessie)
   1. POSSESSION OF FRIEARM BY EX-FELON
      Dismissed
   2. POSSESSION OF CONTROLLED SUBSTANCE WITH INTENT TO SELL
      Dismissed
   3. POSSESSION OF CONTROLLED SUBSTANCE WITH INTENT TO SELL
      Dismissed

**OTHER EVENTS AND HEARINGS**
06/24/2015 Criminal Bindover Packet Las Vegas Justice Court
06/26/2015 Information
07/02/2015 Initial Arraignment (10:00 AM) (Judicial Officer De La Garza, Melisa)
   Parties Present
   Minutes
   Result: Case Dismissed
07/12/2015 Transcript of Proceedings

## BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES
### NATIONAL TRACING CENTER
**Phone:(800) 788-7133  Fax:(800) 578-7223**
**Print Date: August 24, 2017**

### FIREARMS TRACE SUMMARY

**Trace Number: T20150020783**   **Request Date: January 21, 2015**   **Completion Date: February 02, 2015**

JASON GRACE
LAS VEGAS FIELD OFFICE
8965 S EASTERN AVE STE 200
LAS VEGAS, NV 89123

**Badge No:**
**Investigation No: 786020-15-0064**

### FIREARM INFORMATION

**Manufacturer:** SMITH & WESSON
**Model:** 34
**Caliber:** 22
**Serial Number:** M37231
**Type:** REVOLVER
**Country:** UNITED STATES
**Importer:**
**Obliterated:**
**Identifying Marks:** MODEL READS 34-1
**NIBIN:**
**Gang Name:**

### RECOVERY INFORMATION

**Recovery Date:**
**Time to Crime:**

HARMONA T KOVAL
LAS VEGAS, NV 89169
**Possessor:** OMAR QAZI
**DOB:** 11/09/1987
**POB:** UNITED STATES

### DEALER INFORMATION                    **FFL:** 33904206

BILLS SPORTING GOODS INC
724 MAIN ST
LOMIRA, WI 53048-0000
**Phone:** (920) 269-4414 ·   **Ship-To-Date:** 09/07/1971
Ext:

### ADMINISTRATIVE INFORMATION

786020-15-0064
NON-ATF
JMGRACE
1728578

### SUMMARY OF RESULTS

THIS FIREARM WAS TRACED TO A FEDERAL FIREARMS LICENSEE (FFL) WHO IS A WHOLESALE OR RETAIL
DEALER AND HAS NO RECORD OF THE FIREARM. FOR ANY QUESTIONS PLEASE CONTACT THE ATF NATIONAL
TRACING CENTER AT 1-800-788-7133.

**Additional Remarks:**

*(watermark: Unclassified // Controlled Information)*



DEFENDANT'S
EXHIBIT
525

The information in this report must be validated prior to use in any criminal proceedings.

# Firearm Trace Details

## Trace Reference

| | | | |
|---|---|---|---|
| Trace Number: | **T20150020783** | Request Date: | 01/21/2015 |
| Status: | Completed | eTrace User: | |
| Completion Date: | 02/02/2015 | | |

## Summary of Results

THIS FIREARM WAS TRACED TO A FEDERAL FIREARMS LICENSEE (FFL) WHO IS A WHOLESALE OR RETAIL DEALER AND HAS NO RECORD OF THE FIREARM. FOR ANY QUESTIONS PLEASE CONTACT THE ATF NATIONAL TRACING CENTER AT 1-800-788-7133.

## Firearm Information

| | | | |
|---|---|---|---|
| Manufacturer: | SMITH & WESSON | Type: | REVOLVER |
| Caliber: | 22 | | |
| Model: | 34 | | |
| Serial Number: | M37231 | Country of Origin: | UNITED STATES |
| Barrel: | | Ballistics No.: | |
| Finish: | | | |
| Importer: | | | |
| Obliterated? | No | Removal Code: | |

Restored:                                          Drill Size:
Identifying Marks:    MODEL READS 34-1
Images Attached:      0

## Requestor Information

ATF Office                                  Agent Last Name:      GRACE
786020
LAS VEGAS FIELD OFFICE                      Agent Suffix:
8965 S EASTERN AVE STE 200
LAS VEGAS, NV 89123                          Agent First Name:     JASON
UNITED STATES
                                            Agent Badge No.:

ATF Case No.:    786020-15-0064

## Recovery Information

Firearm Recovered
Recovery Date:                              Time to Crime:
Address:    HARMONAT KOVAL                  Vehicle Year:
            LAS VEGAS, NV 89169             Vehicle Make:

                                            Vehicle Model:
                                            Vehicle Tag Number:
Location Type:                              Vehicle Tag State:
                                            Vehicle Tag Country:

## Dealer Information

**Dealer: 1**
Business Name:    S&W / SMITH & WESSON / T/C ARMS /
                  GEMTECH / M&P
Licensee Name:    SMITH & WESSON CORP
Address:          2100 ROOSEVELT AVE
                  SPRINGFIELD, MA 01104

FFL Number:       60401684          Last Inspection:    09/29/2009
Contact Name:                       Phone:              (413) 781-8300
Invoice Number:                     Transaction Date:

**Dealer: 2**
Business Name:                                          Out of Business
Licensee Name:    FABER BROTHERS INC
Address:          4141 S PULASKI RD
                  CHICAGO, IL 60632

| | | | | |
|---|---|---|---|---|
| FFL Number: | 33600012 | Last Inspection: | 10/27/2006 | |
| Contact Name: | | Phone: | (773) 376-9300 | |
| Invoice Number: | 6433 | Transaction Date: | 08/19/1971 | |

**Dealer: 3**
Business Name:
Licensee Name:  BILL'S SPORTING GOODS INC
Address:  724 MAIN ST
LOMIRA, WI 53048

| | | | | |
|---|---|---|---|---|
| FFL Number: | 33904206 | Last Inspection: | 06/10/2016 | |
| Contact Name: | | Phone: | (920) 269-4414 | |
| Invoice Number: | | Transaction Date: | 09/07/1971 | |

## Possessor/Associate Information
**Possessor**

| | | | |
|---|---|---|---|
| Name: | OMAR QAZI | Criminal History? | N/A |
| Last Known Address: | 1800 E ROCHELLE AV APT 12 LAS VEGAS, NV 89118 | Race: | OTHER |
| | | Sex: | M |
| | | Height: | 6 ft 2 in |
| | | Weight: | 210 lbs |
| DOB: | 11/09/1987 | | |
| POB: | UNITED STATES | | |
| ID 1: Country 1: | DRIVER'S LICENSE | #: | |
| ID 2: Country 2: | OTHER | #: NV 04215408 | |
| Alias Name: | | Alias DOB: | |

## Administrative Information

| | | | |
|---|---|---|---|
| Priority: | ROUTINE | | |
| NCIC Crime Code: | 5212 | POSSESSION OF WEAPON | |
| Special Instructions: | | | |
| Gang Name: | | | |
| Admin Labels: | | Value: | 786020-15-0064 |

NON-ATF
JMGRACE
1728578

**LAS VEGAS METROPOLITAN
POLICE DEPARTMENT**
JOSEPH LOMBARDO, Sheriff

*Partners with the Community*

September 9, 2016

Mr. Omar Qazi
1680 E. Rochelle Ave., 212
Las Vegas, NV  89119

N.S.D.C.
Inmate Omar Qazi
2190 E. Mesquite Ave.
Pahrump, NV  89060

Reference: SOC2016-0074 (Duplicate letter sent 8-6-16)

Dear Mr. Qazi:

The complaint you filed with the Las Vegas Metropolitan Police Department has been fully investigated. We thank you for bringing this matter to our attention. Without citizen participation and scrutiny, it would be difficult to maintain the high standard of discipline we demand of our employees.

A complaint may make allegations that give rise to one or several possible policy violations. The Department has many policies relating to employee conduct as well as performance and procedural matters. Your complaint may allege misconduct, but other policy violations may be discovered by your allegations as well. Based on your complaint and a thorough investigation, a policy violation* was found to be sustained.

The Department "Managing Employee Performance and Conduct" handbook and guide will be applied to determine the appropriate corrective action for this employee. A copy of the guide is available, if you so desire.

If you are not satisfied with this finding, and the complaint was against a Police or Corrections Officer, you may file a complaint with the Citizen Review Board (CRB). The CRB serves as an independent civilian oversight agency for LVMPD Police and Corrections Officers, and will review the investigation that was conducted by Internal Affairs. The CRB is not affiliated with the LVMPD. The CRB is located at 330 South 3rd Street, Suite 670, Las Vegas, NV 89101. They can be reached at (702) 455-6322. Please note you only have one year from the date of the incident to file a complaint with them.

If you have any pertinent additional information, or if you wish to discuss this matter further with the LVMPD Internal Affairs, please call me at (702) 828-3422. Thank you for bringing this incident to the attention of the Department. Your interest in helping us ensure we provide the best service possible to our community is appreciated.

Very truly yours,
**JOSEPH LOMBARDO, SHERIFF**

By:  **SEAN McNULTY, LIEUTENANT**
Internal Affairs Bureau

JL:SMmf
*We are unable to disclose which policy violation was sustained as such matters are confidential by law.

400 S. Martin L. King Blvd. • Las Vegas, Nevada 89106-4372 • (702) 828-3111
www.lvmpd.com • www.protectthecity.com


DEFENDANT'S
EXHIBIT
5746



JOSEPH LOMBARDO, *Sheriff*

*Partners with the Community*

November 9, 2017

Embry Executrix
c/o DS Post Office Box 671
Crane, OR 97732

Dear Julie Embry:

This letter is to acknowledge receipt of your request dated Oct 30, 2017. It is our understanding that you are requesting:

- Public portion of event #150103-0060

We have reviewed your request, however, there is no police report associated with the requested event number. If you would like to order the call for service, please visit lvmpd.com/Bureaus/Communications/Research Office Procedures for directions on how to do so. If you would like any other documentation, we would require an original signed and notarized authorization from the subject involved, authorizing you to receive the documentation, along with $9 (cashier's check or money order) for each document requested.

If you have any questions regarding your request, please contact the LVMPD Document and Report Management Section at (702) 828-7395.

Sincerely,

Amber Nordin #13435
Document and Report Management, RFB
Las Vegas Metropolitan Police Dept.
Phone (702) 828-7395

**DEFENDANT'S EXHIBIT**
527

'17 NOV 3 PM 1:38

October 30, 2017

Las Vegas Metropolitan Police Department
**Attention Correspondence**
400 South Martin Luther King Boulevard
Las Vegas Nevada 89106

Regarding Event #150103-0060

This is a public record request for the public portion of the police report or event, in 2015, #150103-0060. Per my phone call with Public Records Department I am making a written request for the public portion of the report. Enclosed please find a money order for $9 per instructions. Enclosed please find a copy of photo identification of the requester.

The information/report should be sent via enclosed pre-addressed stamped envelope to:

        EMBRY EXECUTRIX
        c/o DS Post Office Box 671
        Crane Oregon 97732

Thank you for your assistance in this matter.

                                        Respectfully

                                        Embry, Julie
                                        Embry Julie (Exe)



U.S. POSTAGE ≫ PITNEY BOWES

ZIP 89120 $ 000.45
02 4W
0003457900 NOV. 13

PRESORTED
FIRST CLASS



LAS VEGAS METROPOLITAN
POLICE DEPARTMENT
JOSEPH LOMBARDO, Sheriff
400 S. Martin L King Blvd.
Las Vegas, NV 89106-4372

Embry Execuhnx
c/o DS  PO Box 471
Crane, OR 97732

134  JRDFNMP 97732



# SCALES BIOLOGICAL LABORATORY, INC.

220 Woodgate Dr. S., Brandon, MS 39042 USA♦(601) 825-3211♦scalesbio@aol.com -

October 5, 2017

**Case No.:** SBL 10-16
**Client:** Omar Qazi
**Client Case No.:** 2:15-cr-00014-APG-VCF
**Date Case Accepted:** 3/21/16
**Case Documentation Received and Examined By:** George Schiro
**Dates of Analysis:** 3/21/16 to 10/5/17
**Type of Examination Requested:** Review and evaluate collection and preservation of the evidence, chain of custody, and DNA analysis case documentation
**Specimens Received:** Las Vegas Metropolitan Police Department (LVMPD) Arrest Reports for Event #1993576/150106-2982 by Frank Bien; LVMPD Officer Report for Event #150106-2982 by Frank Bien; photographs of a revolver in the vehicle and in the lab; LVMPD HQ Temporary Evidence/Property Control Log dated January 8, 2015; LVMPD Forensic Laboratory Biology/DNA Forensic Casework Report of Examination issued by Kimberly D. Dannenberger on August 13, 2015 and associated case file; and LVMPD Criminalistics Bureau Chain of Custody for EV # 1501062982 dated January 12, 2017
**Analytical Procedures:** Reviewed and analyzed case documentation.

## RESULTS:

A reference DNA sample was collected from Mr. Qazi on January 6, 2015 at 6:15 PM.[1] Detective Kitchen photographed the Smith & Wesson model 34-1 .22 LR revolver, S/N M37231 in Officer Frank Bien's presence. Officer Bien recovered the gun using fresh latex gloves. The temporary evidence control log indicates that the revolver and reference DNA sample were impounded on January 6, 2015 at 7:05 PM by Officer Bien at LVMPD headquarters. The LVMPD Criminalistics Bureau Chain of Custody states that Randall Morris took possession of the gun from Frank Bien on January 8, 2015.

The DNA analysis in this case appears to meet the FBI quality assurance standards for forensic DNA testing laboratories. All of the data supports the results and conclusions in the report and there does not appear to be any in-lab contamination events associated with the gun. The reagent blank (labeled RBQ-061315-KDD1) associated with the extraction of the DNA from the gun shows signs of a contaminant; however, this contaminant is below the analytical threshold. It is unknown if the lab investigated this contaminant. The presence of this contaminant does not impact the results obtained in this case.

---

[1] LVMPD arrest report for event #1993576 incorrectly lists the date as 1-6-14.



DEFENDANT'S
EXHIBIT
528

# SCALES BIOLOGICAL LABORATORY, INC.

220 Woodgate Dr. S., Brandon, MS 39042 USA♦(601) 825-3211♦scalesbio@aol.com

**CONCLUSIONS**

**1. Based on the provided documentation, there appear to be inconsistencies and a gap in the revolver chain of custody.**

Based on the documentation provided, the gun was seized by Officer Bien after 6:15 PM on January 6, 2015. It next appears on the headquarters temporary evidence control log at 7:05 PM on January 6, 2015. The log suggests that Mr. Morris took possession of it on January 6 at 7:05 PM. The LVMPD Criminalistics Bureau chain of custody states that it is the official account of all transactions that occurred with the gun while in custody of the LVMPD from January 8, 2015 until January 12, 2017. This chain of custody states that Mr. Morris took possession of the revolver on January 8. Based on this information, it is unknown what happened to the revolver, where it was stored or who had possession of the gun from the time it was collected until Randall Morris took possession of it. No information was found in the discovery materials indicating the location of the gun from January 6-8, 2015. The LVMPD policy and procedures manual as it related to the collection and storage of firearms evidence was requested in order to shed light on the whereabouts of the gun during this time period, but the LVMPD and U.S. Government would not release the requested information. Based on the provided documentation, it is unknown if the firearm was handled and stored according to LVMPD policies and procedures and general evidence collection and preservation guidelines.

**2. The mixed DNA profile on the gun could be from a primary DNA transfer, a secondary DNA transfer, or a combination of both.**

A person's DNA can be transferred to a surface by direct physical contact or when DNA containing cells leave the body, such as when a person sneezes, coughs, sweats, bleeds, etc. This is a primary or direct transfer of DNA from the person to a surface.

Indirect or secondary transfer of DNA can occur when the person's DNA containing cells end up on a surface via an intermediate surface without the person ever having come in contact with the second surface.[2] Numerous research papers have reported documented incidences of indirect DNA transfer and the results of studies on indirect DNA transfer.[3, 4, 5, 6, 7, 8] Secondary transfer of

---

[2] Georgina Meakin and Allan Jamieson, "DNA transfer: Review and implications for casework," *Forensic Science International: Genetics* 7 (2013) 434-443.

[3] Eleanor Alison May Graham and Guy Nathan Rutty, "Investigation into 'Normal' Background DNA on Adult Necks: Implications for DNA Profiling of Manual Strangulation Victims," *J. Forensic Sci*, September 2008, Vol. 53, No. 5, 1074-1082.

[4] Sarah Jones and Kristy Scott, "The transfer of DNA through non-intimate, social contact" from Body Fluids Conference Jointly hosted by the Forensic Science Society & the Centre for Forensic Investigation, University of Teesside, 18-19 April 2008, Convenors: Julie Allard and Brian Rankin, Conference Report, *Science and Justice* 50 (2010) 104.

[5] Mariya Goray, R. John Mitchell, and Roland A.H. van Oorschot, "Investigation of secondary DNA transfer of skin cells under controlled test conditions," *Legal Medicine* 12 (2010) 117-120.

[6] Mariya Goray, Roland A.H. van Oorschot, and John R. Mitchell, "DNA transfer within forensic exhibit packaging: Potential for DNA loss and relocation," *Forensic Science International: Genetics* 6 (2012) 158-166.

# SCALES BIOLOGICAL LABORATORY, INC.

220 Woodgate Dr. S., Brandon, MS 39042 USA♦(601) 825-3211♦scalesbio@aol.com

DNA can even occur in the controlled conditions of laboratories.[9] Research has shown that secondary transfer of DNA should be considered in the evaluation of touch DNA results.[10]

The mechanism as to how the DNA got on the gun is unknown. Secondary transfer of DNA from Mr. Qazi to the gun cannot be ruled out. The quantity of DNA obtained and the quality of the profile are not reliable indicators of direct versus indirect DNA transfer.[11, 12, 13] Complete or nearly complete profiles from secondary DNA transfers have also been documented.[14, 15, 16, 17, 18] Although it appears that Officer Bien and lab personnel took steps to prevent secondary transfer of Mr. Qazi's DNA to the gun, the secondary transfer could have occurred prior to the seizure of the gun. For example, Mr. Qazi could have come into contact with another person's hand. The second person could have then handled the gun, inadvertently transferred DNA from Mr. Qazi to the gun, and put the gun in the car without Mr. Qazi ever coming into contact with the gun. In this case, it cannot be determined if the mixed DNA profile is the result of direct DNA transfer, indirect DNA transfer, or a combination of both.

These results and conclusions are subject to alteration if any new or previously undisclosed information is provided.

George Schiro, MS, F-ABC
Forensic Scientist

---

[7] Mariya Goray, John R. Mitchell, and Roland A.H. van Oorschot, "Evaluation of multiple transfer of DNA using mock case scenarios," *Legal Medicine* 14 (2012) 40-46.

[8] Alex Lowe et al., "The propensity of individuals to deposit DNA and secondary transfer of low level DNA from individuals to inert surfaces," *Forensic Science International* 129 (2002) 25-34.

[9] A. Poy and R.A.H. van Oorschot, "Beware: gloves and equipment used during the examination of exhibits are potential vectors for transfer of DNA-containing material," *International Congress Series* 1288 (2006) 556-558.

[10] Georgina Meakin and Allan Jamieson, "DNA transfer: Review and implications for casework," *Forensic Science International: Genetics* 7 (2013) 434-443.

[11] *Ibid.*

[12] Mariya Goray, John R. Mitchell, and Roland A.H. van Oorschot, "Evaluation of multiple transfer of DNA using mock case scenarios," *Legal Medicine* 14 (2012) 40-46.

[13] R.K. Farmen et al.,"Assessment of individual shedder status and implication for secondary DNA transfer," *Forensic Science International: Genetics Supplement Series* 1 (2008) 415-417.

[14] Alex Lowe et al., "The propensity of individuals to deposit DNA and secondary transfer of low level DNA from individuals to inert surfaces," *Forensic Science International* 129 (2002) 25-34.

[15] Susan F. Petricevic, Jo-Anne Bright, and Sarah Cockerton. "DNA profiling of trace DNA recovered from bedding," *Forensic Science International* 159 (2006) 21-26.

[16] A. Poy and R.A.H. van Oorschot, "Beware: gloves and equipment used during the examination of exhibits are potential vectors for transfer of DNA-containing material," *International Congress Series* 1288 (2006) 556-558.

[17] Dyan J. Daly, Charlotte Murphy, and Sean D. McDermott, "The transfer of touch DNA from hands to glass, fabric and wood ," *Forensic Science International: Genetics* 6 (2012) 41-46.

[18] Mariya Goray, John R. Mitchell, and Roland A.H. van Oorschot, "Evaluation of multiple transfer of DNA using mock case scenarios," *Legal Medicine* 14 (2012) 40-46.





TRANSCRIBED FROM DIGITAL RECORDING

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

UNITED STATES OF AMERICA,       )
                                )   Case No. 2:15-cr-014-APG-VCF
          Plaintiff,            )
                                )   Las Vegas, Nevada
          vs.                   )   Wednesday, August 3, 2016
                                )   Courtroom 3A
OMAR QAZI,                       )
                                )   MOTION TO SUPPRESS
          Defendant.            )
                                )   C E R T I F I E D   C O P Y
_____)


TRANSCRIPT OF PROCEEDINGS

BEFORE:          THE HONORABLE CAM FERENBACH,
                 UNITED STATES MAGISTRATE JUDGE


APPEARANCES:              See Next Page

DIGITALLY RECORDED:       Liberty Court Recorder (LCR)
                          10:17:00 a.m.

RECORDED BY:              Jerry Ries

TRANSCRIBED BY:           Heather K. Newman
                          (702) 471-0002


Proceedings recorded by electronic sound recording, transcript
produced by mechanical stenography and computer.

DEFENDANT'S
EXHIBIT
530

TRANSCRIBED FROM DIGITAL RECORDING

2

 1    APPEARANCES:

 2    For the Plaintiff:

 3            UNITED STATES ATTORNEY'S OFFICE
              BY:   ALEXANDRA M. MICHAEL
 4            501 Las Vegas Boulevard South, Suite 1100
              Las Vegas, NV  89101
 5            (702) 388-6336

 6    For the Defendant:

 7            GREGORY & WALDO LLC
              BY:   JENNIFER A. WALDO
 8            1701 West Charleston Boulevard, Suite 600
              Las Vegas, NV  89102
 9            (702) 830-7925

10    Also present:

11            Craig Retke
              Nevada Investigative Group
12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRANSCRIBED FROM DIGITAL RECORDING

3

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Ryan Rotta | 15 | 35 | 47 | 51 |
| Joshua Glover | 54 | 63 | 69 | -- |

E X H I B I T S

| EXHIBIT NO: | RECEIVED IN EVIDENCE |
|---|---|
| 1 | 56 |
| 2 | 51 |
| 3 | 51 |
| 4 | 29 |

TRANSCRIBED FROM DIGITAL RECORDING

4

1      LAS VEGAS, NEVADA; WEDNESDAY, AUGUST 3, 2016; 10:17:00 A.M.

2                              --oOo--

3                      P R O C E E D I N G S

4

5            COURTROOM ADMINISTRATOR:  Please rise.

6            THE COURT:  Thank you.  Be seated.

7            COURTROOM ADMINISTRATOR:  United States of America

8      vs. Omar Qazi, 2:15-cr-14-APG-VCF.  This is before the Court on

9      a Motion to Suppress.

10           Counsel, appearances, please.

11           MS. MICHAEL:  Good morning, Your Honor.

12     Alexandra Michael for the United States.

13           THE COURT:  Ms. Michael.

14           MS. WALDO:  Good morning, Your Honor.  Jennifer Waldo

15     on behalf of the defendant, Mr. Qazi, who is also present.

16           Also with me today is my investigator Craig Retke

17     from Nevada Investigative Group.

18           THE COURT:  Craig Retke.

19           Okay.  Thank you, Ms. Waldo.  Mr. Retke.

20           Okay.  So, I'd like to just take a minute here and

21     make sure we're all in agreement on what we're doing today.

22     The -- I -- I don't believe there's going to be any real fact

23     issue, issue of fact regarding the content of the warning that

24     was given; is that right?  Everyone agrees what the warning was

25     given?

TRANSCRIBED FROM DIGITAL RECORDING

5

1          MS. WALDO:  That is correct, Your Honor.

2          MS. MICHAEL:  Yes, Your Honor.  I do believe the

3    parties were anticipating presenting the body camera footage

4    for the Court, just to verify -- so we have the facts on the

5    record --

6          THE COURT:  Okay.  That's fine.

7          MS. MICHAEL:  -- in terms of what the evidence is.

8          THE COURT:  But I just need to focus on what facts I

9    need to decide.

10          MS. MICHAEL:  Understood.

11          THE COURT:  So, okay.  Good.

12          So then really I guess we're having the evidentiary

13    for the timing issue?  Is there really a dispute about the

14    timing of when the warning was given and then when the

15    questioning was?

16          MS. MICHAEL:  Your Honor, the Government doesn't

17    believe so.

18          MS. WALDO:  I -- I don't believe there's necessarily

19    a timing issue.

20          THE COURT:  Okay.  So what is the question of fact

21    that I -- the material question of fact that I'm going to be

22    trying to focus on as I get the evidence here?

23          MS. WALDO:  I guess the way I'd present it is I

24    don't -- I believe that we are in agreement that the warnings

25    were given.  I believe what our question is, is the sufficiency

TRANSCRIBED FROM DIGITAL RECORDING

6

1   of the warning, the actual language of the warning --

2            THE COURT:  The content.  Right.  Right.  I

3   understand.

4            MS. WALDO:  -- that was used.  The content.

5            THE COURT:  Okay.

6            MS. WALDO:  And then additionally, there was some

7   facts that we were going to bring out related to when

8   Detective Kitchen arrived, where Mr. Qazi was taken, how he was

9   dressed.  I think there's some factual issues related to that

10  as well that would obviously go to Mr. Qazi's state of mind

11  regarding what was taking place and whether or not he, at that

12  time, could have knowingly and intelligently waived his rights

13  and agreed to speak to Detective Kitchen.

14           THE COURT:  Okay.  Okay.  So it sounds to me like

15  what I want to be focusing on as the testimony comes in is sort

16  of the totality of the circumstances of the timing, you know,

17  when the warning was given and what happened and what was going

18  on as the warning was given, those of sorts of things and

19  you're going to probably argue some of that.  Is that -- is

20  that the point?

21           MS. WALDO:  That's correct, Your Honor.

22           THE COURT:  All right.  Okay.

23           Do you agree with that, Ms. Michael?

24           MS. MICHAEL:  Yes, Your Honor.  That's my

25  understanding that that's what defense was anticipating or

TRANSCRIBED FROM DIGITAL RECORDING

7

1    requesting the hearing for.  However, originally it was the

2    Government's position that a hearing wasn't needed because

3    mainly these are questions of law.

4              THE COURT:  Right.

5              MS. MICHAEL:  But, understanding that, Your Honor,

6    we're prepared to present information --

7              THE COURT:  All right.

8              MS. MICHAEL:  -- on those issues.

9              THE COURT:  And I think that's the right thing to do

10   because, you know, if there's any question, a lot of times, you

11   know, somebody objects to my ruling, then the question is, "Why

12   didn't you hold a hearing?" and all this.  So I'd rather, to be

13   safe, go ahead and hold the hearing now.  Hopefully we'll have

14   a clean record.

15             So, all right.  So, let me just say then it's the

16   defendant's Motion to Suppress.  So that means the Government

17   has the burden of proving that the defendant received a timely

18   and adequate Miranda warning.  That's really what I'm here to

19   decide today.  Since they have the burden, and the way I

20   usually do it, is have the Government go first with their

21   evidence.  Then your evidence, Ms. Waldo.  Then the Government

22   gets a rebuttal if they need it.  And the argument will go the

23   same way.

24             So --

25             MS. MICHAEL:  Understood.

TRANSCRIBED FROM DIGITAL RECORDING

8

 1           THE COURT:  -- everyone in agreement there?  Good.

 2           MS. WALDO:  Yes.

 3           THE COURT:  All right.  So, call your first witness.

 4           MS. WALDO:  I guess, Your Honor, before we do that,

 5   could I just make a quick record of an issue that we ran into?

 6           THE COURT:  Oh, sure.

 7           MS. WALDO:  Sure.

 8           And we're still prepared to go forward, I just want

 9   to make that clear.  However, as part of our preparation for

10   this hearing we believe that Detective Kitchen was a necessary

11   witness for this case.

12           THE COURT:  Hold on a minute.

13           Are there any witnesses in the courtroom right now?

14           MS. MICHAEL:  Yes, Your Honor.  There -- I can have

15   the officers step out.

16           MS. WALDO:  Yeah.

17           THE COURT:  That's -- I think we better do that.

18   Yeah.  I assume somebody's going to invoke the Exclusionary

19   Rule, so . . .

20           MS. MICHAEL:  I was going to, Your Honor.

21           MS. WALDO:  Yeah.

22           MS. MICHAEL:  I also just do have to let you know, I

23   do believe the defendant's mother is in the courtroom as well.

24   She actually testified, Your Honor, on a hearing that was held

25   in state court on this case, so when I requested Your Honor --

TRANSCRIBED FROM DIGITAL RECORDING

9

```
 1   when I was going to request Your Honor to impose the
 2   Exclusionary Rule, I was also going to request that she be
 3   asked to step out because I do believe she potentially could be
 4   a witness at trial for the defense.
 5             MS. WALDO:  And that would be my position as well,
 6   Your Honor, so . . .
 7             THE COURT:  All right.  I'm sorry, Ms. -- Ms. -- is
 8   it Mrs. Qazi or?
 9             MS. QAZI:  Yes.
10             THE COURT:  I'm sorry, the lawyers have asked that
11   you be excluded from this hearing because of your potential
12   witness.  You know, it's not -- but she's not going to be a
13   witness today; right?
14             MS. WALDO:  Not for me, Your Honor.
15             MS. MICHAEL:  Not for the Government either,
16   Your Honor.  However --
17             THE COURT:  Okay.  Well, then --
18             MS. MICHAEL:  Well, we are dealing with evidence and
19   information that potentially could also come out at trial so
20   then she would know potentially what officers would testify to
21   here and potentially know how their testimony would go at trial
22   and therefore she could alter her testimony at trial based on
23   that information.
24             THE COURT:  Well, are you going to want to seal this
25   transcript then?  Or seal the record, the recording?  Am I
```

___ TRANSCRIBED FROM DIGITAL RECORDING ___

10

1   going to have to order Mr. Qazi not to tell his mom what any

2   officers said here today?  I mean, I don't quite see that.  As

3   I see the purpose of the Exclusionary Rule is, you know,

4   whatever is being -- that I'm trying to decide today, I am

5   entitled to the witness', you know, testimony that's not

6   affected by what she heard right now, you know, at the time of

7   the proceeding.  But I don't know that the Exclusionary Rule --

8   I mean, the Exclusionary Rule has to do with excluding

9   witnesses from a particular hearing, I believe.  I mean . . .

10  help me out here.  Because it seems -- I don't want to -- I

11  don't want to exclude her --

12          MS. MICHAEL:  Understand.

13          THE COURT:  -- when it's sort of a fruitless act

14  because this is an open hearing.  The recording is going to be

15  available on the record.  You know, it's a public hearing.  And

16  if she's not actually testifying today, well, what -- why

17  should I exclude her?  I don't understand.

18          MS. MICHAEL:  I think it was just in an abundance of

19  caution, Your Honor.

20          THE COURT:  All right.  Well, I -- I don't think

21  that's right.  I think --

22          MS. MICHAEL:  Okay.

23          THE COURT:  -- her son's here.  It's an important

24  hearing.  I -- I mean, she gets to stay.

25          MS. MICHAEL:  Understood.

TRANSCRIBED FROM DIGITAL RECORDING

11

1        THE COURT:  Anything else?

2        MS. WALDO:  Just, Your Honor, briefly on --

3        THE COURT:  Oh, yeah, you were --

4        MS. WALDO:  -- Detective Kitchen.

5        THE COURT:  -- yeah.

6        MS. WALDO:  So, I -- I was under the . . . I guess

7   the misunderstanding that the Government was going to plan to

8   have him here.  They do have another officer that they are

9   presenting and are saying that he was present during the time

10  that Detective Kitchen took the statement from Mr. Qazi.  I

11  don't believe that's necessarily supported.  He's in the CAD

12  log but he's not mentioned in the Arrest Reports.  He's not

13  mentioned in the transcript of the -- of the statement.  So,

14  we'll obviously wait -- we'll get into that with him during

15  cross-examination but my -- I guess my concern, I just want to

16  note for the record is we did attempt to serve

17  Detective Kitchen multiple times with a subpoena.  It's our

18  belief that he was obviously dodging service.  He was aware.

19  We had even -- my investigator had even spoken with a neighbor

20  who said, "Yes, he's there; he's at the house" and then a few

21  minutes later the same neighbor kid is down kind of scouting

22  out my investigator, just, you know, getting his information

23  from his car and so forth.  Obviously some of that's just

24  speculation, but I just wanted to make it clear for the record

25  that we did want -- would have wanted him here for the -- for

TRANSCRIBED FROM DIGITAL RECORDING

12

 1    the hearing but we were not able to successfully serve him with

 2    a subpoena.

 3                THE COURT:  Ms. Michael.

 4                MS. MICHAEL:  Yes, Your Honor, if I may just briefly.

 5                THE COURT:  Sure.

 6                MS. MICHAEL:  I would let the Court know that once

 7    the Government decided which witnesses it was going to call I

 8    did let defense counsel know in a timely fashion so that she

 9    could get any witnesses that she felt were necessary.  I also

10    let her know if, for some reason, there wasn't sufficient time

11    to serve that individual or if he wasn't present, that I

12    understood if he was still necessary, I assumed perhaps the

13    Court would be willing to bifurcate the hearing for that

14    additional testimony.  I don't have any objection.  I

15    understand if she needs a witness, if she needs something, the

16    Government understands that.  We just tried to give her as much

17    notice as possible to be able to present whatever evidence she

18    needs.  And I still stand by that.

19                THE COURT:  Right.  Okay.

20                MS. WALDO:  And I'm not -- she did.

21                THE COURT:  Yes.

22                MS. WALDO:  She immediately put me on notice when she

23    knew what witnesses she was going to call, which is why we

24    immediately went out and tried to serve him.  I don't

25    necessarily -- I -- I would have liked him here to

TRANSCRIBED FROM DIGITAL RECORDING

13

1   cross-examine him on some of these issues.  For some of the

2   issues that are before the Court I'm not sure it's going to be

3   necessary.  I'll probably reserve to make that decision at the

4   end whether or not it will be.  We may need to continue the

5   hearing so that I can actually have him here.

6           THE COURT:  All right.  Well, you know, I think

7   everyone's handled this very professionally and I think the way

8   to go is let's just get started.  It may very well be that you

9   don't need him here.  But if you think you do and Ms. Michael

10  doesn't object, you know, I'll certainly accommodate for a

11  hearing.

12          Let's see, the trial got continued but it's October

13  17th, I think; is that right?

14          MS. MICHAEL:  I believe that's correct, Your Honor.

15          MS. WALDO:  Yes.

16          MS. MICHAEL:  Mid-October.

17          THE COURT:  So . . . you know, we should have enough

18  time to get it in if we have to.  All right.

19          MS. MICHAEL:  Yes.

20          THE COURT:  All right.

21          MS. WALDO:  Thank you, Your Honor.

22          THE COURT:  So, no one wants to make an opening

23  statement, I'm sure?

24          MS. MICHAEL:  No, Your Honor.  I just -- last --

25          THE COURT:  I've read everything, so . . . okay.  Why

TRANSCRIBED FROM DIGITAL RECORDING

14

1   don't you call --

2           MS. MICHAEL:  Well -- yes, Your Honor.  Sorry.  The

3   only last thing was I was going to ask for the Court's

4   indulgence as I deal with the -- the technical computer aspects

5   of moving from the recording to the video.  Just, I'm not great

6   with it.  I'm just letting Your Honor know.  I apologize in

7   advance.

8           THE COURT:  Won't hold it against you.

9           MS. MICHAEL:  Okay.

10          Your Honor, in that case the Government would call

11  its first witness.  It's Officer Ryan Rotta.

12          THE COURT:  Thank you.

13

14                          RYAN ROTTA,

15  called as a witness on behalf of the Government, having been

16  first duly sworn, was examined and testified as follows:

17

18          THE COURT:  Watch your step there.

19          MS. MICHAEL:  And, Your Honor, I think we already

20  took cake of it, but the Exclusionary Rule is in effect.

21          THE COURT:  All right.

22          MS. MICHAEL:  And, in fact, there's no other

23  witnesses we intend to call in the courtroom.

24          THE COURT:  Thank you.

25          COURTROOM ADMINISTRATOR:  Raise your right hand.

TRANSCRIBED FROM DIGITAL RECORDING

15

1              You do solemnly swear that the testimony you shall

2    give in the cause now before this Court shall be the truth, the

3    whole truth, and nothing but the truth, so help you God?

4              THE WITNESS:  Yes, sir.

5              COURTROOM ADMINISTRATOR:  Have a seat and say and

6    spell your name for the record.

7              THE WITNESS:  Ryan Rotta, R-y-a-n-R-o-t-t-a.

8              MS. MICHAEL:  Your Honor, may I proceed?

9              THE COURT:  Yes, please.

10             MS. MICHAEL:  And, Your Honor, may I remain seated at

11   counsel table?

12             THE COURT:  Sure.  Wherever you're most convenient.

13             MS. MICHAEL:  Okay.  Thank you, Your Honor.

14

15                  DIRECT EXAMINATION OF RYAN ROTTA

16   BY MS. MICHAEL:

17   Q.   Good morning, Officer.

18   A.   Good morning.

19   Q.   Can you tell us where you work.

20   A.   Las Vegas Metropolitan Police Department.

21   Q.   And how long have you worked there?

22   A.   Four and a half years now.

23   Q.   Where are you currently assigned?

24   A.   Southeast Area Command.

25   Q.   Now, I want to take you back to the date of January 6th of

TRANSCRIBED FROM DIGITAL RECORDING

16

1    2015.

2              Do you recall being on duty on that evening?

3    A.   Yes, ma'am.

4    Q.   Or, I'm sorry, in what capacity were you working on that

5    evening?

6    A.   I was working with the Firearms Investigation Unit.

7    Q.   Okay.  And were you assigned to that unit at that time?

8    A.   Yes.

9    Q.   So, how did you become assigned to that unit at that time?

10   A.   I was on administrative leave, routine paid leave from a

11   shooting that I was involved in in Patrol in July of 2014 and

12   during the course of that investigation by the department that

13   takes place, officers are assigned to other units outside of

14   Patrol while the department just does their internal

15   investigation.

16   Q.   Okay.  And is your -- as you understand it, is that sort

17   of routine policy for the circumstances?

18   A.   Yes, ma'am.

19   Q.   And what was the end result in relation to that

20   investigation?

21   A.   That I was justified, cleared for my shooting.

22   Q.   Okay.  So, then who were you working with specifically on

23   this evening?

24   A.   Detective Kitchen.

25   Q.   And do you recall -- I'm sorry.  You were actually on duty

TRANSCRIBED FROM DIGITAL RECORDING

17

1   when you were called out to a specific location for this case?

2   A.   I believe so, yes.

3   Q.   And do you recall what, if any, information you received

4   prior to going to the location?

5   A.   We received information that there was a car stop at

6   Harmon and Koval and that a firearm had been discovered during

7   the course of that stop by Patrol and they requested the

8   Firearms Investigation Unit to respond.

9   Q.   Okay.  And how did you get there?

10  A.   We drove in an unmarked vehicle.

11  Q.   Was that you and Detective Kitchen?

12  A.   I believe so.

13  Q.   And what were you wearing at that time?

14  A.   I can't say exactly.  I was in plain clothes, not a

15  uniform.

16  Q.   And --

17  A.   Jeans and I want to say like a hoodie-type sweatshirt with

18  a hood.

19  Q.   Okay.  And is that -- is that normal?

20  A.   That was normal for us, yes.

21  Q.   And why is that?

22  A.   The detectives in the Firearms Investigation Unit all wore

23  plain clothes.  They did everything outside of uniform.  Due to

24  a lot of investigations involving surveillance and their

25  unmarked vehicles, being in uniform would be counterproductive.

TRANSCRIBED FROM DIGITAL RECORDING

18

1   Q.   And in terms of your experience, were they usually called

2   out to scenes where patrol officers sort of made the first

3   initial contact with individuals?

4   A.   Yes.

5   Q.   So you described what you were wearing.  Do you recall

6   what Detective Kitchen was wearing on this evening?

7   A.   From what I remember, he had a black, like, leather jacket

8   on.   I believe he had jeans or dark pants, and then once we

9   arrive on scene, he puts on usually a hat or a beanie or

10  something and due to his status in the unit, being the primary

11  undercover detective, he has distinct facial hair -- or he did

12  at the time -- and he would cover that with, like, a

13  bandanna-type style garment just to conceal his identity while

14  he was out on scene with marked units and marked patrol

15  officers.

16  Q.   And are you aware if that's the sort of normal policy for

17  officers that also work in undercover capacities?

18  A.   As far as I know, yes.

19  Q.   And you had worked with Detective Kitchen before this

20  evening?

21  A.   Yes, ma'am.

22  Q.   And was what he was wearing on this evening consistent

23  with how he was dressed in previous calls that you took with

24  him?

25  A.   Yes.

TRANSCRIBED FROM DIGITAL RECORDING

19

1    Q.   Okay.  So, can you just tell us where you arrived?

2    A.   We arrived at the intersection of Harmon and Koval just

3    west of -- we parked our unmarked vehicles roughly maybe 20

4    feet in front of the car stop that was conducted there.

5    There's a dirt, like, sidewalk shoulder or construction area up

6    on the sidewalk and that's where we parked our vehicles.

7    Q.   And when you arrived, what, if anything, did you see and

8    who, if anyone, did you come into contact with?

9    A.   We saw, I believe, two patrol cars; the vehicle of the

10   defendant that he was driving at the time.  I saw the defendant

11   in the back seat of the patrol car, and we made contact with

12   the patrol detective -- or, I'm sorry, the patrol officers.

13   Q.   Okay.  Now, you just gestured and said "the defendant."

14   Do you recognize anyone in the courtroom here that you saw on

15   that evening?

16   A.   I do, yes.

17   Q.   And if you could just point to and describe by an article

18   of clothing or a look in the courtroom who that person is.

19   A.   To my left across from me in a blue shirt.

20            MS. MICHAEL:  Your Honor, for the record, the witness

21   has identified the defendant with a blue shirt and seated at

22   defense counsel table.

23            THE COURT:  Yes.  The defendant -- I mean, the

24   witness has identified defendant Omar Qazi.

25            ///

TRANSCRIBED FROM DIGITAL RECORDING

20

1   BY MS. MICHAEL:

2   Q.   So, I'm sorry, you said that there were -- you believe

3   recalling that there were two patrol vehicles and two patrol

4   officers that you came into contact with when you and

5   Detective Kitchen arrived?

6   A.   Yes, ma'am.

7   Q.   Were there any other Firearms detectives that responded to

8   this call?

9   A.   Yes.

10  Q.   And who would that have been?

11  A.   Al Bien -- Frank Bien and Sergeant Bud Wolfenbarger.

12  Q.   Okay.  And what were their roles in this investigation?

13  A.   I believe Bien was the primary detective on this scene as

14  far as obtaining the search warrant and the sarge is just,

15  like, a supervisor.  He . . . doesn't really do much hands-on;

16  he's just kind of a supervisor role.

17  Q.   And then in terms of you and Detective Kitchen, what was

18  your role in terms of this investigation?

19  A.   My role specifically is really just to shadow the

20  detective that I'm with at the time.  Detective Kitchen was

21  assigned or elected to interview the defendant.

22  Q.   And where was the defendant physically when you arrived on

23  scene and came into contact with him?

24  A.   He was in the back of a patrol car.

25  Q.   Was he cuffed at that point?

TRANSCRIBED FROM DIGITAL RECORDING

21

1    A.    Yes, ma'am.

2    Q.    And under arrest as far as you knew?

3    A.    Yes, ma'am.

4    Q.    Now, based on your role during this investigation as more

5    shadowing Detective Kitchen would you be surprised to learn

6    that your name or information wouldn't -- doesn't appear in the

7    Arrest Report or the police paperwork for this case?

8    A.    No.

9    Q.    But in terms of -- sorry.  Are you familiar with unit logs

10   and CAD reports?

11   A.    Yes.

12   Q.    And it's your understanding that your information is

13   reflected in both of those documents for this investigation?

14   A.    Yes.

15   Q.    And, sorry.  Just for verification, what's your P number?

16   A.    13422.

17   Q.    Okay.  And those documents obviously collect information

18   regarding all the officers that were on the scene?

19   A.    Correct.

20   Q.    Now when you arrived, did you know about how long the

21   defendant and the patrol officers had been in that location?

22   A.    I did not.

23   Q.    And where were the patrol officers in relation to the

24   defendant?

25   A.    Just standing outside the marked patrol car.

_____ TRANSCRIBED FROM DIGITAL RECORDING _____

22

1   Q.   Okay.  Do you recall if you had anything that you were

2   wearing that identified yourself as an officer?

3   A.   I usually wore a -- when I was in the plain clothes, my

4   uniform of my plain clothes was just a hanging badge of, like,

5   metal key chain style necklace with full size badge actually

6   just in, like, a Velcro pouch, hanging --

7   Q.   So you --

8   A.   -- on my chest.

9   Q.   You referred to the badge that you're physically wearing?

10  A.   Correct.  It's this exact badge.  It fits into a little

11  Velcro attachment that hangs from a necklace.

12  Q.   Okay.  And do you recall if Detective Kitchen had anything

13  identifying him as a police officer or detective on him --

14  A.   I --

15  Q.   -- on his person?

16  A.   I don't recall.

17  Q.   So you indicated that you and Detective Kitchen were

18  assigned to speak with or interview the defendant.  Is that

19  fair to say?

20  A.   Yes.

21  Q.   And so, what did you -- what did you do in terms of

22  setting up that -- that interview?

23  A.   I went to the patrol car and removed the defendant from

24  the vehicle and we walked to the general location of where we

25  parked our plain cars, just ahead of the car stop that was

TRANSCRIBED FROM DIGITAL RECORDING

23

1   effected in the roadway.

2   Q.   And when you say "we," you mean you and the defendant

3   walked to that location?

4   A.   Correct.

5   Q.   About how far was that from where he had previously been

6   seated inside of the patrol vehicle?

7   A.   Maybe . . . 30 steps.

8   Q.   So, still . . . in the line of sight?  You could still see

9   the patrol vehicle?

10   A.   Absolutely.

11   Q.   And where was Detective Kitchen?

12   A.   He was at that same location that I'm describing just

13   ahead of the car stop.

14   Q.   So you walked --

15   A.   Next to our unmarked cars.

16   Q.   Okay.  So fair to say that you walked the defendant to

17   where Detective Kitchen was?

18   A.   Yes.

19   Q.   At that time all the individuals on scene, only officers

20   and the defendant?

21   A.   Yes.

22   Q.   There was -- there were no -- there was no one else in

23   that area?

24   A.   No.  There might have been the random pedestrian that

25   walked down the sidewalk.  We didn't have it, like, closed off

TRANSCRIBED FROM DIGITAL RECORDING

24

1    but, the only people that were stationary there essentially

2    were officers or detectives, yes.

3    Q.    Okay.  And then when you walked the defendant over to

4    where Detective Kitchen was, what happened at that point?

5    A.    Detective Kitchen interviewed him.

6    Q.    And can you just describe how this interview began as you

7    recall.

8    A.    Detective Kitchen was already there prior to me walking

9    the defendant up.  So, as soon as we walked up, he began his

10   interview and started talking to the defendant and I stood next

11   to Detective Kitchen.

12   Q.    Did you stand next to Detective Kitchen and the defendant

13   for out the entire -- throughout the entire duration of the

14   interview?

15   A.    Yes.

16   Q.    And are you aware that that interview was audio recorded?

17   A.    Yes.

18   Q.    And so you guys were -- the three of you were physically

19   outside at the time, not inside of a patrol vehicle?

20   A.    Correct.

21   Q.    And were the patrol officers and Detective Bien still in

22   the general vicinity?

23   A.    Bien was next to us but inside of a car, and the patrol

24   officers remained at the patrol car.

25   Q.    Okay.  Do you recall about how -- how long that interview

TRANSCRIBED FROM DIGITAL RECORDING

25

1  or statement was?

2  A.    I'd say maybe 10 minutes.

3  Q.    And can you just describe the demeanor, as you recall, of

4  Detective Kitchen when he was questioning the defendant.

5  A.    Very casual.  Calm.  Nothing abnormal.  Just -- it was a

6  conversation.

7  Q.    Did you hear him threaten the defendant at any point?

8  A.    Not at all.

9  Q.    Or make any promises to the defendant?

10  A.    No, ma'am.

11  Q.    Did he display any force?  Did he have a gun out at any

12  point?

13  A.    No, ma'am.

14  Q.    Or physically do anything towards the defendant?

15  A.    No, ma'am.

16  Q.    And the same question for you.  Did you at any point --

17  did you even speak to the defendant during the interview?

18  A.    No.

19  Q.    And if you could also describe the demeanor of the

20  defendant while Detective Kitchen was questioning him.

21  A.    Also relatively calm.  Towards the end a little emotional.

22  Just crying a little bit but not -- not abnormal.

23  Q.    And based on your observation of the entire interaction,

24  you say the defendant was emotional and/or crying, what was

25  your impression of -- of why he was doing that or can you just

TRANSCRIBED FROM DIGITAL RECORDING

26

1    describe what he was doing.

2    A.    Um . . . he was -- I mean, I would describe it as, like,

3    kind of breaking down, like, emotionally.  He was -- he was

4    having this conversation with Detective Kitchen and kind of

5    realizing where he was at and the situation that he was in and

6    I think it was an emotional time.

7    Q.    At no point did you hear the defendant ask for an

8    attorney?

9    A.    No.

10   Q.    Or ask for Detective Kitchen to stop questioning him or

11   stopping talking to him?

12   A.    No.

13   Q.    At no point did the defendant try and run away or scream

14   out for help or anything?

15   A.    No.

16   Q.    And you're aware that at some point during that -- that

17   interview or that statement, that the defendant did admit to

18   possessing the firearm that was inside of the vehicle?

19   A.    Yes.

20   Q.    Do you recall about at what point in the interview that

21   occurred?

22   A.    It was towards the very end.

23   Q.    Okay.  And do you remember if, prior to that, he had, for

24   the most part, denied knowledge of sort of any sort of criminal

25   activity?

TRANSCRIBED FROM DIGITAL RECORDING

27

1   A.    Yes.   That's correct.

2   Q.    And did the demeanor of either Detective Kitchen or the

3   defendant change at any point during the duration of this

4   interview?

5   A.    No.

6   Q.    Were the interview techniques that you saw

7   Detective Kitchen utilize any different from any other

8   interview techniques you've seen detectives use before?

9   A.    No.

10  Q.    And the entire time -- where were you for the entire time

11  of this interview?

12  A.    Standing next to Detective Kitchen.

13  Q.    What happened at the end of the interview?

14  A.    I walked the defendant back to the patrol car and placed

15  him back inside.

16  Q.    So there was no break at any point during this interview?

17  A.    No.

18  Q.    In location or people talking to the defendant?

19  A.    Not at all.

20  Q.    Now, did you have an opportunity to listen to the audio

21  recording that you were present for where Detective Kitchen

22  interviewed the defendant?

23  A.    Yes.

24  Q.    And would you be able to recognize that?

25  A.    Yes.

TRANSCRIBED FROM DIGITAL RECORDING

28

1          MS. MICHAEL:  Your Honor, if I may, I do believe

2    counsel and I are in agreement that the audio of the interview

3    will be entered into evidence.  I think, unfortunately, I have

4    it a little out of order in terms of numbering and was going to

5    number it Government's Number 6.

6          THE COURT:  Okay.  Hold on.  I've got it -- these are

7    my copies here or are these the actual exhibits?

8          COURTROOM ADMINISTRATOR:  Those are yours,

9    Your Honor.

10         THE COURT:  Okay.

11         I only have 1 through 4.  Do you have a transcript of

12   this --

13         MS. MICHAEL:  The transcript is actually contained in

14   that, Your Honor.  I was planning to give the Court either the

15   actual disk at the end of this or it was actually previously

16   submitted to the Court as an exhibit to one of my filings.  So

17   really, whichever is easier for the Court.  But the

18   transcript -- at this time, Your Honor, I would also -- it

19   would be appropriate to also move the transcript into evidence.

20   Again, I believe both counsels are in agreement that it would

21   be submitted to the Court, and that would be Government's

22   Exhibit No. 4.

23         THE COURT:  Okay.  4 is the Voluntary Statement.  But

24   it says Voluntary Statement but it's actually a transcription

25   of a -- of a recording?

TRANSCRIBED FROM DIGITAL RECORDING

29

1          MS. MICHAEL:  Correct, Your Honor.  I believe that's

2     just the template heading --

3          THE COURT:  All right.

4          MS. MICHAEL:  -- for the transcripts of the

5     statements that are taken.

6          THE COURT:  Okay.  Ms. Waldo, any objection to the

7     admittance of Exhibit 4?

8          MS. WALDO:  No, Your Honor.  Stipulated.

9          THE COURT:  All right.  Exhibit 4 will be admitted in

10    evidence.

11               (Government Exhibit 4 was

12                received into evidence.)

13          THE COURT:  With regard to the actual CD, if -- if

14    that -- you're saying that was attached as an exhibit to -- in

15    response, I assume, to the Motion to Suppress.

16          MS. MICHAEL:  Yes, Your Honor.  It was manually filed

17    as well for the Court.

18          THE COURT:  Manually filed.

19          So it's in the Court's -- it's in the clerk's

20    possession and can be retrieved if needed on record.  So

21    let's -- I don't think we need to put another one in here

22    today.

23          MS. MICHAEL:  Okay, Your Honor.

24          THE COURT:  Unless, Ms. Waldo, you want one.

25          MS. WALDO:  No, Your Honor.  That's fine.

TRANSCRIBED FROM DIGITAL RECORDING

30

1            THE COURT:  Okay.  Then that's what we'll do.

2            MS. MICHAEL:  Your Honor, I was going to play it for

3    the Court because I do believe it's helpful for the Court's

4    determination in terms of voluntariness and the circumstances.

5    So, with Your Honor's indulgence, I do believe it's about 19

6    minutes.

7            THE COURT:  Okay.

8            Any objection, Ms. Waldo?

9            MS. WALDO:  No, Your Honor.

10           THE COURT:  Okay.  I'm going to read along.

11           MS. MICHAEL:  And obviously, understanding,

12   Your Honor, that this is strictly for purposes of the Motion to

13   Suppress Evidentiary Hearing.  Obviously if and when we went to

14   trial, we wouldn't -- we wouldn't necessarily be utilizing all

15   of the portions of this -- of the statement.

16           (Recording duly played.)

17           MS. MICHAEL:  I'm sorry.  I'm just going to pause it

18   for a moment, Your Honor.  I just wanted the officer -- are you

19   able to identify who that is speaking in that audio?

20           THE WITNESS:  That's Detective Kitchen.

21   BY MS. MICHAEL:

22   Q.   And is it fair to say that this audio -- you can hear some

23   sort of background noise --

24   A.   Correct.

25   Q.   -- consistent with you saying that the interview took

TRANSCRIBED FROM DIGITAL RECORDING

31

1   place outside --

2   A.    Right.

3   Q.    -- the vehicles?

4   A.    Yes, ma'am.

5   Q.    And he was obviously speaking with the defendant at the

6   time?

7   A.    Yes.

8         MS. MICHAEL:  And, Your Honor, I stopped this, for

9   the record, at 55 seconds.  I'm going to continue playing it.

10        THE COURT:  Thank you.

11        (Recording duly played.)

12   BY MS. MICHAEL:

13   Q.    Now, Officer, I just want to go ahead and I'm going to put

14   in the body cam footage.

15        You had a chance to review that?

16   A.    Yes, ma'am.

17   Q.    And it's just specifically going to be in reference to the

18   location of where you spoke to defendant in relation to where

19   he was officially first stopped by patrol officers.

20        So, Your Honor, if I may . . . again, this is going

21   to be marked as Exhibit No. 5.  Both parties do agree to it

22   coming into evidence.

23        THE COURT:  Ms. Waldo, you've seen this?  You don't

24   object?

25        MS. WALDO:  Yes, Your Honor.  That's correct.

TRANSCRIBED FROM DIGITAL RECORDING

32

```
 1              THE COURT:  All right.  Exhibit 5 will be admitted.

 2                   (Government Exhibit 5 was

 3                   received into evidence.)

 4              THE COURT:  Now, this one was not attached to any

 5     exhibit with the Court; right?  So the clerk will take custody

 6     of that.

 7              MS. MICHAEL:  It was, Your Honor.

 8              THE COURT:  Oh.

 9              MS. MICHAEL:  I believe, again, the . . . yes,

10     Your Honor.  I believe it was previously attached as an exhibit

11     to that same response to the Motion to Suppress and it was done

12     in a manual filing.

13              THE COURT:  All right.  Well, then we won't take

14     another one here; we'll just rely on the one in the record.

15              MS. MICHAEL:  So let me just take one moment to pull

16     it up.

17                   (Brief pause in proceedings.)

18              MS. MICHAEL:  I'm sorry.  It's taking a minute to

19     load.  It was stuck in one spot.

20                   (Brief pause in proceedings.)

21              MS. MICHAEL:  I'm just playing a portion from 6:30.

22                   (Recording duly played.)

23              MS. MICHAEL:  I'm just going to try and stop it

24     around 6:40.

25                   ///
```

TRANSCRIBED FROM DIGITAL RECORDING

33

1    BY MS. MICHAEL:

2    Q.   Officer, can you just briefly describe what you -- I'm

3    sorry.  Can you even see this?

4    A.   It's hard, but I -- yeah -- it's hard to see it but I

5    can -- I can still describe it, yes.

6            MS. MICHAEL:  Your Honor, could the witness just step

7    down for a moment?

8            THE COURT:  That's fine.  Just turn the microphone so

9    it picks up his testimony.

10   BY MS. MICHAEL:

11   Q.   So I have the body cam footage here stopped at 6:40 on the

12   second track.  If you could just describe what -- what we're

13   looking at.

14           THE COURT:  You can -- you can just stand there and

15   talk.

16           THE WITNESS:  All right.  Perfect.

17           THE COURT:  That will be fine.  Yeah.

18           THE WITNESS:  The Saturn there is the defendant's

19   vehicle.  Patrol car parked behind it.  That's on Harmon, just

20   west of Koval, right shoulder.

21   BY MS. MICHAEL:

22   Q.   And do you recall where you would have parked in relation

23   to these two vehicles?

24   A.   If you can kind of see up in the distance, there's the

25   sidewalk here (indicating) and you can kind of see there's a

TRANSCRIBED FROM DIGITAL RECORDING

34

1  large dirt shoulder.  And so we parked in that dirt shoulder

2  just on this side (indicating) of that large power pole.

3              (Recording duly played.)

4  BY MS. MICHAEL:

5  Q.   And first off, Officer, this is prior to your arrival?

6  This footage?

7  A.   Correct.

8  Q.   Okay.  So, I just -- this is a better -- better shot of

9  the area at 6:35.

10             So, the patrol vehicle that you just identified, was

11 that where the defendant was located when you arrived and then

12 took him from there to speak with Detective Kitchen?

13 A.   Yes.

14 Q.   Okay.  And so about how -- how far down did you walk the

15 defendant from when he was interviewed with Detective Kitchen?

16 A.   Um . . . basically probably halfway between the front of

17 the Saturn and the power poles because our cars were parked

18 coming towards the car stop and we were on this side

19 (indicating) of all of our cars and I believe we had three

20 there so . . . the width of three cars on this side

21 (indicating) of that power pole and we were just on this side

22 (indicating) of that, if that makes sense.

23 Q.   Okay.  And this is a fair and accurate representation of

24 the area as it was when you arrived?

25 A.   Yes.

TRANSCRIBED FROM DIGITAL RECORDING

35

1    Q.    I would assume maybe the only difference was that it might

2    have been a little darker?

3    A.    Correct.

4    Q.    And was it the same patrol vehicle that you returned the

5    defendant to when the interview was completed?

6    A.    Yes.

7              MS. MICHAEL:  You can go ahead and be seated.

8              Your Honor, I don't believe I have any other

9    questions for the witness at this time.

10             THE COURT:  Okay.  That you, Officer Rotta.

11             Cross-examination, please.

12             MS. WALDO:  Thank you, Your Honor.

13             Is it also okay if I sit here at counsel table?

14             THE COURT:  Absolutely.

15             MS. WALDO:  Thank you.

16

17                 CROSS-EXAMINATION OF RYAN ROTTA

18   BY MS. WALDO:

19   Q.    Hi, Officer Rotta.  How are you?

20   A.    Good, ma'am.

21   Q.    Can you hear me okay?

22   A.    Yes, ma'am.

23   Q.    Okay.  So, I know you indicated earlier that you've been

24   with Metro for four and a half years; correct?

25   A.    Yes, ma'am.

TRANSCRIBED FROM DIGITAL RECORDING

36

1    Q.    Now, is that as of today's date?

2    A.    Yes.   That's my time as a police officer.

3    Q.    Okay.  So, at the -- the incident occurred back in January

4    of last year; correct?

5    A.    Yes.

6    Q.    So at that time you would have been on Patrol for maybe

7    about three years, or with Metro?

8    A.    Yes, ma'am.

9    Q.    Okay.  And I know you indicated that you had been involved

10   in an officer-involved shooting so you had been put on

11   administrative leave; correct?

12   A.    Yes, ma'am.

13   Q.    And that was in July of 2015?

14   A.    Of '14, ma'am.

15   Q.    Of '14.  I apologize.

16         And so then you were assigned to this Firearms Unit;

17   correct?

18   A.    Yes.

19   Q.    And how long had you been with that unit prior to this

20   incident?

21   A.    I was there starting I want to say mid-September of '14 up

22   until this incident and then approximately till, I think, early

23   February of '15.

24   Q.    Okay.  So shortly after this incident you were moved to a

25   different unit?

TRANSCRIBED FROM DIGITAL RECORDING

37

1  A.   I was back into my Patrol Unit --

2  Q.   You were back --

3  A.   -- where I --

4  Q.   Okay.

5  A.   -- originated.

6  Q.   And when you were moved to this unit, did you have any

7  sort of specialized training for this particular unit?

8  A.   No, ma'am.

9  Q.   So, it was just standard protocol to move you to a

10  different unit?

11  A.   Yes.

12  Q.   And did you have any special knowledge of firearms or any

13  particularized knowledge that would, I guess, move you to this

14  particular unit?

15  A.   No.

16        MS. MICHAEL:  Objection, Your Honor.  Relevance.

17        THE COURT:  Well, I'm going to give her a little

18  leeway here.  It's cross-examination --

19        MS. MICHAEL:  Yes, Your Honor.

20        THE COURT:  -- but, yeah.  It does seem kind of --

21        MS. WALDO:  Understood, Your Honor.  I just want to

22  get kind of his --

23        THE COURT:  This is not a discovery period.

24        MS. WALDO:  Understood.

25        THE COURT:  Okay.

TRANSCRIBED FROM DIGITAL RECORDING

38

1   BY MS. WALDO:

2   Q.   Okay.  So, and I apologize.  Was your answer "no" to that

3   question?

4   A.   Not -- not anything specific or particular.  They just

5   give you options essentially when you're no longer in Patrol

6   for your -- your leave after a shooting, which is routine.

7   Q.   Okay.

8   A.   So I elected on my own to go to the Firearms Investigation

9   Unit because it interested me.

10  Q.   Understood.

11         And then were you immediately assigned to

12  Detective Kitchen?

13  A.   I wasn't assigned to anybody in particular.  It would just

14  depend on who was at work that day and what tasks individuals

15  would have and I would just kind of hop from one to the other

16  depending on what they were doing and what I could learn.

17  Q.   And I apologize.  This may have been asked on direct.

18  Prior to January 6th, 2015, had you worked with

19  Detective Kitchen before that date?

20  A.   Yes.

21  Q.   Can you say about how many times?

22  A.   I -- I mean, four days a week, from September to January.

23  Q.   All right.

24  A.   You know, accounting for a couple days off here or there

25  for him or I.

TRANSCRIBED FROM DIGITAL RECORDING

39

1   Q.   Okay.  Understood.

2   A.   Numerous times.

3   Q.   Okay.  So, moving forward to January 6th, do you recall

4   about what time you got on scene that night?

5   A.   I don't.

6   Q.   Okay.  If I -- are you familiar with a CAD log?

7   A.   Yes, ma'am.

8   Q.   And just to be, for the record, that just documents when

9   officers arrive on scene and kind of documents the time and the

10  events that take place that day?

11  A.   Yes, ma'am.

12  Q.   Okay.  If I told you it was approximately around 6:55 p.m.

13  that night, would that sound about correct?

14  A.   Yes, ma'am.

15  Q.   And this was in January.  So, it would have been dark

16  around that time?

17  A.   Yes, ma'am.

18  Q.   And you indicated that you actually parked several feet in

19  front of Mr. Qazi's car; correct?

20  A.   Correct.

21  Q.   And then I believe you testified that you actually walked

22  down to the patrol vehicle; correct?

23  A.   Correct.

24  Q.   And do you recall which patrol vehicle he was in?

25  A.   I believe it was the front -- the front most patrol car.

_____ TRANSCRIBED FROM DIGITAL RECORDING _____

40

1   Q.   Okay.  And did you -- when you -- and then you just opened

2   the car door and said get out of the car?

3   A.   Essentially, yes.  Opened the door, "go ahead and step

4   out" and then we walked to where Detective Kitchen was.

5   Q.   Okay.  And I believe you testified that you're in plain

6   clothes; correct?

7   A.   Correct.

8   Q.   And you had a -- I believe a badge that you said was

9   hanging from your neck?

10  A.   We called it a hanging badge, yes.

11  Q.   Okay.  Now, it's January; correct?

12  A.   Correct.

13  Q.   So, was it cold that evening, do you recall?

14  A.   I would assume so.  Like I said, I was wearing a hoodie, I

15  think, so . . . generally, yes.

16  Q.   So were you -- is it a hoodie that, like, zips up?

17  A.   No.  It's a pullover.

18  Q.   And you -- were you wearing any other jacket or anything?

19  A.   No, ma'am.

20  Q.   So, is it your recollection that your badge would have

21  been visible?

22  A.   Yes.  It was -- it would be on the outside.

23  Q.   Okay.  But you never identified yourself and said I'm

24  Officer Rotta?

25  A.   Not directly, no.

TRANSCRIBED FROM DIGITAL RECORDING

41

1    Q.    Okay.  So you just took him out of the car and then walked

2    him towards Detective Kitchen?

3    A.    Yes.

4    Q.    When you got down to Detective Kitchen, was the recorder

5    already started?

6    A.    I'm not sure.  I believe it was.

7    Q.    Okay.  So, that beginning part -- and I'm not going to

8    play it again -- but where he identifies who he is and who he's

9    talking to, where he's at, were you present for that time

10   frame?

11   A.    I don't believe so.  I think he was doing that as I'm

12   walking up.  So, the timing worked out that at his conclusion

13   of that we were now present and he began his rest of the

14   interview.

15   Q.    Was his recorder visible?

16   A.    I don't recall.

17   Q.    Okay.  So you're not aware whether or not Mr. Qazi was

18   aware that his statement was being recorded?

19          MS. MICHAEL:  Objection, Your Honor.  It calls for

20   speculation.

21          THE COURT:  It does call for speculation but, you

22   mean, maybe you can rephrase it so you're not just inquiring

23   about --

24          MS. WALDO:  Okay.

25          THE COURT:  -- what your client thought but . . .

HEATHER K. NEWMAN - (702) 471-0002

TRANSCRIBED FROM DIGITAL RECORDING

42

1           MS. WALDO:  Okay.

2           THE COURT:  Do you have any --

3    BY MS. WALDO:

4    Q.    So, you don't recall the recorder being visible?

5    A.    I don't recall.  Correct.

6    Q.    And the statement with Detective Kitchen saying who he is,

7    where he's at, that occurred as you were walking up?

8    A.    I believe so.

9    Q.    Okay.  And you never actually heard Detective Kitchen tell

10   Mr. Qazi this -- this statement is being recorded; correct?

11   A.    Correct.

12   Q.    Okay.  Now, you indicated earlier on direct that your name

13   wouldn't typically appear in Arrest Reports or police reports

14   because you're just shadowing Detective Kitchen; is that

15   correct?

16   A.    Correct.

17   Q.    And why is that?

18   A.    Just because of my -- kind of the terms of my assignment

19   there.  I'm not -- I'm not a detective; I'm still an officer.

20   I'm not going to be there for a long period of time.  We know

21   that going in so, I elected to -- I'm not even sure that it's

22   necessarily a policy specific, but I just elected that I would

23   not take over their roles because they're going to be there

24   when I'm gone so it would be -- I would still be in Patrol and

25   then having to go back to do detective things that I was never

HEATHER K. NEWMAN - (702) 471-0002

TRANSCRIBED FROM DIGITAL RECORDING

43

1    a detective for.

2    Q.   So, it's not a Metropolitan policy to not include your

3    name in the Arrest Reports; correct?

4    A.   Not necessarily.

5    Q.   And you understand, obviously, the importance of police

6    reports; correct?

7    A.   Yes, ma'am.

8    Q.   And you understand that, you know, defense attorneys,

9    Government attorneys, we're going to be looking at these

10   reports to identify potential witnesses?

11   A.   Yes, ma'am.

12   Q.   Okay.

13           MS. MICHAEL:  Your Honor, I'm going to object to that

14   line of questioning as it hasn't been established that this

15   officer is the one who creates said reports that his name would

16   or would not have been contained inside of.

17           THE COURT:  I understand, Ms. Michael, but I believe

18   he already testified that it was his choice not to be included

19   so he must have had some ability to make that choice --

20           MS. MICHAEL:  Yes, Your Honor.

21           THE COURT:  -- and apparently that's what happened.

22   So, the objection's overruled.

23           MS. WALDO:  Thank you, Your Honor.

24           THE WITNESS:  Can I clarify something?

25           THE COURT:  Well, only -- if -- here's the way it

TRANSCRIBED FROM DIGITAL RECORDING

44

1    works.  Just answer her questions.  If Ms. Michael thinks you

2    need to clarify something, she's going to have a chance on

3    redirect.  So . . .

4              THE WITNESS:  Yes, sir.

5              THE COURT:  You can rely on her.  I know she'll do a

6    good job.

7              THE WITNESS:  Yes, sir.

8              MS. WALDO:  Thank -- thank you, Your Honor.

9    BY MS. WALDO:

10   Q.   Now, you indicated that you walked Mr. Qazi away from the

11   patrol units; correct?

12   A.   That's correct.

13   Q.   Is there any particular reason why you would have walked

14   him from the -- from, I guess, the car itself?

15   A.   We just walked to where unmarked cars were just to get

16   away from the patrol officers.  The -- a little bit away

17   from -- if you can see on the video there, there's a large

18   shoulder, so it's a little bit more away from the street where

19   traffic is still coming by.  So it's just a little bit more

20   quiet even though it's still -- there's still noise out, but .

21   . .

22   Q.   Okay.  Because I -- I mean, just looking on -- what --

23   on -- on the screen, there's a shoulder and it looks like,

24   almost like a gravel dirt lot.

25   A.   Correct.

_____ TRANSCRIBED FROM DIGITAL RECORDING _____

45

1   Q.   And you chose just not to walk him over in that area so he

2   would have been away from traffic, but still by the patrol

3   units; correct?

4   A.   Maybe I'm not understanding your question.  The dirt lot

5   I'm referring to is the dirt that you can see on the right side

6   of the screen there (indicating).

7   Q.   Yes.

8   A.   The dirt beyond that is fenced off.

9   Q.   Oh, okay.  Understood.

10         And I -- I apologize.  You said it was approximately

11  30 steps away?

12  A.   Just estimated, but yes.

13  Q.   Okay.  Now, are you familiar with that Koval and Harmon

14  intersection?

15  A.   Not intimately.

16  Q.   But, I mean, just looking on the screen, you can tell that

17  there's quite a bit of traffic in that area; correct?

18  A.   Yes.

19  Q.   Okay.  Now, you indicated that you were present during the

20  entire statement for Mr. Qazi; correct?

21  A.   Correct.

22  Q.   Now, you just listened to the statement that the

23  Government played; correct?

24  A.   Correct.

25  Q.   And you heard, if I'm summarizing correctly, Mr. Qazi, you

TRANSCRIBED FROM DIGITAL RECORDING

46

1   know, express numerous concerns about going to jail; correct?

2   A.   Correct.

3   Q.   And in response to that Detective Kitchen, I believe, told

4   him several times that "I'm not even sure if you're going to

5   jail"; correct?

6           MS. MICHAEL:   Objection, Your Honor.   At this point

7   counsel's testifying to the transcript.   I believe it does

8   speak for itself.

9           THE COURT:   Well, I assume she'll have a follow-up

10  question, so . . .

11          MS. MICHAEL:   Yes, Your Honor.

12          MS. WALDO:   Yes.

13          THE COURT:   Okay.   I think it's just setting the

14  foundation.

15          MS. WALDO:   Yes.

16          THE COURT:   Go ahead.

17          THE WITNESS:   I'm sorry, can you repeat it?

18  BY MS. WALDO:

19  Q.   So you -- on the transcript, Detective Kitchen said

20  numerous times that "I'm not sure you're going to prison.   You

21  may not go to prison."   Something to that effect; correct?

22  A.   That's correct.

23  Q.   And I know you testified on direct that Detective Kitchen

24  didn't make him any promises; correct?

25  A.   That's correct.

TRANSCRIBED FROM DIGITAL RECORDING

47

1   Q.   Now, what's a promise or I guess statements regarding

2   "you're not even going to go to jail" or "you may not go to

3   jail," wouldn't those be -- would those constitute promises in

4   your opinion?

5           MS. MICHAEL:  Objection, Your Honor.  I mean, it's

6   relevance and it's improper opinion.

7           THE COURT:  I think what -- what -- what this officer

8   thinks about that, it's really -- you can -- I heard that on

9   the tape.  If you want to argue that at the end, I'll be happy

10  to hear it but you don't need to make that argument by asking

11  him questions.

12          MS. WALDO:  Okay.

13          THE COURT:  Okay.

14          MS. WALDO:  Understood.

15          THE COURT:  Okay.

16          I guess I should say, objection sustained.

17          MS. WALDO:  No further questions, Your Honor.

18          THE COURT:  All right, Ms. Waldo.

19          Anything -- follow-up, Ms. Michael?

20          MS. MICHAEL:  Yes, Your Honor.  Just briefly.

21          THE COURT:  All right.

22

23          REDIRECT EXAMINATION OF RYAN ROTTA

24  BY MS. MICHAEL:

25  Q.   Officer, you were asked a few questions about walking the

TRANSCRIBED FROM DIGITAL RECORDING

48

1    defendant away from the patrol vehicle.  Would it be fair to

2    say that while you and Detective Kitchen -- or -- sorry.  While

3    you were present for Detective Kitchen's interview of the

4    defendant, the other officers were handling other duties?

5    A.    Yes, ma'am.

6    Q.    And they may have been speaking, whether it be on radio or

7    to each other?

8    A.    Correct.

9    Q.    So the location that you took the defendant to would have

10   potentially been quieter in that sense?

11   A.    Correct.

12   Q.    Would it also be fair to assume that any recording devices

13   utilized by Detective Kitchen would have been retrieved from

14   his vehicle?

15   A.    From --

16   Q.    From the vehicle where the defendant was walked towards.

17   A.    Correct.

18   Q.    So, I'm sorry, what I meant is the defendant was not only

19   walked toward Detective Kitchen, but also whatever was --

20   whatever devices were utilized for recording the interview?

21   A.    Correct.

22   Q.    You were asked about identifying yourself as an officer

23   that night.  Was anything that you did out of -- not ordinary

24   or unusual?

25   A.    It was not unusual for us, no.  It would have been unusual

TRANSCRIBED FROM DIGITAL RECORDING

49

1   for just a random person to do, so . . .

2   Q.   Right.  And at that point the defendant had already been

3   with officers, law enforcement patrol that were in uniform in

4   marked vehicles for some time prior to your arrival?

5   A.   Correct.

6   Q.   I think you were also asked briefly about the beginning

7   portion of the transcript of the statement.  Would it be fair

8   to say that that's sort of the preamble where Detective Kitchen

9   identifies himself and sets forth event number and all the

10  pertinent information?

11  A.   Yes, ma'am.

12  Q.   Again, is it unusual for a detective to do that preamble

13  prior to a defendant being present or prior to speaking with a

14  defendant?

15  A.   Not at all.

16  Q.   You were also asked in terms of your name or information

17  appearing in the documents regarding this investigation.  So

18  why wasn't your information or name included in those

19  documents?

20  A.   I don't -- I didn't write, like, the Arrest Report or, you

21  know, the documents that -- that noted who was present, so I

22  had no control over that but, what I meant by that was just

23  like, writing -- if I were to conduct the Property Report or

24  something, I wouldn't -- it would be done -- like,

25  Detective Kitchen or Detective Bien would complete it and my

TRANSCRIBED FROM DIGITAL RECORDING

50

1  name would not be on there because there's only -- only one of

2  them would go on there.  The detective who is handling the

3  case, their name would go on that report.  There's not

4  additional lines for additional officers there.

5  Q.   And fair to say that those detectives would be the ones

6  assigned to this case and to do any sort of follow-up or

7  additional investigation in terms of the case?

8  A.   That's correct.

9  Q.   But again, you did indicate obviously that your

10  information would be captured and documented in terms of your

11  presence there on the CAD and on the unit log?

12  A.   That's correct.

13  Q.   And would it be fair to say that those documents would

14  show sort of your interaction to be similar or in conjunction

15  to that of Detective Kitchen?

16  A.   In a sense --

17  Q.   Like, in terms of timing?

18  A.   Correct.  And my -- just my general presence.

19       MS. MICHAEL:  Your Honor, I don't have any other

20  questions.

21       THE COURT:  All right.  Let me ask some.

22       You want -- does counsel want Exhibits 2 and 3 in

23  evidence?  Everybody's been talking about these.

24       MS. MICHAEL:  Yes, Your Honor.  The Government would

25  officially move to enter those into evidence.  Again, I believe

TRANSCRIBED FROM DIGITAL RECORDING

51

1   both counsels are agreeing to them and that's 2 being the unit

2   log and 3 being the CAD report.

3           THE COURT:  Ms. Waldo?

4           MS. WALDO:  That is correct, Your Honor.

5           THE COURT:  All right.  2 and 3 will be admitted.

6              (Government Exhibits 2 and 3

7              were received into evidence.)

8           THE COURT:  Now, there's another exhibit here, Number

9   1.  Is another witness going to handle that?

10          MS. MICHAEL:  Yes, Your Honor.  That will be

11  Officer Glover.

12          THE COURT:  Okay.  All right.  So, anything more?

13          MS. WALDO:  Just briefly.

14          THE COURT:  Okay.

15

16            RECROSS-EXAMINATION OF RYAN ROTTA

17  BY MS. WALDO:

18  Q.   Officer Rotta, on the CAD log and the officer report

19  that -- or the unit log that we've been discussing, all that

20  documents is the officers' name and the time that they arrive

21  and the time that they would leave; correct?

22  A.   Essentially, yes.

23  Q.   So, it wouldn't specifically identify what role you would

24  have played in an investigation; correct?

25  A.   That's correct.

TRANSCRIBED FROM DIGITAL RECORDING

52

1   Q.   That would normally be done in the documented Arrest

2   Reports or police reports; correct?

3   A.   Correct.

4   Q.   So, if you played a substantial role in the investigation,

5   we wouldn't be able to determine that just by looking at the

6   unit log or the CAD log; correct?

7   A.   That would be correct.

8            MS. WALDO:   No further questions, Your Honor.

9            THE COURT:   All right.   Anything more, Ms. Michael?

10           MS. MICHAEL:   Nothing.

11           THE COURT:   No.   Okay.

12           Officer Rotta, thank you very much for your

13   testimony.

14           THE WITNESS:   Thank you.

15           THE COURT:   He's free to go; right?   Nobody's going

16   to need him any more today?

17           All right.

18           MS. MICHAEL:   I don't, Your Honor.

19           THE COURT:   You're free to go.   Thank you.

20           (Witness excused.)

21           THE COURT:   Next witness, Ms. Michael.

22           MS. MICHAEL:   Yes, Your Honor.   That's going to be

23   Officer Glover.

24           May I just retrieve the officer?

25           THE COURT:   Okay.

HEATHER K. NEWMAN - (702) 471-0002

TRANSCRIBED FROM DIGITAL RECORDING

53

1                          JOSHUA GLOVER,

2    called as a witness on behalf of the Government, having been

3    first duly sworn, was examined and testified as follows:

4

5              THE COURT:  How long do you think he's going to take?

6              MS. MICHAEL:  Maybe 15 minutes.

7              THE COURT:  Okay.  We'll do him and then I'll

8    probably take a break for you guys.

9              Is that going to be the only other witness?

10             MS. MICHAEL:  Yes, Your Honor.

11             THE COURT:  Okay.

12             MS. MICHAEL:  Yes.

13             THE COURT:  Okay, then.  So let him testify and then

14   we'll take a short break before your argument.

15             (Brief pause in proceedings.)

16             COURTROOM ADMINISTRATOR:  Raise your right hand.

17             You do solemnly swear that the testimony you shall

18   give in the cause now before this Court shall be the truth, the

19   whole truth, and nothing but the truth, so help you God?

20

21             THE WITNESS:  Yes.

22             THE COURT:  Have a seat and say and spell your name

23   for the record.

24             THE WITNESS:  Joshua Glover, J-o-s-h-u-a-G-l-o-v-e-r.

25             THE COURT:  Ms. Michael.

TRANSCRIBED FROM DIGITAL RECORDING

54

1          MS. MICHAEL:  Yes.

2

3               DIRECT EXAMINATION OF JOSHUA GLOVER

4     BY MS. MICHAEL

5     Q.   Good morning, Officer.

6     A.   Good morning.

7     Q.   Can you tell us where you work.

8     A.   Las Vegas Metropolitan Police Department.

9     Q.   And how long have you worked there?

10    A.   Just over seven years.

11    Q.   Okay.  And where are you currently assigned?

12    A.   Internal Affairs Bureau, Diversity Section.

13    Q.   Where were you assigned in January of 2015?

14    A.   Convention Center Area Command.

15    Q.   Okay.  And do you recall being on duty that evening?

16    A.   Yes.

17    Q.   Do you recall conducting a traffic stop?

18    A.   Yes.

19    Q.   And what location was that in?

20    A.   It was Harmon just west of Koval.

21    Q.   And do you recall coming into contact with anyone you see

22    here in the courtroom today?

23    A.   Yes.

24    Q.   If you could just point to that individual and identify

25    him by an article of clothing or location in the courtroom.

TRANSCRIBED FROM DIGITAL RECORDING

55

1   A.   Blue t-shirt.

2        MS. MICHAEL:  Your Honor, for the record, the witness

3   has identify -- sorry -- identified the defendant by point of

4   finger and article of clothing.

5        THE COURT:  The witness has identified Omar Qazi.

6   BY MS. MICHAEL:

7   Q.   And I'm sorry, Officer, are you now a detective actually?

8   A.   Yes.

9   Q.   Okay.  I -- yes.

10       So Detective, when you came in contact with the

11  defendant, was there a point at which you did provide him or

12  read to him Miranda warnings?

13  A.   Yes, there was.

14  Q.   And what did you read from when you provided those?

15  A.   My department issued Miranda card.

16  Q.   And do you recall reviewing that card and providing it to

17  the Government, the one that you utilized on that evening?

18  A.   Yes.

19  Q.   Okay.  Do you also recall providing notes that you took in

20  relation to your encounter with the defendant on that evening?

21  A.   Yes.

22       MS. MICHAEL:  Your Honor, if I may, I'm referencing

23  Exhibit No. 1.  Again, I do believe the parties are agreeing to

24  enter this into evidence.  I can show it to the witness if

25  Your Honor would prefer, just for identification purposes.

TRANSCRIBED FROM DIGITAL RECORDING

56

1          THE COURT:  That's -- any objection?

2          MS. WALDO:  We have an agreement, Your Honor.

3          THE COURT:  Okay.  Exhibit 1 is admitted into

4   evidence there being no objections, stip -- by stipulation.

5               (Government Exhibit 1 was

6                 received into evidence.)

7          MS. MICHAEL:  And, Your Honor, if I may, I just

8   wanted to approach the witness with the exhibit.

9          THE COURT:  Sure.

10          MS. MICHAEL:  Just let the record reflect I've

11   approached the witness with what has been marked as Exhibit 1.

12   BY MS. MICHAEL:

13   Q.   And Detective, do you recognize those documents?

14   A.   Yes, I do.

15   Q.   Now, did you also have a chance to go over the body camera

16   footage in relation to your encounter with the defendant?

17   A.   I did.

18   Q.   And did you see the portion where you did provide him his

19   Miranda warnings?

20   A.   Yes, I did.

21          MS. MICHAEL:  Your Honor, if I may, I'm going to

22   refer to that portion.

23          THE COURT:  Sure.

24          (Recording duly played.)

25          MS. MICHAEL:  Your Honor, this appears to be frozen

TRANSCRIBED FROM DIGITAL RECORDING

57

1    for a second so I'll just come back to that for a minute.

2              THE COURT:  You might, you know --

3              MS. MICHAEL:  Close it and start it again?

4              THE COURT:  My experience, yeah, close it and reopen

5    it I would -- I would guess; right?  That's usually the first

6    thing, when you call the System's Department, that's the first

7    thing they say.

8              (Brief pause in proceedings.)

9              THE COURT:  Let it load and then you can try it

10   again.

11             (Brief pause in proceedings.)

12             MS. MICHAEL:  Well, Your Honor, the Government did

13   try and attempt to play 3:50 to around 4:15 of the body camera

14   footage, the second track.

15   BY MS. MICHAEL:

16   Q.   Officer, you do -- I'm sorry, Detective, you do recall

17   reviewing that portion?

18   A.   Yes.

19   Q.   And when you reviewed that portion, as best you can tell,

20   was it consistent with the card that you provided?

21   A.   Yes.

22             THE COURT:  That -- that's the card that's Exhibit 1

23   right in front of you there; right?

24             THE WITNESS:  Correct.  Yes, Your Honor.

25             THE COURT:  Okay.

TRANSCRIBED FROM DIGITAL RECORDING

58

1    BY MS. MICHAEL:

2    Q.   But fair to say that when you did review this, there are

3    some sort of interruptions in the video recording so it's a

4    little difficult to make out all the words?

5    A.   Yes.   That's correct.

6    Q.   Would it be fair to say that your intention was to read

7    the card in its entirety to the defendant?

8    A.   Yes, it was.

9    Q.   Now also, there is -- and again, I'm referring to Exhibit

10   No. -- No. 1, these are your notes.   And we could see in the

11   body camera footage you checking your watch?

12   A.   Yes.

13   Q.   And why did you do that?

14   A.   To document when I had read him his Miranda rights.

15   Q.   Okay.   And did you go ahead and notate that in the sort of

16   note pad that we have a copy of here?

17   A.   Yes, I did.

18   Q.   And, I'm sorry, can you just find for me and verify the

19   time frame that it was.

20   A.   It's about five lines down and it says "read Miranda," the

21   at sign, "1609."

22   Q.   Okay.   And also looking up at the top, did you document

23   when you first stopped the defendant?

24   A.   Yes.   It's in the upper right corner.   It says "TOS,"

25   which stands for time of stop, and that was 1553.

HEATHER K. NEWMAN - (702) 471-0002

TRANSCRIBED FROM DIGITAL RECORDING

59

1    Q.    And at the time you read the defendant his Miranda rights

2    obviously he was in custody at that time?

3    A.    That's correct.

4    Q.    And fair to say the defendant responded that he understood

5    his rights?

6    A.    Yes.  I believe he asked a question.  I restated if he

7    understood his rights and he said yes.

8    Q.    I know we showed a little bit of it but, do you recall as

9    part of the body camera footage that it does show that he

10   continues to engage you or ask questions of you in relation to

11   the stop at that time or your encounter with him at that time?

12   A.    Yes, that's correct.

13   Q.    And what, if any, questions do you recall asking him after

14   you provided him his Miranda rights?

15   A.    What questions did I ask him?

16   Q.    Yes.

17   A.    I -- I don't recall specifics.

18   Q.    Do you recall them just being general questions?

19   A.    I believe so.

20   Q.    And do you recall that you didn't ask him questions for

21   very long; that your conversation with him was relatively

22   short?

23   A.    Yes, that's correct.

24   Q.    And at no point did he ask for an attorney?

25   A.    No.

TRANSCRIBED FROM DIGITAL RECORDING

60

1    Q.    And at no point did he ask for you to stop asking him

2    questions?

3    A.    No.

4    Q.    And would it be fair to say that due to the firearm that

5    was found or located in the vehicle that the defendant had been

6    previously operating you called Firearms?

7    A.    Yes, that's correct.

8    Q.    Why did you do that?

9    A.    Because I knew Firearms detectives were the ones at the

10   time responsible for coming out to conduct a search warrant to

11   recover that firearm.

12   Q.    So that was normal procedure for you?

13   A.    In this case, yes.

14   Q.    Okay.  And did Firearms actually arrive?

15   A.    Yes, they did.

16   Q.    Do you recall who arrived?

17   A.    I recall Detective Frank Bien.  Possibly an Officer Ryan

18   Rotta who is doing a ride-along with Firearms, and their

19   sergeant, Bud Wolfenbarger, and there was another detective,

20   possibly Mike Kitchen.

21   Q.    And when they arrived, do you recall sort of briefing them

22   or giving them information about what had occurred up to this

23   point?

24   A.    Yes.  I gave them a full brief from my note pad.

25   Q.    And I may have already asked you this but, when you

TRANSCRIBED FROM DIGITAL RECORDING

61

1   encountered the defendant, you were in a marked vehicle?

2   A.   Yes, that's correct.

3   Q.   In full uniform?

4   A.   Yes.

5   Q.   As was the other officer whose body camera footage was

6   provided for -- for this investigation?

7   A.   Yes.

8   Q.   And you were the only two on location prior to the

9   Firearms detectives arriving?

10  A.   Myself and Officer Voodre?

11  Q.   Yes.

12            And when the detectives arrived, how were they

13  attired?

14  A.   In plain clothes.

15  Q.   Is that normal?

16  A.   Yes.

17  Q.   And do you recall sort of who did what in terms of the

18  detectives when they arrived?

19  A.   From what I recall, myself and Detective Bien began the

20  process of doing the search warrant, the telephonic search

21  warrant and Sergeant Wolfenbarger was kind of supervising both

22  the scene and Detective Kitchen was going to be responsible for

23  the evidentiary collection, meaning actually once we had the

24  telephonic search warrant signed off, he was going to retrieve

25  and do the DNA collection and evidentiary collection of the

TRANSCRIBED FROM DIGITAL RECORDING

62

1    firearm from the vehicle.

2    Q.    And in terms of anyone speaking to the defendant, are you

3    aware if one of the detectives did speak to the defendant?

4    A.    Afterwards it was told to me that Kitchen --

5    Detective Kitchen did an interview with the defendant.

6    Q.    Okay.  Now, when you did the briefing of these detectives

7    as to what had happened, did you let them know that you had

8    provided the defendant with his Miranda rights?

9    A.    Yes, I did.

10   Q.    And that he had indicated to you that he understood them?

11   A.    Yes.

12   Q.    And that you had had sort of a brief exchange or a brief

13   conversation?

14   A.    Yes, that's correct.

15   Q.    Would it be fair to say that after that brief exchange or

16   brief conversation that you had with the defendant prior to

17   Firearms arriving that otherwise, you did not speak to the

18   defendant?

19   A.    That's correct.

20   Q.    Okay.  You didn't ask him any questions about the gun or

21   about anything else in terms of the circumstances?

22   A.    I definitely didn't ask him about the gun.  But again, I

23   think the general questions right after, you know, may have

24   been related to is that his car or he was driving that car

25   and --

TRANSCRIBED FROM DIGITAL RECORDING

63

1   Q.   But there was a time frame for which there was no

2   interaction or exchange in terms of questioning or

3   interrogation between you and the defendant, prior to Firearms

4   arriving?

5   A.   Yes, that's correct.

6   Q.   And do you recall where the defendant was throughout that

7   duration?

8   A.   Originally he was sitting on the sidewalk and at one point

9   he was moved to the back of the patrol vehicle.

10  Q.   And do you recall about how far or where he was taken when

11  he was interviewed, if -- if you saw it?

12  A.   I didn't see it.

13  Q.   Okay.

14          MS. MICHAEL:   Your Honor, I don't think I have any

15  other questions for the witness at this time.

16          THE COURT:   Thank you, Ms. Michael.

17          Ms. Waldo.

18          MS. WALDO:   Thank you, Your Honor.

19

20              CROSS-EXAMINATION OF JOSHUA GLOVER

21  BY MS. WALDO:

22  Q.   Hi, Detective Glover.

23  A.   Hi.

24  Q.   So, I just want to back up a little bit.  So, on

25  January . . . I believe it was 6th; correct?  Or is it 5th?

TRANSCRIBED FROM DIGITAL RECORDING

64

 1   January 5th.

 2   A.    6th.

 3   Q.    6th, 2000 -- 2015, you were working -- you were a patrol

 4   officer at that time; correct?

 5   A.    Yes.

 6   Q.    So you -- and how long had you been a patrol officer at

 7   that point?

 8   A.    Six years.

 9   Q.    Okay.  And you -- I guess I want to just kind of back up

10   because I don't think the Government got into it but, what

11   brought you into contact with Mr. Qazi on that night?

12            MS. MICHAEL:  Your Honor, I'm going to object to

13   this.  This Evidentiary Hearing is obviously very limited in

14   terms of Miranda and the circumstances surrounding that so I

15   don't believe it would be appropriate to get into the previous

16   issues that have already been addressed by the Court and ruled

17   on.

18            THE COURT:  Okay.  Well, there's -- why is this

19   relevant to today's hearing, Ms. Waldo?

20            MS. WALDO:  Pardon?

21            THE COURT:  Why is the reason for the stop

22   relevant --

23            MS. WALDO:  Well, I guess I want to know --

24            THE COURT:  -- to today's hearing?

25            MS. WALDO:  -- I mean -- I mean, obviously he, at

TRANSCRIBED FROM DIGITAL RECORDING

65

1    some point, I would imagine, had either detained Mr. Qazi or

2    placed him under arrest and I want to know what the basis was

3    for that because at that point that's when he would have read

4    his Miranda rights.

5              THE COURT:  Well, but, you see, I mean, the only two

6    issues we're trying to decide today is the adequacy of the

7    Miranda warning and the timing and circumstances.  You know,

8    nobody disputes that he was detained.

9              MS. WALDO:  Okay.

10             THE COURT:  So I really don't see what's relevant

11   about how -- how he got to be detained.

12             MS. WALDO:  Okay.  I'll move on.

13             THE COURT:  Convince me.  I'll give you another

14   chance.

15             MS. WALDO:  All right.  Thank you, Your Honor.

16             THE COURT:  All right.  Go ahead.

17   BY MS. WALDO:

18   Q.   Okay.  So I'm going to fast-forward now to when you

19   actually read him his rights.

20             MS. WALDO:  Do you guys mind if I use my computer?

21             MS. MICHAEL:  No.  It's the same.  It's the same.

22             MS. WALDO:  Your Honor, I'm not -- it's not going to

23   be on screen, but mostly I just want to hear the actual reading

24   of the rights.

25             THE COURT:  Okay.

_____ TRANSCRIBED FROM DIGITAL RECORDING _____

66

1          MS. WALDO:  And it's the same that she has up there.

2          THE COURT:  Can you bend the microphone down to it?

3    That's our high tech way of doing it.

4          (Recording duly played.)

5    BY MS. WALDO:

6    Q.   Officer, can you hear this okay?

7    A.   Yeah.  It's fine.

8    Q.   Okay.

9          (Recording duly played.)

10   BY MS. WALDO:

11   Q.   Okay.  I'm going to stop it right there for a second,

12   Your Honor -- Officer -- or Detective, I apologize.

13         So, I'm looking at the card that you -- what's been

14   marked as Government's Exhibit 1.  So, I -- I hear on there

15   "you have the right to remain silent"; correct?

16   A.   Yes.

17   Q.   And then you say, "Anything you say can be used against

18   you in a court of law"; correct?

19   A.   Yes.

20   Q.   Now, the next point I believe is where I'm going to have

21   my question.  On the card it says, "You have the right to the

22   presence of an attorney during questioning"; correct?

23   A.   Yes.

24   Q.   All right.  So I'm going to play that portion again for

25   you.

_____ TRANSCRIBED FROM DIGITAL RECORDING _____

67

 1              (Recording duly played.)

 2              MS. WALDO:  Or the whole thing again.

 3    BY MS. WALDO:

 4    Q.   Okay.  So, on that statement, what I hear is "you have the

 5    right to the presence of an attorney"; correct?

 6    A.   Yes.

 7    Q.   So, you don't actually add the words "during questioning";

 8    correct?

 9              THE COURT:  You know what, Ms. Waldo, why don't you

10    start at the beginning.  It's -- it's only five lines.  Why

11    don't you play the whole thing through once and then we'll go

12    back and parse it out.

13              MS. WALDO:  Okay.

14              THE COURT:  Yeah.  All right.

15              (Recording duly played.)

16    BY MS. WALDO:

17    Q.   Did you hear that, Detective?

18    A.   I did, yes.

19    Q.   Okay.  So, my recollection or what I hear on this tape is

20    that -- and I'm just going to be referring to the -- to the

21    third line on this Miranda card.  It says, "You have the right

22    to the presence of an attorney during questioning"; correct?

23    That's on the Miranda card?

24    A.   Correct.

25    Q.   But in -- what I hear on this body cam footage is that

TRANSCRIBED FROM DIGITAL RECORDING

68

1   "you have the right to the presence of an attorney"; correct?

2   A.    That's correct.  I agree.

3   Q.    And then you move on to the next one; right?  Which is

4   you -- "if you cannot afford an attorney, one will be appointed

5   before questioning"; correct?

6   A.    That's correct.

7   Q.    Okay.  So, you would agree that on that body cam footage

8   during the reading of the Miranda rights you don't say "during

9   questioning"; correct?

10  A.    It -- it appears that way, yes.

11  Q.    Okay.

12              THE COURT:  I -- I mean, to me it's obvious.  I mean,

13  that's what I heard.

14              Does the Government dispute that?

15              It appears the witness inadvertently left out the two

16  words "during questioning."

17              MS. MICHAEL:  That's correct, Your Honor.

18              THE COURT:  Okay.

19              MS. MICHAEL:  I think at one point in the recording,

20  there's a pause, there's a little noise, it's hard to tell, but

21  from hearing it again, yes.

22              THE COURT:  It sounds like it went right through

23  smoothly there.

24              MS. WALDO:  Correct.

25              THE COURT:  I mean, there is honking and whatnot but,

TRANSCRIBED FROM DIGITAL RECORDING

69

 1    the witness agreed.  I think all counsel agree, necessarily

 2    what I heard, and I'm not, you know -- I'm not giving you a

 3    hard time.  We're just trying to establish what the facts are.

 4                THE WITNESS:  Absolutely.

 5                THE COURT:  Okay.  Thank you.

 6                MS. WALDO:  Your Honor, based on that, I don't

 7    believe I have any further questions.

 8                THE COURT:  All right.

 9                Ms. Michael.

10                MS. MICHAEL:  Yes.  Just one follow-up.

11

12                REDIRECT EXAMINATION OF JOSHUA GLOVER

13    BY MS. MICHAEL:

14    Q.    Officer -- sorry, Detective, was that intentional?

15    A.    No.  Absolutely not.

16                MS. MICHAEL:  Your Honor, I don't have any other

17    questions.

18                THE COURT:  Fine.  Thank you so much for coming in.

19                We don't need this witness anymore?

20                MS. WALDO:  No, Your Honor.

21                THE COURT:  All right.  And why don't I -- let's take

22    like a 10 minute break, get organized, and I'll hear argument

23    and I'm going to take it under submission.

24                COURTROOM ADMINISTRATOR:  Please rise.

25                (Recess was taken at 11:39:19 a.m.)

TRANSCRIBED FROM DIGITAL RECORDING

70

 1              (Proceedings resumed at 11:53:17 a.m.)

 2              COURTROOM ADMINISTRATOR:  Please rise.

 3              THE COURT:  Thank you.  Please be seated.

 4              COURTROOM ADMINISTRATOR:  This is the conclusion of

 5    USA vs. Omar Qazi, 2:15-cr-14-APG-VCF.

 6              THE COURT:  Hope -- hopefully it's the conclusion.  I

 7    realize that we need to talk, I guess, briefly about

 8    Detective Kitchen.  Do you still think you need to call him for

 9    any reason, Ms. Waldo?

10              MS. WALDO:  Not at this time, Your Honor.

11              THE COURT:  Okay.  So it is the conclusion.

12              So, as I said, the Government has the burden.  So,

13    I'll hear from the Government first on the issue of the timing

14    of the warning and also its content.

15              MS. MICHAEL:  Yes, Your Honor.

16              Your Honor, I had sort of prepared to address all

17    three.  So, as I understand it, we had the three issues in

18    front of us; the Miranda warnings in terms of sufficiency.

19    However, we've established what those warnings are.  We've

20    briefed them.  And that's really a question of law at this

21    point.  There was also --

22              THE COURT:  Sufficiency.  Okay.  Sufficiency is one.

23              MS. MICHAEL:  There was also the issue of whether the

24    defendant needed to be re-Mirandized, which, again, the

25    Government's position is that's a legal issue and I do believe

HEATHER K. NEWMAN - (702) 471-0002

TRANSCRIBED FROM DIGITAL RECORDING

71

 1    both parties argued it.  However, the Government still stands

 2    by the fact that the defense or defendant has not provided any

 3    case law to support that that was required, whereas the

 4    Government did provide case law saying --

 5              THE COURT:  Hold on.  What's the third issue then?

 6              MS. MICHAEL:  The third issue is -- is sort of the

 7    general voluntariness --

 8              THE COURT:  Voluntariness.  Oh, okay.

 9              MS. MICHAEL:  -- the Government believes.  So I guess

10    I just parsed them out to try and keep it -- the argument --

11              THE COURT:  No.  That's fine.  Let's do all three.

12    Perfect.  Yes.

13              MS. MICHAEL:  But obviously the voluntariness sort of

14    plays in to the others as well.

15              THE COURT:  Um-hmm.

16              MS. MICHAEL:  But, um . . . but, again -- yeah.

17    Again, in terms of the re-Mirandizing being required, I don't

18    believe defense has provided any case law that supports that

19    that had to have been done in this case.  But I guess,

20    Your Honor, that plays in to this -- the facts and

21    circumstances.

22              As it stands, I do believe both parties are in

23    agreement on the facts and circumstances in the sense of the

24    time frame between when the defendant received Miranda rights

25    from Officer Glover and then the time that he was interviewed

TRANSCRIBED FROM DIGITAL RECORDING

72

1    by Detective Kitchen.  There is that difference in time frame.

2    The difference in location, which now has been a little more

3    explained on the record by use of the body camera footage and

4    by the witnesses, which I believe feeds into the Government's

5    argument that it wasn't a significant change in location.  It

6    wasn't a significant change in terms of who was present.

7          And just generally, in terms of there being some sort

8    of break in the time frame or the encounter the defendant was

9    having with law enforcement, again, I don't believe that there

10   have been any facts on this record to show that there was any

11   substantial break in time, location, and again, as the

12   Government had provided in the case law, even if there's a

13   change in who the defendant's speaking with, that doesn't

14   create a problem in terms of him having to be re-Mirandized by

15   the new individual.  So, Your Honor, I do believe the facts

16   that have been put forth on the record from witnesses and from

17   the evidence do support that he did not to be -- did not need

18   to be re-Mirandized.

19          Now, Your Honor --

20          THE COURT:  Hold on.  Hold on.  Hold on a minute.

21          MS. MICHAEL:  Oh, yes.  Of course.

22          THE COURT:  So, while we're on that part, I -- I was

23   trying to listen and pay attention.  You know, we certainly

24   know what time he was Mirandized.  It seems very clear that it

25   was at 1609.  That's on Exhibit 1, I think; right?

TRANSCRIBED FROM DIGITAL RECORDING

73

1           Let me see . . . 1553 was the stop and . . .

2           MS. MICHAEL:  Five lines down I do believe it says

3   1609.  That's what Officer Glover testified -- or

4   Detective Glover testified to.

5           THE COURT:  Oh, yeah.  Read Miranda 1609.

6           Now, what time did -- you know, can we pick out a

7   time when the interview started?  The transcript, you know, a

8   lot -- it says 1913 hours.

9           MS. MICHAEL:  And I did -- I did actually confer with

10  defense counsel to make sure that we were understanding.  We

11  both utilized that time frame.

12          THE COURT:  Okay.

13          MS. MICHAEL:  However, since then we've also

14  discovered that the date on there unfortunately appears to be

15  incorrect, but we were both utilizing that time frame for our

16  argument, so that's what we had both relied upon.

17          THE COURT:  You know what?  We can sort of

18  double-check to the extent this -- these Exhibits 1 and 2 are

19  in here.

20          MS. MICHAEL:  Yes.

21          THE COURT:  Let's see . . . it shows that -- looks

22  like Kitchen -- the first time his name shows up is 1854.

23  Kitchen and Rotta show up and then I -- I mean, I don't know

24  what all these codes are, but that's the first time he shows up

25  and . . . that would make about -- that would make about right.

TRANSCRIBED FROM DIGITAL RECORDING

74

1         MS. MICHAEL:  Correct.

2         THE COURT:  So I --

3         MS. MICHAEL:  And that's what defense counsel was

4    just pointing out, that it appears to be an accurate time frame

5    based on when you look at it, in connection with the CAD --

6         THE COURT:  Okay.

7         MS. MICHAEL:  -- and the unit log.

8         THE COURT:  So I'm going to find that the warning was

9    at 1609 and the interview started at 1913.  Okay.  Great.

10        Go ahead.

11        MS. MICHAEL:  And then, Your Honor, I do believe the

12   last sort of set of facts that were presented by defense

13   counsel, again, the Government was interpreting that as a

14   voluntariness argument where defense was talking about what

15   Detective Kitchen was wearing, whether he identified himself as

16   a police officer, the facts --

17        THE COURT:  You know, the mask is a little

18   disconcerting, I would think; right?  I mean, where -- what's

19   a -- you know, a citizen is arrested and then, you know, Rotta

20   shows up.  Apparently he's got the badge, so that's a little

21   reassuring but then he brings him over to some character in --

22   you know, with a -- with a -- hiding his face.  I mean, that --

23   isn't that -- wouldn't that cause you concern if you were the

24   defendant?

25        MS. MICHAEL:  Well, Your Honor, I -- perhaps.  But

TRANSCRIBED FROM DIGITAL RECORDING

75

1   the problem is there hasn't been that information placed on the

2   record, in terms -- it was just an argument.  No one is --

3           THE COURT:  No.  No.  He -- he said -- because

4   Officer -- or Officer Rotta said that it was standard practice

5   for this detective, because he was an undercover detective, he

6   had distinctive facial hair and things of that nature, that he

7   would hide his face when he would interview a witness.

8           MS. MICHAEL:  Correct, Your Honor.  But in terms of

9   the defendant being scared or threatened --

10          THE COURT:  Oh.

11          MS. MICHAEL:  -- the defendant -- we don't know the

12  defendant's state of mind.

13          THE COURT:  State of mind.  All right.  True.

14          MS. MICHAEL:  So -- so what the Government is arguing

15  is that what we do have and what is required under the case law

16  is to look at the totality of the circumstances.  Obviously the

17  Government's required to show that the waiver was voluntary.

18  However, if the defense is trying to say that -- I'm sorry, a

19  statement was obtained involuntarily, they have to show

20  coercion on behalf of law enforcement, and just making

21  arguments that, you know, someone felt threatened or

22  uncomfortable or didn't know if he was law enforcement or not,

23  I don't believe that's what the totality of the circumstances

24  or the evidence provided to the Court supports.

25          It is quite a high -- a high standard, Your Honor,

TRANSCRIBED FROM DIGITAL RECORDING

76

1  and I do have a few cases that I -- that I can note in terms,

2  Your Honor, where confession is involuntarily coerced, either

3  by physical intimidation or psychological pressure, which is

4  *United States vs. Haswood,* 350 F.3d 1024, 1027, Ninth Circuit.

5  "In determining whether defendant's confession was voluntary,

6  the question is whether the defendant's will was overborne at

7  the time he confessed."  That's *Clark vs. Murphy*, 331 F.3d

8  1062, at 1072, Ninth Circuit.  There's additional quotations

9  for that.  And the -- "In the end result, we must consider the

10  totality of the circumstances involved and their effect upon

11  the will of the defendant," and that's *U.S. vs. Crawford*, which

12  is also a Ninth Circuit case that was citing -- I'm sorry,

13  *Schneckloth vs. Bustamonte* but, I guess my point, Your Honor,

14  is that just based -- based what's on -- what's on the record,

15  and that's why I specifically wanted to play the defendant's

16  statement --

17          THE COURT:  Um-hmm.

18          MS. MICHAEL:  -- so Your Honor could hear the

19  demeanor of Detective Kitchen and the response of the

20  defendant -- I mean, there's -- there's quite a few facts that

21  support that it was not coerced.

22          THE COURT:  Um-hmm.

23          MS. MICHAEL:  The casualness of the encounter.

24  Your Honor can hear the tone of Detective Kitchen and the tone

25  of the defendant.  I mean, if he was so scared, he doesn't

TRANSCRIBED FROM DIGITAL RECORDING

77

 1   scream out for help.  He doesn't say, "Who are you?  What's

 2   happening?"  There's -- there's nothing to indicate that.  He's

 3   been in police custody the entire time.  I mean, even based on

 4   the defendant's statement himself, this is not his first

 5   encounter with law enforcement.  He did ask questions of the

 6   patrol units.  I'd say it would be unreasonable for anyone to

 7   assume that some random person is going to show up with a mask

 8   and ask them questions and then provide personal information

 9   such as your date of birth, Social Security number, your ---

10   your prior criminal history.  You know, he knows he's talking

11   to a police officer.  And I think it's very clear from how he

12   responds that he's not threatened or coerced into doing

13   anything.  I understand, Your Honor, that some of the tactics

14   may not be looked upon favorably by some individuals, but none

15   of the interrogation -- none of the ways that Detective Kitchen

16   interrogated him, according to, again, case law, are a problem.

17   He didn't make --

18             THE COURT:  Well, yeah.  I -- yeah.  Because I -- I

19   think, you know, naturally when you're reading along with the

20   transcript and you're hearing the words, and there's no

21   question that the detective was a very experienced

22   interviewer/interrogator and he used his experience to motivate

23   the defendant to change his position.  Because at the beginning

24   he was saying, "No, I don't know anything about it," you know,

25   the car was maybe broken into, "I never" -- and then, of

TRANSCRIBED FROM DIGITAL RECORDING

78

1    course, at the end of the time he changed his story and

2    obviously he wouldn't have changed his story had not Detective

3    Kitchen sort of taken him down the road.  But the question is,

4    is that -- I think what you're saying, does that really amount

5    to making it an involuntary admission.

6                MS. MICHAEL:  Correct.

7                THE COURT:  I mean, it was certainly an admission

8    that was motivated by the questioning, but there must be a line

9    there in the -- in the continuum of getting someone to talk.

10   And, you know, there's no question . . . "Your kids are in the

11   next room and I'm not going to let them out until you tell me."

12   All right.  But, you know, that wasn't -- clearly not that.

13   But it is on the continuum here.  I have to give it some

14   serious thought.  So, go ahead and finish --

15               MS. MICHAEL:  Oh -- I'm --

16               THE COURT:  -- but I just want to let you know where

17   I'm going here.

18               MS. MICHAEL:  Understood, Your Honor.

19               And I think what, again, helps in terms of facts at

20   looking at that, look at where the interview took place.

21               THE COURT:  Um-hmm.

22               MS. MICHAEL:  You know, it's outside.  It's in the

23   presence of two officers.  Look at the length of the interview.

24   We're talking about 19 minutes, at most.  We're not talking

25   about hours and hours of a detective going over and over

TRANSCRIBED FROM DIGITAL RECORDING

79

 1    something.

 2           Also look at the language in the questions that are

 3    used.  Detective Kitchen doesn't particularly change anything

 4    he's asking or saying at the point that the defendant does, in

 5    fact, confess.  You know, the defendant felt strong enough or

 6    comfortable enough to deny it all the way up to about -- until

 7    about 15 minutes into the interview, and there's nothing

 8    particular that Detective Kitchen does or changes in the way of

 9    his interrogation that causes the defendant to change his

10    answer.  It's almost surprising.  You almost miss it when you

11    read the transcript --

12           THE COURT:  Well --

13           MS. MICHAEL:  -- because he just says, "How long have

14    you had the gun?" and all of a sudden he says, "Oh, I don't

15    know, two or three weeks."  I mean, there's --

16           THE COURT:  A couple of weeks.  Yeah.

17           MS. MICHAEL:  -- there's -- there's -- it really is

18    something you could almost miss if you were not specifically

19    looking for it because -- because of how the conversation

20    occurred.  So I think those are the factors that are really

21    important to look at, you know, the time frame, the questions,

22    the demeanor, the location.

23           You know, and even when he gave that response, it

24    didn't -- again, you know, the -- it's not like the detective

25    smelled blood or anything and kept asking and getting more

TRANSCRIBED FROM DIGITAL RECORDING

80

 1    aggressive.  He just asked him a couple more follow-up

 2    questions, you know, about the gun and continued.

 3              And he didn't specifically make any promises or

 4    threats.  Obviously they talk generally about individuals

 5    cooperating or not cooperating.  You know, and again, this is

 6    an individual -- and this is from his statement -- who has had

 7    encounters with law enforcement before and throughout that

 8    talks about understanding the circumstances and understanding

 9    the situation.  So, that is part of the Court's analysis, it

10    can be, is the defendant's personal history --

11              THE COURT:  Um-hmm.

12              MS. MICHAEL:  -- and experience in the past as to

13    whether, you know, this is a law enforcement officer taking

14    advantage of let's say a juvenile, or taking advantage of

15    someone who has never had any contact with law enforcement

16    before, or -- you know, or doing it down at a station house, in

17    a more custodial setting.  Those are scenarios where I believe

18    courts have found that that is what pressures someone to

19    confess.  Because the whole point is, no one wants a confession

20    that is not -- that is not credible.

21              THE COURT:  Let me -- let me just maybe redirect

22    things a little bit.

23              MS. MICHAEL:  Yes, Your Honor.

24              THE COURT:  If -- of course, if I were to find that

25    the standard Miranda card that was used back then, you know,

TRANSCRIBED FROM DIGITAL RECORDING

81

1    doesn't comport with Ninth Circuit case law and so it wasn't a

2    good enough warning, the content of the warning was defective,

3    then the voluntariness is no longer an issue; right?  I mean,

4    that's the end of the inquiry.

5            So why don't you focus on that.

6            MS. MICHAEL:  On that.  Yes, Your Honor.  I can do

7    that.

8            And, Your Honor, in terms of the Miranda issue, what

9    I'd like to point out, you know, obviously I understand that

10   defense counsel has briefed this, but I do believe their

11   briefing and argument is a little bit misguided.  Miranda

12   analysis by courts, it's not a one-size-fits-all type of

13   scenario.  I think the courts have been very clear that there

14   are four rights that Miranda requires and I just -- you know,

15   Your Honor, I'm just going to read them real quickly.

16           THE COURT:  Okay.

17           MS. MICHAEL:  That the defendant has the right to --

18           THE COURT:  Take your time.

19           MS. MICHAEL:  That's okay.

20           That the defendant has the right to remain silent;

21   that anything he says can be used against him in a court of

22   law; that he has the right to the presence of an attorney; and

23   that if he cannot afford an attorney, one will be appointed for

24   him prior to any questioning if he so desires.

25           THE COURT:  Yeah, but there is that Ninth Circuit

TRANSCRIBED FROM DIGITAL RECORDING

82

 1   case that says it has to be -- it's the *Snaer* case or -- I'm

 2   talking about where it says you have to tell them you have the

 3   right to consult with an attorney.

 4          MS. MICHAEL:  Well, Your Honor, actually, and here's

 5   the thing about that case.  I don't believe that's correct.

 6          THE COURT:  All right.  You mean --

 7          MS. MICHAEL:  A lot of --

 8          THE COURT:  You mean --

 9          MS. MICHAEL:  A lot of these cases, what they do is

10   every case has to look at the Miranda warnings that apply in

11   that case.

12          THE COURT:  Right.

13          MS. MICHAEL:  And the court has to say, based on

14   those warnings, were these four rights understood by the

15   defendant.  There's no specifics in terms of words that have to

16   be used --

17          THE COURT:  No.  That's true.  There's no magic

18   words.

19          MS. MICHAEL:  -- or phrases.  And actually, in *Snaer*,

20   the warning in that case is less than the -- than Metro's

21   typical warning.  That's what's so concerning and that's why

22   the Government technically right now has no -- there's at least

23   one case on appeal regarding that because --

24          THE COURT:  Yeah, I -- I --

25          MS. MICHAEL:  That case actually --

TRANSCRIBED FROM DIGITAL RECORDING

83

1           THE COURT:  -- my law clerk has brought me up to

2      this.

3           MS. MICHAEL:  No.  I understand.

4           THE COURT:  There's a split in the -- in the Circuit

5      and everything but --

6           MS. MICHAEL:  Yes.  In the -- in the district courts.

7      That case actually doesn't include the term "during."  So, in

8      terms of the defense arguing, "during" is not required under

9      *Snaer* --

10          THE COURT:  Not "during" but it's --

11          MS. MICHAEL:  -- but it talks about "consult."  But

12     again, it just shows that that's an example.  It talks about

13     "consult" in the sense that it would allow the defendant to

14     understand that they could have had an attorney present at the

15     time.  So, it doesn't --

16          THE COURT:  Well, presence is -- no.  Presence -- you

17     know what, you -- did you bring that case with you?

18          Does anybody have that *Snaer* case handy?  Because I

19     think that really is kind of the heart of it here.

20          Nobody has it?

21          Judge Foley doesn't have a computer here.

22          But as I remember, I mean, the *Snaer* case, they

23     affirmed -- they -- they -- you know, and it was Judge Canby,

24     he talked -- I -- actually was a professor of mine.  Although

25     he didn't write the opinion --

TRANSCRIBED FROM DIGITAL RECORDING

84

```
 1              MS. MICHAEL:  Okay.
 2              THE COURT:  -- but I thought it was interesting that
 3    he was involved in it.
 4              But, it said, you know, in the part, it said you have
 5    a right to -- it was a timing thing.  And they implied the
 6    right to consult because of the way it said you had this and
 7    that.
 8              MS. MICHAEL:  Correct.
 9              THE COURT:  But they specifically said it has to be
10    clear that you have the right to consult.  And so . . . you
11    know, this warning says, "You have the right to remain silent.
12    Anything you say can be used against you."  That's fine.
13              "You have the right to presence of an attorney during
14    questioning."  Of course, he left out "during questioning."
15    That's another issue.  But, "If you cannot afford an attorney,
16    one will be appointed before questioning."
17              So it seems to me maybe I could hang my hat on that
18    "before questioning," that that implies, because he has to be
19    appointed for you before questioning, you would have a right to
20    consult before questioning.
21              MS. MICHAEL:  And that's been the Government's
22    position, Your Honor, that really, I mean, what is the other
23    point of having an attorney?  The whole point of being allotted
24    or being given the right to have an attorney present is to
25    consult with an attorney about what you should do.  And I do
```

TRANSCRIBED FROM DIGITAL RECORDING

85

1   believe that's how the more recent district court cases in the

2   District of Nevada have come forth.  Judge Mahan and

3   Judge Dawson --

4           THE COURT:  I -- yeah.  Judge Dawson reversed me on

5   that one and . . .

6           MS. MICHAEL:  I wasn't aware of that.

7           THE COURT:  That's okay.

8           MS. MICHAEL:  I wasn't aware that that was

9   Your Honor.  I just saw the case.

10          THE COURT:  But that's all right.  I mean, you know,

11  that's why we do it this way.

12          MS. MICHAEL:  Right.

13          THE COURT:  And . . . but obviously it's a very fine,

14  fine line here.  And then, but as I understand it,

15  Judge Bouleware and Judge Dorsey have gone the other way.

16          MS. MICHAEL:  That's -- that's correct, Your Honor.

17  And like I said, the decision by Judge Dorsey is on appeal by

18  our office and this decision by Judge Bouleware is on appeal

19  but for a different issue, but our office is standing by the

20  fact that we don't agree with that interpretation in *Chavez*,

21  how Judge Bouleware looked at -- or, I'm sorry.  How the court

22  interpreted *Chavez* and *Snaer*.

23          THE COURT:  All right.

24          MS. MICHAEL:  And that's why, because again, in

25  the -- it's the same thing with the *Duckworth*, the use of that

TRANSCRIBED FROM DIGITAL RECORDING

86

1  case by defense.  I feel that -- the Government feels that

2  oftentimes defense will take an example of a case where it says

3  these warnings were sufficient and then interpret that to mean

4  every word and every right listed in that warning is required.

5  And that's not what the case law says.  It just reviews it --

6  and again, against Miranda -- says here are the four rights.

7  Based on the words that were given to the defendant at that

8  time, are those four rights understood by the defendant.

9          THE COURT:  Let me see, I think in the *Snaer* case

10  what they said was it -- it is important that the defendant

11  understand he has a right to consult and even though the word

12  "consult" wasn't used in the warning, the way those two clauses

13  went one and then the other, that sufficiently implied the

14  right to consult that they said it was okay.  But they

15  didn't -- you know, they didn't say because they used the word

16  "consult" it's okay because, in fact, they didn't use the word

17  "consult."  You know, they had to reach to find an implied, you

18  know, communication of the right to consult the way those two

19  phrases were put together.  And that was, you know, one right

20  after the other as you're logically listening.  It seems like

21  you're trying to get me to say, if I were to support your

22  position, that because right at the end it says you can -- "if

23  you cannot afford an attorney, one will be appointed for you

24  before questioning."  The fact that that last, you know, little

25  clause is there says -- you know, that means, you know, you

TRANSCRIBED FROM DIGITAL RECORDING

87

 1    have a right to consult --

 2                MS. MICHAEL:  And as I --

 3                THE COURT:  -- or you're on notice that these rights

 4    included the opportunity to consult.

 5                MS. MICHAEL:  Yes.  And that would be a reasonable

 6    understanding of the rights as they are read.  And again, I

 7    don't have the *Snaer* case in front of me, Your Honor, but I

 8    actually -- my recollection was that those Guam rights did

 9    include and did have the term "consult," but they left out

10    "during."  So the time frame was whether the before was enough

11    to be a continuum of the time frame, and of the attorney being

12    present but -- but obviously, Your Honor, the case is what it

13    is, but the Government's position was that it --

14                THE COURT:  Oh, wait.  Wait.

15                MS. MICHAEL:  Oh.  You have it?

16                THE COURT:  All right.  Let me see here.  I got it.

17    Okay.

18                Here's what they read.  Let's see . . . "*Snaer*

19    executed and had read to him Guam's Custodial Interrogation

20    Warning form which reads as follows:  'Before you ask you any

21    questions you must understand your rights.  You have the right

22    to remain silent.  You do not have to talk to me unless you

23    want to do so.  If you want to talk to me, you must advise

24    you'" -- with a little sic in there.  You know, the courts are

25    terrible.  I mean, I felt bad for this guy.  He left out some

TRANSCRIBED FROM DIGITAL RECORDING

88

1    words -- "'you must advise you that whatever you say can and

2    will be used against you in a court. You have the right to

3    consult with a lawyer'" -- so, you're right. It did say

4    ·consult with a lawyer -- "'and to have a lawyer present with

5    you while you are being questioned.'" So, that's during the

6    questioning. "'And if you want a lawyer or are unable to pay

7    for one, a lawyer will be appointed to represent you free of

8    any cost to you. Knowing these rights, do you want to talk to

9    me?'"

10              Now that's . . .

11              Oh, you're right. So the point was, it didn't say

12   you have the right to consult "before questioning."

13              MS. MICHAEL: Correct.

14              THE COURT: So it was -- yeah. Actually, it wasn't

15   the "during," it was the before.

16              MS. MICHAEL: Oh, I guess --

17              THE COURT: Yeah. That's right.

18              MS. MICHAEL: -- okay.

19              THE COURT: It says, "The right to consult with an

20   attorney before questioning is significant because counsel

21   cannot advise the client whether to exercise the right or

22   remain completely silent or if he chooses to speak, which

23   questions to answer or how to answer them. Thus, it is

24   extremely important that a defendant be adequately warned of

25   this right." And then they talk about that *Noti* case but --

TRANSCRIBED FROM DIGITAL RECORDING

89

1          MS. MICHAEL:  So I guess there, it was that they had

2     "before" and "consult" that they found was sufficient to

3     overcome the not having "during."

4          THE COURT:  Right.  Because it had the word "consult"

5     and made it clear before.  And -- and so . . . that's kind of

6     the issue I'm mulling around here.

7          Anyway . . .  Okay.

8          MS. MICHAEL:  Understood, Your Honor, but, again, I

9     guess I've made my argument, that I do believe as they were

10    given to the defendant, you know, he understood them and I -- I

11    do actually think the Court can also take into consideration

12    the defendant's response, that he did acknowledge that he

13    understood them and asked the officer some questions.  He

14    didn't at any point ask for a lawyer and he didn't at any point

15    say he didn't want to continue to speak to the officer.  So I

16    do believe by the rights he was given he understood his rights

17    and that they were sufficient in terms of what Miranda

18    requires.

19          So with that, Your Honor, unless you have --

20          THE COURT:  No.

21          MS. MICHAEL:  -- any other questions --

22          THE COURT:  Thank you very much.

23          MS. MICHAEL:  Thank you so much.

24          THE COURT:  Very helpful.

25          Okay.  Ms. Waldo.

TRANSCRIBED FROM DIGITAL RECORDING

90

1          MS. WALDO:  Thank you, Your Honor.

2          Your Honor, I think I'm going to, just for efficiency

3    sake, focus on the issue related to the Miranda warnings

4    because --

5          THE COURT:  I think that's probably wise.

6          MS. WALDO:  -- I think -- I think the issue regarding

7    voluntariness has been fully briefed.

8          THE COURT:  Right.

9          MS. WALDO:  I think to start, what I'd like to do is

10   draw the Court's attention to Page 9 of the Government's

11   response, which is Document 196.  In the first paragraph the

12   Government argues that "In order to be valid, a Miranda warning

13   must convey clearly to the arrested party that he or she

14   possesses the right to have an attorney present prior to and

15   during questioning."  And I think just in that statement alone,

16   based on what we heard on the body cam footage from

17   Officer Glover, it's very clear that he left out very important

18   words in the warnings that were given.  And I think, as this

19   Court has somewhat highlighted, is that these words are not

20   happenstance.  They're not meaningless words.  Each of the

21   words that are in the Miranda warning card have very sufficient

22   important -- or very -- are important because they convey --

23         THE COURT:  Hold on.  Let me stop you, Ms. Waldo.

24         MS. WALDO:  Okay.

25         THE COURT:  So actually, because until we listened to

HEATHER K. NEWMAN - (702) 471-0002

TRANSCRIBED FROM DIGITAL RECORDING

91

1   the recording today, the fact that "during questioning" was

2   left out, you know, that wasn't briefed or brought up at all, I

3   don't think.

4           MS. WALDO:  It was -- it was actually briefed in my

5   motion.

6           THE COURT:  Oh, okay.

7           MS. WALDO:  I actually argued in my motion --

8           THE COURT:  Because you had listened to the tape?

9           MS. WALDO:  I had.

10          THE COURT:  Okay.

11          MS. WALDO:  And --

12          THE COURT:  So you -- but, what you're saying is

13  something a little different than what I was focusing on.

14  You're saying, okay.  It -- because you said -- "if you cannot

15  afford an attorney, one will be appointed before questioning,"

16  but it -- but he didn't make it clear that he had the presence

17  of an attorney during questioning.

18          MS. WALDO:  Correct.  And I believe it's kind of --

19  the warnings as they are read to my client were insufficient in

20  the totality of the circumstances --

21          THE COURT:  Um-hmm.

22          MS. WALDO:  -- because I believe, as the Court

23  highlighted from the *Snaer* case, the right to consult with an

24  attorney "before questioning" is a very important right that

25  should be clearly depicted to a defendant or an arrestee.

TRANSCRIBED FROM DIGITAL RECORDING

92

1    Because obviously that's the most -- I think the most critical

2    component of that right is making that determination, "Do I

3    want to speak with an attorney before I speak with this

4    officer?" because an attorney -- I believe any defense attorney

5    is going to tell a client or a potential -- an arrested

6    suspect, "Don't talk."

7                 THE COURT:  Sure.

8                 MS. WALDO:  And I don't even think most attorneys

9    would advise a suspect in that case to, you know, "Answer only

10   these particular questions."  I -- most are going to advise,

11   "Don't speak to the police; it's not going to help you."  And

12   so, I believe that's why the *Snaer* case, the Ninth Circuit

13   cases are starting to say these are important rights and this

14   certainly was not clear from what Officer Glover read to

15   Mr. Qazi that day.

16                But I -- the reason why I'm pointing out the "during

17   questioning" component is because if you look at the

18   Government's response, what they've kind of -- what they've

19   done in looking at the case law, is they've combined the two

20   rights.  They've said, okay.  He's been advised of a right

21   during question -- that he has a right to an attorney during

22   questioning, and then you couple that with the right to have an

23   attorney appointed to you before questioning.  So they're kind

24   of combining those two rights and saying a suspect can infer

25   from that that you have the right to an attorney during and

TRANSCRIBED FROM DIGITAL RECORDING

93

1   before questioning.  And what I'm arguing is that because in
2   this particular case Officer Glover -- or Detective Glover
3   now -- left out that critical component "during questioning,"
4   he -- my client could not reasonably infer from the rights that
5   were read to him that he had the right to consult with an
6   attorney before questioning, or that he even had the right to
7   an attorney during questioning.  And those -- these are the
8   critical components of, I guess, when we're looking at a
9   Miranda waiver.
10           THE COURT:  Um-hmm.
11           MS. WALDO:  So, I'm not going to belabor the point.
12   I believe it's pretty clear from the case law that we cited to,
13   as well as some of the cases that are going on in this
14   district, as well as the Ninth Circuit.  In this particular
15   case Officer Glover left out critical rights.  They were not
16   clearly conveyed to my client at the time that he decided to
17   then speak to Officer Glover.  And, I understand the
18   Government's argument that, "Well, look what he did; he then
19   started asking questions."  Well, the bottom line is, he didn't
20   understand his rights.  He didn't understand that at that very
21   moment he had the right to ask to speak to an attorney before
22   he answered any questions and he didn't understand that he had
23   the right to have an attorney present during questioning.  So
24   the fact that he then later responded and started asking
25   questions of the officer is really -- is a moot point, because

TRANSCRIBED FROM DIGITAL RECORDING

94

1   he didn't understand what his rights were at that time.

2   Therefore, there could not have been a voluntary waiver, an

3   intelligent waiver of those rights.

4          And it is very clear from the transcript with

5   Detective Kitchen that Detective Kitchen relied on

6   Officer Glover's warnings.  He did not re-Mirandize.  So, we

7   don't even have to, I think, go to the next step of determining

8   whether or not Detective Kitchen should have re-Mirandized.

9   The bottom line is, the warnings read to -- to Mr. Qazi by

10  Officer Glover were insufficient.  There were not subsequent

11  warnings read again, and therefore any statement provided by

12  Mr. Qazi must be suppressed.

13         And with that, I'll submit it.

14         THE COURT:  All right.  Thank you, Ms. Waldo.

15         Okay, Ms. Michael.  You get the last word.

16         MS. MICHAEL:  Your Honor, I'm fine submitting it --

17         THE COURT:  Oh, you're good?

18         MS. MICHAEL:  -- on as-is.  Yes.

19         THE COURT:  Okay.  Well, let -- let me just ask you

20  then --

21         MS. MICHAEL:  Yes.

22         THE COURT:  -- if you don't mind . . .

23         MS. MICHAEL:  Yes, Your Honor.

24         THE COURT:  I'll just give you a chance.

25         Ms. Michael?

HEATHER K. NEWMAN - (702) 471-0002

TRANSCRIBED FROM DIGITAL RECORDING

95

1          MS. MICHAEL:  Oh, I'm sorry.

2          THE COURT:  Because it is kind of interesting and I

3    was just thinking about, as it's going here today, you know, of

4    course the warning happened and then there was a delay in the

5    warning.  And, you know, Detective Kitchen's technique was --

6    was, you know, frankly, I mean, I'm going to think back through

7    it and read everything, I don't think it rises to the level of

8    making it involuntary, but there's an interesting sort of nexus

9    to me between, you know, creating an incentive to go ahead and

10   be honest because if-you-tell-me-everything-now-it-will-go-

11   easier-for-you-later kind of approach.  And, I mean, those

12   same -- that same argument is also kind of conveying, you know,

13   obviously if you get an attorney and don't talk at all, you

14   know, then we're going to have to go through all the rigamarole

15   of testing the DNA and doing all this and that's a lot of

16   expense and that's going to run hard on you.  So even though he

17   didn't expressly say that, it seems like it's kind of implied

18   in his questioning that, you know, it's in his interest to

19   cooperate and come clean now rather than, you know, go through

20   the formal steps.

21          I mean, you see what I -- you see why I'm bothered

22   there a little bit?

23          MS. MICHAEL:  I do understand, Your Honor.

24          THE COURT:  Yeah.

25          MS. MICHAEL:  However, I do believe -- I don't

TRANSCRIBED FROM DIGITAL RECORDING

96

1   believe that the detective would have inferred that or meant

2   anything in terms to getting an attorney.  I think it's more

3   investigative steps that they have to take.  Because regardless

4   of what the defendant does -- regardless of whether the

5   defendant got an attorney at that point --

6          THE COURT:  Um-hmm.

7          MS. MICHAEL:  -- or decided to stop speaking to

8   Detective Kitchen, he's going to go ahead and get DNA and

9   submit the DNA for testing and continue to do his investigation

10   to prove -- to prove his case.  So, I don't --

11         THE COURT:  Whether or not he confessed; right?

12   Whether or not --

13         MS. MICHAEL:  Yes, Your Honor.

14         THE COURT:  Yeah.  But he kind of implied in his --

15   in his conversation there that it -- you know that by -- by

16   going ahead -- Mr. Qazi goes in and tells, "Yeah, that's my

17   gun" or whatever, I got it from a Nation guy two weeks ago, I

18   mean, he goes ahead and says those things.  By saying those

19   things, the D.A. is going to go easier on him because he's not

20   making the State -- and we won't even talk about him being over

21   here in federal court -- go through the steps to -- to do all

22   this and it turns out they were going to do those steps anyway;

23   right?

24         MS. MICHAEL:  Yes.  And I guess, Your Honor, I still

25   just don't think Detective Kitchen or his point of questioning

TRANSCRIBED FROM DIGITAL RECORDING

97

1    was really going beyond what he was going to be doing as an

2    investigator or the law enforcement on scene at that point that

3    evening.

4              THE COURT:  Right.

5              MS. MICHAEL:  I don't believe that there's any --

6    when he was talking about talking to the D.A., that was in

7    regards to, you know, another defendant on another case.  I

8    don't think he took it that next step of saying beyond what he

9    was going to have to do; it was more, you know, if the

10   defendant was going to give him information now or come clean

11   on it, that would potentially make what they're doing at the

12   scene easier.  I don't believe it extended to anything that

13   would have gone beyond that.

14             THE COURT:  Beyond that.

15             MS. MICHAEL:  That the D.A. or that the Court or that

16   trial or anything like that.  My understanding and my

17   interpretation was that was just contained in what they were

18   doing right then and there.

19             THE COURT:  No.  It is interesting.  Obviously a

20   very -- very effective detective.

21             All right.  Nobody else has anything.  I really

22   appreciate it.  I thought the arguments were helpful and it was

23   good to get this evidence in today.

24             So, thank you.  Have a good day.

25             MS. MICHAEL:  Thank you, Your Honor.

TRANSCRIBED FROM DIGITAL RECORDING

98

1          MS. WALDO:  Thank you, Your Honor.

2          (Proceedings adjourned at 12:22:39 p.m.)

3

4                    C E R T I F I C A T E

5

6          I, Heather K. Newman, court-approved transcriber,

7    certify that the foregoing is a correct transcript transcribed

8    from the official electronic sound recording of the proceedings

9    in the above-entitled matter.

10

11         /s/ Heather K. Newman              10-14-2016
           Heather K. Newman                     Date
12

13

14

15

16

17

18

19

20

21

22

23

24

25

HEATHER K. NEWMAN - (702) 471-0002